# 26-1246-cv

## United States Court of Appeals

*for the*

## Second Circuit

WILLIE MADDIX,

*Plaintiff-Appellant,*

– v. –

CITY OF NEW YORK, MARRIOTT HOTEL SERVICES, INC.,
MARRIOTT INTERNATIONAL, INC., d/b/a JW Marriott Essex House Hotel,

*Defendants-Appellees,*

KYLE REEVES,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

# BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

ANDREW M. STENGEL
THE LAW FIRM OF ANDREW M. STENGEL
*Attorneys for Plaintiff-Appellant*
11 Broadway, Suite 715
New York, New York 10004
(212) 634-9222

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (393756)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iv

JURISDICTIONAL STATEMENT ....................................................................... 1

ISSUES PRESENTED ....................................................................... 2

PRELIMINARY STATEMENT ....................................................................... 3

STATEMENT OF FACTS ....................................................................... 9

A. Maddix's Criminal Prosecution and the *Brady* and *Giglio* Violations ....................................................................... 9

1. The Underlying Crime ....................................................................... 9

2. The District Attorney Illegally Imprisons Its Star Witness, DeJesus, In Its Hotel Custody Program After He Refuses To Testify Against Maddix ....................................................................... 10

3. Marriott's Approval Of Paperwork Specifically Referencing Maddix, His Case, DeJesus' Status As A Material Witness, And DeJesus' Incarceration As A Prisoner Under Custody Number 1407 ....................................................................... 18

4. The Prosecutor Secretly Promises DeJesus He Would Be Released From Custody If He Testifies ....................................................................... 20

5. The Prosecutor Suppresses The Coercive Tactics Used To Secure DeJesus' Testimony, And Falsely Portrays Him To The Jury At Maddix's Trial As A Good Samaritan With No Incentive For Testifying ....................................................................... 21

B. The KCDAO's 30-Year Cover Up Of The *Brady* and *Giglio* Material ....................................................................... 22

C. The Civil Lawsuit ....................................................................... 25

D. The District Court's Decision ....................................................................... 26

SUMMARY OF ARGUMENT ....................................................................... 27

ARGUMENT ..........29

POINT I

THE DISTRICT COURT ERRED AS A MATTER OF LAW IN HOLDING THAT, IN ORDER TO STATE A *BRADY* CLAIM, MADDIX WAS REQUIRED TO ALLEGE THE PROSECUTION'S SECRET ARREST AND COERCION OF ITS STAR WITNESS RESULTED IN HIS FALSE TRIAL TESTIMONY ..........29

A. Standard of Review ..........29

B. The District Court's *Brady* Decision Has No Basis in Law, And Directly Conflicts With Supreme Court and Circuit Court Precedent ..........30

C. The District Court Overlooked Maddix's Related *Giglio* Claim ..........37

POINT II

MADDIX PLAUSIBLY ALLEGED MARRIOTT ENGAGED IN STATE ACTION BY SHARING THE CITY'S UNLAWFUL GOAL OF DEPRIVING HIM OF *BRADY* AND *GIGLIO* MATERIAL AND COVERING UP THAT MISCONDUCT ..........38

A. Standard of Review ..........38

B. Maddix's Allegations and Exhibits Plausibly Allege Marriott Shared The City's Unlawful Goals ..........39

1. Marriott's Creation and Approval of Administrative Paperwork Documenting DeJesus's Confinement As A Witness In Maddix's Case Plausibly Alleges A Common Goal ..........41

2. The Hotel Managers' Knowledge Of The Illegality Of The Hotel Custody Program ..........41

3. The Regularity With Which The Hotel Managers Facilitated The Hotel Custody Program Supports An Inference Of A Common Scheme ..........43

C. The Dismissal of Maddix's Supplemental State Law Claim Against Marriott Should Be Reversed ..........44

POINT III

UNRESOLVED FACTUAL ISSUES REGARDING EQUITABLE ESTOPPEL AND THE DILIGENCE-DISCOVERY RULE PRECLUDE AFFIRMANCE ON ANY ALTERNATIVE GROUND ........45

A. Equitable Estoppel & The Diligence-Discovery Rule ........................45

1. Equitable Estoppel Bars Defendants From Raising The *Heck* Defense And, In Any Event, Maddix Is Entitled To Invoke The Non-Custody Exception To *Heck* ....................47

2. Equitable Estoppel Bars Defendants from Raising The Statute of Limitations Defense And, In Any Event, Under The Federal Accrual And Diligence-Discovery Rules, Maddix's Claims Did Not Accrue Until December 2024 When He Discovered His Constitutional Injuries.............................................................56

B. The *Rooker-Feldman* Doctrine Is Inapplicable To Maddix's Injuries Occurring Before And After The State Court Judgment .........................................................................58

C. Prosecutorial Immunity Does Not Bar Maddix's *Monell* Claim .........................................................................................60

CONCLUSION .........................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Amnesty Am. v. Town of West Hartford*,
361 F.3d 113 (2d Cir. 2004) ....................39

*Anderson v. City of Rockford*,
932 F.3d 494 (7th Cir. 2019) .................... 7, 31, 32

*Anilao v. Spota*,
27 F.4th 855 (2d Cir. 2022) ....................60

*Artec Constr. and Dev. Corp. v. City of New York*,
2017 WL 5891817 (S.D.N.Y. Nov. 28, 2017)....................53

*Avery v. City of Milwaukee*,
847 F.3d 433 (7th Cir. 2017) ....................33

*Banks v. Dretke*,
540 U.S. 668 (2004)....................55

*Barmapov v. Barry*,
2011 WL 32371 (E.D.N.Y. Jan. 5, 2011)....................52

*Barnes v. City of New York*,
68 F.4th 123 (2d Cir. 2023) ....................46

*Bellamy v. City of New York*,
914 F.3d 727 (2d Cir. 2019) .................... 22, 29, 31, 61

*Bermudez v. City of New York*,
790 F.3d 368 (2d Cir. 2015) ....................31

*Best v. Kelly*,
39 F.3d 328 (D.C. Cir. 1994)....................48

*Betts v. Shearman*,
751 F.3d 78 (2d Cir. 2014) .................... 38, 39

*Brady v. Maryland*,
373 U.S. 83 (1963).................... *passim*

*Chapman v. Fais*,
540 F.Supp.3d 304 (E.D.N.Y. 2021) .................... 54, 55

*Chillemi v. Town of Southhampton*,
943 F.Supp.2d 365 (E.D.N.Y. 2013) ........................................................52

*City of New York v. Shalala*,
34 F.3d 1161 (2d Cir. 1994) ....................................................................46

*Clark v. Hanley*,
89 F.4th 78 (2d Cir. 2023) .......................................................................45

*Colvin v. LeBlanc*,
2 F.4th 494 (5th Cir. 2021) ................................................................ 47-48

*Cotton v. Noeth*,
96 F.4th 249 (2d Cir. 2024) .....................................................................49

*Cox v. City of New Rochelle*,
2019 WL 3778735 (S.D.N.Y. Aug. 12, 2019)..............................................52

*Davis v. Alaska*,
415 U.S. 308 (1974)..................................................................................32

*Davis v. Travis*,
07 CV 3047 (WHP), 2008 U.S. Dist. LEXIS 99801
(S.D.N.Y. Dec. 3, 2008) ...........................................................................52

*Dennis v. Sparks*,
449 U.S. 24 (1980)....................................................................................39

*Dixon v. Hodges*,
887 F.3d 1235 (11th Cir. 2018) .................................................................48

*Dorce v. City of New York*,
2 F.4th 82 (2d Cir. 2021) ..........................................................................59

*Drake v. Portuondo*,
553 F.3d 230 (2d Cir. 2009) .....................................................................36

*Fappiano v. City of New York*,
640 F.App'x 115 (2d Cir. 2016) ................................................................33

*Fields v. Wharrie*,
740 F.3d 1107 (7th Cir. 2014) ..................................................................33

*Freeman v. HSBC Holdings PLC*,
57 F.4th 66 (2d Cir. 2023) .......................................................................43

*Galloway v. County of Nassau*,
141 F.4th 417 (2d Cir. 2025) .......................................................... 33, 34

*Garcia Pinach v. Bondi*,
147 F.4th 117 (2d Cir. 2025) ............................................................34

*Giglio v. United States*,
405 U.S. 150 (1972)........................................................................ *passim*

*Ginsberg v. Healey Car & Truck Leasing, Inc.*,
189 F.3d 268 (2d Cir. 1999) ............................................................39

*Greathouse v. Meddaugh*,
2023 WL 5439456 (2d Cir. 2023) ................................................ 5, 47

*Green v. Dep't of Educ. of City of New York*,
16 F.4th 1070 (2d Cir. 2021) ............................................................29

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983)..........................................................43

*Hardy v. Fischer*,
701 F.Supp.2d 614 (S.D.N.Y. 2010) ..................................................52

*Harvey v. People of the City of New York*,
435 F.Supp.2d 175 (E.D.N.Y. 2006)..................................................53

*Heck v. Humphrey*,
512 U.S. 477 (1994)........................................................................ *passim*

*Hoblock v. Albany County Bd. of Elections*,
422 F.3d 77 (2d Cir. 2005) ..............................................................58

*Hope v. City of New York*,
2010 WL 331678 (E.D.N.Y. Jan. 22, 2010).........................................52

*Houston v. City of New York*,
2013 WL 1310554 (E.D.N.Y. Mar. 28, 2013)......................................52

*Hunter v. McMahon*,
75 F.4th 62 (2d Cir. 2023) ................................................................58

*Hurd v. City of New York*,
2019 WL 4696364 (E.D.N.Y. Sept. 26, 2019) ......................................52

*In re Brooklyn Navy Yard Asbestos Litig.*,
971 F.2d 831 (2d Cir. 1992) ..............................................................18

*Jackson v. City of Cleveland*,
925 F.3d 793 (6th Cir. 2019) .............................................................. 7, 32, 33

*Jean–Laurent v. Cornelius*,
2017 WL 933100 (S.D.N.Y. Mar. 8, 2017)......................................................53

*Jeanty v. City of Utica*,
2017 WL 6408878 (N.D.N.Y. Aug. 18, 2017).................................................52

*Jeffes v. Barnes*,
208 F.3d 49 (2d Cir. 2000) ..............................................................................40

*Jenkins v. Haubert*,
179 F.3d 19 (2d Cir. 1999) ....................................................................... 52, 55

*John v. Lewis*,
2017 WL 1208428 (E.D.N.Y. Mar. 31, 2017)..................................................52

*Johnson v. Spencer*,
950 F.3d 680 (10th Cir. 2020) .........................................................................48

*Kates v. New York*,
2024 WL 3228051 (W.D.N.Y. June 27, 2024)..................................................52

*Keating v. Carey*,
706 F.2d 377 (2d Cir. 1983) ............................................................................47

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
274 F.3d 706 (2d Cir. 2001) ..................................................................... 45, 46

*Kronisch v. United States*,
150 F.3d 112 (2d Cir. 1998) ............................................................................47

*Leach v. City of New York*,
2022 WL 4468288 (E.D.N.Y. Sept. 26, 2022) ........................................... 54, 55

*Leather v. Eyck*,
180 F.3d 420 (2d Cir. 1999) ............................................................................55

*LeBlanc-Sternberg v. Fletcher*,
67 F.3d 412 (2d Cir. 1995) ..............................................................................39

*McKithen v. Brown*,
481 F.3d 89 (2d Cir. 2007) ......................................................................... 58-59

*Monell v. Department of Social Services*,
436 U.S. 658 (1978)......................................................................... *passim*

*Morgan v. City of New York*,
2017 WL 6561161 (E.D.N.Y. Dec. 22, 2017) .................................................52

*Nappi v. Yelich*,
793 F.3d 246 (2d Cir. 2015) .......................................................................32

*O'Brien v. Town of Bellingham*,
943 F.3d 514 (1st Cir. 2019) .......................................................................48

*Opperisano v. P.O. Jones*,
286 F.Supp.3d 450 (E.D.N.Y. 2018) ........................................................ 53, 57

*Palmenta v. Blank*,
2018 WL 4516676 (D. Conn. Sept. 20, 2018) ............................................ 54, 55

*Patsy v. Florida Bd. of Regents*,
457 U.S. 496 (1982) .....................................................................................55

*Pearl v. City of Long Beach*,
296 F.3d 76 (2d Cir. 2002) ..........................................................................47

*Penn v. New York State*,
2018 WL 10670473 (S.D.N.Y. July 17, 2018) ...............................................52

*People v. Rodriguez*,
186 A.D.3d 1724 (2d Dep't 2020) .................................................................10

*Pinaud v. County of Suffolk*,
52 F.3d 1139 (2d Cir. 1995) ..................................................................... 47, 60

*Pipitone v. City of New York*,
57 F.Supp.3d 173 (E.D.N.Y. 2014) ...............................................................47

*Polzin v. Gage*,
636 F.3d 834 (7th Cir. 2011) .......................................................................48

*Poventud v. City of New York*,
715 F.3d 57 (2d Cir. 2013) ..........................................................................51

*Poventud v. City of New York*,
750 F.3d 121 (2d Cir. 2014) .................................................................. *passim*

*Quezada v. Smith*,
08 CV 5088 (KAM) (E.D.N.Y.) ....................................................................18

*Quezada v. Smith*,
624 F.3d 514 (2d Cir. 2010) .......................................................................18

*Redd v. New York State Division of Parole*,
678 F.3d 166 (2d Cir. 2012) ....................................................................31

*Reed v. Goertz*,
598 U.S. 230 (2023)................................................................................46

*Ricciuti v. N.Y.C. Transit Authority*,
124 F.3d 123 (2d Cir. 1997) ............................................................. 34, 35

*Roe v. City of Waterbury*,
542 F.3d 31 (2d Cir. 2008) ......................................................................40

*Rojas v. Alexander's Dept. Store, Inc.*,
924 F.2d 406 (2d Cir. 1990) ....................................................................39

*Rounseville v. Zahl*,
13 F.3d 625 (2d Cir.1994) ........................................................................39

*Saint-Jean v. Emigrant Mortg. Co.*,
129 F.4th 124 (2d Cir. 2025) ...................................................................45

*Sanders v. Williams*,
2015 WL 7963135 (S.D.N.Y. Nov. 10, 2015), *report and recommendation adopted,* 2015 WL 8073810 (S.D.N.Y. Dec. 4, 2015)..............................................53

*Schloss v. Bouse*,
876 F.2d 287 (2d Cir.1989) ......................................................................25

*Scott v. City of White Plains*,
2012 WL 1267873 (S.D.N.Y. Apr. 10, 2012) ...............................................53

*Scotto v. Almenas*,
143 F.3d 105 (2d Cir. 1998) ....................................................................39

*Shabazz v. Artuz*,
336 F.3d 154 (2d Cir. 2003) ................................................................ 8, 30

*Shahzad v. County of Nassau*,
2016 WL 11540145 (E.D.N.Y. Mar. 31, 2016)..............................................53

*Simon v. City of New York*,
893 F.3d 83 (2d Cir. 2018) ................................................................. 4, 42

*Singleton v. City of New York*,
632 F.2d 185 (2d Cir. 1980) ....................................................................57

*Smalls v. Collins*,
10 F.4th 117 (2d Cir. 2021) ....................................................................35

*Smith v. Burdette*,
No. 18-5670, 2019 WL 2713138 (6th Cir. April 26, 2019) ..............................48

*Spencer v. Kemna*,
523 U.S. 1 (1998)...........................................................................................50

*Steidl v. Fermon*,
494 F.3d 623 (7th Cir. 2007) ..........................................................................22

*Strickler v. Greene*,
527 U.S. 263 (1999)........................................................................................31

*Su v. Filion*,
335 F.3d 119 (2d Cir. 2003) ................................................................ 37, 48, 54

*Target Media Partners v. Specialty Mktg. Corp.*,
881 F.3d 1279 (11th Cir. 2018) ......................................................................59

*Teichmann v. New York*,
769 F.3d 821 (2d Cir. 2014) ........................................................................ 51, 52

*Thomas v. Mason*,
2023 WL 2709730 (N.D.N.Y. Mar. 30, 2023), *aff'd,*
2024 WL 5199296 (2d Cir. Dec. 23, 2024)..................................................34-35

*Topa v. Melendez*,
739 Fed.Appx. 516 (11th Cir. 2018)................................................................48

*United States v. Gaudin*,
515 U.S. 506 (1995).........................................................................................31

*United States v. Vozzella*,
124 F.3d 389 (2d Cir. 1997) ............................................................................36

*Veal v. Geraci*,
23 F.3d 722 (2d Cir. 1994) ..............................................................................46

*Vuyanich v. Smithton Borough*,
5 F.4th 379 (3d Cir. 2021) ...............................................................................47

*Washington v. Los Angeles Cty. Sheriff's Dep't*,
833 F.3d 1048 (9th Cir. 2016) .........................................................................48

*Webster v. Himmelbach*,
271 F.Supp.3d 458 (W.D.N.Y. 2017) .......... 53

*Wiggins v. Mellia*,
2023 WL 6222303 (2d Cir. Sept. 26, 2023) .......... 5, 51

*Wilson v. Celestin*,
2019 WL 2211062 (E.D.N.Y. May 22, 2019) .......... 53

*Wilson v. Midland County, Texas*,
116 F.4th 384 (5th Cir. 2024), *cert. denied*, 2026 WL 858442
(March 30, 2026) .......... 51

**Statutes and Other Authorities:**

U.S. Const., amend. IV .......... 2, 4, 13, 35

U.S. Const., amend. V .......... 1, 7, 27, 35

U.S. Const., amend. XIV .......... 2

28 U.S.C. § 1291 .......... 2

28 U.S.C. § 1331 .......... 2

28 U.S.C. § 1343 .......... 2

42 U.S.C. § 1983 .......... *passim*

Fed.R.Civ.P. 11 .......... 23

Fed.R.Civ.P. 12 (b)(6) .......... *passim*

9 N.Y.C.R.R. § 7502.1(e) .......... 42

9 N.Y.C.R.R. § 7510.1(a) .......... 42

CPL § 330.30 .......... 23

CPL § 620.30 .......... 42

CPL § 620.50 .......... 42

CPL § 440.10 .......... 23, 55, 56

New York City Administrative Code § 9-125 .......... 11

Alan Feuer, *Brooklyn District Attorney Hopes to Void 1997 Murder Conviction*, New York Times, July 11, 2017 .......... 10

UNITED STATES COURT OF APPEALS
SECOND CIRCUIT

WILLIE MADDIX,

Plaintiff-Appellant,

-against-

THE CITY OF NEW YORK, MARRIOTT HOTEL SERVICES, INC., and MARRIOTT INTERNATIONAL, INC.,

Defendants-Appellees.

Docket No. 26-1246-cv

**PLAINTIFF-APPELLANT'S OPENING BRIEF**

## JURISDICTIONAL STATEMENT

On April 8, 2025, Plaintiff-Appellant Willie Maddix ("Maddix") commenced this 42 U.S.C. § 1983 civil rights action in the United States District Court for the Eastern District of New York against Defendant-Appellees the City of New York, Marriott Hotel Services, Inc., and Marriott International, Inc. (collectively "Marriott"). Maddix's First Amended Complaint ("FAC") asserted claims under 42 U.S.C. § 1983 and the United States Constitution's Fifth and

Fourteenth Amendments for violations of his right to a fair trial by the suppression of *Brady* and *Giglio* material; a Fourteenth Amendment substantive due process and right to petition claim based on the City's post-conviction coverup of *Brady* and *Giglio* material suppressed during Maddix's trial; *Monell* and civil conspiracy claims; and a pendent New York State Constitutional claim asserted solely against Marriott.

On April 8, 2026, the district court granted Defendants' Fed.R.Civ.P. 12 (b)(6) motions for judgment on the pleadings and dismissed the case. A-8.[1] The district court entered judgment the following day, April 9, 2026. A-374.

On May 4, 2026, Maddix filed a timely notice of appeal. A-8, 375. This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291, and the district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

## ISSUES PRESENTED

1. Did Maddix plead plausible constitutional *Brady* and *Giglio* violations predicating his *Monell* claims by alleging his trial prosecutor suppressed that he illegally imprisoned his star witness in a hotel room, promised him he would be released from custody if he testified against Maddix, and then falsely portrayed the witness to the jury at Maddix's trial as a Good Samaritan with no motive to lie and "nothing at stake"?

[1] References to the Appendix are preceded by "A-."

2. Did Maddix plausibly allege, at the pleading stage, that Marriott engaged in state action for § 1983 purposes, by alleging Marriott policymakers created and approved documentation specifically referencing Maddix and the unlawful imprisonment of a material witness against him, regularly facilitated and financially benefitted from serving as a black site for the Kings County District Attorney's blatantly illegal Hotel Custody Program, and the policymakers knew that covering up their unlawful conspiracy with the KCDAO was required for its success?

3. Did any of the grounds the district court declined to rule on provide an alternative basis to affirm the dismissal of Maddix's lawsuit at the pleading stage?

## PRELIMINARY STATEMENT

Plaintiff-Appellant Willie Maddix's § 1983 action sought damages for his wrongful 19-year incarceration caused by misconduct of the Kings County District Attorney's Office ("KCDAO"), under the administration of former District Attorney Charles J. Hynes. Unbeknownst to Maddix, the star witness against him at his 1994 trial was secretly coerced into testifying after being subjected to the KCDAO's illegal "Hotel Custody Program," which systematically abused material witness warrants to incarcerate recalcitrant witnesses in a network of New York hotels until the witnesses agreed to testify.

Under the Hotel Custody Program, imprisoned witnesses were never brought before judges as required by New York law and the plain terms of their material witness warrants, and instead held against their will in hotel rooms, *incommunicado*, unable to access the statutorily mandated material witness court process and attorneys they were constitutionally entitled to. *See e.g. Simon v. City of New York*, 893 F.3d 83, 93 (2d Cir. 2018) ("[A] person detained as a material witness enjoys any Fourth Amendment protection that is extended to criminal suspects" and "[a] seizure that flouts the plain terms of its authorizing instrument is therefore unreasonable.").

When the witnesses finally broke down and agreed to testify, prosecutors would present them at criminal trials while suppressing the coercive tactics used to secure their testimony, all in clear violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States,* 405 U.S. 150 (1972). As if this systematic suppression were not bad enough, prosecutors would exacerbate the resultant prejudice from their suppression by falsely portraying the witnesses to the criminal trial juries as Good Samaritans who had "no motive" to testify.

Maddix was convicted following a trial corrupted by this deception. In 1994, he was convicted of weapon possession in the Supreme Court, Kings County and sentenced to 5 to 15 years in prison. He was released in 2012. Over a decade after his release, a researcher investigating an unrelated wrongful conviction case

discovered the star witness in Maddix's case agreed to testify only after he was confined for nearly three days in a Marriott hotel under the KCDAO's Hotel Custody Program. When the researcher provided this information to Maddix, Maddix was ineligible to raise his *Brady* and *Giglio* claims in a federal habeas corpus petition because, having been released from prison and discharged from parole, he could not satisfy the "in custody" requirement needed to pursue habeas corpus relief.

In April 2025 Maddix commenced his § 1983 action contending the Defendants' misconduct and 30-year coverup of the *Brady and Giglio* material equitably estopped them from raising the statute of limitations and *Heck v. Humphrey*, 512 U.S. 477 (1994) defense, that his action was timely under the diligence-discovery rule, and that his inability to seek federal habeas review, through no fault of his own, entitled him to bring his lawsuit notwithstanding *Heck*. *See e.g. Greathouse v. Meddaugh*, 2023 WL 5439456, at *3 (2d Cir. 2023) (summary order) ("In this case, we assume without deciding that the procedural bar" of *Heck* "is waivable[.]") (Emphasis added); *Wiggins v. Mellia*, 2023 WL 6222303, at *2 (2d Cir. Sept. 26, 2023) (summary order) ("There is … a narrow exception to the *Heck* bar that permits a § 1983 suit where federal habeas relief is unavailable.")

Maddix's lawsuit sought to hold the City of New York and Marriott liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). He contended the KCDAO's suppression of the coercive tactics used to secure the star witness' testimony was a *Brady* and *Giglio* violation, as the suppressed evidence demonstrated the falsity of the prosecutor's "Good Samaritan" trial and summation narrative, demonstrated the witness had an undisclosed inducement and incentive for testifying, enabled Maddix to attack the integrity of the prosecution's case, and provided the legal basis to have the witness' trial testimony suppressed on New York abuse of process and legal coercion grounds.

Maddix contended the City was liable for these *Brady* and *Giglio* violations as they resulted from, among other things, the District Attorney's deliberate indifference to his subordinates' *Brady* and *Giglio* violations, and their use of false or misleading evidence and argument. Marriott was liable for these *Brady* and *Giglio* violations as well, Maddix contended, as his injuries were a reasonably foreseeable consequence of several overt acts Marriott policymakers committed in furtherance of their civil conspiracy with KCDAO to illegally imprison the witness and to cover up the *Brady* and *Giglio* material in Maddix's case.

On April 8, 2026, the district court dismissed Maddix's case on two fundamentally flawed grounds.

*First*, the district court held that because Maddix alleged the prosecutor coerced the star witness's testimony, Maddix was required to allege that testimony was false in order to state a *Brady* claim. But not a single decision imposes such a requirement. To the contrary, the circuits that have squarely addressed this issue hold the exact opposite. *See e.g. Anderson v. City of Rockford,* 932 F.3d 494, 507 (7th Cir. 2019) ("Regardless of whether … statement (and resulting testimony) was true or false, *Brady* imposed a disclosure obligation: due process required disclosure to the plaintiffs of the coercive tactics used to obtain [the] statement.); *Jackson v. City of Cleveland*, 925 F.3d 793, 825 (6th Cir. 2019) (Plaintiffs did not know [the witness'] statement had been coerced, and that fact could have been used to impeach [the witness'] testimony at trial. Therefore, [the police officer] had an obligation to disclose that fact to Plaintiffs").

The district court's conclusion that Maddix was required to show the witness' trial testimony was false erroneously conflated case law governing Fifth Amendment *evidence fabrication* claims, a claim Maddix *never* raised, with the analytically distinct *Brady* and *Giglio* claims Maddix advanced as predicate constitutional violations for his *Monell* claims.

Further, the district court's conclusion ignored the prosecutor's undisclosed promise to the witness to release him from custody if he testified, a quintessential *Giglio* violation. *See Giglio v. United States,* 405 U.S. 150, 155 (1972)

(prosecutor's failure to disclose promise of immunity to key prosecution witness required reversal); *Shabazz v. Artuz*, 336 F.3d 154, 162 (2d Cir. 2003) ("Impeachment evidence includes promises that the prosecution makes to key witnesses in exchange for their testimony.").

*Second*, the district court held Maddix failed to demonstrate Marriott engaged in state action for § 1983 purposes because his allegations in that regard were conclusory and failed to show Marriott and the City "shared a common unlawful goal" to deprive him of his constitutional rights. In doing so, the district court overlooked Marriott's creation and approval of documentation specifically referencing Maddix and the unlawful imprisonment of a material witness against him, its routine facilitation of, and the financial benefits it derived from serving as a black site for, the KCDAO's blatantly illegal Hotel Custody Program, and that Marriott *knew* covering up its unlawful conspiracy with the KCDAO was required for the success of the conspiracy. Drawing all inferences in Maddix's favor, his allegations and the documentary evidence at the pleading stage are sufficient to show Marriott engaged in state action.

Maddix's case, while presenting several complex issues on its surface, is at its heart a simple one: Prosecutors concealed *Brady* and *Giglio* material throughout Maddix's trial, covered it up throughout *all* of his appeals and 19 years of incarceration, and continued to cover up that material for over a decade after he

was released from prison. Ironically, the district court's decision served to protect the two entities that caused all of this and the widespread, systematic violation of witnesses' rights, while precluding Maddix, the victim of this scheme, from receiving any federal review of his constitutional injuries. The district court's decision should be reversed, and Maddix should finally be afforded his day in court.

## STATEMENT OF FACTS

### A. Maddix's Criminal Prosecution and the *Brady* and *Giglio* Violations

The district court dismissed Maddix's case solely on the pleadings, and thus the allegations in his First Amended Complaint ("FAC") must be accepted as true and he is entitled to all reasonable inferences from those facts. *See* p. 29, *infra.* As Maddix's FAC included 22 exhibits supporting his claims, he is entitled to, and does, rely on those exhibits as well. A-83-238.

#### 1. The Underlying Crime

On July 20, 1993, Jose Felix was killed during a shootout by at least two groups of men in front of 657 Vermont Avenue in Brooklyn. A-17 at ¶ 20. Another man, Larry Blutcher, was shot as well but survived. *Id.* Maddix was arrested on August 30, 1993, over one month after the shooting. A-17 at ¶ 21.

The KCDAO ultimately built its case against Maddix on two key witnesses: Blutcher and a man named Robert DeJesus. A-27 at ¶ 70.

### 2. The District Attorney Illegally Imprisons Its Star Witness, DeJesus, In Its Hotel Custody Program After He Refuses To Testify Against Maddix

Unbeknownst to Maddix, as his trial approached the following year, DeJesus was recalcitrant and refused to testify. A-24 at ¶ 50. In response, on July 30, 1994, the prosecutor handling Maddix's prosecution, Assistant District Attorney Kyle Reeves,[2] obtained an *ex-parte* material witness warrant requiring DeJesus to be arrested and produced in court in accordance with New York Criminal Procedure Law. A-25 at ¶¶ 50-51. However, after KCDAO detective-investigators ("DIs") located DeJesus, rather than bring him to court as required by that warrant, they brought him to the Marriott LaGuardia Hotel on Ditmars Boulevard in East Elmhurst, New York where they imprisoned him in accordance with the KCDAO's Hotel Custody Program. A-25 at ¶¶ 52; A-22 at ¶ 45.

The Hotel Custody Program, maintained from 1990 to 2013 under the administration of former Kings County District Attorney Charles J. Hynes, used a network of New York hotels as CIA-like "black sites" to illegally imprison and

[2] Reeves was a prosecutor with a "horrendous history of prosecutorial misconduct." A-17 at ¶ 22. In September 2020, the Appellate Division affirmed the vacatur of one of Reeves's 1999 murder convictions because he failed to disclose *Brady* material concerning benefits received by his witness and falsely argued in summation that the witness "never took a deal" and "never asked for anything in return" for cooperating. *People v. Rodriguez*, 186 A.D.3d 1724, 1725 (2d Dep't 2020). A-17 n. 2. In July 2017, the KCDAO moved to vacate the wrongful 1997 murder conviction of Jabbar Washington, admitting that Reeves knowingly used false testimony, suppressed *Brady* material, and caused Washington to spend 20 years in prison. *See* Alan Feuer, *Brooklyn District Attorney Hopes to Void 1997 Murder Conviction*, New York Times, July 11, 2017. *Id* (summarizing additional cases).

coerce witnesses who refused to cooperate in criminal cases. A-18 ¶¶ 24-26; A-22 at ¶ 45.

CPL Article 620 required material witnesses to be produced in court "forthwith" for assignment of counsel and a hearing to determine whether they should be held in custody or released on their own recognizance, A-18-19 ¶ 28, and New York City Administrative Code § 9-125, only authorized the New York City Commissioner of Corrections to maintain custody of civil prisoners. A-18 ¶ 25. Yet deposition testimony from KCDAO executives and DIs in several federal civil rights cases revealed the KCDAO would ignore the statutorily mandated material witness court process and incarcerate recalcitrant witnesses *incommunicado*, in hotel rooms, under armed guard, in the sole custody of the KCDAO. A-18 ¶ 26; A-19 n. 3; A-90-91, 94-96, 101.

As a matter of practice, DIs would approach the target witnesses, tell them the DIs had a warrant for their arrest, and inform the witnesses they had to come with the DIs to the KCDAO, or else they would be arrested. A-18 at ¶ 27. If the witnesses refused to accompany the DIs to the KCDAO, the DIs would arrest them, handcuff them, and take them to the KCDAO by force. A-18-19 at ¶ 29 and n. 3 (referencing DI deposition testimony that should the witness decline the DIs' "request," DIs would immediately handcuff the witness, even if the only thing the witness had on was underwear and bring him to the KCDAO by force).

At the KCDAO, prosecutors would falsely inform the witnesses they had the choice of either staying in the KCDAO's custody until they testified and being held in a hotel, or going to jail, A-19 at ¶ 30, when, in truth, the witnesses were entitled to a hearing, assignment of counsel, and either release on their own recognizance or a reasonable bail. A-19 at ¶ 31. Witnesses deceived in this manner were then taken, against their will, to various New York hotels where they were literally confined as "prisoners," under the sole control of the KCDAO, without any judicial or public oversight. A-19 at ¶ 32; A-96; A-184.

The witnesses would be placed in hotel rooms adjoining a second hotel room where two armed DIs stood on watch. A-20 at ¶ 34. The witnesses' hotel room doors would be shackled with handcuffs and leg irons. A-20 at ¶ 36 and n. 4. An internal KCDAO directive concerning the custody of such witnesses instructed DIs guarding the witnesses that "[h]allway doors will be secured at all times with a security lock in the custodies room" and that "[t]he door between the room[s] will have the lock removed and will be kept open at all times." A-20 at ¶ 36; A-85 at ¶ 10. That directive also provided that "[i]n the case of a hostile witness ... Detectives will exercise sufficient control to guard against escape." A-20 at ¶ 35; A-84 at ¶ 1.

In violation of the Fourth Amendment to the U.S. Constitution and New York law establishing minimum standards under which civil prisoners can be detained, the imprisoned witnesses were held *incommunicado*, unable to make telephone calls, have visitors, or seek the legal counsel they were entitled to. A-20 at ¶ 37; A-84 at ¶¶ 2, 5.

A KCDAO form letter used to reserve the rooms with participating hotels, A-89, instructed the hotels that "[t]here will be no food, telephone, or movie privileges for the single room. Telephone privileges only will be provided for the adjoining double":

A-89



ISTRICT ATTORNEY OF KINGS COUN
MUNICIPAL BUILDING
BROOKLYN, N.Y. 11201
(718) 802-2000

CHARLES J. HYNES
DISTRICT ATTORNEY

Date NOV. 30, 1994

HOLIDAY INN CROWNE PLAZA
104-04 DITMARS BLVD
EM-T ELMHURST N.Y.
FAX (718) 899-9768
TEL.# (718) 457-6300

Re: Custody # 1467

Dear Sir or Madam:

This letter is to confirm reservations made on NOV. 30, 1994 (date) with LINDA (contact) for two rooms (single and adjoining double). This custody was reserved under the name of MICHAEL WISHNER and will begin on NOV. 30, 1994 (date) and end on DEC. 1, 1994 (date)

There will be no food, telephone or movie privileges for the single room. Telephone privileges only will be provided for the adjoining double.

All billing is to be directed to the Kings County District Attorney's Office, Attention: Mr. Richard Safianow.

Should you have any questions, please contact me at 718-802-2994.

Very truly yours,

Richard I. Safianow
Deputy Director of Operations

Confirmation # 62288013

OPER 26 – Rev. 6/94

A-622

A KCDAO form used to record the rotation of DIs guarding the witnesses, A-21, 87, included a section to be checked off when witnesses were being held as prisoners:

**A-21**



- PAGE 2 -

LOCATION : Holiday Inn Crowne Plaza
PHONE NUMBER : 457-6300
ADA : Kyle Reeves - Ind 6587/94 ZONE : Red
SUPERVISOR : Tony Sorrentino
HOME PHONE # : [redacted] BEEPER # : [redacted]
NAME OF WITNESS IN CUSTODY : [redacted]
PRISONER : Y ✓ N ___ FEMALE ___ MALE ✓

| DAY / DATE | 0001 X 1200 HRS | 1600 X 2400 HRS |
|---|---|---|
| SUNDAY | | |

The KCDAO admitted it had no legal authorization for this practice. A-22 at ¶ 45. During a videotaped deposition in another federal civil rights lawsuit, former Kings County District Attorney Charles J. Hynes personally admitted to the existence of his Hotel Custody Program, that witnesses held in the hotels were held as “prisoners,” and that he could not provide any statutory or legal basis authorizing him to imprison those witnesses. A-22 at ¶ 45; A-94-96, 101.

DeJesus was subjected to this unlawful imprisonment. A-24-26 at ¶¶ 50-61. After DIs brought him to the Marriott LaGuardia Hotel, they imprisoned him in a hotel room at that location. A-25 at ¶ 52. There, DeJesus was held in a hotel room, unable to leave, adjoined by another room with DIs who controlled the entry and exit from his room. A-25 at ¶ 55. The door to DeJesus' hotel room was shackled with leg irons. A-25 at ¶ 56. DeJesus was not allowed visitors and had no access to anyone other than the DIs guarding him. A-25 at ¶ 57. DeJesus had no access to a telephone, a lawyer, or the court, and was thus unable to challenge his custody. *Id*; A-186. KCDAO documentation created during DeJesus' confinement confirms he was held as a "Prisoner," A-184, and that the KCDAO assigned him "Custody Number 1407." A-181-182.

Marriott International, Inc. owned and operated the Marriott LaGuardia Hotel where DeJesus was imprisoned, A-16 at ¶¶16, 18; A-76-79 at ¶¶ 297-316, and was the corporate parent of Marriott Hotel Services Inc. which managed the day-to-day operations of the hotel. *Id.* ¶ 17. Both Marriott entities delegated final policymaking authority to several local hotel managers at the Marriott LaGuardia Hotel where DeJesus was imprisoned, A-76 at ¶¶ 297-298, and those managers directly communicated with the KCDAO's Witness Relocation Coordinator concerning witnesses' custodies. A-77 at ¶ 304 (a).

The managers knew the KCDAO was confining witnesses in the hotel. A-77 at ¶ 299. They observed DIs transporting the witness-prisoners in and out of the hotel rooms in handcuffs and leg shackles, A-77 at ¶ 304 (c); observed damage to the hotel room doors caused by the shackles DIs would place on the doors to prevent the witnesses from escaping, A-77 at ¶ 304 (d); and they observed NYPD responses to the hotel due to volatile prisoner behavior, A-78 at ¶ (e).

The managers took affirmative steps to ensure that, in accordance with the KCDAO's wishes, the witnesses had no way to complain or alert anyone about their confinement by, for example, ensuring the witnesses could not use the telephones in their rooms. A-78 at ¶¶ 306-307. Instead of using witnesses' legal names, the managers used the witnesses' KCDAO custody numbers to track the witnesses' hotel rooms and referenced the custody numbers in billings to the KCDAO. A-77 at ¶¶ 301-302. While the managers failed to report to any law enforcement agency the obviously unlawful confinement of witnesses in the hotel, the managers reported all unusual incidents involving the witnesses to the KCDAO. A-78 at ¶ 310.

The managers instructed hotel staff to keep the practice confidential and rewarded those who did with recognition, good performance evaluations, promotions and raises.

Marriott committed these acts in connection with DeJesus' imprisonment "to accomplish the goal of a conspiracy with the KCDAO to illegally imprison DeJesus and cover[] up the *Brady/Giglio* material resulting from those actions." A-80 at ¶ 319.

The frequency of Marriott's facilitation of the KCDAO's Hotel Custody Program was significant. A KCDAO "Hotel Custody Log," A-354-355, attached to, and summarized in, Maddix's opposition to Marriott's motion to dismiss, A-334, documents *six* other occasions in the month before Maddix's trial, where Marriott served as a black site for the KCDAO's Hotel Custody Program:

| **HOTEL** | **CUSTODY NO.** | **IND.** | **BUREAU** | **DATE IN** | **DATE OUT** |
|---|---|---|---|---|---|
| LaGuardia Marriott | 1126 | 6326/92 | Orange ADA Bruen | 1/18/93 | 1/20/93 |
| LaGuardia Marriott | 1129 | 1545/92 | [Illegible] | [Illegible] | 1/25/93 |
| LaGuardia Marriott | 1136 | VOID | Trial Cadre Plazner | [Illegible] | |
| LaGuardia Marriott | 1139 | 7312/92 | Paiser Red | 2/11/93 | 2/17/93 |
| LaGuardia Marriott | 1141 | 14314/91 | Blue Liaison | 2/16/93 | [Illegible] |

| | | | | | |
|---|---|---|---|---|---|
| LaGuardia Marriott[3] | 1144 | 7812/92 | Green Omalley | 2/18/93 | [Illegible] |

A-334.

Marriott reaped substantial financial benefits and a dependable stream of income from facilitating the KCDAO's illegal Hotel Custody Program. A-78 at ¶ 312.

**3. Marriott's Approval Of Paperwork Specifically Referencing Maddix, His Case, DeJesus' Status As A Material Witness, And DeJesus' Incarceration As A Prisoner Under Custody Number 1407**

Marriott's managers participated in "creating and approving the administrative paperwork" to facilitate the KCDAO's illegal imprisonment of witnesses as prisoners. A-77 at ¶ 300.

Two such documents, attached to the FAC, were a KCDAO letter to Marriott confirming DeJesus' confinement, and a Custody Reservation Request, both dated July 29, 1994. A-181-182.

---

[3] Maddix included the Hotel Custody Log in his opposition to the Marriott Defendants' motion to dismiss and asked the district court to judicially notice it. A-333 at n. 2; A-334; A-354-355; *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 839 (2d Cir. 1992) (district court may take judicial notice of its own records) (citation omitted). The log was part of the record in an EDNY habeas case involving a witness who had been confined in the KCDAO's Hotel Custody Program, *Quezada v. Smith*, 624 F.3d 514, 522 (2d Cir. 2010); *Quezada v. Smith*, 08 CV 5088 (KAM) (E.D.N.Y.), ECF Doc. No. 26-1. The log was disclosed by the KCDAO in opposition to the Quezada petitioner's motion for discovery in his habeas action. *Id.*

The Custody Reservation Request identifies Maddix, his indictment number, and that DeJesus would be held as a material witness in his case for two days under Custody Number 1407:

A-181


Case 1:25-cv-01909-HG Document 5-10 Filed 04/22/25 Page 2 of 3 PageID #: 413

OFFICE OF THE
District Attorney
KINGS COUNTY

CUSTODY RESERVATION REQUEST

P. v. Willie Maddix

INDICTMENT #: 10234/93 CUSTODY #: 1407

REQUESTED BY: Kyle Reeves DATE: 7/29/94

BUREAU: Red Zone SIGNED: Kyle Reeves (Requestor's Signature)

APPROVED BY: (Bureau Chief) APPROVED: (Director - Witness Protection & Relocation Unit)

APPROVED BY: (Executive A.D.A.)

DATE(S) RESERVED: FROM: TO:

HOTEL: TELEPHONE #:

CONTACT:

REMARKS: Material witness - Robert Dejesus
Custody - Weekend
2 adjoining Rms.

ORIGINAL - FISCAL MANAGER COPY - OPERATIONS MANAGER

FIS 16 - Rev. 5/90

A-181.

The KCDAO's letter to Marriott confirming DeJesus' confinement requested "only telephone service in double room," where DIs would be guarding DeJesus, and "none in [the] single room." A-182. The KCDAO form used to

record the rotation of DIs guarding DeJesus had the section checked indicating DeJesus was held as "prisoner," from July 31, 1994, to August 1, 1994. A-184.

### 4. The Prosecutor Secretly Promises DeJesus He Would Be Released From Custody If He Testifies

The same day DIs imprisoned DeJesus in the Marriott hotel, the assigned prosecutor, Reeves, visited the hotel room where DeJesus was being held. A-25 at ¶ 58.

Reeves informed DeJesus, in sum and substance, that if DeJesus testified in accordance with Reeves's case narrative, DeJesus would be released from custody. A-25 at ¶ 59. DeJesus's release from custody was thus dependent on him cooperating against Maddix. A-26 at ¶ 60. Nearly three days later, DeJesus abandoned his recalcitrance and agreed to testify. A-26 at ¶ 61.

Reeves's coercion of DeJesus's trial testimony was *Brady/Giglio* material Reeves was obligated to disclose to Maddix and his attorney, as it provided Maddix with the basis to preclude DeJesus's trial testimony on legal coercion and abuse of process grounds, A-26 at ¶ 62 and n. 9, demonstrated DeJesus's secret motive for testifying, A-26 at ¶ 62 and n. 10, enabled Maddix to attack the integrity of the prosecution's case, A-26 at ¶ 62 and n. 11, and demonstrated the falsity of Reeves' trial and summation narrative. A-64 at ¶ 250.

The information was also material, and had it been disclosed, there is a reasonable probability that the result of Maddix's trial would have been different. A-28 at ¶ 77; A-35 at ¶ 120.

#### 5. The Prosecutor Suppresses The Coercive Tactics Used To Secure DeJesus' Testimony, And Falsely Portrays Him To The Jury At Maddix's Trial As A Good Samaritan With No Incentive For Testifying

Throughout Maddix's trial, Maddix relied on Reeves's factual representations that no *Brady/Giglio* material existed regarding DeJesus, and that DeJesus had no undisclosed motive for testifying. A-31 at ¶ 104; A-32 at ¶ 111.

Reeves presented two witnesses at Maddix's trial, Blutcher, the surviving victim, and DeJesus. A-27 at ¶ 70. Blutcher had a horrendous criminal history, and outstanding warrants for narcotics possession that called his credibility into question. *Id.* DeJesus thus became Reeves's star witness at trial. *Id.* Rather than disclose the coercive methods used to secure DeJesus' testimony, at trial Reeves falsely portrayed DeJesus to the jury as a Good Samaritan with no undisclosed motive for testifying. A-27 at ¶72.

Reeves led DeJesus to testify they had spoken twice before trial, creating the impression that DeJesus and the prosecutor were being open and forthright about their pretrial interactions. A-28 at ¶ 73. In summation Reeves argued DeJesus "came in here and told you what he saw. He's got no motivation to lie. He's got nothing at stake." A-28 at ¶ 74. The jury, unaware of the coercive tactics used to

secure DeJesus' testimony, convicted Maddix of criminal possession of a weapon in the second degree based in part on DeJesus's testimony. A-28 at ¶ 78. (Maddix was acquitted of the murder charge. A-28 n. 12.) On August 22, 1994, Maddix was sentenced to 5 to 15 years in prison. A-28 at ¶ 79.

All of Reeves's misconduct and the *Brady/Giglio* violations detailed above preceded the judgment of conviction, and the judgment of conviction merely ratified, acquiesced in or left Reeves's pre-judgment conduct unpunished. A-28 at ¶ 80.

## B. The KCDAO's 30-Year Cover Up Of The *Brady* and *Giglio* Material[4]

Following Maddix's 1994 conviction, the KCDAO had a continuing obligation to disclose the *Brady/Giglio* material it suppressed during his trial. A-29 at ¶ 81; *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007) ("For evidence known to the state at the time of the trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings. Put differently, the taint on the trial that took place continues throughout the proceedings, and thus the duty to disclose and allow correction of that taint continues.")

---

[4] Under this Court's *Monell* jurisprudence, the KCDAO's post-conviction actions are attributable to City. *See Bellamy v. City of New York,* 914 F.3d 727, 759 (2d Cir. 2019) ("[W]e have been consistent in holding that the actions of county prosecutors in New York are generally controlled by municipal policymakers for purposes of *Monell*[.]")

Yet rather than disclose that material, the KCDAO suppressed it throughout Maddix's entire 19-year incarceration, and for 11 years after he was released from prison. A-29 at ¶ 82; A-31 at ¶¶ 101-102.

In response to Maddix's 1994 CPL § 330.30 motion, 1997 direct appeal, and 1998 CPL § 440.10 motion, the KCDAO continued to suppress the *Brady* and *Giglio* material and reiterate in their opposing submissions the false or misleading arguments ADA Reeves made at trial, recount DeJesus's coerced trial testimony implicating Maddix while omitting any reference to how that testimony was obtained, A-29 at ¶ 87, or represent DeJesus' testimony was credible while suppressing the *Brady* and *Giglio* material. A-29-30 at ¶¶ 83-91.

In 1999 Maddix brought a federal habeas corpus proceeding in the Eastern District of New York. A-30 at ¶ 92. In response, the KCDAO submitted the state court record to the EDNY. A-30 at ¶ 93. Under Fed.R.Civ.P. 11, the KCDAO, by making those submissions, represented to the district court that "the factual contentions have evidentiary support[.]" A-30 at ¶ 94. The KCDAO continued to suppress the *Brady* and *Giglio* material, precluding Maddix from moving to amend his habeas petition, stay it, or seek leave to file a second or successive petition, actions Maddix would have taken had the *Brady* and *Giglio* material been disclosed. A-30 at ¶ 95. Maddix relied on the KCDAO's misrepresentations to his detriment, and it was due solely to the KCDAO's misconduct that he was unable to

raise the *Brady/Giglio* issues in his habeas corpus petition. A-32 at ¶ 110; A-33-34 at ¶¶ 114-115. A-32 at ¶ 110.

Maddix's habeas petition was denied in March 2000, and following that denial, he served an additional 12 years in prison. A-30 at ¶¶ 87-99. On August 29, 2012, Maddix was finally released from prison and later discharged from parole supervision. A-31 at ¶ 100. From Maddix's release in 2012, until December 2024, the KCDAO continued to conceal the *Brady/Giglio* material. A-31 at ¶¶ 101-102.

It was not until December 18, 2024, that Maddix finally discovered the *Brady/Giglio* material existed. A-31 at ¶¶ 103-104; A-31-32 at ¶¶ 106-107. A researcher working on an unrelated wrongful conviction case alerted him to the *Brady/Giglio* material in Maddix's case. *Id.*[5] Until then, Maddix did not know, or have any reason to know, of the *Brady* and *Giglio* violations in his case. *Id.* at ¶ 104. To the contrary, Maddix relied on the prosecutor's representations throughout trial that no such impeachment materials existed, and that DeJesus had no undisclosed motive for testifying. *Id.*

At the time Maddix discovered the *Brady/Giglio* material, and at the time he commenced this § 1983 action, Maddix was neither in custody nor on parole. A-32

[5] The researcher obtained the *Brady/Giglio* material through a public records request. A-31 at ¶ 103.

at ¶ 109; A-33 at ¶ 112. Maddix, through no fault of his own, and due solely to the misconduct of defendants, never had any opportunity to raise his *Brady* and *Giglio* claims in a federal *habeas* petition. A-31 at ¶ 110. To the contrary, Defendants' actions totally precluded Maddix from discovering and raising the *Brady* and *Giglio* issues in his habeas petition.

As a result of Defendants' conduct, Maddix lost 19 years of his life in prison, was deprived of the ability to challenge his conviction in federal court, and suffered a host of other damages. A-34 at ¶ 117.

### C. <u>The Civil Lawsuit</u>

Maddix commenced the underlying § 1983 action on April 8, 2025. He asserted *Monell* claims against the City and Marriott.[6] Maddix grounded his *Monell* claims on the violation of three constitutional rights: (1) the right to disclosure of *Brady/Giglio* material during his trial; (2) the right to not have knowingly false or misleading testimony and argument used at his trial; and (3) the post-conviction due process right to ongoing disclosure of *Brady/Giglio* material suppressed during his trial, and to petition for relief.[7]

---

[6] Maddix initially named Reeves as a defendant for prospective relief. *See Schloss v. Bouse*, 876 F.2d 287, 292 (2d Cir.1989) (prosecutor's entitlement to "absolute immunity from a claim for damages does *not* bar the granting of injunctive relief … or other equitable relief.") (emphasis added) (citations and quotes omitted). Maddix later withdrew his claim against Reeves.

[7] These predicate constitutional violations were additionally asserted as causes of action under Counts I, III, and VII. In each of those counts, Maddix asserted the City and Marriott were liable

Maddix's FAC asserted his justifiable reliance on the Defendants' misrepresentations equitably estopped them from invoking the *Heck v. Humphrey* and statute of limitations defenses. A-34 at ¶¶ 115-116.

On May 29, 2025, the court (Gonzalez, J.) granted the Defendants' motion to stay discovery pending the outcome of their Rule 12 (b)(6) motions. *Maddix v. City of New York*, 2025 WL 1530648 (E.D.N.Y. May 29, 2025) (Gonzalez, J.).

On April 8, 2026, the court granted the Defendants' Rule 12(b)(6) motions and dismissed Maddix's case with prejudice. *Maddix v. City of New York*, 2026 WL 948287 (E.D.N.Y. Apr. 8, 2026) (Gonzalez, J.).

### D. <u>The District Court's Decision</u>

The district court decision rested on two main grounds. First, it held Maddix failed to plead a constitutional *Brady* claim because he failed to allege DeJesus' "coerced" testimony was false, which the district court deemed a "necessary" element of Maddix's *Brady* claim. *Maddix v. City of New York*, 2026 WL 948287, at *5 (E.D.N.Y. 2026) ("[T]wo elements—both coercion *and* fabrication—are necessary for Plaintiff's *Brady* claim to survive a motion to dismiss") (citations omitted). As a result of this ruling, the Court concluded Maddix could not sustain a *Monell* claim as there was no underlying constitutional violation.

---

for those violations by virtue of their *Monell* policies. *See* A-36 at ¶¶ 125-127 (Count I); A-39-40 at ¶¶ 146-148 (Count III); and A-80 at ¶¶ 323-325 (Count VII).

Second, the district court held Maddix failed to plausibly allege Marriott was a state actor, because he failed to allege Marriott and the City "shared a common unlawful goal" to deprive him of his rights. *Maddix v. City of New York*, 2026 WL 948287, at *7. Maddix's allegations that Marriott conspired with the KCDAO, the district court held, were "speculative and conclusory[.]"

## SUMMARY OF ARGUMENT

The district court erred in holding Maddix failed to state a *Brady* claim because he did not allege that DeJesus's coerced trial testimony was *false*. No such requirement exists in either Supreme Court or this Court's *Brady* jurisprudence. The district court's decision mistakenly elides the distinction between two analytically distinct constitutional claims: a Fifth Amendment evidence fabrication claim, which Maddix <u>never</u> raised and which requires a showing that the evidence was false, and a Fifth Amendment *Brady* claim, which merely requires a showing that the prosecution suppressed favorable, material, evidence.

*Brady* and its progeny impose a disclosure obligation independent of whether suppressed evidence ultimately proves the witness lied. The constitutional violation lies in the suppression of material impeachment or exculpatory evidence, not in the truth or falsity of the witness's account, which is a question for the jury.

Relatedly, the district court's ruling ignored the independent and sufficient *Giglio* violation arising from Reeves's undisclosed promise to DeJesus to release him

from custody in exchange for his testimony — a classic inducement the Supreme Court and this Circuit have long recognized as required to be disclosed.

The district court also erred in holding Maddix failed to plausibly allege Marriott acted under color of state law. The court's conclusion that Maddix's civil conspiracy allegations were "conclusory" ignored detailed, non-conclusory factual allegations — corroborated by 22 exhibits — showing Marriott's on-site managers knowingly facilitated the KCDAO's illegal Hotel Custody Program, approved paperwork identifying DeJesus by his custody number in connection with Maddix's prosecution, observed and concealed the physical *indicia* of witnesses' unlawful confinement, disabled witnesses' ability to communicate with the outside world, and were financially compensated for their continuing cooperation. Moreover, in light of the inherently illegal nature of the Hotel Custody Program, Marriott necessarily understood concealing its conduct, including DeJesus' imprisonment, was necessary for the success of its conspiracy with the KCDAO. These allegations, accepted as true, plausibly alleged Marriott and the City shared the common unlawful objective of concealing the resulting *Brady/Giglio* material from Maddix.

Finally, none of the grounds the district court declined to reach provide a valid, alternative basis to affirm the dismissal of Maddix's lawsuit. Maddix plausibly alleged Defendants' decades-long concealment of the *Brady/Giglio* material and affirmatively false representations equitably estop them from invoking the *Heck v. Humphrey* and

statute of limitations defenses, claims that cannot be resolved on a motion to dismiss. The *Rooker-Feldman* doctrine has no application to Maddix's case, and it is well settled in this Court that a prosecutor's absolute immunity cannot preclude a *Monell* claim. *See e.g. Bellamy v. City of New York*, 914 F.3d 727, 760 (2d Cir. 2019). To the extent that any of these issues are not resolved by this Court's decision on this appeal, those issues should be considered by the district court in the first instance.

## ARGUMENT

## POINT I

### THE DISTRICT COURT ERRED AS A MATTER OF LAW IN HOLDING THAT, IN ORDER TO STATE A *BRADY* CLAIM, MADDIX WAS REQUIRED TO ALLEGE THE PROSECUTION'S SECRET ARREST AND COERCION OF ITS STAR WITNESS RESULTED IN HIS FALSE TRIAL TESTIMONY

### A. Standard of Review

This Court reviews "*de novo* a district court's dismissal of a complaint pursuant to Rule 12 (b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Green v. Dep't of Educ. of City of New York*, 16 F.4th 1070, 1076 (2d Cir. 2021).

### B. The District Court's *Brady* Decision Has No Basis in Law, And Directly Conflicts With Supreme Court and Circuit Court Precedent

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and its progeny, "the government has a due process obligation to disclose to the defendant its knowledge of material evidence favorable to the defendant either because it is exculpatory or because it can serve to impeach a key witness." *Shabazz v. Artuz*, 336 F.3d 154, 161–62 (2d Cir. 2003).

Maddix's FAC establishes his trial prosecutor suppressed impeachment evidence regarding the most important prosecution witness in his case. The prosecutor suppressed that he secretly coerced DeJesus into testifying against Maddix by illegally arresting him, holding him *incommunicado*, and promising him he would be released if he testified. After nearly three days of imprisonment, DeJesus finally agreed to testify. The prosecutor then falsely portrayed DeJesus to the jury at Maddix's trial as a Good Samaritan with no motive for testifying. Had Maddix been aware of the true facts, he could have impeached DeJesus' testimony as the fruit of prosecutorial coercion, attacked the prosecution's case as founded on fraud, and likely had DeJesus' testimony suppressed in its entirety on New York abuse of process or legal coercion grounds. A-26 at ¶ 62 and nn. 9-11.

Yet the district court ignored all of this and held Maddix could not state a *Brady* claim based on these facts because he did not allege DeJesus' trial testimony

was false. This conclusion is contrary to law. *See e.g. Anderson v. City of Rockford,* 932 F.3d 494, 507 (7th Cir. 2019) ("Regardless of whether … statement (and resulting testimony) was true or false, *Brady* imposed a disclosure obligation: due process required disclosure to the plaintiffs *of the coercive tactics used to obtain [the] statement*.") (Emphasis added).

A true *Brady* violation consists of three elements: (1) the evidence must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the government; and (3) the evidence must be material. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (*en banc*) (same). Evidence is material if there is "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019).[8]

The Supreme Court has long recognized that evidence bearing on a witness's motive to testify — including promises, rewards, or inducements of any kind, explicit or implicit — falls squarely within *Giglio*'s ambit, without regard to the ultimate truth

[8] Intent, materiality, and causation are issues to be resolved by the trier of fact. *See United States v. Gaudin*, 515 U.S. 506, 512 (1995) (materiality); *Bermudez v. City of New York*, 790 F.3d 368, 376 n.3 (2d Cir. 2015) (intent); *Redd v. New York State Division of Parole*, 678 F.3d 166, 178 (2d Cir. 2012) (causation and intent).

or falsity of witness' testimony. *Giglio*, 405 U.S. at 154–155 (undisclosed promise of leniency to a witness violates due process).

A defendant is entitled to have his jury weigh a witness's credibility, and evidence that the witness did not agree to testify until he had been arrested and held illegally for several days is powerful evidence of his motive, bias, and interest in testifying. *See e.g. Nappi v. Yelich*, 793 F.3d 246, 251 (2d Cir. 2015) ("[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."), citing *Davis v. Alaska*, 415 U.S. 308 (1974).

At least two sister circuits have squarely rejected the conclusion that plaintiffs like Maddix, raising *Brady* claims based on suppression of the government's coercion of a prosecution witness, are required to prove the witness' resultant trial testimony was false. For example, in *Anderson v. City of Rockford*, 932 F.3d 494, 507 (7th Cir. 2019), the Seventh Circuit held "[r]egardless of whether ... [the] statement (and resulting testimony) was true or false, *Brady* imposed a disclosure obligation: due process required disclosure ... of the coercive tactics used to obtain [the] statement."

In *Jackson v. City of Cleveland*, 925 F.3d 793, 825 (6th Cir. 2019), the Sixth Circuit held that the fact that a witness's statement was coerced was itself independently disclosable impeachment material, wholly apart from whether the

statement was accurate. *Id.* at 825 ("Plaintiffs did not know [the witness'] statement had been coerced, and that fact could have been used to impeach [the witness'] testimony at trial. Therefore, [the police officer] had an obligation to disclose that fact to Plaintiffs[.]"); *accord Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) ("Because coerced testimony may in fact be true, the due-process right to a fair trial isn't implicated *absent a violation of the Brady duty to disclose facts about the coercive tactics used to obtain it."*) (Emphasis added); *Fields v. Wharrie*, 740 F.3d 1107, 1123 (7th Cir. 2014) (Sykes, J., concurring in part and dissenting in part) ("[I]f the police officers ... withhold exculpatory information about coerced ... evidence, the aggrieved defendant will have a good § 1983 claim against the officers for violation of *Brady*.").

Likewise, in *Galloway v. County of Nassau*, 141 F.4th 417, 426 (2d Cir. 2025), this Court held without analysis that a jury could find detectives' failure to disclose "the fact that [a witness's false] testimony was coerced" was "a *Brady* violation." Significantly, *Galloway* analyzed the evidence fabrication and *Brady* claims separately, each under its own discrete jurisprudence, never holding falsity of the evidence was required to state a *Brady* violation. *Id.*

Nothing in *Brady*, *Giglio*, or this Court's *Brady* jurisprudence requires a showing otherwise. *See e.g. Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (*en banc*); *Fappiano v. City of New York*, 640 F.App'x 115, 118 (2d Cir. 2016)

(summary order). To the contrary, this Court has repeatedly set forth only three elements needed to establish a *Brady* claim: (1) favorable evidence, (2) suppression of that evidence, and (3) materiality. *See Poventud v. City of New York*, 750 F.3d at 133 (*en banc*).

The district court's citation of *Galloway v. County of Nassau*, 141 F.4th at 426 as support for its decision is erroneous. As previously stated, *Galloway* simply held that a jury could find detectives misled the prosecutor about "the fact that [a witness's false] testimony was coerced ... a *Brady* violation." The Court did not *require* any showing of falsity or engraft that requirement into the settled *Brady* standard. Indeed, as this Court's prior precedents have established the three elements required for a *Brady* claim, the *Galloway* court could not have disturbed those precedents. *See e.g. Garcia Pinach v. Bondi*, 147 F.4th 117, 129 (2d Cir. 2025) ("Our Court is bound by the decisions of prior panels until such time as they are overruled either by an *en banc* panel of this Court or by the Supreme Court." Accordingly, it is neither appropriate nor possible for a panel of this Court to disregard an opinion of a previous panel") (cleaned up).

Nor do the two other cases cited by the district court support its decision. *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123 (2d Cir. 1997) was an evidence fabrication case, not a *Brady* case. *Thomas v. Mason*, 2023 WL 2709730 (N.D.N.Y. Mar. 30, 2023) (Stewart, M.J.), *aff'd,* 2024 WL 5199296 (2d Cir. Dec.

23, 2024), involved a plaintiff who raised an evidence fabrication claim based on allegedly being coerced into making a false statement to police. The Magistrate's analysis of the plaintiff's separate *Brady* claim, based on the alleged suppression of an autopsy report, recognized the analytical distinction between evidence fabrication and *Brady* claims, and employed only the latter body of case law in its *Brady* analysis of the allegedly suppressed report.

In contrast, the district court's decision in Maddix's case confused his *Brady* suppression claim with a Fifth Amendment claim, fabrication of evidence, sounding in due process (or, in some formulations, the Fourth Amendment). This type of fabrication theory explicitly requires a plaintiff to show the fabricated evidence was false. *See e.g. Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (cited by the district court); *Smalls v. Collins*, 10 F.4th 117, 132 (2d Cir. 2021) (setting forth elements of a fabrication of evidence claim). But this is <u>not</u> a theory Maddix pled. *See* A-300 (Maddix's Opposition to the City's Motion to Dismiss) ("[T]he City argues Maddix cannot establish an underlying constitutional violation because he does not allege the trial prosecutor coerced the star witness into giving false testimony, a requirement for a Fifth Amendment coercion claim. *That claim is a red herring. Maddix never pled a coercion claim*.") (Emphasis added); A-35-81 (FAC setting forth Maddix's causes of action). Thus,

the district court erred in ruling Maddix was required to demonstrate DeJesus' trial testimony was false.

Maddix's FAC also plausibly alleges there is a reasonable probability that but for the suppression of the *Brady* and *Giglio* material regarding DeJesus, the result of his trial would have been different. Even without that material, Maddix was acquitted of the top charge, murder. The suppression of the fact that DeJesus was coerced through illegal confinement and released only after agreeing to testify would have destroyed DeJesus' testimony as the fruit of legal coercion and undermined the integrity of the case before a jury already skeptical of the prosecution's proof (as reflected by its acquittal of Maddix for murder).

This is particularly so considering the prosecutor's elicitation of DeJesus's trial testimony that he and the prosecutor had spoken twice before trial. That testimony created the false impression that DeJesus and Reeves' meetings were straight-forward, above-board trial preparation when, in truth, the prosecutor had incarcerated DeJesus and used his release as leverage to compel him to testify. *See Drake v. Portuondo*, 553 F.3d 230, 243 (2d Cir. 2009) ("The prosecutor plainly crafted the question to achieve literal accuracy while conveying [a] false impression[.]"); *United States v. Vozzella*, 124 F.3d 389, 392 (2d Cir.1997) (in context of analyzing *Brady* claim, finding that certain records were "known to be

partially false and were presented to the jury in a fashion so highly misleading as to amount to falsity regarding their veracity as a whole").

Despite coercing DeJesus, Reeves argued in his summation that DeJesus had no motive for testifying: "[He] came in here and told you what he saw. He's got no motivation to lie. He's got nothing at stake." Had the jury learned Reeves personally orchestrated this deception, it would have been "devastating" to the prosecution's case. *See e.g. Su v. Filion*, 335 F.3d 119, 129 n. 6 (2d Cir. 2003) (noting it would be "devastating" to the prosecution's case for the jury to learn that the prosecutor was complicit in having a witness testify falsely).

### C. <u>The District Court Overlooked Maddix's Related *Giglio* Claim</u>

Exacerbating the district court's error, it ignored Maddix's *Giglio* claim based on the secret promise Reeves made to DeJesus to release him from custody if he testified.

This undisclosed promise provides an independent constitutional violation predicating Maddix's *Monell* claims. *See Giglio v. United States*, 405 U.S. at 154–55 (holding that the prosecution's failure to disclose promise of leniency made to its key witness violated due process, because such an inducement bears directly on the witness's credibility, "and the jury was entitled to know" of it).

## POINT II

## MADDIX PLAUSIBLY ALLEGED MARRIOTT ENGAGED IN STATE ACTION BY SHARING THE CITY'S UNLAWFUL GOAL OF DEPRIVING HIM OF *BRADY* AND *GIGLIO* MATERIAL AND COVERING UP THAT MISCONDUCT

The district court held Maddix failed to demonstrate Marriott engaged in state action for § 1983 purposes because he failed to show Marriott and the City "shared a common unlawful goal" to "deprive" him of his constitutional rights.

Drawing all inferences in Maddix's favor as required on a Rule 12(b)(6) motion, the record plausibly alleges Marriott policymakers shared the unlawful common goal with the KCDAO of concealing DeJesus' confinement in Maddix's case, with full awareness that his confinement was unlawful, that Maddix was a criminal defendant in a pending case, and that DeJesus was a material witness against him. Further, Marriott knew that covering up its unlawful conspiracy with the KCDAO was required for the success of the conspiracy. Thus, Maddix plausibly alleged Marriott shared the KCDAO's unlawful goal.

### A. Standard Of Review

"Under 42 U.S.C. § 1983, constitutional torts are only actionable against state actors or private parties acting 'under the color of' state law.'" *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) (citation omitted). A private party who conspires with a state official acts under color of state law for § 1983 purposes.

*Dennis v. Sparks,* 449 U.S. 24, 27–28 (1980); *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Even if the state actor is immune from suit, private parties who conspire with them may be held liable for damages. *Dennis,* 449 U.S. at 28; *Rounseville v. Zahl,* 13 F.3d 625, 633 (2d Cir.1994).

A private actor can be "a willful participant in joint activity with the State or its agents" if the two share some common goal to violate the plaintiff's rights. *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014); *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 272 (2d Cir.1999).

### B. Maddix's Allegations and Exhibits Plausibly Allege Marriott Shared The City's Unlawful Goals

The *Monell* standard applies in § 1983 actions seeking to hold a private corporation liable. *See e.g. Rojas v. Alexander's Dept. Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990). Thus, if a Marriott policymaker takes part in a civil conspiracy, his or her participation in the conspiracy renders the entity for which he or she is a policymaker liable for resultant damages. *See e.g. LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995) (municipality may be liable for conspiracy under § 1985); *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 127 (2d Cir. 2004) (Even a single action by a policymaker is sufficient to establish *Monell* liability).

Maddix's FAC alleged both Marriott entities "wholly delegated final policymaking authority to several local managers of the Marriott LaGuardia Hotel[,]" those managers were "autonomous and their decisions on the assistance

provided and the hotel rooms they rented to the KCDA went unreviewed and were never overruled[,]" and "[t]hrough those managers, Marriott implemented a plainly illegal, unconstitutional, improper and deliberately indifferent policy, custom, or practice "to knowingly facilitate … the KCDAO's illegal imprisonment of witnesses as prisoners and to serve as one of Hynes's *de facto* black sites. A-76 at ¶¶ 196-298.

Under this Court's precedents, those local managers acted as final policymakers with respect to the decisions to facilitate … the KCDAO's illegal imprisonment of witnesses as prisoners and to serve as one of Hynes's *de facto* black sites. *See e.g. Roe v. City of Waterbury*, 542 F.3d 31, 38 (2d Cir. 2008) (official has final policymaking authority "if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions."); *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (explaining that courts may look to "a custom or usage having the force of law" in determining whether an official is a policymaker (citation and quotation marks omitted).

Maddix alleged Marriott conspired with the KCDAO to (1) illegally imprison DeJesus, (2) coverup the *Brady/Giglio* material resulting from those actions, and (3) "to deprive *Maddix of his constitutional rights* to timely disclosure of material evidence" under *Brady*, *Giglio*, and due process. A-80 at ¶ 321. His submissions below plausibly allege such a conspiracy.

### 1. Marriott's Creation and Approval of Administrative Paperwork Documenting DeJesus's Confinement As A Witness In Maddix's Case Plausibly Alleges A Common Goal

Maddix alleged Marriott's policymakers "participated in creating and approving the administrative paperwork" to facilitate the KCDAO's systematic illegal imprisonment of witnesses as prisoners. A-77 at ¶ 300; A-76 at ¶ 298.

Two such documents attached to Maddix's FAC –a Hotel Reservation Letter to Marriott, and a Custody Reservation Request, both dated July 29, 1994, A-181-182– collectively reveal (1) Maddix's name, (2) his status as a criminal defendant ["P. v. Willie Maddix"], (3) his indictment number, and that DeJesus, who was being housed under "Custody # 1407" was a material witness against him: "Material witness – Robert DeJesus Custody – Weekend[.]"

Marriott's approval of such paperwork is an affirmative, independent act attributable to Marriott itself. A private actor who creates records documenting an unlawful confinement and is aware of exactly whose prosecution it serves, has plausibly aligned itself with the state actor's particular objective in that regard.

### 2. The Hotel Managers' Knowledge Of The Illegality Of The Hotel Custody Program

"New York law requires a full-dress hearing before someone can be adjudged and detained as a material witness, and a material witness warrant is issued expressly to secure the prospective witness's attendance at the hearing."

*Simon v. City of New York*, 893 F.3d 83, 96 (2d Cir. 2018) citing CPL §§ 620.30, 620.50.

Yet the KCDAO's Hotel Custody Program systematically abused New York material witness warrants, deprived victimized witnesses of their right to counsel and a hearing and imprisoned them under restrictions not even present on Rikers. *Compare* pp. 13, 16, *supra* (witnesses in hotel custody were not permitted to use the telephone, have visitors, or contact anyone to contest their confinement) with 9 N.Y.C.R.R. §§ 7510.1 (a) and 7502.1 (e) (providing all inmates shall have the right to call their attorneys, make telephone calls, and receive visitors).

The local Marriott hotel managers where DeJesus was imprisoned had both actual and constructive knowledge of these illegal imprisonments. A-77 at ¶ 304. They communicated directly with the KCDAO's Witness Relocation Coordinator concerning the witness-prisoners. They personally observed DIs transporting them in and out of the hotel rooms in handcuffs and leg shackles. They saw the damage to the hotel room doors caused by the shackles DIs used to lock the doors to keep witnesses from escaping. They observed NYPD officers respond to the hotel due to understandably volatile prisoner behavior.

Instead of using the witnesses' names, they used "Custody Numbers" to track the witnesses' hotel room, thereby ensuring no record could be found of the imprisonment. Unlike regular guests at the hotel who had means of complaining

about their stay or contacting police, if necessary, the managers precluded the witnesses from contacting anyone for help by cutting off the hotel room telephone provided to every other hotel guest. A-77 at ¶ 307.

The managers' knowledge can also be inferred by their failure to report to *any* law enforcement agency that witnesses were being imprisoned in their hotel, despite the lack of any New York law authorizing such confinements. Instead of reporting those confinements, the managers instructed hotel staff to keep the practice confidential and rewarded those who did with recognition, good performance evaluations, promotions and raises. A-77-78 at ¶¶ 300-312.

Moreover, the managers *knew* the conspiracy they were engaged in with KCDAO was illegal, so that the secrecy of the conspiracy was required for its success, and it can thus be inferred the managers knew they would be concealing the specific information regarding Maddix's case.

### 3. The Regularity With Which The Hotel Managers Facilitated The Hotel Custody Program Supports An Inference Of A Common Scheme

Finally, in *Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983), "a leading case" on civil "conspiracy liability," *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 76 (2d Cir. 2023) the court recognized that "[f]actors like the relationship between the parties' acts, the time and place of their execution, and

the duration of the joint activity influence the determination" of whether an illicit agreement existed.

The Hotel Custody Log submitted with Maddix's opposition to Marriott's motion to dismiss suggests Marriott's facilitation of the KCDAO's Hotel Custody Program was extensive. In a one-month period preceding DeJesus' confinement, Marriott served as KCDAO black site on *six other occasions*. *See* A-334; A-354-355. Considered with Maddix's allegations of the Marriott managers' awareness of the illegal activity taking place in the hotel, the Hotel Log provides additional support for the existence of a common scheme.

In sum, Maddix plausibly alleged, at the pleading stage, that Marriott's participation in a civil conspiracy with the KCDAO demonstrated the requisite state action required for § 1983.

### C. The Dismissal of Maddix's Supplemental State Law Claim Against Marriott Should Be Reversed

Should the court reverse the dismissal of Maddix's *Monell* claim, it should also reverse the district court's dismissal of Maddix's supplemental state law claim against Marriott. A-371-372.

Maddix's Eighth Cause of Action raised a supplemental state law claim the district court declined to exercise jurisdiction over in light of its dismissal of Maddix's federal claim. Should this Court reinstate Maddix's *Monell* claim, his supplemental claim should be reinstated as well.

## POINT III

## UNRESOLVED FACTUAL ISSUES REGARDING EQUITABLE ESTOPPEL AND THE DILIGENCE-DISCOVERY RULE PRECLUDE AFFIRMANCE ON ANY ALTERNATIVE GROUND

The district court never decided Maddix's entitlement to equitable estoppel or the diligence-discovery rule with respect to Defendants' *Heck v. Humphrey*, 512 U.S. 477 (1994), and statute of limitations defenses. *See* A-361-362 (explicitly declining to address those issues).

Thus, this Court should remand the case to allow consideration of those issues *after* Maddix has completed discovery. *See e.g. Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 142 (2d Cir. 2025) ("We have emphasized that, because equitable [defenses] often raises fact-specific issues premature for resolution on a Rule 12(b)(6) motion, before a plaintiff can develop the factual record ... it is generally improper to dismiss a complaint as untimely.") (citation omitted); *Clark v. Hanley*, 89 F.4th 78, 94 (2d Cir. 2023) (such issues are "premature for resolution on a Rule 12(b)(6) motion, before a plaintiff can develop the factual record."). In any event, even if this Court considers those issues here, they do not provide an alternative basis for affirming the district court's decision.

### A. Equitable Estoppel & The Diligence-Discovery Rule

Maddix's lawsuit was brought under a federal statute, § 1983, and thus "federal law principles of equitable estoppel are applicable." *Kosakow v. New*

*Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001). Under federal law, a party may be estopped from pursuing a defense where: "(1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; (2) and the other party reasonably relies upon it; (3) to her detriment." *Id.* (citations omitted).

A municipality may be subject to equitable estoppel where the party can establish both that the Government made a misrepresentation upon which the party reasonably and detrimentally relied and that the Government engaged in affirmative misconduct." *City of New York v. Shalala*, 34 F.3d 1161, 1168 (2d Cir. 1994) (citations omitted).

Under the diligence-discovery rule, where a plaintiff "would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called 'diligence-discovery rule of accrual' applies." *Barnes v. City of New York*, 68 F.4th 123, 127 (2d Cir. 2023).[9] The rule delays accrual until the date the "plaintiff kn[ew] or ha[d] reason to know of the injury which is the basis of his action." *Veal v. Geraci,* 23 F.3d 722, 724 (2d Cir.1994).

[9] While state law determines the duration of a § 1983 statute of limitation, *federal law* determines when that statute of limitations begins to run. *Reed v. Goertz*, 598 U.S. 230, 235, (2023) (the question of when the "limitations period began to run" for Section 1983 procedural due process claim was "one of federal law"); *Barnes v. City of New York*, 68 F.4th 123, 127 (2d Cir. 2023) (same).

The diligence-discovery rule can postpone accrual of a cause of action where the government deliberately conceals a plaintiff's injury, and he remained "blamelessly ignorant" of his claim. *Pearl v. City of Long Beach*, 296 F.3d 76, 80, 82 (2d Cir. 2002); *Kronisch v. United States,* 150 F.3d 112, 121 (2d Cir. 1998). Thus, when a "defendant fraudulently conceals the wrong, the [statute of limitations] does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action." *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995) quoting *Keating v. Carey*, 706 F.2d 377, 382 (2d Cir. 1983).[10]

### 1. Equitable Estoppel Bars Defendants From Raising The *Heck* Defense And, In Any Event, Maddix Is Entitled To Invoke The Non-Custody Exception To *Heck*

While this Court has not decided whether *Heck* "is waivable," it has assumed it is a waivable, procedural defense. *Greathouse v. Meddaugh*, 2023 WL 5439456, at *3 (2d Cir. 2023) (summary order) ("In this case, we assume without deciding that the *procedural bar* is waivable[.]") (Emphasis added). The majority of circuits —Third, Fifth, Seventh, Ninth, and Tenth— hold *Heck* is a non-jurisdictional defense that can be forfeited. *See Vuyanich v. Smithton Borough*, 5 F.4th 379, 389 (3d Cir. 2021); *Colvin v. LeBlanc*, 2 F.4th 494, 498-99 (5th Cir.

[10] New York district courts have thus sustained claims under the diligence discovery rule that were brought, as here, 30 years after the injury. *See e.g. Pipitone v. City of New York*, 57 F. Supp.3d 173, 189 (E.D.N.Y. 2014) (Dearie, J).

2021); *Polzin v. Gage*, 636 F.3d 834, 837-38 (7th Cir. 2011); *Washington v. Los Angeles Cty. Sheriff's Dep't*, 833 F.3d 1048, 1056 (9th Cir. 2016) ("[C]ompliance with *Heck* most closely resembles the mandatory administrative exhaustion of PLRA claims, which constitutes an affirmative defense and not a pleading requirement."); *Johnson v. Spencer*, 950 F.3d 680, 697-98 (10th Cir. 2020) (same).[11]

In accordance with the majority view, the Defendants here are equitably estopped from invoking the *Heck* defense. Maddix's FAC details how the KCDAO suppressed critical *Brady* and *Giglio* material and used false or misleading evidence and argument at Maddix's trial and then deceived Maddix and every court to review his conviction for the next 19 years. The FAC plausibly alleges Maddix justifiably relied on the KCDAO's representations that no such material existed as was legally entitled. *See e.g. Su v. Filion*, 335 F.3d 119, 128 (2d Cir. 2003) ("[I]t would be an unreasonable application of federal law, as determined by the Supreme Court, to fault [him] for not proceeding … on the

[11] In contrast, the "minority view" is *Heck* is a jurisdictional rule[,]" *Topa v. Melendez*, 739 Fed.Appx. 516, 518 (11th Cir 2018). The First, Sixth, Eleventh and D.C. Circuits have suggested *Heck* is jurisdictional. *See O'Brien v. Town of Bellingham*, 943 F.3d 514, 528-29 (1st Cir. 2019) ("Whether Heck bars § 1983 claims is a jurisdictional question that can be raised at any time during the pendency of litigation"); *Smith v. Burdette*, No. 18-5670, 2019 WL 2713138, at *2 (6th Cir. April 26, 2019) (referring to dismissal under Heck as "a dismissal on jurisdictional grounds"); *Dixon v. Hodges*, 887 F.3d 1235, 1237 (11th Cir. 2018) (same); *Best v. Kelly*, 39 F.3d 328, 330 (D.C. Cir. 1994) (same).

assumption that the prosecutor is a liar.”). This is thus one of those rare cases where equitable estoppel may be maintained against a government entity.

Alternatively, even if the *Heck* defense could be considered, Maddix qualifies for the non-custody exception to *Heck*. In *Heck*, a divided Supreme Court held a prisoner seeking § 1983 damages for wrongful conviction or conduct that would render his conviction invalid was required to show his conviction had been invalidated. “[T]he rule created by the Supreme Court in *Heck* is an accrual rule designed to avoid inconsistent results and new avenues of collateral attack.” *Cotton v. Noeth*, 96 F.4th 249, 257 (2d Cir. 2024).

In a concurring opinion in *Heck* by Justice Souter, joined in by three justices, Judge Souter reasoned that the majority’s analysis would not apply in the case of a former State criminal defendant who either had not been sentenced to any imprisonment or who was no longer in custody. Justice Souter reasoned that refusing to recognize this type of exception would “deny any federal forum for claiming a deprivation of federal rights ....” *Heck*, 512 U.S. at 500.

Critically, Justice Souter did not see “any policy reflected in a congressional enactment that would justify denying to an individual federal damages … merely because he … discovers after his release from prison that … *state officials deliberately withheld exculpatory material*.” *Id.* at 502 (Emphasis added).

Four years later, in *Spencer v. Kemna*, 523 U.S. 1 (1998), a majority of Justices endorsed Justice Souter's non-custody exception to *Heck*. The issue in *Spencer* was whether a habeas petitioner could bring a procedural challenge to his previous parole revocation where his sentence had expired and he no longer was subject to revocation. Five Justices, in three separate opinions, agreed that *Heck* did not apply at all because the petitioner was no longer in State custody. Justice Souter, in a concurrence joined by Justices O'Connor, Ginsburg and Breyer, reasoned:

> [A] former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy …. After a prisoner's release from custody, the habeas statute and its exhaustion requirement have nothing to do with his right to any relief.

*Spencer*, 523 U.S. at 21.

In a separate concurrence, Justice Ginsburg explained "individuals without recourse to the habeas statute because they are not 'in custody' (people merely fined or whose sentences have been fully served, for example) fit within § 1983's 'broad reach.'" *Id.* at 21 (emphasis added), quoting *Heck*, 512 U.S. at 503 (Souter, J., concurring). Justice Stevens, dissenting from the result, stated: "Given the Court's holding that petitioner does not have a remedy under the habeas statute, it is perfectly clear, as Justice Souter explains, that he may bring an action under 42 U.S.C. § 1983." *Id.* at 25 n.8.

In accordance with this reasoning, under Second Circuit law, *Heck* does not bar a § 1983 action by a former state prisoner like Maddix who is no longer in custody and thus cannot raise his constitutional claims in a federal habeas corpus proceeding. *See e.g. Wiggins v. Mellia*, 2023 WL 6222303, at *2 (2d Cir. Sept. 26, 2023) ("There is … a narrow exception to the *Heck* bar that permits a § 1983 suit where federal habeas relief is unavailable."); *Teichmann v. New York*, 769 F.3d 821, 829-30 (2d Cir. 2014) (Calabresi, J., concurring) ("The law in this Circuit … holds —whether correctly or not— that *Heck* does not bar § 1983 claims when habeas is unavailable, at least so long as the unavailability was not intentionally caused by the plaintiff …. Indeed, it is only because of …seemingly binding Circuit cases that in *Poventud v. City of New York* [715 F.3d 57, 62 (2d Cir. 2013)] the panel majority (as opposed to the *en banc* majority) reached the *Heck*-habeas issue that led to *en banc* consideration in the first place."). This is also the majority rule among other circuits.[12]

Thus, the purpose of the *Heck* exception is to give plaintiffs like Maddix, who through no fault of his own were unable to pursue federal habeas corpus, *a federal*

[12] Even in the minority of circuits that do not recognize the *Heck* non-custody exception, there have been vehement dissents declaring their circuits were on the wrong side of the circuit divide. *See e.g. Wilson v. Midland County, Texas*, 116 F.4th 384, 421 (5th Cir. 2024) (Willett, J., dissenting) ("Our circuit has been on the wrong side of this fateful split for almost a quarter-century. Today, we squander the opportunity to take '[t]he better view' of *Heck* by holding that 'a former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement."), *cert. denied*, 2026 WL 858442 (March 30, 2026).

*forum* to raise their constitutional claims. *See e.g. Jenkins v. Haubert*, 179 F.3d 19, 26 (2d Cir. 1999) ("The concurring opinions in *Spencer* …. revealed that five justices hold the view that, where federal habeas corpus is not available to address constitutional wrongs, § 1983 must be."); *Poventud v. City of New York*, 750 F.3d 121, 163 (2d Cir. 2014) (*en banc*) (Jacobs, J., dissenting) ("The motivating concern [on which the non-custody exception is based] was that circumstances beyond the control of a criminal defendant might deprive him of the opportunity to challenge a federal constitutional violation in federal court."); *Teichmann v New York*, 769 F.3d 821, 825 (2d Cir. 2014) (Calabresi, J.) ("The animating rationale of this result was stated to be that "some federal remedy—either habeas corpus or § 1983—must be available" to redress constitutional violations.").

What remains unsettled are the precise parameters of the non-custody exception. At least 13 district courts recognize the exception can be invoked any time federal habeas relief is unavailable.[13] In contrast, eight district courts

[13] *Kates v. New York*, 2024 WL 3228051, at *2 (W.D.N.Y. June 27, 2024) (Larimer, J.); *Hurd v. City of New York*, 2019 WL 4696364, at *3 (E.D.N.Y. Sept. 26, 2019) (Matsumoto, J.); *Cox v. City of New Rochelle*, 2019 WL 3778735, at *3 n. 2 (S.D.N.Y. Aug. 12, 2019) (Karas, J.); *Penn v. New York State*, 2018 WL 10670473, at *1 (S.D.N.Y. July 17, 2018), n. 3 (Schofield, J.); *Morgan v. City of New York*, 2017 WL 6561161, at *4 n. 2 (E.D.N.Y. Dec. 22, 2017) (Johnson, J.); *Jeanty v. City of Utica*, 2017 WL 6408878, at *4 (N.D.N.Y. Aug. 18, 2017) (Sannes, J.); *John v. Lewis*, 2017 WL 1208428, at *7 (E.D.N.Y. Mar. 31, 2017) (Chen, J.); *Chillemi v. Town of Southhampton*, 943 F. Supp.2d 365, 375 (E.D.N.Y. 2013) (Spatt, J.); *Hope v. City of New York*, 2010 WL 331678, at *2 (E.D.N.Y. Jan. 22, 2010) (Cogan, J.); *Houston v. City of New York*, 2013 WL 1310554, at *3 (E.D.N.Y. Mar. 28, 2013) (Dearie, J.); *Barmapov v. Barry*, 2011 WL 32371, at *4 (E.D.N.Y. Jan. 5, 2011) (Mauskopf, J.); *Hardy v. Fischer*, 701 F.Supp.2d 614, 620 n.6 (S.D.N.Y. 2010) (Stein, J.); *Davis v. Travis*, 07 CV 3047 (WHP), 2008 U.S. Dist. LEXIS 99801, *6 (S.D.N.Y. Dec. 3, 2008).

recognize the exception when: (1) habeas was never reasonably available to the plaintiff through no lack of diligence; or (2) the plaintiff was in custody too briefly to enable him to pursue habeas relief.[14]

Under the first line of case law, because Maddix is no longer in custody or on parole he cannot avail himself of federal *habeas corpus* relief and is thus entitled to invoke the non-custody exception. *See Harvey v. People of the City of New York,* 435 F. Supp.2d 175, 177 (E.D.N.Y. 2006) (Gershon, J.) ("[T]he petitioner must be in custody pursuant to the challenged judgment" to obtain federal habeas corpus relief).

Under the second line of case law, Defendants' suppression of *Brady* and *Giglio* material, use of false arguments at trial, repeated misrepresentations to Maddix, and 30-year suppression and coverup rendered *habeas* review unavailable to him through no fault of his own. Indeed, considering Defendants' repeated misrepresentations, "it would be an unreasonable application of federal law, as determined by the Supreme Court, to fault [Maddix] for not proceeding

[14] *Wilson v. Celestin*, 2019 WL 2211062, at *2 (E.D.N.Y. May 22, 2019) (Brodie, J.); *Opperisano v. P.O. Jones*, 286 F.Supp.3d 450, 459-60 (E.D.N.Y. 2018) (Brodie, J.); *Webster v. Himmelbach*, 271 F.Supp.3d 458, 469 (W.D.N.Y. 2017) (Wolford, J.); *Artec Constr. and Dev. Corp. v. City of New York*, 2017 WL 5891817, at *5 (S.D.N.Y. Nov. 28, 2017) (Failla, J.); *Jean–Laurent v. Cornelius*, 2017 WL 933100, at *6 (S.D.N.Y. Mar. 8, 2017) (Koeltl, J.); *Sanders v. Williams*, 2015 WL 7963135 (S.D.N.Y. Nov. 10, 2015) (Dolinger, M.J.), *report and recommendation adopted,* 2015 WL 8073810 (S.D.N.Y. Dec. 4, 2015); *Sanders v. Williams*, 2015 WL 7963135, at *5 n. 2 (Crotty, J.); *Scott v. City of White Plains*, 2012 WL 1267873, at *3 (S.D.N.Y. Apr. 10, 2012) (Forrest, J.); *Shahzad v. County of Nassau*, 2016 WL 11540145, at *12 (E.D.N.Y. Mar. 31, 2016).

… on the assumption that the prosecutor is a liar." *Su v. Filion*, 335 F.3d 119, 128 (2d Cir. 2003).

When Maddix finally discovered the *Brady/Giglio* violations, he could not bring a federal habeas petition because he could no longer satisfy the "in custody" requirement for federal habeas corpus, having been released from prison and discharged from parole. Defendants' actions forever precluded Maddix from obtaining federal habeas review of his claims, and it would be a travesty to allow those same Defendants to block Maddix from the only remaining federal remedy he has available.

In the court below, Defendants argued Maddix was precluded from invoking the *Heck* non-custody exception based on three district court cases involving pro se plaintiffs who, aware of their constitutional claims from the moment of their arrests and throughout their incarceration, strategically forfeited state and federal remedies while in prison and then, after their release, sought invoke the *Heck* non-custody exception. *See Chapman v. Fais*, 540 F.Supp.3d 304 (E.D.N.Y. 2021) (Cogan, J.), *Leach v. City of New York*, 2022 WL 4468288 (E.D.N.Y. Sept. 26, 2022) (Hall, J), and *Palmenta v. Blank*, 2018 WL 4516676 (D. Conn. Sept. 20, 2018). Under those narrow circumstances, the *Chapman*, *Leach*, and *Palmenta* courts held the former prisoners could not invoke the *Heck* non-custody exception.

But in contrast to those prisoners, Maddix was unaware of his constitutional claims throughout the entirety of his incarceration, and unable to pursue state or federal relief while incarcerated because prosecutors repeatedly deceived him with their false representations that no *Brady/Giglio* existed, and he "cannot be faulted for relying on that representation" *Banks v. Dretke*, 540 U.S. 668 at 693 (2004). Further, unlike the *Chapman*, *Leach* and *Palmenta* plaintiffs, Maddix diligently pursued all available state and federal remedies while in prison but was precluded from raising his constitutional claims because of several government actors' suppression, misrepresentation and interference with his post-conviction efforts to overturn his conviction.

Not a single Second Circuit case holds that such a diligent, victimized plaintiff could be barred from invoking the *Heck* non-custody exception because he did not first file a C.P.L. § 440.10 motion, which is not even required under § 1983. *See e.g. Jenkins v. Herbert*, 179 F.3d 19, 22 (2d Cir. 1999) ('[T]he Supreme Court has consistently held that courts should not impose an exhaustion requirement on § 1983."), *quoting Patsy v. Florida Bd. of Regents*, 457 U.S. 496, 502 (1982); *Leather v. Eyck*, 180 F.3d 420, 423 (2d Cir. 1999) (after noting that the plaintiff had elected not to appeal his State conviction, went on to uphold his right to pursue money damages under § 1983).

In fact, requiring a victimized plaintiff like Maddix to exhaust state court remedies in order to invoke the *Heck* non-custody exception effectively nullifies the very policy concern the exception was meant to address, and would serve to encourage continued prosecutorial misconduct. The whole point of the exception is to give a plaintiff, who through no fault of his own was unable to purse federal habeas corpus, a federal forum to raise his constitutional claims. But if a victimized plaintiff is required to first file a C.P.L. § 440.10 motion, any later § 1983 action brought to challenge that conviction could be barred under *Rooker-Feldman, res judicata,* and collateral estoppel principles.

In other words, deeming exhaustion of state remedies a prerequisite to diligent plaintiffs seeking to invoke the *Heck* non-custody exception would result in the very wrong the exception was recognized to prevent in the first place: depriving a plaintiff of federal review.

### 2. Equitable Estoppel Bars Defendants from Raising The Statute of Limitations Defense And, In Any Event, Under The Federal Accrual And Diligence-Discovery Rules, Maddix's Claims Did Not Accrue Until December 2024 When He Discovered His Constitutional Injuries

For the same reasons discussed above, pp. 45, 48, Defendants' misconduct and 30-year coverup equitably estop them from raising any statute of limitation defense with respect to the accrual or timeliness of Maddix's lawsuit.

Additionally, Maddix's action is timely under the diligence-discovery rule. Where the *Heck* rule applies, the statute of limitations normally begins to run from the date a plaintiff's conviction is vacated. *See e.g. Poventud v. City of New York*, 750 F.3d 121, 130 (2d Cir. 2014) ("[A] § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated."), *citing Heck* 512 U.S. at 489-90. However, the Supreme Court established that rule with respect *to inmates who had access to federal habeas corpus* to challenge their convictions, and whose vacatur of their convictions was a prerequisite to bringing a § 1983 action. Neither the Supreme Court nor this Court has ever considered when the statute of limitations would accrue for non-custodial individuals who were not subject to *Heck*.[15]

When the *Heck* rule does not apply, the accrual of such a claim is logically subject to the general rule applicable in § 1983 actions. Generally speaking, a § 1983 claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of his action. Thus, "[t]he crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York,* 632 F.2d 185, 191, 192 (2d Cir. 1980).

[15] One district court held the statute of limitations begins for *Heck* non-custody purposes when the previously incarcerated plaintiff is released from prison but assumed the plaintiff-prisoner, unlike Maddix, was fully aware of the basis for his lawsuit when he was released. *Opperisano v. P.O. Jones*, 286 F. Supp.3d 450 (E.D.N.Y. 2018) (Brodie, J.).

As established by the FAC, Maddix had no indication that Reeves suppressed the *Brady/Giglio* material. Further, the KCDAO continued to conceal the *Brady/Giglio* material from Maddix and every court to review his case. Even after Maddix's release from prison in 2012, he lacked any knowledge of what had taken place in his case until December 2024 when he was contacted by a researcher who uncovered the misconduct. Thus, under either general accrual rules or the diligence-discovery rule, Maddix's claims did not accrue until December 2024, when he learned or had reason to know of his injuries.

### B. The *Rooker-Feldman* Doctrine Is Inapplicable To Maddix's <u>Injuries Occurring Before And After The State Court Judgment</u>

"[C]ourts should keep one thing in mind when *Rooker-Feldman* is raised: it will almost never apply." *Hunter v. McMahon*, 75 F.4th 62, 67 n. 4 (2d Cir. 2023) (citation omitted). The *Rooker-Feldman* doctrine applies in a given case only if four requirements are met: (1) "the federal-court plaintiff must have lost in state court[;]" (2) "the plaintiff must complain of injuries caused by a state-court judgment[;]" (3) "the plaintiff must invite district court review and rejection of that judgment[;]" and (4) "the state-court judgment must have been rendered before the district court proceedings commenced." *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005).

*Rooker-Feldman* does not preclude Maddix's § 1983 action to the extent it seeks damages for injuries *preceding* the state court judgment. *See e.g. McKithen*

*v. Brown*, 481 F.3d 89, 98 (2d Cir. 2007) ("[G]iven that McKithen in federal court seeks redress for an injury that existed in its exact form prior to the state-court judgment, he cannot be complaining of an injury 'caused by' the state court. Rather, the preexisting injury in this case is properly understood to have been 'simply ratified, acquiesced in, or left unpunished by [the state court].'"); *Dorce v. City of New York*, 2 F.4th 82, 104 (2d Cir. 2021) ("In other words, plaintiffs are permitted to seek damages for injuries caused by a defendant's misconduct in procuring a state court judgment, but not for injuries directly caused by that judgment.").

Likewise, *Rooker-Feldman* does not bar Maddix's lawsuit to the extent it seeks damages for Defendants' post-conviction coverup and denial of his right to petition the courts. *Target Media Partners v. Specialty Mktg. Corp.*, 881 F.3d 1279, 1286 (11th Cir. 2018) ("[I]t's difficult to imagine a case where a federal court could be barred by *Rooker–Feldman* from hearing a claim that arose only after the relevant state court decision had been issued …. This temporal sequence forecloses the applicability of *Rooker– Feldman* and removes our need to inquire into whether the claim presented is identical to or inextricably intertwined with a previously decided state court claim. A claim about conduct occurring after a state court decision cannot be either the same claim or one inextricably intertwined with that state court decision and thus cannot be barred under *Rooker–Feldman*.")

### C. <u>Prosecutorial Immunity Does Not Bar Maddix's *Monell* Claim</u>

Counts I, III, and VII of the FAC raised predicate constitutional claims that Maddix alleged Defendants were liable for by virtue of their *Monell* policies, customs, and practices. *See* A-36 at ¶¶ 125-127 (Count I); A-39-40 at ¶¶ 146-148 (Count III); and A-80 at ¶¶ 323-325 (Count VII). Yet the district court erroneously found Maddix raised these claims under a respondeat superior theory, A-366-367, when in truth, Maddix <u>never</u> raised such a claim with respect to these counts.

The district court went on to state in *dictum* that even if these claims "were not premised on a theory of *respondeat superior*, they still would fail because they are predicated on the conduct of ADA Reeves, which is entitled to absolute immunity." A-367 n. 8. This conclusion is contrary to the law in this Circuit. In *Anilao v. Spota*, 27 F.4th 855, 874 n. 14 (2d Cir. 2022), this Court squarely held a prosecutor's entitlement to absolute immunity does not bar a claim against a municipality: "To the extent the county suggests that it cannot be liable for [prosecutors'] conduct during the judicial phase because of their absolute immunity, that argument is squarely foreclosed by our precedent. *See Pinaud v. County of Suffolk*, 52 F.3d 1139, 1153 (2d Cir. 1995) ("Since municipalities do not enjoy immunity from suit —either absolute or qualified—under § 1983, [the plaintiff's] malicious prosecution claim against the County of Suffolk is not barred by prosecutorial immunity." (quotation marks omitted).

This makes perfect sense. Absolute immunity simply prevents a prosecutor from being sued *individually* for violating a plaintiff's rights. It does not equate with a legal finding that the violation did not occur. Sustaining a prosecutor's absolute immunity simply means that for *individual liability* purposes, the prosecutor's conduct falls under his role as an advocate and the prosecutor is thus protected by absolute immunity from a civil lawsuit in his personal capacity. The prosecutor's conduct may nevertheless still be attributable to a municipality for *Monell* purposes. *See e.g. Bellamy v. City of New York*, 914 F.3d 727, 760 (2d Cir. 2019) ("In contrast to the immunity inquiry, *Monell* addresses not *whether* certain functions can open *individuals* to liability, but simply *which governmental entity* (the state or the municipality) is responsible for a given function.").

## **CONCLUSION**

The district court's dismissal of Maddix's § 1983 action should be reversed.

Dated: July 7, 2026
New York, New York

Andrew M. Stengel
The Law Firm of Andrew M. Stengel, P.C.
11 Broadway Suite 715
New York, New York 10004
Tel: 212-634-9222
Fax: 212-634-9223
Email: andrew@stengellaw.com

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 13,911 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

# SPECIAL APPENDIX

## TABLE OF CONTENTS

| | Page |
|---|---|
| Memorandum and Order of the Honorable Hector Gonzalez, dated April 8, 2026 .................. | SPA-1 |
| Judgment, dated April 9, 2026 .................................. | SPA-19 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

WILLIE MADDIX,

Plaintiff,

v.

THE CITY OF NEW YORK *et al.*,

Defendants.

**MEMORANDUM & ORDER**
25-CV-1909 (HG)

**HECTOR GONZALEZ**, United States District Judge:

Plaintiff Willie Maddix brings this action against Defendants City of New York (the "City"), Marriott Hotel Services, Inc., and Marriott International, Inc. (collectively, the "Marriott Defendants"). Plaintiff alleges several constitutional violations under 42 U.S.C. § 1983 and one related state law claim, asserting that Defendants violated his rights under the United States Constitution and New York Constitution by failing to disclose *Brady* material during Plaintiff's state trial in 1994, and covering up those same alleged violations in the years since. ECF No. 5.[1]

Currently before the Court are two motions to dismiss: the City's motion, ECF Nos. 28, 30 (City's Motion to Dismiss and Memorandum) and the Marriott Defendants' motion, ECF Nos. 31, 32 (Marriott Defendants' Motion to Dismiss and Memorandum). Defendants bring their motions pursuant to Rule 12(b)(6).

For the reasons that follow, Defendants' motions are GRANTED.

[1] Unless otherwise indicated, when quoting cases and the parties' papers, the Court omits all internal quotation marks, alteration marks, emphases, footnotes, and citations. The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

## BACKGROUND[2]

### I. Relevant Facts

In August 1994, Plaintiff was convicted after a jury trial of criminal possession of a weapon in the second degree in connection with a shooting that resulted in the death of Jose Felix and an injury to Larry Butcher. *See* ECF No. 5 ¶¶ 20, 78–79. Two witnesses implicated Plaintiff in the shooting: Larry Butcher, one of the shooting victims, and Felix DeJesus, an eyewitness. *See id.* ¶ 70.

Plaintiff alleges that, on July 30, 1994, the court issued a material witness warrant for DeJesus's arrest and that the assistant district attorney prosecuting his case, Kyle Reeves ("ADA Reeves"), "illegally" and "secretly imprisoned [DeJesus] against his will in a Brooklyn hotel room . . . to coerce his trial testimony." ECF No. 5 ¶¶ 3, 51–52, 61. Plaintiff further alleges that ADA Reeves "conveyed to DeJesus, in sum and substance, that if DeJesus testified in accordance with Reeves's case narrative, DeJesus would be released from custody" and that "DeJesus's release from custody was thus dependent on his cooperation against Maddix." *Id.* ¶¶ 59–60. Plaintiff claims that "Reeves's coercion of DeJesus's trial testimony was *Brady/Giglio* material Reeves was obligated to disclose to Maddix and his attorney." *Id.* ¶ 62.

At trial, DeJesus "testif[ied] against" Plaintiff. ECF No. 5 ¶ 3. Blutcher also testified against Plaintiff. *Id.* ¶ 70. Ultimately, the jury found Plaintiff guilty. *Id.* ¶ 78.

Plaintiff was released from custody on August 29, 2012. *Id.* ¶ 100. More than 12 years after he was released, on December 18, 2024, Plaintiff first discovered the alleged *Brady/Giglio*

---

[2] The Court "recite[s] the substance of the allegations as if they represented true facts, with the understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this stage what are the true facts." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021).

material, and the Kings County District Attorney's Office's ("KCDA") alleged subsequent suppression of that material, through a public records request made by a third party. ECF No. 5 ¶ 103.

**II. Procedural History**

In the years following Plaintiff's trial and conviction, his conviction has not been reversed or otherwise invalidated. Plaintiff commenced this action on April 8, 2025, by filing a complaint against the City, Marriott Defendants, and ADA Reeves.[3] *See* ECF No. 1. About two weeks later, Plaintiff amended his complaint. *See* ECF No. 5 (Amended Complaint).

The Amended Complaint asserts seven causes of action. Plaintiff asserts three causes of action against both the City and Marriott Defendants: a denial of a fair trial claim (Claim I); a substantive due process claim (Claim III); and a conspiracy claim, alleging Defendants conspired to violate Plaintiff's constitutional rights (Claim VII). As to the City alone, Plaintiff asserts two municipal liability (*Monell*) claims (Claim IV and Claim V). Finally, Plaintiff brings two further claims against the Marriott Defendants: a *Monell* claim (Claim VI) and a New York State constitutional due process claim (Claim VIII). *See generally id.*

On June 27, 2025, the Marriott Defendants filed a pre-motion letter in anticipation of their motion to dismiss the Amended Complaint. *See* ECF No. 24. The Court then ordered Plaintiff to "address whether he believes the amended complaint can be further amended to address the issues" raised in the Marriott Defendants' letter. June 30, 2025, Text Order. After the City filed a similar pre-motion letter on July 14, 2025, *see* ECF No. 25, the Court again

[3] Plaintiff initially sued ADA Reeves, *see* ECF No. 1, but Plaintiff "agree[d] to voluntarily discontinue [Claim II] (First Amendment Right of Access) and to dismiss Defendant [] Reeves" and to assert claims against only the City and Marriott Defendants, *see* ECF Nos. 21, 23.

ordered Plaintiff to "address whether Plaintiff believes the complaint can be amended to address the issues raised in" the City's letter, July 16, 2025, Text Order.

In response to those Orders, Plaintiff informed the Court that "the allegations in the [Amended Complaint] are sufficient to establish [the Defendants'] liability." ECF No. 26 at 5 n.3. On July 24, 2025, the Court acknowledged that "Plaintiff's response to Defendants' letters states that Plaintiff does not intend to further amend the complaint." July 24, 2025, Text Order. Less than a week later, Plaintiff confirmed that "he does not intend to amend the complaint." ECF No. 27 at 1.

On September 2, 2025, Defendants filed their respective motions to dismiss pursuant to Rule 12(b)(6). *See* ECF Nos. 28, 30–32. Plaintiff filed oppositions to each motion on October 1, 2025, *see* ECF Nos. 34 (Opposition to City); 35 (Opposition to Marriott Defendants), and Defendants filed their respective replies on October 14, 2025, *see* ECF No. 36 (City's Reply), and October 15, 2025, *see* ECF No. 37 (Marriott Defendants' Reply).

## LEGAL STANDARD

Defendants move to dismiss Plaintiff's Amended Complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under this Rule, a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is plausibly alleged 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matzell v. Annuci*, 64 F.4th 425, 433 (2d Cir. 2023) (quoting *Iqbal*, 556 U.S. at 678). In making this assessment, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from

those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). The Court must, however, disregard any "conclusory allegations, such as formulaic recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678. A pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.*

## DISCUSSION

The Court begins by addressing two preliminary hurdles that Plaintiff must overcome with respect to his claims. The parties spend considerable time in their submissions arguing, first, why the bar set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994), and second, whether the statute of limitations should, or should not, apply to Plaintiff's claims. *See, e.g.,* ECF No. 30 at 12–19; ECF No. 32 at 14–21; ECF No. 34 at 18–28. The Court discusses the applicability of the *Heck* bar and the statute of limitations before turning to Defendants' arguments concerning the substance of Plaintiff's claims.

### I. Preliminary Hurdles

#### *A. The Heck Bar*

Under *Heck*, if a plaintiff "seeks damages in a § 1983 suit" and a judgment in his favor "would necessarily imply the invalidity of his conviction or sentence . . . the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. at 487. Whether *Heck* applies to circumstances like those seen here—where a non-custodial plaintiff brings a § 1983 case that necessarily challenges the validity of his conviction but has not taken steps to attack the conviction's validity through collateral attack—is an open question in this Circuit. *Compare, e.g., Chapman v. Fais*, 540 F. Supp. 3d 304, 307–08 (E.D.N.Y. 2021) (finding suit *Heck* barred where plaintiff "deliberate[ly]" chose to file § 1983

action "over the established procedures to obtain a formal vacatur of a conviction") *with, e.g., John v. Lewis*, No. 15-cv-5346, 2017 WL 1208428, at *7 (E.D.N.Y. Mar. 31, 2017) ("It is Second Circuit law that a plaintiff not in State custody, who thus does not have a *habeas corpus* remedy available, may bring a § 1983 action, even if a successful claim would 'necessarily imply the invalidity of his conviction.'") (quoting *Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir. 1999)).

The Court does not endeavor to answer that open question here. Instead, it is persuaded by Judge Calabresi's concurrence in *Teichmann v. New York* which states that "many cases . . . can be disposed of based on well-settled principles" and "it is generally desirable . . . to decide them on [] non Heck grounds." 769 F.3d 821, 829 (2d Cir. 2014) (Calabresi, J., concurring). Accordingly, the Court declines the parties' invitation to "try to read the . . . tea leaves," *Packer ex rel. 1-800-Flowers.com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 54 (2d Cir. 2024), and foregoes addressing *Heck* questions in favor of "well-settled principles," *Teichman*, 769 F.3d at 829.[4]

### *B. The Statute of Limitations*

"The statute of limitations for [§] 1983 claims brought in a federal court in New York is three years from the date the underlying constitutional violation occurred." *Opperisano v. P.O. Jones*, 286 F. Supp. 3d 450, 463 (E.D.N.Y. 2018). However, for "[§] 1983 damages claims

---

[4] The Court has neither the occasion nor need to address the parties' arguments regarding equitable estoppel or the *Rooker-Feldman* doctrine because it concludes that Plaintiff fails to state a claim for which relief can be granted. *See infra* Part II.A.

The Court also acknowledges Plaintiff's and the City's letters concerning the Supreme Court's recent decision in *Oliver v. City of Brandon*, 607 U.S. ___ (2026), issued on March 20, 2026, *see* ECF Nos. 38, 39. However, *Oliver* has no bearing on the case before the Court, as *Oliver* concerns the applicability of the *Heck* bar to prospective relief and does not involve a collateral attack on the petitioner's conviction. The Court further acknowledges Plaintiff's and the City's letters concerning the Supreme Court's recent denial of *certiorari* in *Wilson v. Midland County*, No. 24-672, 2026 WL 858442 (Mar. 30, 2026), *see* ECF Nos. 40, 41, but declines to address them for the reasons set forth in this section.

based on unconstitutional convictions or sentences," claims "'do[] not accrue until the conviction or sentence . . . has been invalidated.'" *Id.* (quoting *Heck*, 512 U.S. at 490). With respect to exceptions to *Heck*, the statute of limitations accrues when "habeas [relief] is no longer available, despite due diligence." *Id.* at 464. Here, Plaintiff's conviction has neither been reversed nor invalidated, and while his claims are based on an alleged constitutional violation, *see generally*, ECF No. 5, there is no constitutional violation in fact. Moreover, habeas relief is no longer available because he was released from prison in August 2012. *Id.* ¶ 100; *Huang v. Johnson*, 251 F.3d 65, 75 (2d Cir. 2001); *accord Smith v. Duquesnay*, No. 07-cv-2795, 2012 WL 1116450, at *1 n.1 (E.D.N.Y. Mar. 30, 2012) (acknowledging that the Second Circuit has "specifically noted that no habeas remedy lies for an individual that has been released from custody"). Thus, Plaintiff's claims have either not accrued or have expired, at the very latest, on August 29, 2015. *See* ECF No. 30 at 16; *Opperisano*, 286 F. Supp. 3d at 463.

Defendants each argue that Plaintiff's claims are time-barred. *See* ECF No. 30 at 16–19; ECF No. 32 at 16–21. Plaintiff counters that the statute of limitation should be tolled, asserting that the diligence-discovery rule or equitable estoppel apply. *See* ECF No. 34 at 13, 28; ECF No. 35 at 17–22. At the motion to dismiss stage, a "dismissal is appropriate only if a complaint clearly shows the claim is out of time." *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999). Here, the Parties' arguments on tolling, the diligence-discovery rule, and equitable estoppel raise a question of whether the Amended Complaint is time-barred on its face. However, the Court need not resolve those issues at this juncture because, as set forth below, Plaintiff has not plausibly alleged a constitutional injury sufficient to state a claim under § 1983. *See infra* Part II.A; *see also Venticinque v. Brown*, No. 09-cv-2861, 2010 WL 3824122, at *1–3 (E.D.N.Y. Sept. 23, 2010) (addressing the merits of plaintiff's § 1983 claim despite the fact that

it was likely time-barred because "[e]ven if the court ignored the statute of limitations, the action still fails to state a claim for which relief can be granted").

**II. Plaintiff's Substantive § 1983 Claims**

Preliminary hurdles aside, Plaintiff's claims under § 1983 and related state law are predicated on an alleged *Brady* violation prior to Plaintiff's 1994 trial and the alleged subsequent coverup. To maintain a claim under § 1983: "(1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994).

*A. Plaintiff Fails to Plausibly Allege Constitutional Injury*

i. Defendants did not Violate *Brady*

Plaintiff's *Brady*-related claims are premised on his assertion that the KCDA's failure to disclose DeJesus's hotel stay amounts to a violation of the prosecutor's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). However, as further explained below, Plaintiff's claims fail because the relevant conduct did not violate *Brady* and, therefore, did not deprive Plaintiff of "rights, privileges, or immunities secured by the Constitution." *Pitchell*, 13 F.3d at 547. In any event, Plaintiff's claims fail against the Marriott Defendants because they were not "acting under color of state law." *Id.*

At bottom, Plaintiff has failed to allege any conduct that deprived him of his constitutional rights. Although Plaintiff contends that Defendants did not disclose that DeJesus stayed at a Marriott hotel for nearly three days prior to testifying at Plaintiff's trial, ECF No. 5 ¶¶ 3, 51–52, 61–80, his argument hinges on the notion that, by securing DeJesus's attendance at trial through a material witness warrant and detaining him at the hotel until he testified, ADA

Reeves coerced DeJesus's testimony. That, in Plaintiff's view, constitutes a *Brady* violation. The Court disagrees.

For Plaintiff to prevail on such a claim, he would need to allege in non-conclusory fashion that Defendants fabricated DeJesus's testimony, which he fails to do; coercion, standing alone, is insufficient absent resulting fabrication. *See Galloway v. County of Nassau*, 141 F.4th 417, 423–24 (2d Cir. 2025) (finding *Brady* violation where police officers coerced witness into signing false statement and withholding that fact from prosecutors, thereby withholding it from defendant); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (finding when "police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial"); *see also Thomas v. Mason*, No. 17-cv-626, 2023 WL 2709730, at *7 (N.D.N.Y. Mar. 30, 2023) ("There is clearly a difference between coercing [a witness] to testify and fabricating witness testimony."). Here, even when reading the Amended Complaint in the light most favorable to Plaintiff, the Court finds no indicia of fabrication in the allegations, only "the coercion leading to DeJesus's trial testimony." ECF No. 5 ¶ 3; *see also id.* ¶¶ 62, 75, 87, 95, 106.

The *Brady* violation which Plaintiff alleges stems from ADA Reeves's holding DeJesus in a Marriott hotel for nearly three days leading up to Plaintiff's trial. *Id.* ¶¶ 52, 61. During this time, Plaintiff alleges that DeJesus remained in a hotel room that was "shackled," and where officers "controlled all entry and exit[]." *Id.* ¶¶ 55–56. DeJesus was given no telephone and permitted no visitors, except for ADA Reeves and select KCDA personnel. *See id.* ¶¶ 57–58.

Plaintiff alleges that DeJesus "refused to testify during [Maddix's] trial" and that ADA Reeves informed DeJesus that he "would be released if he testified." ECF No. 5 ¶ 3. This allegation, in Plaintiff's own words, concerns only coercion. *See id.* (alleging "the prosecutor

secretly imprisoned the witness against his will . . . to coerce his trial testimony"). Thus, even when the Court reads the Amended Complaint in the light most favorable to Plaintiff, as the Court is required to do at this stage, *Roth*, 489 F.3d at 510, Plaintiff alleges facts sufficient to satisfy only one of the necessary elements to state a *Brady* claim. However, two elements—both coercion *and* fabrication—are necessary for Plaintiff's *Brady* claim to survive a motion to dismiss. *See Galloway*, 141 F.4th at 423–24; *Ricciuti*, 124 F.3d at 130; *Thomas*, 2023 WL 2709730, at *7.

Moreover, Plaintiff's allegation that ADA Reeves told DeJesus that he "would be released from custody," as long as he "testified in accordance with Reeves's case narrative,"[5] ECF No. 5 ¶ 59, reaches the same result. That is, even when read in Plaintiff's favor, Plaintiff alleges only coercion, not coercion *and* fabrication, as is required. *See Galloway*, 141 F.4th at 423–24; *Ricciuti*, 124 F.3d at 130; *Thomas*, 2023 WL 2709730, at *7. Nothing in the Amended Complaint supports even an inference that DeJesus did not testify truthfully or that ADA Reeves induced DeJesus to fabricate any portion of his testimony.[6] At most, therefore, the Amended Complaint asserts only that DeJesus's release from the hotel room was "dependent on his cooperation against Maddix," and the legal conclusion that "Reeves's coercion of DeJesus's trial testimony was *Brady/Giglio* material [that] Reeves was obligated to disclose to Maddix[.]" ECF

[5] Notably, Plaintiff fails to allege that ADA Reeves's case narrative was false. *See generally* ECF No. 5. The only non-conclusory allegations relating to falsity concern ADA Reeves's "falsely portray[ing]" DeJesus's reasons for testifying. ECF No. 5 ¶¶ 5, 46, 72, 106.

[6] Moreover, even after the City raised this argument in its Motion, ECF No. 30 at 22–25, Plaintiff still failed to address fabrication in his Opposition, *see generally* ECF No. 35. Accordingly, Plaintiff abandons any argument as to fabrication. *See Charlier v. 21 Astor Place Condo.*, No. 22-cv-05903, 2024 WL 4026253, at *8 (S.D.N.Y. Sept. 3, 2024) (deeming claims abandoned where plaintiff did not raise any contrary arguments in opposition to a motion to dismiss).

No. 5 ¶¶ 60, 62. Stated otherwise, even if the Court squints to read as much as possible from Plaintiff's allegations, it is unable to find any allegation that DeJesus's testimony was fabricated.

In short, because Plaintiff does not complain of conduct that has "deprived [him] of rights, privileges, or immunities secured by the Constitution or laws of the United States," *see Pitchell*, 13 F.3d at 547, his *Brady*-related claims must be dismissed with prejudice.[7]

#### ii. Plaintiff's Non-*Monell* Claims Against the City Fail Because they are Premised on a Theory of *Respondeat Superior*

"An individual plaintiff may sue a municipality directly under § 1983 only for constitutional deprivations inflicted pursuant to a governmental custom or policy. . . . A municipality may not be held liable under § 1983 for the actions of its employees under a theory of *respondeat superior*." *Flores v. City of Mount Vernon*, 41 F. Supp. 2d 439, 446 (S.D.N.Y. 1999). Here, Plaintiff's allegations concerning a conspiracy that denied him of the right to a fair trial and substantive due process are premised entirely on the conduct of ADA Reeves. *See* ECF No. 5 ¶¶ 118–27, 139–48, 317–25. And without alleging that any such conduct was undertaken pursuant to an official policy, custom, or practice, as required under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), the claims are necessarily brought under a theory of *respondeat superior*. Accordingly, even if Plaintiff were to establish an underlying constitutional violation, the claims against the City are barred as an impermissible attempt to

[7] While the Court acknowledges Plaintiff's conspiracy claim (Claim VII), it need not address it here as it is implausible based on the absence of constitutional harm. *See Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) ("Because . . . the underlying [§] 1983 cause[] of action can[not] be established, the claim for conspiracy also fails.") (citing *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)).

impose *respondeat superior* liability under § 1983. The Court therefore dismisses Claims I, III, and VII against the City.[8]

*B. The Marriott Defendants are not State Actors*

"Constitutional torts are only actionable against state actors or private parties acting 'under the color of' state law." *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) (quoting *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002)). This rule is unwaivable and is known as the "state action requirement." *Astacio v. City of New York*, 698 F. Supp. 3d 530, 535 (E.D.N.Y. 2023), *aff'd*, No. 23-7598, 2025 WL 80069 (2d Cir. Jan 13, 2025). A private party's actions are deemed state action only:

> (1) when the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); [or] (3) when the entity has been delegated a public function by the state ("the public function test").

*Barrows v. Becerra*, 24 F.4th 116, 135 (2d Cir. 2022). Taking each circumstance in turn, the Court concludes that Plaintiff fails to plausibly allege the Marriott Defendants are state actors.

First, Plaintiff fails to plead sufficiently that the "compulsion test" is satisfied. The Amended Complaint is silent as to whether the Marriott Defendants were compelled to rent rooms to the KCDA. *See generally*, ECF No. 5 ¶¶ 296–316. Marriott Defendants raise in their

---

[8] Moreover, even if Claims I, III, and VII were not premised on a theory of *respondeat superior*, they still would fail because they are predicated on the conduct of ADA Reeves, which is entitled to absolute immunity. *See Hill v. City of New York*, 45 F.3d 653, 660–62 (2d Cir. 1995) ("State prosecutors are entitled to absolute immunity for that conduct intimately associated with the judicial phase of the criminal process," including *Brady* violations.); *Solely v. Cnty. of Nassau*, No. 18-cv-377, 2022 WL 2954055, at 7 (E.D.N.Y. July 26, 2022) ("A conspiracy claim also falls within the ambit of absolute prosecutorial immunity.") (citing *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)); *McDonough v. Smith*, no. 15-cv-1505, 2022 WL 3279348, at *19 (N.D.N.Y. Aug. 11, 2022) ("The 'coercion of witnesses' is a prosecutorial activity for which absolute immunity applies.") (citing *Taylor v. Kavanaugh*, 640 F.2d 450, 452 (2d Cir. 1981)).

Motion—and Plaintiff does not contest—that the Amended Complaint contains no allegations that the Marriott Defendants were compelled to rent rooms to the KCDA. *See* ECF No. 32 at 22–23.[9] Without allegations of compulsion, the Amended Complaint suggests only arms-length commercial negotiations between the Defendants. Such garden-variety contractual arrangements do not create state action. *See Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 492 (2d Cir. 2009). Thus, Plaintiff fails to satisfy the compulsion test. *See Becerra*, 24 F.4th at 135.

Plaintiff next argues that the actions of the Marriott Defendants satisfy the "joint action test" through their alleged conspiracy with the KCDA because they "jointly engaged with the Kings County District Attorney" in their conduct. *See* ECF No. 5 ¶ 314. "To state a claim against a private entity on a [§] 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act." *Ciambriello*, 292 F.3d at 324 (2d Cir. 2002) (quoting *Spear v. Town of W. Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)). Specifically, a plaintiff must plausibly allege: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Id.* at 324–25 (citing *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)). Such a complaint must allege "particular acts or facts" rather than mere conclusory allegations. *Brewster v. Nassau Cnty.*, 349 F. Supp. 2d 540, 547 (E.D.N.Y. 2004). And such facts must detail the "joint, coordinated behavior" between the Marriott Defendants and the City evidencing they "shared a common unlawful goal" to "deprive" Plaintiff of his constitutional rights. *See Defeo v. Leibstein*, No. 16-cv-5150, 2018 WL 5777023, at *4 (E.D.N.Y. Nov. 1, 2018).

---

[9] Because Plaintiff fails to contest this point in his Opposition, he has abandoned any argument that this prong is satisfied. *See Charlier*, 2024 WL 4026253, at *8.

Plaintiff provides no "particular acts or facts" to support his argument, let alone any showing that Defendants "shared a common unlawful goal" to "deprive" Plaintiff of his rights. Instead, Plaintiff's conspiracy theory rests on speculative and conclusory allegations that the City and Marriott Defendants "explicitly and/or corruptly agreed to commit with each other, and/or other unarmed conspirators, the wrongs" and to "cover-up each other's misconduct." ECF No. 5 ¶ 318. Plaintiff has shown no agreement, tacit or otherwise, between Defendants which shows an intention to act in concert to inflict an unconstitutional injury upon Plaintiff. *See Cambriello*, 292 F.3d at 324–25. The most Plaintiff alleges is that "joint action" can be found by the mere fact that the Marriott Defendants implemented the same "custody number organizing system" as the KCDA (*i.e.*, tracking room reservations using the same number the KCDA used to identify individuals in custody), followed KCDA's instructions as to the rooms and to the services that should be provided to witnesses, and provided "government rates." ECF No. 5 ¶¶ 301–09, 313–14. But none of these purported allegations give any plausible indication of a conspiracy between the parties. Put simply, the Marriott Defendants offered standard hotel services to the City.[10]

Lastly, the Marriott Defendants' conduct does not satisfy the "public function test" because the act of renting of hotel rooms is private conduct innate to operation of a hotel, regardless of the renter's intent. *See Lurch v. City of New York*, No. 19-cv-11253, 2021 WL 1226927, at *3 (S.D.N.Y. Mar. 31, 2021). In *Lurch*, the court held a hotel was not a state actor because "decisions made in the day-to-day administration of a [hotel] are [not] the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public."

[10] The Court need not, and does not, address Plaintiff's aiding and abetting liability argument given "§ 1983 does not support aiding and abetting liability." *See Woods v. Chadwick*, No. 21-cv-0662, 2021 WL 12318012, at *3 n.4 (N.D.N.Y. July 19, 2021).

*Id.* Here, the circumstances presented are the same. Marriott Defendants are alleged to have rented two rooms to the KCDA and provided other services commensurate with operating a hotel. *See* ECF No. 5 ¶ 57. Consequently, the alleged conduct of the Marriott Defendants does not satisfy the public function test. *See Becerra*, 24 F.4th at 135.

In light of the foregoing, Plaintiff fails to plausibly allege that the Marriott Defendants are state actors. Accordingly, the Court hereby dismisses Counts I, III, and VII against the Marriott Defendants with prejudice.

**III. Plaintiff's *Monell* Claims Fail**

Plaintiff brings *Monell* claims against both the City and the Marriott Defendants. To state a *Monell* claim, a plaintiff must prove the following elements: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). Plaintiff fails to meet this standard.

Defendants tackle the second factor of the *Roe* test similarly, arguing that because there has been no deprivation of a constitutional right, Plaintiff fails to state a cognizable claim. *See* ECF No. 30 at 20; ECF No. 32 at 28. The Court agrees and the law is clear: "[i]t is well-settled that a *Monell* claim cannot succeed without an underlying constitutional violation." *Mastromonaco v. Cnty. of Westchester*, 779 F. App'x 49, 51 (2d Cir. 2019). Moreover, "[*Monell*] is an extension of liability, not an independent cause of action, and therefore requires an underlying constitutional violation. . . . '[Without an] underlying constitutional violation, [a court's] decision not to address the municipal defendants' liability under *Monell* [is] entirely correct.'" *Soto v. City of New York*, 132 F. Supp. 3d 424, 459 (E.D.N.Y. 2015) (quoting *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006)).

Plaintiff fails to address this factor, but the Court has already found he fails to allege a constitutional violation. *See supra* Part II.A. Because Plaintiff has not alleged an underlying constitutional violation, he therefore fails to plausibly state a cognizable *Monell* claim. *See Soto*, 132 F. Supp. 3d at 459; *Mastromonaco*, 779 F. App'x at 51.[11]

**IV. State Constitutional Due Process Claim**

Plaintiff's final claim alleges that the Marriott Defendants violated his rights under the Due Process and Equal Protection provisions of the New York Constitution. ECF No. 5 ¶¶ 326–329. Plaintiff does not allege a separate theory of subject matter jurisdiction for this claim. Instead, he invokes the Court's supplemental jurisdiction. *See id.* ¶ 327 (noting this claim is brought "by virtue of [Marriott Defendants'] acts and omissions detailed above").

Although district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," 28 U.S.C. § 1367(a), such jurisdiction is discretionary, *see City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997). And a district court "may decline to exercise supplemental jurisdiction" if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). District courts may exercise their discretion in deciding whether to exercise supplemental jurisdiction over state law claims when all federal claims were dismissed at the pleading stage. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006); *see also Cangemi v. United States*, 13 F.4th 115, 133–34 (2d Cir. 2021).

---

[11] Even if Plaintiff were to plausibly allege a constitutional violation, which he has not, his *Monell* claim (Claim VI) against the Marriott Defendants would still fail, as they are not state actors and, therefore, do not meet the requirement of taking action "under color of law." *See Roe*, 542 F.3d at 36.

Here, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Since this case has progressed only to the motion to dismiss stage without the parties conducting any discovery, applying the normal presumption against supplemental jurisdiction is appropriate. *See Onibokun v. Chandler*, 749 F. App'x 65, 67 (2d Cir. 2019) ("find[ing] no abuse of discretion" in declining supplemental jurisdiction at motion to dismiss stage).

**LEAVE TO AMEND**

Plaintiff does not seek leave to amend, and, in fact, has repeatedly declined his opportunities for further amendment. *See* ECF No. 26 at 5 n.3; ECF No. 27 at 1. Accordingly, the Court dismisses Plaintiff's claims with prejudice. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [to amend] that was not made.").

Even if Plaintiff had sought leave to amend the Amended Complaint, the Court would not grant it because it would be futile. *See Jones-Bey v. Stanislov*, No. 23-cv-5599, 2024 WL 3520636, at *6 (S.D.N.Y. July 23, 2024) ("Because Plaintiff fails to allege a constitutional violation and provides no basis to conclude that any amendment could remedy [his] pleadings . . . granting Plaintiff leave to amend would be futile."). Without a viable *Brady* violation, any amendment of Plaintiff's claims would also be futile. Moreover, Plaintiff "ha[s] had multiple opportunities to allege sufficient specific facts to render his claims plausible," including in his original complaint, the Amended Complaint, and after being twice notified by the Court of the complaint's deficiencies. *See Williams v. Calderoni*, No. 11-cv-3020, 2012 WL 691832, at *8 (S.D.N.Y. 2012). Therefore, "leave to amend would be futile because [P]laintiff ha[s] already had two bites at the apple and they have proven fruitless." *Harris v. Westchester Cnty. Med. Ctr.*, No. 08-cv-1128, 2011 WL 2637429, at *4 (S.D.N.Y. July 6, 2011).

**CONCLUSION**

For the reasons set forth above, the Court GRANTS Defendants' motions, ECF Nos. 28 and 31, and DISMISSES Plaintiff's Amended Complaint in its entirety pursuant to Rule 12(b)(6). The Clerk of Court is respectfully directed to enter judgment consistent with this Order and close this case.

SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
April 8, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
WILLIE MADDIX,

Plaintiff,

v.

THE CITY OF NEW YORK et al.,

Defendants.
---------------------------------------------------------------X

JUDGMENT
25-CV-1909 (HG)

A Memorandum and Order of the Honorable Hector Gonzalez, United States District Judge, having been filed on April 8 2026, granting Defendants' motions, ECF Nos. 28 and 31, and dismissing Plaintiff's Amended Complaint in its entirety pursuant to Rule 12(b)(6); it is

ORDERED and ADJUDGED that judgment is hereby entered in favor of Defendants.

Dated: Brooklyn, New York
April 9, 2026

Brenna B. Mahoney
Clerk of Court

By: /s/Jalitza Poveda
Deputy Clerk