# 26-1246

## United States Court of Appeals
## for the Second Circuit

WILLIE MADDIX,

*Plaintiff-Appellant*,

*against*

CITY OF NEW YORK, MARRIOTT HOTEL SERVICES, INC.,
MARRIOTT INTERNATIONAL, INC., d/b/a JW MARRIOTT
ESSEX HOUSE HOTEL,

*Defendants-Appellees*,

KYLE REEVES,

*Defendant*.

On Appeal from the United States District Court
for the Eastern District of New York

## BRIEF FOR APPELLEE THE CITY OF NEW YORK

RICHARD DEARING
JAMISON DAVIES
BO MALIN-MAYOR
   *of Counsel*

August 10, 2026

STEVEN BANKS
*Corporation Counsel
of the City of New York*
100 Church Street
New York, New York 10007
212-356-0820
bmalin@law.nyc.gov

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................iii

PRELIMINARY STATEMENT............................................................1

ISSUES PRESENTED........................................................................3

STATEMENT OF THE CASE.............................................................3

    A.  Maddix's acquittal of murder and conviction for second degree weapon possession.................................................3

    B.  Maddix's appeal, motion to vacate, and habeas petition...4

    C.  The alleged pattern or practice of unlawful behavior in the Kings County DA's office between 1990 and 2013 ......5

    D.  Maddix's discovery of an alleged *Brady* violation in 2024.................................................................................7

    E.  The District Court's dismissal of Maddix's complaint.......9

SUMMARY OF ARGUMENT AND STANDARD OF REVIEW .....11

ARGUMENT.....................................................................................13

POINT I ...........................................................................................13

THE DISTRICT COURT CORRECTLY HELD THAT MADDIX FAILED TO ALLEGE AN UNDERLYING *BRADY* VIOLATION...13

    A.  Maddix has not alleged that DeJesus's credibility was material to Maddix's conviction for weapon possession. 15

    B.  Maddix has not alleged the withheld information would have caused the jury to doubt DeJesus's credibility. .......20

POINT II...........................................................................................24

## TABLE OF CONTENTS (cont'd)

Page

MADDIX'S COMPLAINT MUST BE DISMISSED FOR
MULTIPLE INDEPENDENT REASONS........................................24

    A. Maddix has no § 1983 claim under *Heck v. Humphrey*
       because his conviction remains valid. ..............................25

        1. There is no exception to *Heck* for a plaintiff who is
           released from prison without invalidating his
           conviction................................................................28

        2. Assuming there is an exception, it would not apply to
           Maddix here. ............................................................34

    B. Maddix's claim is barred by the statute of limitations.....38

CONCLUSION ...............................................................................48

CERTIFICATE OF COMPLIANCE ................................................49

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.Q.C. v. United States,*
656 F.3d 135 (2d Cir. 2011) .......................................................... 41

*Abdel-Fakhara v. Vermont,*
2023 WL 3486236 (2d Cir. May 17, 2023) .................................... 41

*Amaker v. Weiner,*
179 F.3d 48 (2d Cir. 1999) ...................................................... 26, 27

*Anderson v. City of Rockford,*
932 F.3d 494 (7th Cir. 2019) ........................................................ 21

*Arista Recs., LLC v. Doe 3,*
604 F.3d 110 (2d Cir. 2010) .......................................................... 18

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ....................................................................... 17

*Barrett v. United States,*
689 F.2d 324 (2d Cir. 1982) ..................................................... 41, 44

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ....................................................................... 18

*Bell v. Bell,*
512 F.3d 223 (6th Cir. 2008) ........................................................ 45

*Bellamy v. City of New York,*
914 F.3d 727 (2d Cir. 2019) ..................................................... 14, 16

*Biro v. Conde Nast,*
807 F.3d 541 (2d Cir. 2015) .......................................................... 18

*Bracey v. Superintendent Rockview SCI,*
986 F.3d 274 (3d Cir. 2021) .......................................................... 45

*Care One, LLC v. NLRB,*
166 F.4th 335 (2d Cir. 2026) ........................................................ 32

*Coggins v. Cnty. of Nassau,*
615 F. Supp. 2d 11 (E.D.N.Y. 2009) .............................................. 27

iii

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Cohen v. Longshore,*
621 F.3d 1311 (10th Cir. 2010) ................................................ 30, 35

*Corsello v. Verizon New York, Inc.,*
18 N.Y.3d 777 (2012) ............................................................... 46

*Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.,*
810 F.3d 861 (2d Cir. 2015) ..................................................... 24

*Dibrell v. City of Knoxville,*
984 F.3d 1156 (6th Cir. 2021) .................................................. 39

*Entzi v. Redmann,*
485 F.3d 998 (8th Cir. 2007) .................................................... 30

*Fermin v. Annucci,*
2020 WL 13017118 (E.D.N.Y. Aug. 26, 2020) .............................. 22

*Figueroa v. Rivera,*
147 F.3d 77 (1st Cir. 1998) ...................................................... 30

*Galloway v. Cty. of Nassau,*
141 F.4th 417 (2d Cir. 2025) .................................................... 21

*Gelboim v. Bank of Am. Corp.,*
823 F.3d 759 (2d Cir. 2016) ..................................................... 25

*Gilles v. Davis,*
427 F.3d 197 (3d Cir. 2005) ..................................................... 30

*Green v. Montgomery,*
219 F.3d 52 (2d Cir. 2001) ....................................................... 31, 36

*Guerrero v. Gates,*
442 F.3d 697 (9th Cir. 2006) .................................................... 35, 36

*Harden v. Pataki,*
320 F.3d 1289 (11th Cir. 2003) ................................................. 30, 35

*Harrington v. Richter,*
562 U.S. 86 (2011) .................................................................. 38

*Heck v. Humphrey,*
512 U.S. 477 (1994) ............................................................*passim*

iv

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Huang v. Johnson,*
   251 F.3d 65 (2d Cir. 2001) ...................................................... 31, 36

*Jackson v. City of Cleveland,*
   925 F.3d 793 (6th Cir. 2019) ...................................................... 21

*Jenkins v. Haubert,*
   179 F.3d 19 (2d Cir. 1999) ...................................................... 31, 36

*Jones v. Haynes,*
   2025 WL 3090549 (S.D.N.Y. Oct. 10, 2025) ................................ 43

*Jusino v. Fed'n of Cath. Teachers, Inc.,*
   54 F.4th 95 (2d Cir. 2022) ........................................................ 25

*Klein v. Martin,*
   607 U.S. 213 (2026) ............................................................ 14, 17

*Koral v. Saunders,*
   36 F.4th 400 (2d Cir. 2022) ...................................................... 47

*Kosakow v. New Rochelle Radiology Assocs.,*
   P.C., 274 F.3d 706 (2d Cir. 2001) ............................................. 26

*Kronisch v. United States,*
   150 F.3d 112 (2d Cir. 1998) .................................................. 41, 44

*Leather v. Ten Eyck,*
   180 F.3d 420 (2d Cir. 1999) .................................................. 31, 36

*Leatherman v. Tarrant Cty. Narcotics Intelligence &*
   *Coordination Unit,*
   507 U.S. 163 (1993) ................................................................ 11

*Lyall v. City of L.A.,*
   807 F.3d 1178 (9th Cir. 2015) ................................................ 30, 35

*Mallet v. New York State Dep't of Corr. & Cmty.*
   *Supervision,*
   126 F.4th 125 (2d Cir. 2025) ................................................ 39, 40

*McDonough v. Smith,*
   588 U.S. 109 (2019) ................................................ 32, 33, 37, 40

*Mooney v. City of New York,*
   219 F.3d 123 (2d Cir. 2000) ...................................................... 27

# TABLE OF AUTHORITIES (cont'd)

Page(s)

*O'Neal v. City of New York,*
196 F. Supp. 3d 421 (S.D.N.Y. 2016) .............................................. 17

*Opperisano v. P.O. Jones,*
286 F. Supp. 3d 450 (E.D.N.Y. 2018) .............................................. 40

*Pearl v. City of Long Beach,*
296 F.3d 76 (2d Cir. 2002) .............................................. 41

*People v. Arhin,*
203 A.D.2d 62 (1st Dep't 1994).............................................. 20, 21

*People v. Lundy,*
48 A.D.3d 1046 (4th Dep't 2008) .............................................. 20

*People v. Maddix,*
244 A.D.2d 432 (2d Dep't 1997).............................................. 4, 5

*People v. Sims,*
247 A.D.3d 938 (2d Dep't 2026).............................................. 38

*People v. Spruill,*
164 A.D.3d 1270 (2d Dep't 2018).............................................. 20

*Perez v. Bondi,*
166 F.4th 327 (2d Cir. 2026) .............................................. 43

*Perez v. Miller,*
2024 WL 3328588 (E.D.N.Y. July 8, 2024).............................................. 20

*Pettaway v. Nat'l Recovery Sols., LLC,*
955 F.3d 299 (2d Cir. 2020) .............................................. 12

*Pipitone v. City of New York,*
57 F. Supp. 3d 173 (E.D.N.Y. 2014) .............................................. 42

*Poventud v. City of N.Y.,*
715 F.3d 57 (2d Cir. 2013) .............................................. 31

*Poventud v. City of New York,*
750 F.3d 121 (2d Cir. 2014) .............................................. 2, 27, 31, 36

*Powers v. Hamilton Cnty. Pub. Defender Comm'n,*
501 F.3d 592 (6th Cir. 2007).............................................. 30, 34, 35

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Rotkiske v. Klemm,*
    589 U.S. 8 (2019)................................................................ 39

*Savoca v. United States,*
    2013 WL 10054392 (S.D.N.Y. Mar. 12, 2013) ................... 20, 21, 23

*Savory v. Cannon,*
    947 F.3d 409 (7th Cir. 2020) ............................................ 30, 32, 33

*Shomo v. City of N.Y.,*
    579 F.3d 176 (2d Cir. 2009) ........................................................ 39

*Singh v. Deloitte LLP,*
    123 F.4th 88 (2d Cir. 2024) ......................................................... 18

*Skinner v. Switzer,*
    562 U.S. 521 (2011)............................................................ 16, 26, 32

*Solorio v. Muniz,*
    896 F.3d 914 (9th Cir. 2018) ....................................................... 45

*Spencer v. Kemna,*
    523 U.S. 1 (1998)......................................................... 29, 30, 31, 32

*Strickler v. Greene,*
    527 U.S. 263 (1999)......................................................... 13, 15

*Teichmann v. New York,*
    769 F.3d 821 (2d Cir. 2014) .................................................*passim*

*Thompson v. Clark,*
    596 U.S. 36 (2022)........................................................... 32, 33, 37

*Turner v. United States,*
    582 U.S. 313 (2017)............................................................ 17

*United States v. Brown,*
    582 F.2d 197 (2d Cir. 1978) ....................................................... 22

*United States v. Kukoyi,*
    126 F.4th 806 (2d Cir. 2025) ...................................................... 32

*United States v. Ulbricht,*
    858 F.3d 71 (2d Cir. 2017) ......................................................... 12

vii

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*United States v. Wong,*
78 F.3d 73 (2d Cir. 1996) .............................................................. 14

*Wallace v. Kato,*
549 U.S. 384 (2007)....................................................................... 39

*Wilkinson v. Dotson,*
544 U.S. 74 (2005)..................................................................... 32, 33

*Williams v. City of New York,*
2025 WL 2782810 (E.D.N.Y. Sept. 27, 2025) .................... 42, 44, 45

*Wilson v. Johnson,*
535 F.3d 262 (4th Cir. 2008) ..................................................... 30, 35

*Wilson v. Midland Cnty., Texas,*
116 F.4th 384 (5th Cir. 2024)........................................................ 30

*Zumpano v. Quinn,*
6 N.Y.3d 666 (2006) ...................................................................... 47

## Statutes

N.Y. Criminal Procedure Law § 440.10 ................................................ 5

N.Y. Criminal Procedure Law § 620.20 ................................................ 8

N.Y. Criminal Procedure Law § 620.50 ................................................ 8

N.Y. Penal Law § 265.03.................................................................... 3

## PRELIMINARY STATEMENT

In his 1994 criminal trial, plaintiff Willie Maddix was acquitted of murder but convicted of second-degree weapon possession. He was sentenced to 5 to 15 years in prison and released in 2012.

In 2024, a researcher alerted Maddix that one of the witnesses in his trial, Robert DeJesus, may have been confined in a hotel prior to testifying under a now-discontinued practice of the Kings County District Attorney's Office (KCDA) at the time of Maddix's trial. Though the hotel custody practice and alleged *Brady* violations under the tenure of the then-District Attorney had been common knowledge for more than a decade, Maddix had never previously investigated whether any such issues could have occurred at his trial. Once he found out, he brought this § 1983 claim alleging that the KCDA's failure to disclose the use of hotel custody was a *Brady* violation. Although his complaint goes into great detail regarding purported unsavory practices of the KCDA in past decades, it provides essentially no information about Maddix's own case and how it was affected by the government's failure to disclose the hotel custody. The District Court (Gonzalez, J.), dismissed Maddix's complaint for failure to state a *Brady* claim.

This Court should affirm, as Maddix fails to state a viable *Brady* claim. Maddix's threadbare allegations regarding his trial do not

support an inference that, if the jury had known about the use of hotel custody, it would have changed its evaluation of DeJesus's testimony. And Maddix's conclusory statement that such a change would have created a reasonable probability of his acquittal on both charges, rather than only the top charge, is unsupported by any factual allegations.

Maddix's complaint also suffers from two other fundamental issues, both of which were fully briefed below and provide alternative grounds for affirmance. First, because Maddix never had his criminal conviction invalidated, his § 1983 claim is barred as an impermissible collateral attack on that conviction under *Heck v. Humphrey*, 512 U.S. 477 (1994). Although Maddix attempts to invoke a controversial exception to that rule, *see Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014), even supporters of the exception do not understand it to cover the facts here.

Second, even assuming all the preceding issues were resolved in Maddix's favor, his complaint would be years too late. Although Maddix alleges he did not know of the *Brady* violation until recently, he also alleges a wealth of publicly available information that should have led him to investigate earlier. And even the first step in such an investigation would have revealed the documents underlying his complaints here, which were discovered via a public records request.

## ISSUES PRESENTED

1. Did the District Court correctly dismiss Maddix's complaint for failure to plead a *Brady* claim, given the lack of any factual allegations showing that the withheld evidence was material to the result of his trial?

2. In the alternative, should Maddix's claim be dismissed:

> a) Because it improperly uses § 1983 to collaterally attack a valid state conviction, in violation of *Heck v. Humphrey*, 512 U.S. 477 (1994)?

> b) Because it was filed more than 12 years after the latest possible accrual date of his claim, well beyond the statute of limitations?

## STATEMENT OF THE CASE

### A. Maddix's acquittal of murder and conviction for second degree weapon possession

Maddix's complaint reveals little about the facts of his own case. From what is alleged, the case seems to have concerned a 1993 shooting incident which resulted in the death of Jose Feliz and serious injury to Larry Blutcher (A17). Maddix was charged with the murder of Feliz and with criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03) (A28 & n.12).

3

At the trial, the government presented two witnesses: Blutcher and Robert DeJesus (A27). Maddix's complaint does not explain any of the evidence at trial, beyond describing DeJesus as the prosecution's "star witness" (A14, 24, 26–27). The result of the trial was that Maddix was acquitted of murder (A28 n.12). However, he was convicted on the weapon possession charge "based in part on DeJesus's testimony" (A28).

Maddix does not allege that he was innocent of this charge or that DeJesus's testimony was false. (A27–28). He does not explain the content of DeJesus's testimony or how it related to his conviction.

### B. Maddix's appeal, motion to vacate, and habeas petition

Before Maddix's sentencing, he moved to set aside the jury verdict, arguing that the court should have precluded DeJesus's testimony because the DA lost a recording of one of DeJesus's pretrial interviews with the DA's office (A29). The court denied the motion (A29). Maddix was sentenced to 5 to 15 years in prison (A28).

Maddix appealed his conviction to the Appellate Division, Second Department, which affirmed. *People v. Maddix*, 244 A.D.2d 432, 432 (2d Dep't 1997). The Second Department noted that the trial court had given an adverse inference instruction concerning the loss of the

4

recording, and that Maddix had been provided with the interviewer's notes and an opportunity to cross-examine the interviewer. *Id.*

Maddix then moved in the trial court to vacate his conviction under CPL § 440.10, arguing that his trial attorney was ineffective and the verdict was repugnant (A29). The government opposed the motion, and the court denied it (A30).

Subsequently, Maddix filed a petition for habeas corpus in the Eastern District of New York, arguing ineffective assistance of counsel (A30). The district court denied the petition (A30). This Court then denied Maddix a certificate of appealability (A30).

All of these proceedings terminated by late 2000 (A30). Maddix was released from prison in 2012 (A31).[1]

### C. The alleged pattern or practice of unlawful behavior in the Kings County DA's office between 1990 and 2013

Around the time of Maddix's release from prison, a series of lawsuits and press reports addressed unlawful practices in the KCDA's office under the leadership of former District Attorney Charles J. Hynes, who served in that position from 1990 to 2013 (A14, 18–22, 40–58). As the

---

[1] It is not clear from Maddix's complaint why he was in prison for about 19 years, given his sentence of 5 to 15 years.

5

complaint alleges at length, at least three civil lawsuits alleged that the office was unlawfully confining material witnesses in hotels prior to trial, a practice which was confirmed by DA's office employees in at least eight depositions (A18–23, 43 & n.19, 53–54). Indeed, Hynes himself allegedly admitted to this practice in a 2013 deposition (A22, 90–101). Employees also admitted in at least two cases that the office had "no written *Brady* disclosure policy, no formal rules of behavior governing how cases would be prosecuted ... and no formal disciplinary system for investigating or disciplining prosecutors" (A48).

These alleged admissions are consistent with Maddix's allegation that dozens of other court decisions found *Brady* violations by the office during Hynes's tenure (A50). A number of these cases found specifically that ADA Kyle Reeves, the prosecutor in Maddix's case, had committed *Brady* violations or engaged in other improper conduct (A17 n.2).

These issues received significant media attention. For example, a judge's 2012 reprimand of the office's practices in a witness coercion case was "reported in virtually all major New York newspapers" (A59). "[T]he high-profile Samuel Kellner prosecution in 2011" brought criticism of Hynes for suppressing evidence (A46), and there was "intense media coverage of suppression" in the Damien Crooks case that same year (A51–52). Concerns with Hynes' practices led to the election of new

DA Kenneth Thompson in 2013, the first time an incumbent KCDA had been defeated in 100 years. (A24 n.8).

Thompson ended the hotel custody practice and publicly declared he "inherited a legacy of disgrace" because of Hynes's policies encouraging conviction at all costs (A24 n.8). The "scandal" caused the DA's office to form a conviction review unit and resulted in extensive press coverage regarding wrongful convictions during the Hynes administration (A17 n.2, 24 n.8). In 2020, the office published a report allegedly admitting that the "use of false evidence and suppression of *Brady* material were institutional failures of the Hynes administration, and resulted in at least 25 wrongful convictions" (A45).

Nevertheless, Maddix never took any action to investigate *Brady* violations or other issues during his trial (A32). He alleges that he would have had no reason to do so because he "was entitled to, and did" rely on ADA Reeves' 1993 representation that he had disclosed all *Brady/Giglio* material (A32).

### D. **Maddix's discovery of an alleged *Brady* violation in 2024**

It was not until 2024, twelve years after Maddix's release from prison, that a researcher working on an unrelated case alerted Maddix to documents allegedly showing a *Brady* violation during his trial (A31).

The researcher discovered these documents "through a public records request" (A31).

The alleged *Brady* violation involved the DA's office's failure to disclose the circumstances of DeJesus' testimony. According to the complaint, DeJesus was initially reluctant to testify against Maddix (A24). The ADA handling the case, Reeves, had therefore obtained a material witness warrant for DeJesus and taken him into custody to ensure his attendance at the trial (A25). An affidavit attached to the material witness warrant states that DeJesus's reluctance to testify was due to "safety concerns" (A284–85).

The statute governing material witness warrants, N.Y. Criminal Procedure Law § 620.50, generally requires material witnesses to be produced for a court hearing on the warrant and held in the custody of the sheriff (A25).[2] However, the DA's office instead held DeJesus in a room at the Marriott LaGuardia Hotel for three days prior to trial, consistent with the hotel custody practice described in a number of other

---

[2] Pursuant to Article 620 of New York's Criminal Procedure Law, a court may issue a material witness warrant when there is reasonable cause to believe a person possesses material information regarding a crime and will not be responsive to a subpoena to testify at trial. N.Y. CPL § 620.20 (1). The witness may then be taken into custody and presented to the court for a hearing to determine whether he is, in fact, a material witness who would be unresponsive to a subpoena. *Id.* § 620.30(2)(b). If the court so finds, it may order the witness to post bail to secure his attendance or may order him committed to the custody of the sheriff. *Id.* § 620.50(3).

lawsuits (A25–26). The complaint alleges that Reeves "conveyed to DeJesus, in sum and substance," that he would only be released if he testified "in accordance with Reeves's case narrative" (A25).

The DA's office did not disclose these facts to the defense (A30). At trial, DeJesus testified that he had met with prosecutors twice before testifying (A28). In summation, Reeves argued that DeJesus had no motivation to lie (A28).

The DA's office also never disclosed the circumstances of DeJesus's testimony during any of Maddix's post-trial motions or appeals (A29–30).

### E. The District Court's dismissal of Maddix's complaint

Maddix filed this § 1983 action in 2025, alleging that the failure to disclose that DeJesus was confined in a hotel before testifying was a *Brady* violation. He named as defendants both the City and Marriott, the hotel where DeJesus was allegedly confined (A14).

The City moved to dismiss Maddix's claims for multiple independent reasons (SDNY ECF No. 30). The City first argued that pursuant to *Heck v. Humphrey*, 512 U.S. 477, 487 (1994), Maddix could not use § 1983 to collaterally attack the validity of a state-court conviction that had never been overturned or invalidated (SDNY ECF No. 30 at 6–9).

9

In the alternative, Maddix's claims were untimely (*id.* 10–13). Even under Maddix's theory that *Heck* no longer applied after he was released from prison, the claim would be barred by the statute of limitations because Maddix failed to file his complaint for twelve additional years (*id.* 12–13).

Furthermore, the City argued that Maddix failed to plead an underlying *Brady* violation (*id.* 14–20). Even if DeJesus was coerced into testifying, there is no allegation the resulting testimony was untrue (*id.* 17). Relatedly, the complaint only speculated that Reeves coerced DeJesus to give pro-prosecution testimony, rather than simply to testify, and there was nothing to support an inference that failing to disclose the coercion was material to the result of the trial (*id.* 18–19).

In opposition, Maddix thoroughly briefed the *Heck* and statute of limitations issues (SDNY ECF No. 34 at 7–20). But Maddix's only response to the City's arguments on failure to state a claim was a confusing introductory paragraph in which he stated that he "never pled a coercion claim" (*id.* 6–7). Maddix never addressed whether he had sufficiently alleged any element of a *Brady* claim (*id.*). And he repeatedly declined invitations to amend his complaint, including after the City had pointed out the lack of allegations supporting his underlying *Brady* claims

10

(SDNY ECF No. 27; *see* SDNY ECF No. 25; A372 (noting that Maddix "has repeatedly declined his opportunities for further amendment").

Marriott also moved to dismiss, making many of the same arguments as the City (SDNY ECF No. 32).

The District Court (Gonzalez, J.) granted both motions to dismiss with prejudice based on Maddix's failure to state a *Brady* claim (A363–71).[3] The Court held that the Maddix's *Brady* claim failed because he did not allege that Reeves coerced DeJesus to testify falsely, as opposed to simply coercing him to testify (*id.*). It further noted that Maddix had failed to oppose the City's arguments on this point (*id.*). The Court discussed the *Heck* and statute of limitations issues, but it did not rule on them (A360–62).[4]

## SUMMARY OF ARGUMENT AND STANDARD OF REVIEW

This Court reviews the grant of a motion to dismiss de novo, accepting the complaint's factual allegations as true and drawing all

---

[3] In a footnote, the Court held in the alternative that certain claims against the City would be barred by prosecutorial immunity (A367 n. 8). However, the City will not defend this alternative holding. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993).

[4] The Court also declined to address the applicability of the *Rooker-Feldman* doctrine (A361 n.4). As to Marriott, the Court held that Maddix could not state a § 1983 claim because Marriott is not a state actor (A367–70).

11

reasonable inferences in favor of the plaintiffs. *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 304 (2d Cir. 2020).

Although the District Court's imprecisely suggested that false testimony is an element of a *Brady* claim, its holding that Maddix failed to state such a claim is correct (A364). Maddix's threadbare allegations regarding his own case fail to support even a "reasonable probability" the jury would have *believed* Reeves coerced DeJesus to testify falsely or that this would have had resulted in Maddix being acquitted on both charges, rather than only the top charge. *United States v. Ulbricht*, 858 F.3d 71, 112 (2d Cir. 2017). Thus, Maddix fails to plead that the withheld evidence was material to the result of the trial.

Maddix's claim should also be dismissed for multiple independent reasons. First, because Maddix's § 1983 claim collaterally attacks his state criminal conviction, it is barred by *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). Consistent with longstanding principles of "finality and consistency," Maddix must successfully overturn his conviction before seeking damages in a tort action. *Id.* at 485.

Second, because Maddix's § 1983 claim was not filed until twelve years after his release from prison, it is untimely even on his own theory of the case. Although Maddix states that he had no reason to investigate any possible claims between 2012 and 2024, this is belied by his own

account of the public controversy over wrongful convictions in the KCDA's office, which was so extensive that even the DA's office *itself* repudiated its prior practices. If Maddix had taken even the first step to investigate, he would have discovered the material that now forms the foundation of his complaint.

## ARGUMENT

### POINT I

### THE DISTRICT COURT CORRECTLY HELD THAT MADDIX FAILED TO ALLEGE AN UNDERLYING *BRADY* VIOLATION

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82 (1999).

Here, Maddix fails to plead prejudice. Although the District Court's opinion sometimes suggests that Maddix failed to plead the separate "element" of false testimony (A365), false testimony is not an element of a *Brady* claim. Rather, the District Court's reasoning illustrates one of the multiple ways that Maddix's allegations of prejudice are deficient.

13

"[T]o show prejudice the claimant 'must demonstrate a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019) (quoting *United States v. Ulbricht*, 858 F.3d 71, 112 (2d Cir. 2017)). If the withheld evidence is impeachment material, as it is here, the claimant must thus show a reasonable probability that the evidence would have changed the jury's assessment of the witness' credibility. *See United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996). The claimant must also show that, if the witness had been effectively impeached, "the result of the proceeding would have been different." *Bellamy*, 914 F.3d at 751. There is no *Brady* violation if the evidence might have harmed the witness' credibility, but the claimant would have been convicted regardless. *See Klein v. Martin*, 607 U.S. 213, 222 (2026).

Here, nothing about Maddix's allegations explains how impeaching DeJesus could have prevented his conviction on the weapon possession charge. Despite full knowledge of what happened at trial and multiple opportunities to amend his complaint, Maddix fails to explain in any way how DeJesus's testimony was connected to that charge. Furthermore, as the District Court reasoned, revealing that DeJesus was

14

coerced to testify would not have impeached his credibility absent any reason for the jury to believe he was coerced to testify falsely.

Although the use of hotel custody was improper—as the office itself acknowledged more than a decade ago—whether this practice was proper or violated DeJesus's rights is not at issue here (A24 n.8). Maddix's allegations do not support an inference that revealing the use of hotel custody would have harmed DeJesus's credibility in a manner that would have changed the result of Maddix's trial.

A. **Maddix has not alleged that DeJesus's credibility was material to Maddix's conviction for weapon possession.**

Even assuming for a moment that the withheld evidence would have harmed DeJesus's credibility, Maddix does not allege any facts suggesting this would have changed the result of his trial. Maddix was acquitted on the top charge of murder (A28 n.12), so any further impeachment of DeJesus could not have "produced a different verdict" on this charge. *Strickler*, 527 U.S. at 281. And Maddix's complaint simply does not explain anything about the weapon possession charge, much less how further impeaching DeJesus could have changed the jury's opinion of it.

15

Maddix's complaint glaringly fails to provide even the most basic explanation of his own case. All we know is that DeJesus and another witness testified against Maddix, and Maddix was convicted of weapons possession "based in part on DeJesus's testimony" (A14, 24, 26–28). There are no allegations regarding what DeJesus's testimony was, what other evidence supported the conviction "in part," what the prosecution and defense argued, or any other fact about the trial. The complaint simply states summarily that if the jury had known of the withheld material, there is a "reasonable possibility" Maddix would have been acquitted (A27–28). And when given multiple opportunities to amend his complaint, Maddix declined to provide any further detail (A372; SDNY ECF No. 27).

These allegations do not show that the withheld evidence was material to the conviction. Factually, Maddix alleges only that DeJesus was a prosecution witness and the withheld evidence could have impeached him. But that simply shows the first two prongs of Brady—that the evidence was favorable to defendant and withheld. *See Skinner v. Switzer*, 562 U.S. 521, 536 (2011). It does nothing to show the third prong—that "had the evidence been disclosed, the result of the proceeding would have been different." *Bellamy*, 914 F.3d at 751. Whether this prong is satisfied depends on facts about defendant's trial which he simply does

not plead here, such as what DeJesus said about Maddix's weapon possession, what other evidence established Maddix's weapon possession, and to what extent DeJesus was impeached by other means. *See, e.g.*, *Klein*, 607 U.S. at 222 (other evidence establishing guilt); *Turner v. United States*, 582 U.S. 313, 327 (2017) (other impeachment evidence). Without such information, there is no basis to believe the withheld evidence had any particular relevance to Maddix's conviction. Maddix's conclusory statements that the evidence would have created a "reasonable probability" of his acquittal cannot remedy his failure to plead relevant facts (A28). *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Allowing Maddix's claim to survive here would suggest that a *Brady* plaintiff can simply allege that impeachment material was withheld, leaving materiality for some later point in proceedings. But *Brady* claims are no exception to generally applicable pleading requirements. *See, e.g.*, *O'Neal v. City of New York*, 196 F. Supp. 3d 421, 433 (S.D.N.Y. 2016) ("When a *Brady* violation is a component of a plaintiff's claim, the plaintiff must allege sufficient facts to assert a plausible claim that a *Brady* violation occurred."), *aff'd sub nom. O'Neal v. Morales*, 679 F. App'x 16 (2d Cir. 2017).

Even in other situations where a claim is highly fact-dependent, the plaintiff is required to plead facts "plausibly suggesting" unlawful

17

conduct. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *see Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015) (applying plausibility requirement to intent); *Singh v. Deloitte LLP*, 123 F.4th 88, 94 (2d Cir. 2024) (dismissing complaint where plaintiff pled "next to nothing" to suggest fiduciary decision was "imprudent"). Because there is no *Brady* violation absent materiality, a complaint which simply alleges impeachment material was withheld remains in "neutral territory." *Twombly*, 550 U.S. at 557. Without some further allegations suggesting that this withholding of evidence was material, a plaintiff has not pled that unlawful conduct occurred.

Moreover, a *Brady* plaintiff should have ready access to facts going to materiality, if they exist. This is not a situation where the pleading is conclusory because relevant facts are unknown or unavailable to plaintiff and can only be revealed through further discovery. *Cf. Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). Maddix knows what happened at his own trial, and he has litigated the relevant events in several previous cases and appeals. If some aspect of DeJesus's testimony were important to his conviction for weapon possession and would have been called into question by the hotel custody evidence, Maddix would have been able to allege it. His failure to do so is even more egregious given that he was offered the opportunity to amend his

18

complaint after the City had pointed out the failure to plead materiality, but opted not to do so (SDNY ECF No. 27; *see* SDNY ECF No. 25 ("[P]laintiff has not sufficiently alleged that the coercion was material."). If a plaintiff in this situation cannot plead at least basic facts suggesting the withheld evidence would have led to acquittal, this strongly suggests that those facts do not exist. In any case, the failure to plead such facts is fatal to stating a viable § 1983 claim.

Maddix suggests that the impeachment evidence would have been "devastating" to the prosecution because DeJesus had elided the fact that he was in hotel custody, and Reeves stated in summation that DeJesus had "no motivation to lie" (App. Br. 36–37). But simply repeating that the evidence would have effectively impeached DeJesus fails to grapple with whether that impeachment would be *material* to Maddix's conviction for second-degree weapon possession. It is already clear from the acquittal on the top charge that the jury had doubts about DeJesus's credibility. Without knowing what DeJesus said, what other evidence was introduced, what the lawyers argued, or any other relevant fact about the trial, there is no basis to believe that further impeachment would have changed the result on his second charge.

19

B. **Maddix has not alleged the withheld information would have caused the jury to doubt DeJesus's credibility.**

Compounding Maddix's problems on this issue, it is not clear that the withheld evidence would have harmed DeJesus's credibility at all. As the District Court suggested, compulsion of a witness's testimony will not harm the witness's credibility unless the jury has some reason to believe the compulsion resulted in fabrication or bias. And Maddix's allegations do not provide reason to believe that cross-examination would have revealed such bias here.

A number of courts which have confronted the issue have held that the mere fact that a witness is being compelled to testify pursuant to a material witness order is not *Brady* material at all, as it is not favorable to the accused. *See Savoca v. United States*, 2013 WL 10054392, at *4 (S.D.N.Y. Mar. 12, 2013); *People v. Spruill*, 164 A.D.3d 1270, 1274 (2d Dep't 2018); *People v. Lundy*, 48 A.D.3d 1046, 1047 (4th Dep't 2008); *People v. Arhin*, 203 A.D.2d 62, 63 (1st Dep't 1994); *see also Perez v. Miller,* 2024 WL 3328588, at *9 (E.D.N.Y. July 8, 2024) (in habeas context, holding that this principle is not an unreasonable application of *Brady*). The reasoning behind this holding is that a material witness order does not compel a witness to testify in a pro-prosecution manner,

20

but only to "testify truthfully in accordance with the oath administered." *Savoca*, 2013 WL 10054392, at \*4.

In fact, in the common case where the witness is reluctant to testify because she has been threatened by the defendant or fears for her safety, the use of compulsion suggests that she is likely to "*minimize* her testimony against the defendant." *Arhin*, 203 A.D.2d at 63. In this situation, any attempt to impeach the witness with evidence of compulsion is likely to backfire and harm the defendant's case (*see* A105 (acknowledging that cross-examination on hotel custody which revealed that the witness was put there because "somebody on behalf of the defendant threatened me" would harm the defendant)).

In suggesting that evidence of compulsion is favorable to the criminal defendant, Maddix relies on cases in which witnesses were coerced into making false statements during an investigation. *See Galloway v. Cty. of Nassau*, 141 F.4th 417, 426 (2d Cir. 2025) (defendants "coerced [the witness] into signing a fabricated statement"); *Jackson v. City of Cleveland*, 925 F.3d 793, 825 (6th Cir. 2019) (detectives "coerced [witness] into signing a false statement"); *Anderson v. City of Rockford,* 932 F.3d 494, 507 (7th Cir. 2019) (prosecutor threatened that witness "would go to jail if he did not give a written statement incriminating the plaintiffs"). But coercing a witness to give a false statement, outside of

21

court, is not the same thing as simply compelling the witness to appear in court and testify. The former necessarily comes with a suggestion of bias, while the latter does not.

Thus, the fact that a witness is reluctant to testify and must be compelled is not necessarily powerful or even favorable impeachment material—rather, its usefulness depends on the circumstances and reasons for the compulsion. *See Fermin v. Annucci*, 2020 WL 13017118, at *5 (E.D.N.Y. Aug. 26, 2020) (witness's reluctance to testify, in itself, not exculpatory for *Brady* purposes); *see also United States v. Brown*, 582 F.2d 197, 200 (2d Cir. 1978) (suggesting that whether the government was obligated to disclose witness reluctance would depend on the situation).

Here, as the district court noted, Maddix's allegations do not show anything more than a reluctant witness being forced to testify to what he truly saw. Maddix does not allege that any of DeJesus's statements were false, and nothing suggests that the government planted a particular story and forced DeJesus to testify to it. Rather, the affidavit supporting the material witness order states that DeJesus was refusing to testify out of fear for his safety (A284–85). It is undisputed that the material witness statute requires the DA's office to overcome such reluctance by placing the witness in the custody of the sheriff until his

22

testimony, if necessary, rather than at a hotel. But this has little relevance for impeachment purposes. The crucial issue is whether DeJesus' release from whatever custody was conditioned on his promise to "testify truthfully in accordance with the oath administered," or rather in a pro-prosecution manner. *Savoca*, 2013 WL 10054392, at *4.

Maddix heavily emphasizes his allegation that Reeves "conveyed to DeJesus, in sum and substance," that he would be released if he testified "in accordance with Reeves's case narrative" (A25). But this allegation is consistent with DeJesus simply being asked to testify to what he actually saw. After all, a prosecutor's case narrative is usually shaped by what the prosecutor's witnesses have told them about the incident, and the complaint here does not allege otherwise. Asking DeJesus to testify truthfully at trial could be characterized as asking him to testify "in accordance with Reeves's case narrative," but this is not problematic absent any gap between "Reeves's case narrative" and DeJesus's own account. (A25).

And the surrounding allegations do nothing to suggest any such gap. Maddix does not allege that Reeves independently decided to implicate Maddix or had any motive to do so, nor does he allege that DeJesus's testimony was false. Other than plaintiff's artful phrasing, nothing here suggests that DeJesus's release was contingent on testifying to

23

a biased or false case narrative, as opposed to his own account of events which had been adopted by the prosecution. And further cutting against such a conclusion, nothing in Maddix's extensive complaint suggests any other witness was kept in a hotel *after* they testified if they failed to give a certain type of testimony, which would make little sense.

In sum, it is not clear that the withheld evidence would have harmed DeJesus's credibility at all, and in any case Maddix has alleged no facts regarding how this would have prevented his conviction. Therefore, he has not pled a *Brady* claim.

## POINT II

### MADDIX'S COMPLAINT MUST BE DISMISSED FOR MULTIPLE INDEPENDENT REASONS

Furthermore, fundamental threshold issues would prevent Maddix from bringing this claim regardless of how it was pled. First, Maddix's claim fails immediately because he cannot use § 1983 to attack the validity of his state conviction, which was never vacated or overturned. *See Heck*, 512 U.S. at 486–87. Second, even under Maddix's theory that his claim accrued when he was released from prison, his complaint is almost a decade untimely.

Each of these issues was fully briefed below and presents questions of law that are reviewed by this Court *de novo*. *See Deutsche Bank*

24

*Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 865 (2d Cir. 2015) ("We review *de novo* a district court's grant of a motion to dismiss, including its legal interpretation and application of a statute of limitations."). And this Court "may affirm on any ground with support in the record … including grounds upon which the district court did not rely." *Jusino v. Fed'n of Cath. Teachers, Inc.*, 54 F.4th 95, 100 (2d Cir. 2022) (citations omitted). In the event the Court determines that Maddix has stated a claim, it therefore would serve judicial economy for this Court to resolve the *Heck* and statute of limitations issues now, as remanding for the district court to address them would likely result in a second appeal raising the exact arguments now before the Court. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) ("The parties have briefed this issue on appeal; judicial economy is accordingly served by our consideration of the question now."). If Maddix's complaint is fundamentally barred by the validity of his state conviction or the statute of limitations, there is no reason to prolong this case.

A. **Maddix has no § 1983 claim under *Heck v. Humphrey* because his conviction remains valid.**

In *Heck v. Humphrey*, the Supreme Court held that "to recover damages for allegedly unconstitutional conviction or imprisonment … a

25

§ 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486–87. The basis for this holding is that § 1983 incorporates common-law tort principles protecting criminal judgments from collateral attack. *Id.* at 485–86.

Here, Maddix's conviction remains valid. And his *Brady* claims expressly and necessarily attack the validity of that conviction. *See Skinner*, 562 U.S. at 536 ("[A] *Brady* claim, when successful postconviction, necessarily yields evidence undermining a conviction."); *Amaker v. Weiner,* 179 F.3d 48, 51 (2d Cir. 1999). Therefore, his suit is barred by *Heck*.

Maddix's first response is that the City is "equitably estopped" from invoking *Heck* because it concealed evidence of the *Brady* violation (App. Br. 48). But this argument is difficult to understand. The City cannot be estopped from asserting that Maddix is convicted and *Heck* applies, because the City has never misrepresented these facts, nor has Maddix relied on any such misrepresentation. *See Kosakow v. New Rochelle Radiology Assocs.*, P.C., 274 F.3d 706, 725 (2d Cir. 2001). Maddix cites cases involving the separate doctrine of waiver, which is the

voluntary relinquishment of a known right (App. Br. 47). *See Mooney v. City of New York*, 219 F.3d 123, 131 (2d Cir. 2000); *Coggins v. Cnty. of Nassau*, 615 F. Supp. 2d 11, 30 (E.D.N.Y. 2009) (explaining that waiver is distinct from estoppel in that it must be intentional, but does not require reliance). But the City also has not waived its *Heck* argument—on the contrary, it asserted this argument immediately in its motion to dismiss (*See* SDNY ECF Nos. 25, 30).[5]

Maddix's second counterargument relies on a purported exception to *Heck* allowing plaintiffs to collaterally attack their convictions via § 1983 when habeas relief is unavailable (App. Br. 15). The possibility of such an exception has been hotly disputed in this Circuit and is the subject of a "deep circuit split." *Teichmann v. New York*, 769 F.3d 821, 829 & n.1 (2d Cir. 2014) (Calabresi, J., concurring); *see Poventud*, 750 F.3d 121. The better position is that no such exception exists. But the Court need not settle that question here, because even if such an exception exists, this case falls outside of it. The posited exception applies narrowly to cases where "habeas was *never* reasonably available to the plaintiff," not broadly to a plaintiff like Maddix who was incarcerated for years and

---

[5] Furthermore, every *Brady* violation involves concealment of evidence. So if this was sufficient for waiver or estoppel, *Heck* would be inapplicable to *Brady* violations. This is clearly not the case. *See, e.g., Amaker*, 179 F.3d at 51.

27

had ample opportunity to seek habeas relief. *Teichmann*, 769 F.3d at 828 (Livingston, J., concurring). Indeed, Maddix sought and was denied habeas relief (A30), making clear that he had an opportunity to seek it.

> 1. **There is no exception to *Heck* for a plaintiff who is released from prison without invalidating his conviction.**

*Heck* itself explicitly states that the principle barring collateral attack on a criminal judgment "is not rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated." *Heck*, 512 U.S. at 490 n.10. On its face, this statement forecloses Maddix's proposed exception based on release from prison. And this conclusion follows unavoidably from the framework *Heck* sets out.

*Heck* addressed the fact that § 1983 might appear to allow a prisoner to challenge the constitutionality of his state-court conviction, a challenge traditionally brought via a habeas corpus petition. *Id*. at 480. The Court held that § 1983 does not in fact allow a prisoner to challenge his conviction, as it incorporates "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Id*. at 486. Therefore, a plaintiff "has no cause of action" under § 1983 based on a criminal conviction until or unless the conviction is invalidated. *Id*. This holding was based on an

28

analogy to the common-law tort of malicious prosecution, which has favorable termination as an element and "does not accrue until the criminal proceedings have terminated in the plaintiff's favor." *Id.*

A plaintiff who is in prison, by definition, does not have a favorable termination of proceedings, and therefore cannot bring a § 1983 claim challenging his outstanding conviction. He must proceed in habeas. However, as the Court noted, a § 1983 claim may still be unavailable due to this rule when the plaintiff "is no longer incarcerated," so long as his conviction remains outstanding. *Heck*, 512 U.S. at 490 n.10.

Four concurring Justices would have taken a different path. *See Heck*, 512 U.S. at 491 (Souter, J., concurring). Rather than holding that § 1983 required favorable termination, they would have held that the habeas statute precludes § 1983 actions for those in custody. *Id.* That approach would have suggested that if habeas is unavailable, including because the individual is not "in custody," § 1983 could be used to collaterally attack an outstanding conviction. *Id.* at 501. However, this view was explicitly rejected by the majority. *Heck*, 512 U.S. at 490 n.10. Thus, after *Heck*, it seemed clear that Maddix's proposed exception did not exist.

The argument for the *Heck* exception is rooted in a concurrence by Justice Ginsburg in *Spencer v. Kemna*, 523 U.S. 1 (1998). Although

29

Justice Ginsburg had joined the *Heck* majority, she stated in her *Spencer* concurrence that she now believed that § 1983 should be available to "[i]ndividuals without recourse to the habeas statute because they are not 'in custody,'" effectively switching to the concurring view in *Heck*. *Id.* at 21 (Ginsburg, J., concurring). However, this change of views was not reflected in the majority opinion in *Spencer* or any other case. The Circuits subsequently split over whether Justice Ginsburg's *Spencer* concurrence can support an exception that seems to contradict the majority opinion in *Heck*. *See Teichmann*, 769 F.3d at 829 & n.1 (Calabresi, J., concurring).[6]

---

[6] The First, Third, Fifth, Seventh, and Eighth Circuits have held that favorable termination is required to state a claim under *Heck* regardless of the availability of habeas relief, reasoning that the Supreme Court should have "the prerogative of overruling its own decisions." *Figueroa v. Rivera*, 147 F.3d 77, 80–81 n.3 (1st Cir. 1998) (quoting *Agostini* v. *Felton*, 521 U.S. 203, 237 (1997)); ; *Gilles v. Davis*, 427 F.3d 197, 209 n.8, 211 (3d Cir. 2005); *see Wilson v. Midland Cnty., Texas*, 116 F.4th 384 (5th Cir. 2024); *Savory v. Cannon*, 947 F.3d 409, 425 (7th Cir. 2020) (overruling prior decisions that had supported a *Heck* exception); *Entzi v. Redmann*, 485 F.3d 998, 1003 (8th Cir. 2007). The Ninth Circuit applies to the same principle to plaintiffs challenging a conviction but holds that a *Heck* exception exists for certain challenges to "loss of good-time credits, revocation of parole or similar matters." *Lyall v. City of L.A.*, 807 F.3d 1178, 1192 (9th Cir. 2015) (quoting *Nonnette v. Small*, 316 F.3d 872, 878 n.7 (9th Cir. 2002)).

On the other hand, the Fourth, Sixth, Tenth, and Eleventh Circuits have relied on *Spencer* in holding that a *Heck* exception exists for certain challenges to an outstanding conviction when habeas is unavailable. *Wilson v. Johnson*, 535 F.3d 262, 267–68 (4th Cir. 2008); *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 603 (6th Cir. 2007); *Cohen v. Longshore*, 621 F.3d 1311, 1317 (10th Cir. 2010); *Harden v. Pataki*, 320 F.3d 1289, 1298–99 (11th Cir. 2003). As discussed below, these circuits have carefully limited the exception.

30

This Circuit's position in the split is unclear. Immediately after *Spencer*, this Court issued several opinions suggesting *Heck* does not apply when habeas is unavailable. *See Jenkins v. Haubert*, 179 F.3d 19, 21 (2d Cir. 1999); *Leather v. Ten Eyck*, 180 F.3d 420, 424 (2d Cir. 1999); *Green v. Montgomery*, 219 F.3d 52, 61 (2d Cir. 2001); *Huang v. Johnson*, 251 F.3d 65, 75 (2d Cir. 2001). [7] But deep disagreement later surfaced regarding whether these cases accurately reflected the law of this Circuit, resulting in a *en banc* rehearing that failed to resolve the issue. *Poventud v. City of N.Y.*, 715 F.3d 57 (2d Cir. 2013), *vacated on reh'g en banc*, 750 F.3d 121 (2d Cir. 2014).

The Court need not and should not take a side in this split here, as Maddix's claim is untimely and would not fit into the *Heck* exception as constructed in any circuit. But the circuits that have held there is no exception have the better of the argument.

The requirements of § 1983 are set out by the controlling majority opinion in *Heck*, not Justice Ginsburg's concurrence in *Spencer*. The

---

[7] Maddix also relies on this Court's recent summary order in *Wiggins v. Mellia*, which suggested that a *Heck* exception existed but declined to apply it because habeas was available to the petitioner. 2023 WL 6222303, at *2 (2d Cir. Sept. 26, 2023). Clearly, dicta in a nonprecedential summary order cannot be understood to have settled a question that this Circuit explicitly left open in an *en banc* decision. *See Poventud*, 750 F.3d at 125 n.1.

31

concurrence may have taken issue with the reasoning of *Heck*, but it "did not purport to overrule or to modify" the decision, nor could it. *United States v. Kukoyi*, 126 F.4th 806, 818 (2d Cir. 2025). Therefore, the Court remains bound by *Heck. See Care One, LLC v. NLRB*, 166 F.4th 335, 350 (2d Cir. 2026) ("It is not within our purview to anticipate whether the Supreme Court may one day overrule its existing precedent."); *Savory*, 947 F.3d at 421 ("The Supreme Court may eventually adopt Justice Souter's view, but it has not yet done so and we are bound by *Heck*."). And *Heck* made clear that the issue is not whether a plaintiff has exhausted any available habeas remedies, but whether a collateral attack on a valid conviction "is cognizable under § 1983 at all." *Heck*, 512 U.S. at 483.

If the Supreme Court wanted to change this law, it could have done so in a controlling majority opinion. It has not. In some cases after *Spencer*, the Court spoke in language suggestive of preclusion, framing *Heck* as creating an "implicit habeas exception" to § 1983. *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005); *see Skinner*, 562 U.S. at 533–34. However, later decisions have reiterated the principle that favorable termination is an element required for a § 1983 claim to accrue, again emphasizing "concerns with parallel litigation and conflicting judgments." *McDonough v. Smith*, 588 U.S. 109, 119 (2019); *see Thompson v. Clark*,

32

596 U.S. 36, 44 (2022). And the Court's recent decision in *Olivier v. City of Brandon* addressed the application of *Heck* to a plaintiff who was out of prison, but mentioned nothing about the unavailability of habeas. 607 U.S. 552, 564 (2026). Rather, the Court held that the suit was proper because the plaintiff was only seeking prospective relief, not attempting to "'collateral[ly] attack' the old conviction." *Id.* If *Heck* was inapplicable for the simple reason that the plaintiff was out of prison, this analysis would have been unnecessary.

These cases reaffirm that, even if one effect of *Heck* was the creation of a "habeas exception" to § 1983, *Wilkinson*, 544 U.S. at 82, the way *Heck* created this exception was by applying a broader principle against collateral attack which continues to underlie the Court's jurisprudence, *see Savory*, 947 F.3d at 421 (discussing *McDonough* as proof that "*Heck* was concerned with more than the exclusivity of the habeas corpus remedy for persons in custody."). To the extent Justice Ginsburg's concurrence suggested the Court might retreat from its element-of-the-claim analysis and refashion *Heck* as focused on avoiding overlap with habeas, this has not come to pass.

In sum, there are certainly arguments that the Supreme Court should have created a *Heck* exception for habeas unavailability, and five justices on the Court may at one point have desired to do this. But it

33

never occurred, perhaps due to the difficulty of force-fitting such an exception into a framework based on broader tort principles independent of the habeas statute. And the animating principle of the exception, that a plaintiff must always have an available federal challenge to a state conviction, is unmoored from and seemingly inconsistent with the Supreme Court's jurisprudence. This Court should not recognize a *Heck* exception.

### 2. Assuming there is an exception, it would not apply to Maddix here.

But even assuming this Court were to recognize a *Heck* exception, it would not apply to Maddix here.

Circuits recognizing a *Heck* exception have applied it only to exceptional cases "where an action under § 1983 was a diligent plaintiff's only opportunity to challenge his conviction in a federal forum." *Teichmann*, 769 F.3d at 828 (Livingston, J., concurring). If a diligent plaintiff is incarcerated for any substantial amount of time, he generally has the opportunity to challenge his conviction via habeas. Thus, the exception has been recognized primarily and perhaps only in cases where the plaintiff was never incarcerated or was incarcerated for an extremely brief period. *See Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 601 (6th Cir. 2007) ("What is dispositive in Powers's situation is

34

not that he is no longer incarcerated, but that his term of incarceration—one day—was too short to enable him to seek habeas relief."); *Cohen v. Longshore*, 621 F.3d 1311, 1315 (10th Cir. 2010) (plaintiff diligently filed habeas petition that was mooted by his transfer out of custody); *Wilson v. Johnson*, 535 F.3d 262, 263 (4th Cir. 2008) (plaintiff filed grievances disputing four months of additional imprisonment, which were not resolved before his release); *Harden v. Pataki*, 320 F.3d 1289, 1299 (11th Cir. 2003) (plaintiff challenged his extradition to another state, which could not be challenged by a writ of habeas in either state).[8]

Here, Maddix had the opportunity to, and did, challenge his conviction via habeas during his lengthy incarceration. No circuit has recognized an exception that would allow a plaintiff who was incarcerated for years and unsuccessfully challenged his conviction via habeas to then collaterally attack the same conviction via § 1983 after his release from prison. *See Powers*, 501 F.3d at 601 ("It seems unlikely that Justice Souter intended to carve out a broad *Heck* exception for all former

---

[8] The Ninth Circuit has held that the *Heck* exception does not apply to challenges to an underlying conviction at all, only to "challenges to loss of good-time credits, revocation of parole or similar matters." *Lyall v. City of L.A.*, 807 F.3d 1178, 1192 (9th Cir. 2015) (quoting *Nonnette v. Small*, 316 F.3d 872, 878 n.7 (9th Cir. 2002)). But even as to those matters, it applies only when the individual "could not seek habeas relief only because of the shortness of his prison sentence." *Guerrero v. Gates*, 442 F.3d 697, 705 (9th Cir. 2006).

35

prisoners."). And turning the finality provided by the *Heck* bar into mere temporary finality would remove any benefit of the rule. If a conviction is eventually going to be challengeable in tort, it would be far better for it to be challengeable immediately, when the state can release the plaintiff from prison and mitigate its damages, than for the state to be allowed to freely incarcerate the plaintiff only to later have the conviction overturned. The purpose of the *Heck* exception is to ensure access to federal court, not to provide a more procedurally favorable damages claim for a plaintiff who failed to obtain relief through the more onerous habeas process. *See Guerrero v. Gates*, 442 F.3d 697, 705 (9th Cir. 2006) (plaintiff may not use his own failure to pursue habeas "as a shield against the implications of *Heck*").[9]

Maddix argues that he falls into even a narrow construction of the exception, because he was "*unaware* of his constitutional claims

---

[9] A bounded reading of any *Heck* exception is also consistent with this Court's precedent. In *Leather v. Ten Eyck*, for example, the plaintiff was never incarcerated at all. 180 F.3d 420, 424 (2d Cir. 1999). Although the Court made broad statements in some other cases suggesting that *Heck* applies only when habeas is unavailable, each of those cases was resolved on alternative grounds. *See Huang v. Johnson*, 251 F.3d 65, 75 (2d Cir. 2001) (claim did not challenge the validity of plaintiff's conviction); *Jenkins v. Haubert*, 179 F.3d 19, 27–28 (2d Cir. 1999) (claim challenged conditions of confinement); *Green v. Montgomery*, 219 F.3d 52, 60 n.3 (2d Cir. 2000) (certifying question to the New York Court of Appeals). And the opinions in *Poventud* and related cases make clear that this Circuit has not settled on whether an exception exists, let alone adopted the sweeping version proposed by Maddix, which is far broader than recognized by any other Circuit.

36

throughout the entirety of his incarceration," and thus could not have brought a habeas claim (App. Br. 18). As discussed below, this elides the crucial issue of whether he *should* have been aware of his claims with the exercise of reasonable diligence. But even assuming Maddix could not have known about his current claim while he was incarcerated, accepting his argument would require piling exceptions on exceptions. Under *Heck*, a plaintiff should not be able to use § 1983 to collaterally attack an outstanding state conviction at all. A few Circuits have recognized a "narrow exception in situations where habeas was never an option," but this exception has been carefully limited. *Teichmann*, 769 F.3d at 828 (Livingston, J., concurring). Maddix now seeks to expand this narrow exception to any situation where a plaintiff could have or did seek habeas while incarcerated, but more information about a constitutional violation came to light later on. Such an expansion cannot be squared with the "concerns for finality and consistency" expressed in *Heck* and numerous subsequent decisions. *Heck*, 512 U.S. at 485; *see McDonough*, 588 U.S. at 119; *Thompson*, 596 U.S. at 44. Maddix's interpretation would open the door for a plaintiff to collaterally attack a criminal conviction via § 1983 whenever he can provide any excuse for not timely bringing his case in habeas, requiring a fact-intensive

37

analysis of whether petitioner *really* had an opportunity to bring a habeas claim.

This Court need not stretch *Heck*'s framework beyond recognition simply to ensure that any possible constitutional claim can be brought in a federal forum. "[S]tate courts are the principal forum for asserting constitutional challenges to state conviction," and it is not unfair for a plaintiff to lack an avenue of collateral attack through a federal damages action. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011). If a plaintiff has a constitutional challenge based on newly discovered evidence, there is nothing preventing him from pursuing this challenge in state court. *See, e.g.*, *People v. Sims*, 247 A.D.3d 938, 941 (2d Dep't 2026) (vacating conviction based on newly discovered evidence).

### B. Maddix's claim is barred by the statute of limitations.

Because Maddix has no complete cause of action until his state conviction is invalidated under *Heck*, his § 1983 claim never accrued. 512 U.S. at 491. But if *Heck* ceased to apply when Maddix was released from prison in 2012, as he argues, then it follows that his claim would have accrued at that time. Maddix did not bring his claim until 2025. Therefore, even assuming Maddix were right about *Heck*, his claim would be barred by the statute of limitations.

"The statute of limitations for claims brought under [§] 1983 is governed by state law, and in this case is the three-year period for personal injury actions under New York State law." *Shomo v. City of N.Y.*, 579 F.3d 176, 181 (2d Cir. 2009). Because Maddix here filed his action in 2025, the claim is untimely unless it accrued in 2022 or later (A14).

To determine when a § 1983 claim accrued, a court must look to the federal law governing such claims. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Generally, a § 1983 claim accrues when the plaintiff "has a complete and present cause of action." *Mallet v. New York State Dep't of Corr. & Cmty. Supervision*, 126 F.4th 125, 131 (2d Cir. 2025) (quoting *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015)). This Court has also stated that a § 1983 claim accrues "when the plaintiff knew or had reason to know of 'the injury which is the basis of his action.'" *Id.* (quoting *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980)).[10]

Maddix's cause of action here is based in *Brady*. All the elements of a *Brady* claim were allegedly satisfied when Maddix was convicted of

---

[10] The Supreme Court has applied only the "complete and present cause of action" formulation to § 1983 claims, and some have questioned whether the plaintiff's knowledge of the injury is necessarily required for a § 1983 claim to accrue. *See Dibrell v. City of Knoxville*, 984 F.3d 1156, 1162 (6th Cir. 2021); *see generally Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (cautioning against assumption that every federal statute incorporates a discovery rule). However, the City does not challenge the point here.

39

second degree weapon possession in 1994 after nondisclosure of the *Brady* material. If the claim accrued at that point, it would be almost 30 years untimely. However, the claim did not accrue at that point, because under *Heck* it would not accrue until Maddix's conviction was invalidated. *See McDonough*, 588 U.S. at 120. Maddix still cannot meet this requirement, and thus his claim still has not accrued. But on Maddix's theory of the case, he had a "complete and present cause of action" in 2012, when he was released from prison and the *Heck* rule became inapplicable. *Mallet*, 126 F.4th at 13; *see Opperisano v. P.O. Jones*, 286 F. Supp. 3d 450, 464 (E.D.N.Y. 2018) (holding that, if the *Heck* exception applied, the claim would accrue "when habeas is no longer available"). Based on this date, Maddix's claim would still be about ten years too late.

Maddix's timeliness arguments thus rely on the idea that he did not know or have reason to know of his injury until very recently. Maddix allegedly did not know about the *Brady* violation until 2024, when a researcher working on an unrelated case alerted him to the *Brady* material (A31). But even if Maddix did not actually know about the underlying facts until this point, he should have known about them in the exercise of reasonable diligence.

The rule that a claim accrues when the plaintiff "knows or has reason to know" of the injury, which this Court has applied to § 1983 claims,

40

is "sometimes referred to as the 'discovery rule.'" *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002).[11] Under this rule, a plaintiff is expected to act "with reasonable diligence" to investigate a possible claim. *A.Q.C. v. United States*, 656 F.3d 135, 140 (2d Cir. 2011); *see Barrett v. United States*, 689 F.2d 324, 327 (2d Cir. 1982). Thus, while "[a] claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, ... such suspicions do give rise to a duty to inquire." *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998).

Here, Maddix alleged myriad pieces of information that should have aroused his suspicions and given rise to a duty to inquire. The complaint details numerous lawsuits describing the "unconstitutional and illegal training, policies, practices and customs detailed in Maddix's complaint," most of which were filed around the time of Maddix's 2012 release from prison (A43–68). *See Abdel-Fakhara v. Vermont*, 2023 WL 3486236, at *1 (2d Cir. May 17, 2023) (summary order) (holding that filing of lawsuit prompted duty to inquire). In these lawsuits, top officials in the DA's office allegedly admitted to the hotel custody policy,

---

[11] Maddix refers to the same standard as the "diligence-discovery rule" (App. Br. 57). He refers to the rule that a claim accrues when a plaintiff "knows or has reason to know" of his injury as the "general accrual rule" (App. Br. 57). Regardless of the terminology, as explained in *Pearl*, these rules express the same standard. 296 F.3d at 80.

41

testified that the office had no written *Brady* disclosure policy, and stated that the office had no process for disciplining prosecutorial misconduct (A45–49).

And these issues were not buried in legal transcripts—on the contrary, Maddix alleges that many instances of misconduct received significant media attention (*see* A46 ("high-profile Samuel Kellner prosecution in 2011"), A52 ("intense media coverage of suppression" in Damien Crooks case), A59 (judicial condemnation in Jabbar Collins case "reported in virtually all major New York newspapers")). *See Pipitone v. City of New York*, 57 F. Supp. 3d 173, 188 (E.D.N.Y. 2014) ("News reports, if sufficiently probative and widely publicized, can trigger accrual, or at least require potential plaintiffs to undertake a reasonably diligent investigation."). The public scandal even contributed to DA Hynes' loss to Kenneth Thompson in the 2013 election (A24 & n.8). The KCDA's office published a report allegedly admitting that "the use of false evidence and suppression of *Brady* material were institutional failures of the Hynes administration" in 2020—still five years before Maddix filed his complaint (A45). This wealth of "publicly available information" should have "triggered a reason to inquire." *Williams v. City of New York*, 2025 WL 2782810, at *14 (E.D.N.Y. Sept. 27, 2025) (citation omitted) (holding *Brady* claim was untimely for this reason).

42

In response, the complaint alleges that Maddix did absolutely nothing. There are no allegations that Maddix made any effort to consult with a lawyer, locate witnesses, seek to have his case reviewed by the newly formed wrongful conviction unit, or investigate in any way whether his case could be implicated in the public reckoning with illegal practices which were apparently widespread at the exact time of his prosecution. Although documents about his case were readily available "through a public records request," he did not seek them (A31). Rather, he waited twelve years until someone *else* discovered and sent him the documents showing the alleged *Brady* violation (A31).

"Doing nothing for years hardly amounts to 'act[ing] with reasonable diligence.'" *Jones v. Haynes*, 2025 WL 3090549, at *12 (S.D.N.Y. Oct. 10, 2025) (quoting *Belot v. Burge*, 490 F.3d 201, 205 (2d Cir. 2007)). Such inaction is appropriate only if there is "[no] reasonable basis to expect that investigation would uncover relevant information." *Perez v. Bondi*, 166 F.4th 327, 334 (2d Cir. 2026) (quoting *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 286 (3d Cir. 2021)). But here, there was ample reason to suspect that an investigation might uncover evidence that the "institutional failures of the Hynes administration" at the time of Maddix's conviction affected his trial (A45). Such suspicions "give rise to a duty to inquire," which cannot be satisfied

43

without some sort of inquiry. *Kronisch*, 150 F.3d at 121; *Williams*, 2025 WL 2782810, at \*14.

And this is not a case where the critical facts would have been impossible to discover "no matter how diligently the [plaintiff] had pursued [his] case." *Barrett*, 689 F.2d at 329. If Maddix had taken even the basic step of submitting a public records request (or asking counsel to do so on his behalf), he would have received the exhibits now attached to his complaint. Even assuming a reasonable plaintiff would only have taken this step in 2020, after numerous lawsuits and articles and the publication of a report detailing 25 wrongful convictions around the time of Maddix's trial, Maddix's 2025 complaint would still be untimely by several years. "Bluntly put, if plaintiff failed to become aware of his [] *Brady* claims …, it was due to his own lack of diligence." *Williams*, 2025 WL 2782810, at \*14.

Maddix's only excuse for failing to investigate anything about his trial in the twelve years after his release from prison is that he "was entitled to, and did" rely on the prosecutor's statements that he had disclosed all *Brady/Giglio* material (A32, *see* App. Br. 55). He relies on the Supreme Court's decision in *Banks v. Dretke*, which held that in general, a defendant need not "scavenge for hints of undisclosed *Brady* material

44

when the prosecution represents that all such material has been disclosed." 540 U.S. 668, 695 (2004).

However, *Banks* did not hold that the prosecutor's representation is a talisman to ward off any need to inquire, no matter the circumstances. It addressed a situation where there was no obvious reason for the defendant to investigate, rebuffing courts that would have nevertheless placed an unreasonable burden on the defendant to assume the state is lying or pursue speculative inquiries. *Banks*, 540 U.S. at 695. Thus, it stands for the principle that a reasonable defendant may *presume* the prosecution's *Brady* disclosure is truthful. *See Bracey*, 986 F.3d at 291. But if there is a clear reason to suspect a *Brady* violation and relevant information is available, reasonable diligence still requires the plaintiff to follow up. *See id.* at 294 ("If there is a reasonable basis for a petitioner to believe additional investigation will yield undisclosed Brady material, that petitioner must investigate."); *Bell v. Bell*, 512 F.3d 223, 236 (6th Cir. 2008) (distinguishing *Banks* when available evidence should have prompted further inquiry and documents showing *Brady* violation were "a matter of public record"); *Solorio v. Muniz*, 896 F.3d 914, 921 (9th Cir. 2018) (holding that plaintiff "fail[ed] to demonstrate due diligence in researching the alleged *Brady* material"); *Williams*, 2025 WL 2782810, at *14.

45

In other words, *Banks* does not create an exception to the reasonable-diligence requirement for *Brady* defendants—it simply explains that in this context, reasonableness does not require assuming the state is lying or pursuing fruitless investigations. Here, no one is arguing that Maddix should have pestered the DA's office for *Brady* material during his incarceration or somehow guessed prior to 2012 that DeJesus had participated in the hotel custody program. But it is unreasonable on its face for Maddix to continue relying blindly on the KCDA's pre-2000 representations even after 2013, when *the DA's office itself* began admitting at least some of these representations were unreliable (A24 n.8, 45). At a minimum, a reasonable plaintiff would have taken some basic action at some point between 2012 and 2022 to investigate whether such practices may have affected his conviction. Because a reasonable plaintiff who did so would have known about the facts in this complaint prior to 2022, the complaint is untimely.

Finally, Maddix's invocation of equitable estoppel is no help to his argument, as the standard for estoppel is stricter than the federal discovery rule (App. Br. 56). Equitable estoppel requires not only that the plaintiff lack awareness of the tortious conduct, but also that the defendant have concealed the wrongdoing via "later acts of deception … separate from the ones for which [the plaintiff] sue[s]." *Corsello v. Verizon*

*New York, Inc.*, 18 N.Y.3d 777, 789 (2012); *see Koral v. Saunders*, 36 F.4th 400, 410 (2d Cir. 2022); *Zumpano v. Quinn*, 6 N.Y.3d 666, 674 (2006). Here, Maddix does not allege any affirmative misrepresentation or concealment which prevented him from uncovering the original *Brady* violation between 2012 and 2025. On the contrary, Maddix alleges that the newly elected DA took affirmative steps to bring to light the issues under his predecessor's tenure. Maddix did not seek material about his case after his release from prison, only to be thwarted by steps on the part of KCDA to conceal it. Rather, he did not seek such material at all.

## CONCLUSION

This Court should affirm the decision below.

Dated:  New York, New York
        August 10, 2026

Respectfully submitted,

STEVEN BANKS
*Corporation Counsel*
*of the City of New York*
Attorney for Respondents

By: _____

BO MALIN-MAYOR
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
212-356-0820
bmalin@law.nyc.gov

RICHARD DEARING
JAMISON DAVIES
BO MALIN-MAYOR
   *of Counsel*

48

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 10,707 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____

BO MALIN-MAYOR

49