# 26-1246-cv

## United States Court of Appeals
*for the*
## Second Circuit

WILLIE MADDIX,

*Plaintiff-Appellant*,

– v. –

CITY OF NEW YORK, MARRIOTT HOTEL SERVICES, INC., MARRIOTT INTERNATIONAL, INC., d/b/a JW Marriott Essex House Hotel,

*Defendants-Appellees*,

KYLE REEVES,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX
## Volume 1 of 2 (Page SA-1 to SA-170)

KONSTANTINOS D. KATSIRIS
EMILY SEIDERMAN WEST
CARLOS H. SALGUERO, JR.
VENABLE LLP
*Attorneys for Defendants-Appellees Marriott Hotel Services, Inc., Marriott International, Inc., d/b/a JW Marriott Essex House Hotel*
151 West 42nd Street
New York, New York 10036
(212) 307-5500

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (395043)

## TABLE OF CONTENTS


**Page**

Letter from Kostas D. Katsiris to the Honorable Hector Gonzalez, dated June 27, 2025 .................. SA-1

Letter from Andrew Stengel to the Honorable Hector Gonzalez, dated July 21, 2025 ................... SA-5

Letter from Andrew Stengel to the Honorable Hector Gonzalez, dated July 30, 2025 ................... SA-12

Memorandum of Law, by Defendants Marriott Hotel Services, Inc. and Marriott International, Inc., in Support of their Motion to Dismiss First Amended Complaint with Prejudice, dated September 2, 2025 ................................................ SA-17

Declaration of Emily Seiderman West, for Defendants Marriott Hotel Services, Inc. and Marriott International, Inc., in Support of their Motion to Dismiss First Amended Complaint with Prejudice, dated September 2, 2025 ............. SA-50

Exhibit 1 to Seiderman West Declaration - Complaint in *Collins v. The City of New York*, United States District Court for the Eastern District of New York, Index No.: CV 11-00766, dated February 16, 2011 ........................................ SA-52

Exhibit 2 to Seiderman West Declaration - Amended Complaint in *Quezada v. Haynes*, United States District Court for the Eastern District of New York, Index No.: 16-CV-6577, dated January 24, 2017 .......................................... SA-164

**Page**

Exhibit 3 to Seiderman West Declaration - Complaint in *Cooper v. The City of New York*, United States District Court for the Eastern District of New York, Index No.: 21-CV-4171, dated July 25, 2021 ................................................ SA-217

Reply Memorandum of Law, by Defendants Marriott Hotel Services, Inc. and Marriott International, Inc., in Further Support of their Motion to Dismiss First Amended Complaint with Prejudice, dated October 15, 2025................. SA-323

VENABLE LLP

151 WEST 42ND STREET 49TH FLOOR NEW YORK, NY 10036
T 212.307.5500 F 212.307.5598 www.Venable.com

June 27, 2025

Emily Seiderman West

t 212.503.9816
f 212.307.5598
EAWest@Venable.com

**By ECF**
Hon. Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: ***Maddix v. City of New York, et al.*, 25-cv-1909 (HG): Pre-Motion Letter of Marriott Defendants**

Dear Judge Gonzalez:

On May 29, 2025, the Court granted the Defendants' joint request to stay discovery pending the outcome of their "forthcoming motions to dismiss" (the "Joint Stay Request" or "JSR") (ECF No. 21). *See* Order (ECF No. 23). In that Order, the Court found that the Defendants made a "strong showing" that Plaintiff's claims were unmeritorious. *Id.* Pursuant to Part IV.A.2 of the Court's Individual Practices, Marriott International, Inc. and Marriott Hotel Services, Inc. (together, the "Marriott Defendants") respectfully submit this pre-motion letter to provide more information about their forthcoming motion to dismiss. For the reasons set forth in the JSR, the Order, and below, the Marriott Defendants respectfully (a) seek leave to file a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), and (b) request that the Court set a briefing schedule allowing all Defendants to file their motions simultaneously, so the Defendants may, if appropriate, refer to each other's arguments.[1]

**Summary of the Dispute**

A summary of the relevant allegations in the First Amended Complaint can be found in the Marriott Defendants' portion of the JSR. *See* JSR at 4. In short, Plaintiff alleges that the Marriott Defendants—two private hotel corporations—conspired with the Kings County District Attorney's Office ("KCDA") and Assistant District Attorney Kyle Reeves to conceal *Brady/Giglio* material from Plaintiff during and after Plaintiff's 1994 criminal trial, and thus deprived Plaintiff of his constitutional rights in violation of 42 U.S.C. § 1983 and the New York State Constitution. *See, e.g.*, First Am. Compl. ("FAC") (ECF No. 5) ¶¶ 118-27, 139-48, 326-29. The *Brady/Giglio* material that was purportedly withheld from Plaintiff is that the prosecution's "star" witness against Plaintiff, Robert DeJesus, was "held" at a Marriott hotel and coerced to testify against Plaintiff as part of the KCDA's decades-long "practice" of incarcerating material witnesses in

[1] The deadline for Defendant City of New York (the "City") to respond to the First Amended Complaint is July 14, 2025. *See* 05/14/2025 Minute Entry.

hotels across New York City. *Id.* ¶¶ 24-49, 50-62, 70-78, 149-295. Although Plaintiff speculates that the Marriott Defendants engaged in a "practice" of providing a "black site" to the KCDA for years, the only non-conclusory allegation tying the Marriott Defendants to Plaintiff's injuries is that DeJesus was held in the Marriott LaGuardia Hotel between July 30 and August 1, 1994. *See id.* ¶¶ 50-62 & Exs. J, K, L. For the numerous reasons discussed below, Plaintiff has failed to state a claim as a matter of law and his claims cannot withstand a motion to dismiss.

**All Federal Claims Against the Marriott Defendants (Causes of Action 1, 3, 6 & 7) Are Barred by *Heck* and On Statute of Limitations Grounds**[2]

Plaintiff does not appear to dispute that (1) his conviction has not been vacated and (2) his *Brady*-based claims necessarily challenge the validity of his criminal conviction. *See* JSR at 2, 8-9. Therefore, Plaintiff's claims are barred by *Heck v. Humphrey*, 512 U.S. 477, 486-90 (1994). In the JSR, the parties addressed whether any exception to the *Heck* bar should apply in light of Plaintiff's failure to file a § 440.10 motion (it does not). Notably, however, Plaintiff argued in response to the Joint Request that a plaintiff's inability to seek *federal* habeas relief, not state court relief, is the "'focus of the exception to *Heck.*'" JSR at 9. But the case Plaintiff cited in support of this principle (*Wiggins v. Mellia*, No. 14-591-CV, 2023 WL 6222303, at *1-2 (2d Cir. Sept. 26, 2023) (summary order)) did not address the issue presented here: *i.e.*, whether an exception to the *Heck* bar applies if the plaintiff could have sought relief in a state collateral proceeding but did not. As a result, the Marriott Defendants submit that full briefing on this issue is appropriate.

Even assuming *arguendo* that Plaintiffs' claims are not barred by *Heck*, they are time-barred. JSR at 3, 6-7. Plaintiff argues that his claims are timely under the "diligence-discovery rule" and/or pursuant to equitable estoppel because the Defendants concealed the *Brady* material and, as a result, Plaintiff did not discover the bases for his claims until a "researcher" provided it to him in December 2024. *Id.* at 9. However, the FAC does not provide any basis to explain why Plaintiff could not have obtained the *Brady* material earlier through a public records request and, to the extent that Plaintiff claims that the Marriott Defendants fraudulently concealed information from him, that claim is not pled with particularity as required under Federal Rule of Civil Procedure 9(b). JSR at 6-7; *see Kyszenia v. Ricoh USA, Inc.*, 583 F. Supp. 3d 350, 361 (E.D.N.Y. 2022) (setting forth elements of fraudulent concealment). Indeed, the FAC does not allege that the Marriott Defendants made *any* representations to Plaintiff or include *any* allegations that support a particularized wrongful concealment theory. And Plaintiff cannot avoid the statute of limitations period by alleging in a generic manner that the Marriott Defendants engaged in an open-ended "civil conspiracy." *See* JSR at 9. In their forthcoming motion, the Marriott Defendants will cite to

---

[2] The remaining claim against the Marriott Defendants arises under the New York State Constitution, and the Marriott Defendants' forthcoming motion will request that the Court decline to exercise supplemental jurisdiction over this claim if the federal claims are dismissed. JSR at 7. In any event, such a claim also requires a finding of state action. *SHAD All. v. Smith Haven Mall*, 66 N.Y.2d 496, 505 (N.Y. 1985).

caselaw confirming that Plaintiff's claims against the Marriott Defendants are time-barred.

**<u>The Federal Claims Against the Marriott Defendants Are Insufficiently Pled</u>**

Even if Plaintiff's claims against the Marriott Defendants were not barred by *Heck* or the statute of limitations (and they are), Plaintiff's claims against Marriott fall well short of applicable pleading standards. For example, Plaintiff fails to plausibly allege state action, as required by § 1983. JSR at 5-6. The Court has already found the Marriott Defendants' position on this issue to be "weighty." Order at 5. Plaintiff also fails to allege liability based on theories of aiding and abetting or a civil conspiracy. JSR at 5-6. Plaintiff has argued that he sufficiently alleged state action on the basis that the Marriott Defendants engaged in a conspiracy to commit and "cover up" the *Brady* violations by purportedly facilitating the KCDA's "kidnappings." JSR at 10. But Plaintiff is bound by the allegations in the FAC, which is bereft of factual allegations suggesting that the Marriott Defendants knowingly participated in such a "conspiracy." Instead, the FAC resorts to conclusory and impermissibly grouped allegations that "Marriott" was involved in a conspiracy. *See* JSR at 5 n.2. Plaintiff points to a letter indicating that the KCDA reserved a room at the Marriott LaGuardia Hotel that was in turn associated with a particular "Custody Number" (in *internal* KCDA documents associated with DeJesus). *See* FAC Exs. J, K, L. These documents, however, in no way suggest that the Marriott Defendants even knew of either DeJesus's or Plaintiff's name much less that DeJesus was held against his will. In their forthcoming motion, the Marriott Defendants will further develop their argument that Plaintiff has failed to sufficiently allege any intent to deprive him of *Brady/Giglio* material. *See Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017) (holding that a § 1983 plaintiff must show "deliberate indifference").

Plaintiff also fails to state a claim based on a *Monell* theory of liability. First, a "*Monell* claim cannot succeed without an underlying constitutional violation, and here there is no constitutional violation." *Mastromonaco v. Cnty. of Westchester*, 779 F. App'x 49, 51 (2d Cir. 2019) (summary order); *see also* JSR at 2-3 (discussing lack of actionable *Brady* claim). Second, the FAC does not adequately allege a policy or custom. *See Jimenez on behalf of J.M. v. Cnty. of Suffolk*, No. 23-CV-9476, 2025 WL 948348, at *18 (E.D.N.Y. Mar. 28, 2025). The FAC fails to allege how unnamed employees of a single Marriott-branded hotel had "final policymaking authority" on the "particular issue" of witness custody or trial disclosures on behalf of the Marriott Defendants. *Clancy v. Town of Southold*, No. 215-CV-7321, 2018 WL 4185706, at *5 (E.D.N.Y. Aug. 31, 2018). Instead, Plaintiff makes one conclusory allegation of delegated authority. FAC ¶ 297. Likewise, a single room rental to the KCDA "does not give rise to an unlawful practice by subordinate officials so permanent and well-settled as to constitute custom or usage." *Jimenez,* 2025 WL 948348, at *18 (cleaned up).

For the foregoing reasons, the Marriott Defendants respectfully seek leave to file their motion to dismiss on a briefing schedule that is aligned with that of the City. The Marriott Defendants also respectfully reserve the right to assert in its motion any other basis for dismissal that may be appropriate.

Respectfully submitted,

/s/ Emily Seiderman West

Kostas D. Katsiris
Emily Seiderman West

cc: All Counsel of Record (via ECF)

THE LAW FIRM OF ANDREW M. STENGEL P.C.
11 BROADWAY, SUITE 715
NEW YORK, NEW YORK 10004
(212) 634-9222 | ANDREW@STENGELLAW.COM | (212) 634-9223 (FAX)

July 21, 2025

**By ECF**
Honorable Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re:** ***Maddix v. The City of New York, et al.*** **25 CV 1909 (HG)**

Dear Judge Gonzalez:

We represent Plaintiff Willie Maddix in this 42 U.S.C. § 1983 action stemming from his wrongful conviction and 19-year imprisonment. I submit this letter in response to Defendants Marriott International, Inc.'s and Marriott Hotel Services, Inc.'s (collectively "Marriott") June 27, 2025, pre-motion letter, and Defendant City of New York's ("City") July 14, 2025, pre-motion letters, concerning their upcoming Fed.R.Civ.P. 12 (b)(6) motions to dismiss. In light of page limitations, any argument not addressed below will be addressed in our opposing motion papers.

## FACTUAL BACKGROUND

In July 1994 Maddix was tried by the Kings County District Attorney's Office ("KCDA") for murder and weapons possession. Prior to and during trial, the trial prosecutor repeatedly represented to Maddix and his attorney that the KCDA was aware of its obligations under *Brady v. Maryland*, 363 U.S. 72 (1963), that no *Brady/Giglio* material existed and that the prosecution's star witness against Maddix, Robert DeJesus, was a Good Samaritan, with no undisclosed motive for testifying. ECF Doc. No. 5, Maddix's First Amended Complaint ("FAC") at ¶¶ 23, 63-69, 72-75, 104, 111, and n. 14. In summation, the prosecutor argued DeJesus had "no motivation to lie," and he had "nothing at stake." *Id.* at ¶¶ 5, 74. The jury, relying on prosecutor's star witness and its narrative, convicted Maddix of weapon possession.

Unbeknownst to Maddix, however, the prosecutor's narrative was false. In truth, the prosecutor secretly and illegally imprisoned the star witness against his will in a Brooklyn Marriott hotel when witness refused to testify against Maddix. The prosecutor held the witness *incommunicado* until he agreed to testify, and only then was he released. These undisclosed facts constituted *Brady*/*Giglio* material in Maddix's case as they (1) demonstrated the falsity of the prosecutor's "Good Samaritan" narrative at Maddix's trial, (2) provided Maddix with the basis to preclude DeJesus's trial testimony on legal coercion and abuse of process grounds, (3) demonstrated the witness had an undisclosed inducement and incentive for testifying, and (4) enabled Maddix to attack the integrity of the prosecution's case. FAC ¶¶ 62 & nn. 9-10 (citing case law establishing such facts constitute *Brady/Giglio* violations).

The FAC alleges Marriott policymakers, its local managers, knowingly facilitated the KCDA's practice of unlawfully imprisoning recalcitrant witnesses. The FAC alleges the mangers (1) "had … actual … notice of the nature of the witnesses' involuntary detentions"; (2) observed KCDA detective-investigators transporting prisoners in and out of the hotel rooms in handcuffs and leg shackles; (3) were aware of damage to the hotel room doors caused by the shackles detective-investigators would place on the doors to prevent the witnesses from escaping; (4) were aware of NYPD responses to the hotel due to volatile prisoner behavior; (5) communicated with the KCDA's Witness Relocation Coordinator concerning the custodies; (6) "took affirmative steps to ensure that the witnesses, in accordance with the KCDA's wishes, had no way to complain or alert anyone of their confinement and that the KCDA's conduct would remain secret;" (7) assigned witnesses "custody" numbers, used those custody numbers to track the witnesses' hotel room, and referenced the custody numbers in billings to the KCD; (8) "instructed employees to keep the practice confidential and rewarded those who did with recognition, good performance evaluations, promotions and raises"; and (9) reported to the KCDA all unusual incidents involving the witnesses. FAC ¶¶ 300-312. Marriott's facilitation of illegal imprisonments was extensive. A KCDA Hotel Custody Log, Exhibit A,[1] documents six other occasions in one month at the time of Maddix's trial, with Marriott serving as a KCDA "black site":

| HOTEL | CUSTODY # | IND. | BUREAU | DATE IN | DATE OUT |
|---|---|---|---|---|---|
| LaGuardia Marriott | 1126 | 6326/92 | Orange ADA Bruen | 1/18/93 | 1/20/93 |
| LaGuardia Marriott | 1129 | 1545/92 | [Illegible] | [Illegible] | 1/25/93 |
| LaGuardia Marriott | 1136 | VOID | Trial Cadre Plazner | [Illegible] | ________ |
| LaGuardia Marriott | 1139 | 7312/92 | Paiser Red | 2/11/93 | 2/17/93 |
| LaGuardia Marriott | 1141 | 14314/91 | Blue Liaison | 2/16/93 | [Illegible] |
| LaGuardia Marriott | 1144 | 7812/92 | Green Omalley | 2/18/93 | [Illegible] |

For 30 years following Maddix's conviction, the KCDA covered up the *Brady/Giglio* material and lied about its existence to every court to review Maddix's case. FAC ¶¶ 81-100. While Marriott did not personally make those misrepresentations, "as a member of [a] [civil] conspiracy [Marriott] … is, as a matter of law, liable for each act taken in furtherance of the conspiracy, even if [it] was not directly involved in the specific act." *O'Hara v. City of New York*, 568 F.Supp.3d 241, 253 (E.D.N.Y. 2021) (Glasser, J.).

[1]The Court may take judicial notice of the log, which was filed in this Court in *Quezada v. Smith,* 08 CV 5088 (KAM)(E.D.N.Y.), ECF Doc. No. 26-1. *Braithwaite v. Suffolk Cnty. New York,* 2022 WL 16837341, at *12 n. 11 (E.D.N.Y. Nov. 9, 2022) (Seybert, J.).

Maddix did not learn of the *Brady* material until December 2024, when a researcher working on an unrelated wrongful conviction case contacted Maddix and alerted him to the *Brady/Giglio* material. FAC ¶ 103. Maddix commenced this action four months later, in April 2025.

## MARRIOTT'S MOTION TO DIMISS

### A. Maddix Is Not Precluded From Invoking *Heck's* Non-Custody Exception

Marriott and the City argue the FAC must be dismissed because Maddix's weapon conviction has not been vacated. But the Second Circuit recognizes "a narrow exception to the *Heck* bar that permits a § 1983 suit where federal *habeas* relief is unavailable." *Wiggins v. Mellia,* 2023 WL 6222303, at *2 (2d Cir. Sept. 26, 2023); FAC at n. 15 (citing cases).

Marriott also incorrectly argues that pursuant to *Chapman v. Fais*, 540 F.Supp.3d 304 (E.D.N.Y. 2021) (Cogan, J.) and *Leach v. City of New York*, 2022 WL 4468288 (E.D.N.Y. Sept. 26, 2022) (Hall, J,) Maddix is not entitled to invoke the *Heck* non-custody because he did not exhaust state court remedies prior to bringing his § 1983 action. But a year or so after *Chapman* and *Leach* were decided, the Second Circuit clarified that it is a plaintiff's inability to seek *federal habeas relief* —not state court relief— that "is the focus of the exception to *Heck*." *Wiggins v. Mellia*, 2023 WL 6222303 (2d Cir. 2023), at *2 (emphasis in original). Moreover, the Second Circuit has emphasized that § 1983 does *not* contain any exhaustion requirement. *See e.g. Jenkins v. Herbert*, 179 F.3d 19, 22 (2d Cir. 1999) ("[T]he Supreme Court has consistently held that courts should not impose an exhaustion requirement on § 1983."), *Heck*, 512 U.S. at 480. (§ "1983 contains no exhaustion requirement beyond what Congress has provided."); *Leather v. Eyck*, 180 F.3d 420, 423 (2d Cir. 1999) (noting the plaintiff elected not to appeal his State conviction, but upholdubg his right to pursue money damages under § 1983).

In addition, the underlying facts in *Chapman* and *Leach* are distinguishable, and involved criminal defendants who unlike Maddix, were aware of their constitutional claims *at the time of their arrests* but strategically forfeited their direct appeals and/or federal *habeas corpus* petitions. In contrast, Maddix diligently challenged his conviction through every available avenue while incarcerated (direct appeal, CPL§ 440.10 motion, and federal *habeas corpus* petition), but he did *not* learn of his claims until 11 years after he was released from prison and was thus precluded from raising the *Brady/Giglio* claim in prior proceedings because of an affirmative 30-year government cover up and not due to an affirmative strategy. *Accord* Joint Letter, ECF Doc. No. 21 pp. 8-9.

### B. Maddix's Statute Of Limitations Did Not Begin To Run Until December 2024

Contrary to Marriott's and the City's claims, Maddix's claims are timely under two independent theories: (1) the diligence-discovery rule, and (2) equitable estoppel. Federal law governs when a Section 1983 claim accrues, *Barnes v. City of New York*, 68 F.4th 123, 127 (2d Cir. 2023), and "[g]enerally speaking, a § 1983 claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Singleton v. City of New York,* 632 F.2d 185, 191, 192 (2d Cir. 1980). "[W]here [a] plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called diligence-discovery rule of accrual applies." *Id.* This rule delays accrual until the date the "plaintiff kn[ew] or ha[d] reason to know of the injury which is the basis of his action." *Veal v. Geraci,* 23 F.3d 722, 724 (2d Cir.1994); *Pipitone v. City of New York*, 57 F.Supp.3d 173, 186 (E.D.N.Y. 2014) (Dearie, J.). Maddix's FAC alleges

defendants actively covered up the *Brady/Giglio* violations, and the first time he learned of them was in December 2024. FAC ¶¶ 103-104. These facts, which must be accepted as true on a motion to dismiss, plausibly demonstrate the timeliness of Maddix's claim under the diligence discovery rule.[2]

First, Marriott and the City, however, ignore the FAC's specific allegations as to how they actively mislead him that no *Brady/Giglio* material existed, FAC at ¶¶ 2, 23, 67-69, 72-76, 82, 89-90, 93-96, 101-105, 108, 110-111, 115-116, 81-116 (the 30-year coverup), ¶¶ 263-295 (the City's Monell coverup policy), ¶¶ 317-325 (the civil conspiracy), and argue Maddix failed to plead these allegations with particularity, and that because a researcher, at some unknown point, was able to obtain the *Brady/Giglio* material through a public records request, the records could not have been suppressed. But as a temporal and factual matter, simply because a researcher obtained the records at some unknown point does not mean those records were previously available to Maddix while he was incarcerated and litigating his criminal case. Moreover, federal law "lend[s] no support to the notion that defendants must scavenge for hints of undisclosed *Brady*/*Giglio* material when the prosecution represents that all such material has been disclosed[,]" *Banks v. Dretke,* 540 U.S. 668, 695, 693 (2004), and the Second Circuit has squarely held the fact that evidence might be available through a public records request does establish it was not concealed for *Brady* purposes. *See United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995) ("Nor are we persuaded that the government's duty to produce the [*Brady* material] was eliminated by that document's availability in a public court file[.]").

Second, "a plaintiff may invoke the doctrine[] … equitable estoppel to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007). The FAC alleges that for over 30-years, Marriott and the City affirmatively misled Maddix and every court to review his case, repeatedly lying that no *Brady*/*Giglio* material existed. *O'Hara v. City of New York*, 568 F. Supp.3d at 253 (under a civil conspiracy, "the fact that [Marriott] may not have been directly involved in the solicitation or use of the fabricated testimony … is irrelevant to [its] liability for th[ose] act[s].") Those actions were "akin to a fraud on the federal habeas courts; that is, the [Defendants] took affirmative actions to conceal [its] tacit agreement with the state's key witness until it was too late, procedurally, for [the petitioner] to use that undisclosed agreement successfully to challenge his … conviction." *Douglas v. Workman*, 560 F.3d 1156, 1193 (10th Cir. 2009). If wrongfully incarcerating a man and covering up for 19 years the very evidence that would free him is insufficient to warrant invocation of equitable estoppel, no set of facts could warrant invocation of the doctrine.

*Opperisano v. P.O. Jones*, 286 F. Supp.3d 450, 464 (E.D.N.Y. 2018) (Hall, J.), cited by Marriott, does not support its untimeliness argument. *Oppersiano* held the statute of limitations accrues for *Heck* non-custody purposes "when habeas is no longer available." But *Opperisano* is distinguishable, involving a plaintiff who was aware of the basis for his § 1983 claim the moment he was released from custody, and who was thus able to pursue a § 1983 action within a year. It was on those specific facts that the *Oppersiano* court held the one-year time limitation applied. *Oppersiano*

[2]As the due diligence-discovery rule provides an independent basis for finding Maddix's claims timely, respectfully, the Court erred in concluding Maddix "must rely on equitable estoppel" to establish the timeliness of his claims. *Maddix v. City of New York*, 2025 WL 1530648, at *2 (E.D.N.Y. May 29, 2025) (Gonzalez, J.) (granting defendants' request to stay discovery pending their motions to dismiss).

had no occasion to consider the impact of a 30-year coverup and the diligence-discovery accrual and equitable estoppel rules. Likewise, *Heck*'s declaration that the statute of limitation for wrongful conviction accrues once a plaintiff's conviction is vacated was announced with respect to prisoners, and did not address the *Heck* non-custodial exception recognized by the Second Circuit.

**C. Maddix Properly Alleges State Action, And Marriott Knowingly Serving As A KCDA Black Site To Imprison Witnesses Against Their Will**

In the Second Circuit, an official has *Monell* final policymaking authority "if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Roe v. City of Waterbury*, 542 F.3d 31, 38 (2d Cir. 2008) (citation and quotation marks omitted). "[W]here a policymaker wholly delegates certain policy powers to a subordinate, the subordinate may herself qualify as a policymaker, thus subjecting the municipality to liability." *Haughey v. Cnty. of Putnam,* 2020 WL 1503513, at *11 (S.D.N.Y. Mar. 29, 2020) (Karas, J.). The FAC alleges Marriott "wholly delegated final policymaking authority to several local managers of the Marriott LaGuardia Hotel. The managers were autonomous and their decisions on the assistance provided and the hotel rooms they rented to the KCDA went unreviewed and were never overruled." FAC ¶ 297. The FAC also alleges through those managers "Marriott created and implemented a plainly illegal, unconstitutional, improper and deliberately indifferent policy, custom, or practice to knowingly facilitate and aid and abet the KCDA's illegal imprisonment of witnesses as prisoners" and to serve as a KCDA black site. *Id.* at ¶ 298. These allegations are more than sufficient at this stage to establish Marriott's liability. *Stalter v. Cnty. of Orange*, 2016 WL 8711397, at *11 (S.D.N.Y. Aug. 5, 2016) (Roman, J.) ("[A]t this stage of the litigation," plaintiff's allegation that Sheriff delegated all final disciplinary authority to defendant and defendant's actions thus constitute municipal policy, "sufficiently alleges *Monell* liability on the basis that Defendant Jones was delegated final policy-making authority.")

These facts also plausibly allege Marriott's knowing participation in a civil conspiracy, aiding and abetting, and the requisite state action for § 1983 purposes. *See e.g.*, *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) ("[A] private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents."); *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980) (private party who conspired with a judge acted under color of state law). Moreover, the frequency of Marriott serving as KCDA black site, as indicated by the KCDA Hotel Custody Log, renders Maddix's allegations all the more plausible.[3]

**THE CITY'S MOTION TO DISMISS[4]**

**A. The *Rooker-Feldman* Doctrine Does Not Bar Maddix's Lawsuit**

Citing a 2011 case, the City argues Maddix's case is barred by the *Rooker-Feldman* doctrine, *Read v. Zugibe*, 2011 WL 1642049, at *1 (S.D.N.Y. Apr. 5, 2011) (Pauley, J.), which bars a district

---

[3]Critically, "even a single action by a decision maker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate the municipality." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 127 (2d Cir. 2004). Thus, the allegations in the FAC are sufficient to establish Marriott's and the City's liability. Without further discovery, there is nothing Plaintiff can add to the FAC by virtue of an amendment.

[4] For the same reasons discussed above in response to Marriott's arguments, neither *Heck* nor the statute of limitation bars Maddix's § 1983 claims.

court from acting as an appellate court for state court judgments. But *Read* is no longer good law, as the Second Circuit clarified in 2021 that the *Rooker/Feldman* doctrine does not bar claims stemming from an opposing party's misconduct during the state court litigation that procured a state court judgment. *See e.g. Dorce v. City of New York*, 2 F.4th 82, 104 (2d Cir. 2021) ("[P]laintiffs are permitted to seek damages for injuries caused by a defendant's misconduct in procuring a state court judgment, but not for injuries directly caused by that judgment."); *Bar-Levy v. Mitchell*, 2022 WL 14746399, at *4 (S.D.N.Y. Oct. 25, 2022) (Seibel, J.) ("[T]he injuries of which Plaintiff complains do not arise from the state-court judgment, but rather from his interaction with Officer Mitchell, and thus they existed in [their] exact form prior to the state-court judgment.")

Further, the *Rooker/Feldman* doctrine does not apply to Maddix's claims based Defendants' 30-year cover up, which took place after the state court judgment was rendered. *See e.g. Deraffele v. City of New Rochelle,* 2016 WL 1274590, at *8–9 (S.D.N.Y. Mar. 30, 2016) (Karas, J.) ("As to any allegations regarding Plaintiff's right to petition subsequent to Judge Kettner's decision, such an injury would be "*independent of* [that] adverse state court decision as Plaintiff complains that Generoso interfered with the filing of his appeal *after* Judge Kettner rendered her decision."); *Target Media Partners v. Specialty Mktg. Corp.*, 881 F.3d 1279, 1286 (11th Cir. 2018) ("[A]s a matter of temporality, it's difficult to imagine a case where a federal court could be barred by *Rooker–Feldman* from hearing a claim that arose only after the relevant state court decision had been issued[.]")

**B. Prosecutorial Immunity Does Not Bar Maddix From Establishing A Predicate Constitutional Violation For His *Monell* Claim**

In *Anilao v. Spota*, 27 F.4th 855 (2d Cir. 2022), the Second Circuit squarely held a prosecutor's entitlement to absolute immunity does not, as the City argues, bar a claim against a municipality. *Id.* at 874 n. 4 ("To the extent the County suggests that it cannot be liable for Spota's and Lato's conduct during the judicial phase because of their absolute immunity, that argument is squarely foreclosed by our precedent") (citations omitted). This well settled rule was applied in *Collins v. City of New York*, 923 F.Supp.2d 462, 472 (E.D.N.Y. 2013) (Block, J). There, Judge Block held a trial prosecutor was entitled to absolute immunity for his trial conduct and dismissed the claims against him, but nevertheless upheld a *Monell* claim based on constitutional violations caused by that same conduct. The City's attempt to mislead the Court regarding this legal issue is outrageous, and based on a misleading case citation.[5]

[5]*See Malik v. City of New York*, 841 F. App'x 281, 284–85 (2d Cir. 2021). In *Malik*, the district court (1) dismissed federal claims against prosecutors on absolute immunity grounds, and (2) dismissed a related *Monell* claim *for pleading deficiencies*, not on absolute immunity grounds. *See Malik. v. City of New York*, 2020 WL 2747979, at *3 (E.D.N.Y. May 27, 2020) (Block, J.). On appeal, the Second Circuit referred to the district court's dismissal of the "federal claims on the ground that the individual City defendants were protected by absolute immunity, and, without any underlying constitutional violation, Malik had no grounds for a *Monell* claim." *Malik v. City of New York*, 841 F.App'x 281, 284 (2d Cir. 2021). In other words, the Second Circuit has not held a prosecutor's entitlement to immunity required dismissal on the *Monell* claim or precluded a *Monell* claim based on that same conduct. Indeed, the Second Circuit has sustained *Monell* claims based on constitutional violations arising from a prosecutor's *Brady* violation and improper summation, acts clearly covered by a prosecutor's absolute immunity. *See e.g. Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir.

Respectfully submitted,

Andrew Stengel

ECF
Encl.

2019) (*Brady* and summation misconduct) and *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) (*Brady* and perjury).

THE LAW FIRM OF ANDREW M. STENGEL P.C.
11 BROADWAY, SUITE 715
NEW YORK, NEW YORK 10004
(212) 634-9222 | ANDREW@STENGELLAW.COM | (212) 634-9223 (FAX)

July 30, 2025

**By ECF**
Honorable Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re:** ***Maddix v. The City of New York, et al.* 25 CV 1909 (HG)**

Dear Judge Gonzalez:

We represent Plaintiff Willie Maddix in this 42 U.S.C. § 1983 action stemming from his wrongful conviction and 19-year imprisonment. I write in response to the Court's July 25, 2025, order, concerning a possible amendment to Maddix's First Amended Complaint ("FAC").

We thank the Court for the invitation to amend; Plaintiff does not intend to amend his complaint. We believe that binding authority overwhelmingly renders the factual allegations in the FAC more than sufficient to state plausible causes of action, and that Defendants' contemplated 12(b)(6) motions fail for the reasons outlined in Plaintiff's pre-motion letter.

The one additional document Plaintiff plans to submit with the opposition to Defendants' upcoming motions is the Kings County District Attorney's Hotel Custody Log (Exhibit A) filed in this Court in *Quezada v. Smith,* 08 CV 5088 (KAM)(E.D.N.Y.), ECF Doc. No. 26-1, featuring one page of entries dated from December 11, 1992, to March 12, 1993. The Log shows six other occasions in a 30-day period, when Marriott served as a Kings County District Attorney "black site," lending to the plausibility of Plaintiff's claims and foreshadowing Plaintiff's ability to prove this was Marriott's settled practice as alleged in the FAC.

The court may take judicial notice of this document on a motion to dismiss without conversion to a motion for summary judgment. *See e.g.*, *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 306 (2d Cir. 2021) ("[O]n a motion for judgment on the pleadings, courts may consider all documents that qualify as part of the non-movant's 'pleading," including: (1) the complaint *or* answer; (2) documents attached to the pleading; (3) documents incorporated by reference in or integral to the pleading; and (4) matters of which the court may take judicial notice.'"); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of pleading in another lawsuit); *Braithwaite v. Suffolk Cnty. New York*, 2022 WL 16837341, at *12 (E.D.N.Y. Nov. 9, 2022) (Seybert, J.); *McKenzie-Morris v. V.P. Recs. Retail Outlet, Inc.*, 638 F. Supp.3d 333, 338 (S.D.N.Y. 2022) (Woods, J.) ("Court may take judicial notice of pleadings filed in other cases

in deciding a motion to dismiss without converting that motion into a motion for summary judgment.")

We thank the Court for its consideration.

Respectfully submitted,

Andrew Stengel

cc: All counsel (by ECF)

# Exhibit A

HOTEL CUSTODY

SA-16





| HOTEL | CUSTODY # | IND # | BUREAU | DATE IN | DATE OUT |
|---|---|---|---|---|---|
| Pan American Pettison 127 | 1120 | 14750/90 | TUMELTY BLUE | 12/11/92 | 2/28/93 |
| Pan American 126 | 1121 ① | 15556-91 | HALE Trial Cadre/Hom. | 12/28/92 | 1-16-9[illegible] |
| Pan American | ② 1122 ① | 69317 | Complaint Rm | 12/30/92 | 2-23-9[illegible] |
| Union Plaza | 1123 | 16298/91 | Shemitz Red | 1/4/93 | 1/6/93 |
| Travel Lodge Rm 236 | Formally E 1108 1124 ④ | 420/92 | Formally 1108 Green Zone | 1/8/93 | 3/18/9[illegible] |
| Pan American Dorkins 128 | 1125 3 | 11644/92 | Adler Gray | 1/4/93 | 7-23-9[illegible] |
| La Guardia Mariott | 1126 | 6326/92 | ORANGE ADA BRUEN | 1/18/93 | 1/20/93 |
| Pan American | 1127 ⑥ | 18/93 | Gray | 1/20/93 | 7/23/9[illegible] |
| Skyline | 1128 ① | 1681/92 | Cadre | 1/21/93 | 1/26/93 |
| LaGuardia Marriott PC | 1129 ① | 1545/92 | [redacted] | [redacted] | 1/25/9[illegible] |
| Pan American | ① 1130 Rm 124 | [redacted] | [redacted] | [redacted] | [illegible] |
| Pan American | 1131 | [illegible] | [redacted] | [illegible] | [illegible] |
| Pan American | 1132 | 9367-91 ① | BIALO-PADIN | 1/31/93 | 2/4/93 |
| Pan American | 1133 ④ | 15666/92 | GRAY STAW-IRWIN | 2/2/93 | 2/16/93 |
| Pan American | 1134 ① | 3288/91 | DVB [illegible] | 2/2/93 | 2/4/93 |
| | 1135 ④ | 14061/91 | ORANGE ADA Kocpulo | 2/3/93 | 2/5/93 |
| Radisson Empire Marriott | 1136 ① | VOID | TRIAL CADRE BLAZWCK | 2/1/93 | |
| Skyline | 1137 3 | 367/93 | RED ADA GRAY | 2/6/93 | 5/3/94 |
| Pan American | 1138 ① | 9367/91 | BIALO-PADIN GREEN | 2/7/93 | 2/[illegible] |
| LaGuardia Marriott PC | 1139 ③ | 7312/92 | RAISNER RED | 2/11/93 | 2-17-9[illegible] |
| Adria | 1140 ① | 9367/91 | BIALO-PADIN GREEN | 2/11/93 | 2-[illegible] |
| LaGuardia Marriott | 1141 ① | 14314/91 | BLUE LUZN | 2/14/93 | 3/8/9[illegible] |
| Adria Rm 201 Vasquez formerly 1133 | 1142 ④ | 15666/91 | IRWIN GRAY | 2/16/93 | 3/[illegible] |
| Park Ave. 2pc | 1143 ② | 9802/92 | Orange KERN | 2/16/93 | [illegible] |
| LaGuardia Marriott | 1144 ① | 7812/92 | GREEN O'MALLEY | 2/18/93 | [illegible] |
| Travelodge | 1145 ① | 9384/89 | MAJOR NARC KORHAN | 2/18/93 | 2/[illegible] |
| Holiday Inn Crown Plaza | 1146 ⑥ | 1366/92 | Orange [illegible] | 2/20/93 | [illegible] |
| ~~Skyline Travelodge~~ VOID | ~~1147~~ | [illegible] | [illegible] VOID | [illegible] | |
| Holiday Inn Crown Plaza PC | 1148 ① | [illegible]9/92 | [illegible] | 2/24/93 | 2-25-9[illegible] |
| " " " PC | 1149 ② | 5501/91 | Orange [illegible] | 3/1/93 | 3-9-9[illegible] |
| " " " " | 1150 ① | 14294/92 | Orange Casto | 2/28/93 | 3-4-9[illegible] |
| PAN AMERICAN GRAMDY 111 112 | 1151 ⑦ | 2328/92 | Blue WEINMAN | 3/4/93 | [illegible] |
| CROWN PLAZA ③ | 1152 ③ | 2579/92 | BURKE GRAY | 3/7/93 | 3/[illegible] |
| HOLIDAY INN CROWN PLAZA | 1153 ① | 908/92 | FARRELL TRIAL CADRE | 3/9/93 | 3/[illegible] |
| [illegible] CUSTODY 1171 | 1154 ① | 994/92 | Ferrell Cadre | 3/9/93 | 4-[illegible] |
| HOLIDAY INN CROWN PLAZA PC | 1155 ① | 13306/91 | Red SHERAN | 3/11/93 | [illegible] |
| | 1156 | | Cadre | | |
| ADRIA Rm 401 | [illegible] ① | 9794/92 | GRAY [illegible]/SUNA | 3/[illegible] | [illegible] |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

WILLIE MADDIX,

Plaintiff,

v.

THE CITY OF NEW YORK, MARRIOTT HOTEL SERVICES, INC., and MARRIOTT INTERNATIONAL, INC.,

Defendants.

25-CV-01909 (HG)

**MEMORANDUM OF LAW OF DEFENDANTS MARRIOTT HOTEL SERVICES, INC. AND MARRIOTT INTERNATIONAL, INC. IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT WITH PREJUDICE**

**VENABLE LLP**

Kostas D. Katsiris
Emily Seiderman West
Carlos H. Salguero
151 West 42nd Street, 49th Floor
New York, New York 10036
(212) 370-6272
(212) 503-9816
(212) 218-2578
kdkatsiris@venable.com
eawest@venable.com
chsalguero@venable.com

*Counsel for Defendants Marriott Hotel Services, Inc. and Marriott International, Inc.*

## TABLE OF CONTENTS

INTRODUCTION .......... 1

FACTUAL BACKGROUND .......... 3

I. The KCDA Rents Two Rooms at the Marriott LaGuardia for a Witness at Plaintiff's Criminal Trial in 1994 .......... 3

II. The KDCA's "Hotel Custody Program" and Marriott's Alleged "Policy and Practice" of Aiding the KCDA .......... 4

III. Plaintiff is Released from Custody and Receives the Purported *Brady* Material .......... 5

IV. The FAC's Causes of Action Against the Marriott Defendants .......... 5

V. Procedural History .......... 6

LEGAL STANDARD .......... 6

ARGUMENT .......... 8

I. Plaintiff's § 1983 Claims Are Barred by *Heck v. Humphrey* .......... 8

II. Even If the *Heck* Bar Does Not Apply, Plaintiff's Claims are Time-Barred .......... 10

A. Plaintiff's Discovery Rule Argument Fails .......... 11

B. Plaintiff's Equitable Estoppel Argument Fails .......... 12

III. The Complaint Fails to State a Claim .......... 15

A. Plaintiff's § 1983 Claims Fail Because Marriott is Not A State Actor .......... 15

B. Aiding and Abetting Liability Is Not Cognizable Under § 1983 .......... 20

C. Plaintiff's Alleged *Monell* Practice of Aiding and Abetting KCDA is Untenable .......... 21

D. Plaintiff Relies on Improper Group Pleading .......... 24

E. The New York Constitutional Claim Fails .......... 25

CONCLUSION .......... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdel-Fakhara v. Vermont*,
No. 22-2543, 2023 WL 3486236 (2d Cir. May 17, 2023) ....................12

*Albert v. City of New York*,
No. 17-CV-04315, 2018 WL 5084824 (E.D.N.Y. Oct. 18, 2018)....................22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................6

*Astacio v. City of New York*,
698 F. Supp. 3d 530 (E.D.N.Y. 2023), *aff'd*, No. 23-7598, 2025 WL 80069 (2d Cir. Jan. 13, 2025)....................15

*Barrows v. Becerra*,
24 F.4th 116 (2d Cir. 2022) ....................16

*Berliner v. Port Auth. of NY & NJ*,
No. 08-CV-3152, 2008 WL 11434516 (E.D.N.Y. Nov. 17, 2008) ....................19

*Betts v. Shearman*,
751 F.3d 78 (2d Cir. 2014)....................15

*Brewster v. Nassau Cnty.*,
349 F. Supp. 2d 540 (E.D.N.Y. 2004) ....................17, 23

*Chapman v. Fais*,
540 F. Supp. 3d 304 (E.D.N.Y. 2021) ....................9

*Ciambriello v. County of Nassau*,
292 F.3d 307 (2d Cir. 2002)....................15, 16, 17, 19

*Clancy v. Town of Southold*,
No. 15-CV-732, 2018 WL 4185706 (E.D.N.Y. Aug. 31, 2018)....................23

*Collins v. City of New York*, *et al.*,
11-CV-766 (E.D.N.Y. 2011)....................4, 5

*Cooper v. U.S. Postal Serv.*,
577 F.3d 479 (2d Cir. 2009)....................17

*Cooper v. City of New York*,
21-CV-4171 (E.D.N.Y. 2021)....................4

*Davis v. Gillespie*,
No. 22-CV-6207, 2023 WL 5002553 (E.D.N.Y. Aug. 4, 2023) ....................14

*De Sole v. Knoedler Gallery, LLC*,
974 F. Supp. 2d 274 (S.D.N.Y. 2013)....................15

*Dean v. Town of Hempstead*,
527 F. Supp. 3d 347 (E.D.N.Y. 2021) ....................17, 19, 20, 23

*Defeo v. Leibstein*,
No. 16-CV-5150, 2018 WL 5777023 (E.D.N.Y. Nov. 1, 2018) ....................18

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)....................25

*DiBenedetto v. Coley*,
No. 24-CV-1029, 2024 WL 4662979 (2d Cir. Nov. 4, 2024)....................18

*Emanuel v. Griffin*,
No. 13-CV-1806, 2013 WL 5477505 (S.D.N.Y. Oct. 2, 2013)....................20

*Estiverne v. Esernio Jenseen*,
910 F. Supp. 2d 434 (E.D.N.Y. 2012) ....................18, 20

*Gallop v. Cheney*,
642 F.3d. 364 (2d Cir. 2011)....................17, 19

*Geiss v. Weinstein Co. Holdings LLC*,
383 F. Supp. 3d 156 (S.D.N.Y. 2019)....................12

*Gill v. Silver Invs. Inc.*,
413 F. Supp. 3d 123 (E.D.N.Y. 2016) ....................16

*Global Network Commc'ns, Inc. v. City of New York*,
458 F.3d 150 (2d Cir. 2006)....................7

*Gonzalez-Ramos v. United States*,
No. 05-CV-3974, 2007 WL 1288634 (S.D.N.Y. May 2, 2007) ....................11

*Harrison v. New York*,
95 F. Supp. 3d 293 (E.D.N.Y. 2015) ....................10, 17

*Heck v. Humphrey*,
512 U.S. 477 (1994)....................1, 8, 9

*Horn v. Politopoulos*,
628 F. App'x 33 (2d Cir. 2015) ....................14

*Int'l Bhd. of Teamsters Loc. 456 Health & Welfare Tr. Fund v. Quest Diagnostics Inc.*,
No. 10-CV-1692, 2012 WL 13202126 (E.D.N.Y. Apr. 19, 2012) ....11

*Jimenez on behalf of J.M. v. Cnty. of Suffolk*,
No. 23-CV-9476, 2025 WL 948348 (E.D.N.Y. Mar. 28, 2025)....23

*Kronisch v. United States*,
150 F.3d 112 (2d Cir. 1998)....11

*Kyszenia v. Ricoh USA, Inc.*,
583 F. Supp. 3d 350 (E.D.N.Y. 2022) ....7, 13, 14

*Leach v. City of New York*,
No. 20-CV-854, 2022 WL 4468288 (E.D.N.Y. Sept. 26, 2022) ....9

*Lockwood v. Town of Hempstead*,
No. 16-CV-3756, 2017 WL 9485687 (E.D.N.Y. Feb. 24, 2017) ....24

*Lozada v. Weilminster*,
92 F. Supp. 3d 76 (E.D.N.Y. 2015) ....22

*Lurch v. City of New York*,
No. 19-CV-11253, 2021 WL 1226927 (S.D.N.Y. Marc. 31, 2021) ....16, 21

*Mastromonaco v. Cnty. of Westchester*,
779 F. App'x 49 (2d Cir. 2019) ....21

*Nesbeth v. New York City Mgmt. LLC*,
No. 17 CV 8650, 2019 WL 110953 (S.D.N.Y. Jan. 4, 2019)....24

*O'Hara v. City of New York*,
568 F. Supp. 3d 241 (E.D.N.Y. 2021) ....13

*Opperisano v. P.O. Jones*,
286 F. Supp. 3d 450 (E.D.N.Y. 2018) ....8, 9, 10

*Palmenta v. Blank*,
No. 3:18-CV-1078, 2018 WL 4516676 (D. Conn. Sept. 20, 2018)....9

*Pearl v. City of Long Beach*,
296 F.3d 76 (2d Cir. 2002)....10, 13

*Pipitone v. City of New York*,
57 F. Supp. 3d 173 (E.D.N.Y. 2014) ....11, 12

*Poventud v. City of New York*,
750 F.3d 121 (2d Cir. 2014) (en banc)....8

*Quezada v. City of New York*,
16-CV-6577 (E.D.N.Y. 2016) (ECF No. 8)....................4, 5, 6, 7

*Quezada v. Smith*,
08-CV-05088 (E.D.N.Y. 2008)....................7

*Raghavendra v. N.L.R.B.*,
No. 08-CIV-8120, 2009 WL 5908013 (S.D.N.Y. Aug. 27, 2009) ....................20

*Red Mountain Med. Holdings, Inc. v. Brill*,
563 F. Supp. 3d 159 (S.D.N.Y. 2021)....................15

*Roe v. City of Waterbury*,
542 F.3d 31 (2d Cir. 2008)....................21, 24

*Salis v. Dopico*,
No. 23-CV-1816, 2024 WL 1282476 (E.D.N.Y. Mar. 26, 2024), *aff'd*, No. 24-1066-CV, 2025 WL 880407 (2d Cir. 2025)....................7

*Scotto v. Almenas*,
143 F.3d 105 (2d Cir. 1998)....................18

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
605 U.S. 280 (2025)....................21

*Tanzi v. Town of Marlborough*,
No. 13-CV-1113, 2014 WL 2815777 (N.D.N.Y. June 23, 2014)....................23

*Teichmann v. New York*,
769 F.3d 821 (2d Cir. 2014) (Livingston, J. concurring in part) ....................8

*Tineo-Santos v. Piccolo*,
No. 19-CV-5038, 2021 WL 266561 (S.D.N.Y. Jan. 27, 2021) ....................9

*United States v. Bestfoods*,
524 U.S. 51 (1998)....................24

*Woods v. Chadwick*,
No. 9:21-CV-0662, 2021 WL 12318012 (N.D.N.Y. July 19, 2021) ....................20

**Statutes and Rules**

42 U.S.C. § 1983.................... *passim*

Fed. R. Civ. P. 9....................7, 9, 14

## INTRODUCTION

Pursuant to 42 U.S.C. § 1983, plaintiff Willie Maddix ("Plaintiff" or "Maddix") seeks $100 million in damages jointly from defendants Marriott Hotel Services, Inc. ("Marriott Services"), its corporate parent, Marriott International, Inc. ("Marriott International") (together, the "Marriott Defendants" or "Marriott") and defendant the City of New York (the "City") (collectively, "Defendants") for events that allegedly occurred in a hotel room in Queens over 30 years ago. Plaintiff alleges that in 1994, an assistant district attorney ("ADA Reeves") from the Kings County District Attorney's office ("KCDA") "coerced" a witness at Plaintiff's criminal trial by "imprisoning" the witness at a Marriott-branded hotel as part of the KCDA's "Hotel Custody Program." Plaintiff alleges that the KCDA deliberately withheld this information in violation of *Brady/Giglio* and then engaged in a 30-year "cover up."

The Court may wonder why the Marriott Defendants, which are corporate entities in the hotel and lodging business, have been sued for the failure to disclose *Brady/Giglio* material in a criminal proceeding. Notably, this is not the first § 1983 lawsuit against the City that is premised on the KCDA's alleged Hotel Custody Program or related prosecutorial misconduct that allegedly occurred during the 1990s. None of those prior lawsuits, however, involved a hotel company. In a misguided attempt to add a "deep-pocketed" defendant to this lawsuit, Plaintiff asserts novel theories of § 1983 liability, including conspiring with and aiding-and-abetting the KCDA.

To characterize these theories of liability as a stretch is an understatement. Plaintiff seeks millions of dollars from Marriott for allegedly depriving him of his civil rights, but Plaintiff admits that no Marriott employee was involved in his trial, ever misrepresented anything to him, or even knew who the Plaintiff—or the witness who testified against him—was when the KCDA booked a hotel room three decades ago. Contrary to the well-established body of § 1983 case law, Plaintiff has concocted a frivolous theory of liability that equates renting hotel rooms to the KCDA with

wrongful conduct. For several independent reasons, neither the primary § 1983 claim nor any derivative theories of liability against Marriott have any merit.

***First***, because this lawsuit is a collateral attack on Plaintiff's underlying conviction and Plaintiff has not secured a vacatur of that conviction, no § 1983 claim has accrued. *See Heck v. Humphrey*, 512 U.S. 477, 486-90 (1994). While Plaintiff seeks to rely on a narrow exception to the *Heck* doctrine, this exception is unavailable to him because his own pleading establishes that he failed to exercise due diligence in seeking habeas or similar relief.

***Second***, Plaintiff's claims are time-barred and—accepting all of Plaintiff's allegations as true for purposes of this Motion—there are no equitable circumstances that excuse this untimeliness.

***Third***, the Marriott Defendants are not state actors and did not engage in state action simply by renting hotel rooms to the KCDA. Plaintiff attempts to impute state action to Marriott by relying on nebulous allegations of a "conspiracy" between the KCDA and the Marriott Defendants. However, the Complaint is bereft of any specific factual allegations that support this far-fetched conspiracy, and Plaintiff's alternative theory that Marriott "aided and abetted" a § 1983 tort has no foundation in the law.

***Fourth***, Plaintiff asserts a *Monell* "claim" against the Marriott Defendants, alleging that they created or implemented a policy of "knowingly facilitating or aiding-and-abetting" the KCDA by providing hotel rooms. Even if the Marriott Defendants were state actors (they are not), there are no factual allegations establishing (i) a pattern or practice of Marriott's, (ii) which was created or ratified by a Marriott employee of sufficient policymaking authority, (iii) that was the "moving force" behind the KCDA's decision not to disclose *Brady/Giglio* evidence to Plaintiff.

For these reasons, amplified below, the claims asserted against Marriott in the First

Amended Complaint should be dismissed. Further, as Plaintiff has conceded that he will not again amend his pleading (ECF No. 27), the Marriott Defendants respectfully request that the Court dismiss the claims against them with prejudice.

## FACTUAL BACKGROUND

The following facts are taken from allegations in the First Amended Complaint ("FAC") (ECF No. 5) and documents attached to the FAC or incorporated by reference. For purposes of this Motion only, Marriott assumes the factual allegations in the FAC to be true.

### I. The KCDA Rents Two Rooms at the Marriott LaGuardia for a Witness at Plaintiff's Criminal Trial in 1994

Maddix was arrested in 1993. FAC ¶¶ 21–22. His case was assigned to ADA Reeves of the KCDA. *Id.* In July 1994, the weekend before Maddix's trial, ADA Reeves obtained an *ex parte* material witness warrant order for Robert DeJesus ("DeJesus"), who would be one of two witnesses to testify at Plaintiff's trial. *Id.* ¶¶ 51, 70. DeJesus was transported to and housed at the Marriott LaGuardia from July 30 to August 1, 1994—about 48 hours. *Id.* ¶ 61, Ex. L.

While the FAC characterizes this stay as imprisonment, *id.* ¶¶ 50–62, Plaintiff has walked back that characterization in subsequent filings, stating that DeJesus was simply "held *incommunicado*." ECF No. 26 at 1. He bases his allegations that DeJesus was held at the Marriott LaGuardia on two documents, both of which are dated July 29, 1994. The first is an *internal* KCDA "custody reservation request" form for "Custody #1407," which includes a notation to "material witness – Robert DeJesus." FAC, Ex. J. The second is a boilerplate KCDA reservation confirmation form generically addressed to the "LaGuardia Marriott Hotel" referencing the same "Custody # 1407" and stating that the "custody was reserved under the name 'Marguerite G.'"[1]

[1] "Marguerite's" full name is not fully legible on the form. *See* Ex. L.

*Id.*, Ex. L. Handwritten on the form are the notes "No Food/Room Service," "No Pay Television," and "Only telephone service in double room. None in single room." *Id.*

Plaintiff does not allege that either document was sent to or received by the Marriott Defendants, and the first document does not reference Marriott at all.[2] At some point, ADA Reeves visited DeJesus and conveyed that if he testified "in accordance with Reeves's case narrative, DeJesus would be released from custody." *Id.* ¶¶ 58-59. DeJesus testified and Maddix was convicted of criminal possession of a weapon in the second degree. *Id.* ¶¶ 3, 70, 73, 78.

## II. The KDCA's "Hotel Custody Program" and Marriott's Alleged "Policy and Practice" of Aiding the KCDA

Aside from the KCDA's room reservation at a Marriott hotel in 1994, there are no *factual* allegations tying the Marriott Defendants to any of the alleged constitutional violations. Plaintiff admits that the Marriott Defendants "did not personally make [] misrepresentations" to him. Plaintiffs Pre-Motion Letter Response ("Pl's PML") at 2, ECF No. 26. Instead, Plaintiff asks the Court to infer that the Marriott Defendants conspired with the KCDA or maintained a policy, custom, or practice to facilitate and aid and abet the KCDA's actions by citing to allegations and testimony from *other* lawsuits filed against the KCDA. *See, e.g.*, FAC ¶¶ 154 n.19, 155.

Specifically, the FAC adopts the allegations from complaints filed in three other cases.[3] In particular, the FAC incorporates allegations that witnesses were "kidnapped and imprisoned" in hotel rooms, "with their hotel doors shackled, guarded by detective-investigators, and without

---

[2] Plaintiff also attaches a document that he claims is a KCDA custody schedule for the LaGuardia Marriott. FAC ¶ 54 & Ex. K. The document refers to the "Location" of the LaGuardia Marriott and lists certain names and dates in 1994 but there are no references to either DeJesus or Maddix.

[3] The three cases are: *Collins v. City of New York*, *et al.*, 11-CV-766 (E.D.N.Y. 2011) (ECF No. 1) ("*Collins* Compl."), *Quezada v. City of New York*, 16-CV-6577 (E.D.N.Y. 2016) (ECF No. 8) ("*Quezada* Compl."), and *Cooper v. City of New York*, *et. al.*, 21-CV-4171 (E.D.N.Y. 2021) (ECF No. 1) ("*Cooper* Compl."). Decl. of Emily Seiderman West in Supp. of Mot., Exs. 1–3.

the ability to use or have visitors without the KCDA's permission." FAC ¶ 153(g); *compare Cooper* Compl. ¶ 296(g) (almost identical allegations); *Quezada* Compl. ¶¶ 8, 104, 167(c), 170, (similar allegations); *Collins* Compl. ¶ 441(b) (similar allegations). The plaintiffs in these other lawsuits asserted § 1983 due process claims against certain ADAs and the City, premised on an array of alleged misconduct by KCDA prosecutors. *See, e.g.*, *Collins* Compl., ¶¶ 414–523; *Quezada* Compl., ¶¶ 163–229; *Cooper* Compl., ¶¶ 292–361, 362–401.

The complaints in these other cases do not name hotel companies as defendants. Even where hotels or a "Hotel Custody Program" *are* mentioned, there are no allegations of third parties conspiring with the KCDA to imprison witnesses. All three of these cases were resolved before summary judgment. *See Collins*, ECF No. 211; *Quezada*, ECF No. 49; *Cooper*, ECF No. 56.

## III. Plaintiff is Released from Custody and Receives the Purported *Brady* Material

Plaintiff was released in 2012. FAC ¶ 100. He alleges that "[t]he first time [he] learned of the *Brady/Giglio* material was on December 18, 2024, when a researcher working on an unrelated wrongful conviction case alerted Maddix to the *Brady/Giglio* material in his case, which was obtained through a public records request." *Id.* ¶ 103. Plaintiff does not specify what he received, but presumably, it was the documentation of DeJesus's hotel stay. *See* FAC, Exs. J, K, L.

## IV. The FAC's Causes of Action Against the Marriott Defendants

The FAC asserts two primary causes of action against all Defendants pursuant to § 1983: (1) violation of Plaintiff's Fifth and Fourteenth Amendment rights to a fair trial, based on the KCDA's suppression of *Brady/Giglio* material during his criminal trial (First Cause of Action) (FAC ¶¶ 118–27), and (2) violation of Plaintiff's substantive due process rights under the Fifth and Fourteenth Amendments, based on the alleged "cover up" of the alleged *Brady* material post-conviction (Second Cause of Action) (*id.* ¶¶ 139–48). Plaintiff's two other federal constitutional

claims against the Marriot Defendants are theories of liability in support of his primary § 1983 claims; the Sixth Cause of Action asserts a § 1983 "*Monell* claim" based on the Marriott Defendants' alleged aiding and abetting of the KCDA by providing hotel rooms for the Hotel Custody Program, *id.* ¶¶ 296–316, and the Seventh Cause of Action asserts a § 1983 civil conspiracy/aiding and abetting claim, *id.*, ¶¶ 317–25. Finally, Plaintiff asserts a parallel due process claim under the New York State Constitution (Eighth Cause of Action). *Id.* ¶¶ 326–29.

### V. Procedural History

Discovery has been stayed pending resolution of the Defendants' motions to dismiss. ECF No. 23 ("Discovery Order"). Plaintiff has represented that he does not "intend to amend his complaint." ECF No. 27. In that same submission, he states that he "plans to submit" as an exhibit a putative KCDA "Hotel Custody Log" (the "KCDA Logbook") retrieved from the *Quezada* litigation. *Id.* The KCDA Logbook exhibit is a single handwritten spreadsheet listing hotel names, and attendant custody numbers, indictment numbers, bureau assignment, and in- and out-dates. Of the 37 entries, "Marriott LaGuardia" appears six times between January and February 1993, which was one year before Plaintiff's trial. The entries also identify other non-Marriott hotels. *Id.*

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). To satisfy this standard, a plaintiff must assert "more than labels and conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,

do not suffice." *Id.* Further, the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

As discussed below, Plaintiff avers that the Marriott Defendants made fraudulent misrepresentations that excuse his untimely claims. Therefore, the heightened pleading standards of Rule 9(b) apply to those allegations. *Kyszenia v. Ricoh USA, Inc.*, 583 F. Supp. 3d 350, 361 (E.D.N.Y. 2022) (citing Fed. R. Civ. P. 9(b)). Rule 9(b) requires that plaintiffs alleging fraud "must state with particularity the circumstances constituting [the] fraud." *Id.* at 358.

In addition, the FAC refers extensively to documents filed in other litigations. If the Court is inclined to take judicial notice of these documents, it may not do so "for the truth of the matters asserted in the other litigation[s] but rather [only] to establish the fact of such litigation[s] and related filings." *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 157 (2d Cir. 2006) (citation omitted). Additionally, the Court should not consider the KCDA Logbook or anything else that is not contained in the FAC for purposes of this Motion. *See Salis v. Dopico*, No. 23-CV-1816, 2024 WL 1282476, at *1 n.2 (E.D.N.Y. Mar. 26, 2024) (declining to consider "anything the plaintiff claimed in his oppositions to the motions or in the multiple letters to the Court" on a motion to dismiss), *aff'd*, No. 24-1066-CV, 2025 WL 880407 (2d Cir. 2025). This is especially important as Plaintiff has declined to amend the FAC yet insists that the Court must take judicial notice of the KCDA Logbook. *See* ECF No. 27.[4] Regardless, even if the Court chooses to treat the KCDA Logbook as if it is a part of the FAC, it does not support any of Plaintiff's claims against Marriott, as discussed below. *See infra* Part III.

---

[4] Plaintiff claims the KCDA Logbook submitted here is the same as one filed in in the *Quezada* matter and was placed under seal in 2013. *See* July 24, 2013, Order in *Quezada v. Smith,* 08-CV-05088 (E.D.N.Y. 2008); Pl's PML at 2, n.1. In correspondence with counsel, Plaintiff claimed he downloaded a copy of the document before the Court sealed it.

## ARGUMENT

The FAC does not allege that the Marriott Defendants directly committed any constitutional deprivations. Rather, Plaintiff seeks damages from a singular "Marriott," *see* FAC ¶¶ 121–26, 139–41, 298–316, 317–25, 326–29, based on novel theories of conspiracy and *Monell* liability. For the reasons below, the FAC should be dismissed in its entirety with prejudice, as Plaintiff will not (and cannot) amend his complaint to correct any of its fatal flaws. ECF No. 27.

### I. Plaintiff's § 1983 Claims Are Barred by *Heck v. Humphrey*

*Heck v. Humphrey* "precludes the use of § 1983 suits for damages that necessarily have the effect of challenging existing state or federal criminal convictions." *Poventud v. City of New York*, 750 F.3d 121, 124 (2d Cir. 2014) (en banc). A plaintiff must first secure a "favorable termination" of the underlying conviction, such as successful vacatur pursuant N.Y. Crim. Pro. L. ("CPL") § 444.10.[5] *See id.* at 126–27. Claims invoking *Brady* violations "necessarily imply the invalidity of the challenged conviction." *Id.* at 132–33.[6]

Plaintiff does not dispute that his conviction has not been vacated or that his claims necessarily challenge the validity of his conviction. Instead, Plaintiff argues that *Heck* does not apply to him because he is no longer in custody and thus cannot resort to federal *habeas corpus* to challenge his conviction, relying on a "narrow" exception to the *Heck* bar that he claims is recognized in the Second Circuit. FAC at 20, n.15. To the extent that the Second Circuit recognizes narrow exceptions to the *Heck* bar, they are not implicated here. *See Opperisano v.*

---

[5] CPL § 444.10 provides defendants an avenue to vacate a judgment of conviction "at any time after entry of judgement" for a list of enumerated causes. *Id.*

[6] Contrary to Plaintiff's belief, *see* Pl's PML at 3, in holding that a plaintiff must secure a favorable termination prior to allowing § 1983 damages, the Supreme Court "d[id] not engraft an exhaustion requirement upon § 1983, but rather *den[ied] the existence of a cause of action*." *Heck*, 512 U.S. at 489 (emphasis added).

*P.O. Jones*, 286 F. Supp. 3d 450, 457–60 (E.D.N.Y. 2018) (tracing history and scope of these exceptions); *Teichmann v. New York*, 769 F.3d 821, 827–28 (2d Cir. 2014) (Livingston, J. concurring in part) (discussing same). As relevant here, some courts in this District have recognized a "*Jenkins/Leather*" exception, which may allow an otherwise *Heck*-barred claim to proceed if the plaintiff is not in custody and cannot pursue habeas relief. But the exception applies if, and only if, the plaintiff has demonstrated *some* "due diligence in pursuing habeas *or similar relief*[.]" *Opperisano*, 286 F. Supp. 3d at 460 (emphasis added); *Chapman v. Fais*, 540 F. Supp. 3d 304, 307–08 (E.D.N.Y. 2021); *Leach v. City of New York*, No. 20-CV-854, 2022 WL 4468288, at *3 (E.D.N.Y. Sept. 26, 2022) (agreeing with *Chapman*). For example, in *Chapman*, Judge Cogan found the *Leather/Jenkins* exception did not apply because the plaintiff did not seek relief from his conviction by way of a "state collateral proceeding" and forwent such relief "in favor of a chance to extract a money settlement." 540 F. Supp. 3d at 307. In dismissing the complaint, Judge Cogan explicitly noted that relief was available pursuant to a § 440.10 motion. *Id.* at 308.

So too here. Plaintiff has not pursued any state collateral relief—which remains available at any time—and thus has not been diligent.[7] Plaintiff has been at liberty since 2012 and purportedly knew about the *Brady/Giglio* violation since December 2024, yet chose not to file a § 440.10 motion to vacate his conviction. As Plaintiff "deliberate[ly]" chose to file a § 1983 action "over the established procedures to obtain a formal vacatur of a conviction," the Court must find the entire suit barred by *Heck*. *Chapman*, 540 F. Supp. 3d at 307–08. *See Opperisano*, 286 F. Supp. 3d at 461–63 (parolee's claims *Heck* barred where never "even attempted to seek . . . collateral relief"); *Palmenta v. Blank*, No. 3:18-CV-1078, 2018 WL 4516676, at *3 (D. Conn.

[7] There is no statute of limitations or "absolute rule in New York prohibiting successive Section 440.10 motions." *Tineo-Santos v. Piccolo*, No. 19-CV-5038, 2021 WL 266561, at *4 (S.D.N.Y. Jan. 27, 2021).

Sept. 20, 2018) (The court would not "overlook" *Heck* bar, despite expiration of plaintiff's sentence, where Plaintiff "fail[ed] to pursue *any* form of relief in state court to challenge the constitutionality of his arrest or convictions") (emphasis added).

## II. Even If the *Heck* Bar Does Not Apply, Plaintiff's Claims are Time-Barred

Assuming *arguendo* that the *Heck* bar does not apply, Plaintiff's claims are time barred. To be clear, Plaintiff has not disputed that his claims are untimely. Nor could he. The statute of limitations for § 1983 claims brought in federal court in New York is three years. *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002). Plaintiff's main theory of liability against the Marriott Defendants is based on civil conspiracy, and in actions "alleging civil conspiracies, including conspiracies to violate an individual's civil rights, the cause of action accrues and the statute of limitations begins to run from the time of commission of the overt act alleged to have caused damages." *Harrison v. New York*, 95 F. Supp. 3d 293, 327 (E.D.N.Y. 2015) (cleaned up).[8] For § 1983 damages claim that implicates *Heck*, however, the claim does not accrue until the relevant conviction has been invalidated. *Opperisano*, 286 F. Supp. 3d at 463. Therefore, Plaintiff's claims have not accrued because he does not allege that his conviction was invalidated. Even if the Court were to credit Plaintiff's argument that his release from custody in 2012 lifted the *Heck* bar (and the Court should not do so), the statute of limitations expired in 2015. *See id.* 463–64 (concluding plaintiff's § 1983 claim accrued upon release from parole and "habeas [wa]s no longer available").

Grasping at straws, Plaintiff seeks "to relieve [himself] from the bar of a statute of limitations," *Pearl*, 296 F.3d at 80, by claiming that (1) the federal discovery rule delayed accrual

[8] Even applying this rule, Plaintiff's claims are untimely. On the face of the FAC, his claims would have accrued at the time the alleged "overt act" of the hotel room rental occurred on July 29, 1994, *see* FAC Ex. L. Therefore, the statute of limitations for all of Plaintiff's § 1983 claims would have expired in 1997.

of his claims because he did not discover the *Brady/Giglio* material until 2024, FAC ¶ 103, and (2) Defendants hid this information from him during his criminal trial and thereafter, *Id.* ¶ 108, which warrants equitable estoppel. Pl's PML at 3; Joint Stay Request ("JSR") at 7, 9, ECF No. 21. Neither of these arguments can be credited under applicable law.

**A. Plaintiff's Discovery Rule Argument Fails**

Under the federal diligence-discovery rule, a claim accrues only when "the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause." *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998). It applies in cases "where the government conceals the acts giving rise to the plaintiff's claim, or where [the] plaintiff would reasonably have had difficulty discerning the fact or cause of the injury at the time it was inflicted." *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 188 (E.D.N.Y. 2014) (quoting *Kronisch*, 150 F.3d at 121).

Assuming no *Heck* bar applies, Plaintiff cannot rely on the diligence-discovery rule because the FAC acknowledges that he was on inquiry notice of his claims as far back as 2011 and did not exercise the required due diligence. *Pipitone*, 57 F. Supp. 3d at 188 ("Once a duty to inquire is established, the plaintiff is charged with the knowledge of what he or she would have uncovered through a reasonably diligent investigation."). It is well-settled that discovery of the "critical facts" of injury and causation "is not an exacting requirement." *Pipitone*, 57 F. Supp. 3d at 188. Rather, "[w]hether a plaintiff was placed on inquiry (or constructive) notice depends upon what information was 'reasonably accessible' to a plaintiff of ordinary intelligence, including newspaper articles, regulatory filings and other publicly available documents." *Int'l Bhd. of Teamsters Loc. 456 Health & Welfare Tr. Fund v. Quest Diagnostics Inc.*, No. 10-CV-1692, 2012 WL 13202126, at *8 (E.D.N.Y. Apr. 19, 2012) (citation omitted). This "'due diligence' standard

constitutes an objective test, equating due with reasonable diligence." *Gonzalez-Ramos v. United States*, No. 05-CV-3974, 2007 WL 1288634, at *7 (S.D.N.Y. May 2, 2007) (citations omitted).

Here, Plaintiff was on inquiry notice. The FAC admits that Plaintiff knew the identity of ADA Reeves, other KCDA prosecutors, and DA Hynes and cites repeatedly to publicly available reports of their alleged misconduct. *See, e.g.*, FAC ¶¶ 22 n.2 (2015) (NBC NY news report that Reeves failed to disclose *Brady* material resulting in a mistrial); 163 (2011 CBS News report of KCDA paying false witness); 162 n.23 (citing 100-page report published in 2020 by the KCDA's Conviction Review Unit); 209–215 n.26 (alleging that a 2012 story about similar alleged violations by the KCDA was "reported in virtually all major New York newspapers"). These pieces were also published after Plaintiff's release from prison. "News reports, if sufficiently probative and widely publicized, can trigger accrual, or at least require potential plaintiffs to undertake a reasonably diligent investigation." *Pipitone*, 57 F. Supp. 3d at 188.

This material was certainly enough to plausibly raise (at minimum) a "suspicion" that "[gave] rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence," but Plaintiff was not diligent. *Abdel-Fakhara v. Vermont*, No. 22-2543, 2023 WL 3486236, at *1 (2d Cir. May 17, 2023) (summary order). *See also Pipitone*, 57 F. Supp 3d at 188–89 (assuming that knowledge of newspaper article would be a "basis" for a "causal connection" between City and the injury sufficient to charge plaintiff with inquiry notice). To the contrary, Plaintiff failed to reasonably investigate his potential claims further by submitting a FOIL request, as he claims that other incarcerated individuals have done. *See, e.g.*, FAC ¶¶ 274–80; *id.* ¶ 103.

**B. Plaintiff's Equitable Estoppel Argument Fails**

Plaintiff incorrectly argues that the equitable estoppel doctrine should apply here, because of Defendants' alleged fraudulent concealment of the *Brady/Giglio* material. *See* FAC ¶¶ 114–16;

Prayer for Relief. Tolling based on equitable estoppel, however, is an "extraordinary remedy that should be invoked sparingly and only under exceptional circumstances." *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 172 (S.D.N.Y. 2019). *See also* Discovery Order at 4 (quoting same). There are no exceptional circumstances present here warranting application of the doctrine.

To toll the statute of limitations based on fraudulent concealment, Plaintiff must show: "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Kyszenia*, 583 F. Supp. 3d at 361 (cleaned up).

Starting with element (3), Plaintiff has *not* shown that he exercised diligence in pursuing the discovery of his claims or that he was prevented from discovering them. The Second Circuit has "made it clear that" in applying the equitable estoppel tolling doctrine, "[it] had in mind a situation where a plaintiff could show that it would have been *impossible* for a reasonably prudent person to learn about his or her cause of action." *Pearl*, 296 F.3d at 85 (cleaned up) (emphasis in original). This is not the case here, for the reasons discussed above in Part II.A.

But even if the FAC provided a basis for Plaintiff to show that he exercised due diligence with respect to his claims (and it does not), Plaintiff cannot satisfy element (1). Plaintiff has conceded that the Marriott Defendants *could not have* "wrongfully concealed material facts" from Plaintiff because—as he admits—the FAC does not allege that they knew who Plaintiff was in 1994 (or any time after). Pl's PML at 2–4 ("Marriott did not personally make those misrepresentations . . . .").[9] Further, as Plaintiff's estoppel argument is grounded in allegations of

[9] Plaintiff's claim that Marriott can be liable for a prosecutor's potential *Brady* violations through conspiracy puts the cart before the horse. Conspiracy liability can only accrue *after* actually

"self-concealment" and coverups, FAC ¶¶ 81–116, Plaintiff is required to allege some type of "fiduciary relationship giving rise to" an "obligation to inform the plaintiff of the facts underlying the claim." *Horn v. Politopoulos*, 628 F. App'x 33, 34–35 (2d Cir. 2015) (summary order). But the FAC does not—and cannot—allege any such relationship between Marriott and Plaintiff. In fact, only ADA Reeves is alleged to have had such a duty.[10] FAC ¶ 105.

Even assuming *arguendo* that such a fiduciary relationship existed, Plaintiff fails to allege the Marriott Defendants' involvement in the purported fraud with particularity under Rule 9(b). *Kyszenia*, 583 F. Supp. 3d at 358. If the claim is premised on concealment such that Plaintiff "cannot specify the time and place because no affirmative act occurred, the complaint must still allege: (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through the fraud." *Id.* (cleaned up). "Failure to satisfy the Rule 9(b) standard is grounds for dismissal." *Id.* (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir. 2006)).

The FAC falls woefully short of these pleading requirements. The allegations against Marriott simply regurgitate the elements of concealment: "[t]he City, through the KCDA and conduct attributable to the City's co-conspirators Marriott, concealed facts it was constitutionally required to disclose and misrepresentations of fact to Maddix," which Plaintiff "reasonably relied on," and "as a result, was unable to raise the *Brady/Giglio* issues in his federal habeas corpus petition." FAC ¶¶ 114–16. These conclusory statements are nowhere supported by allegations explaining how, when, or where the Marriott Defendants misled Plaintiff or what they could have

---

"adequately alleging" a conspiracy, and the FAC does not do so here. *O'Hara v. City of New York*, 568 F. Supp. 3d 241, 252 (E.D.N.Y. 2021) (cited in Pl's PML at 2); *see also infra* Part III.A.2.

[10] The Marriott Defendants could not violate *Brady* themselves because *Brady* "applies only to lawyers for the government," not hotel employees. *Davis v. Gillespie*, No. 22-CV-6207, 2023 WL 5002553, at *5 (E.D.N.Y. Aug. 4, 2023).

possibly gained from doing so. Courts regularly reject generalized allegations of misconduct such as those asserted against the Marriott Defendants here. *See, e.g.*, *Kyszenia*, 583 F. Supp. 3d at 362 ("Plaintiffs' allegation that they lacked knowledge of the [] problem due to Defendant's concealment of the issue is precisely the generalized or conclusory allegation of fraudulent concealment that is not sufficient to toll a statute of limitations[.]" (cleaned up)); *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 319 (S.D.N.Y. 2013) (no fraudulent concealment where "complaint does not allege a single communication, interaction, or dealing with" the defendants separate from the facts underlying the constitutional claim).

Finally, Plaintiff has failed to allege that the Marriott Defendants took "subsequent and specific actions" that were "separate from those that provide the factual basis for the underlying cause of action," and that these subsequent actions by the Marriott Defendants somehow prevented Plaintiff "from timely bringing suit." *Red Mountain Med. Holdings, Inc. v. Brill*, 563 F. Supp. 3d 159, 179 (S.D.N.Y. 2021) (cleaned up). The FAC does not identify any such conduct, which "alone is sufficient to deny the requested equitable relief." *Id.*

## III. The Complaint Fails to State a Claim

Separate and apart from the bases for dismissal discussed above, Plaintiff has not adequately alleged any cause of action against the Marriott Defendants.

### A. Plaintiff's § 1983 Claims Fail Because Marriott is Not A State Actor

The § 1983 claims against the Marriott Defendants fail for the independent, fundamental reason that they are not state actors. "Constitutional torts are only actionable against state actors or private parties acting 'under the color of' state law.'" *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) (quoting *Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002)). "This unwaivable rule is known as the 'state action requirement.'" *Astacio v. City of New York*, 698 F.

Supp. 3d 530, 535 (E.D.N.Y. 2023), *aff'd*, No. 23-7598, 2025 WL 80069 (2d Cir. Jan. 13, 2025) (citation omitted).

The Marriott Defendants are private parties, not state actors, FAC ¶¶ 15–17, and thus their private conduct, "no matter how discriminatory or wrongful, is generally beyond the reach" of § 1983 liability unless the FAC establishes state action. *Gill v. Silver Invs. Inc.*, 413 F. Supp. 3d 123, 127 (E.D.N.Y. 2016) (citing *Ciambriello*, 292 F.3d at 323). Under the state action doctrine, a private entity's actions may be fairly attributed to the state only "(1) when the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); and (3) when the entity has been delegated a public function by the state ('the public function test')." *Barrows v. Becerra*, 24 F.4th 116, 135 (2d Cir. 2022) (cleaned up). For the reasons explained below, the FAC's allegations do not satisfy any of these tests.

### 1. The Marriott Defendants Do Not Perform an Exclusive Public Function, Nor Were They Compelled By the KCDA to Rent Rooms

The only non-conclusory allegation related to the Marriott Defendants is the rental of two hotel rooms to the KCDA, with one room receiving KCDA-requested accommodations. FAC ¶¶ 57, 297. Such conduct does not satisfy the public function test because a hotel's rental of hotel rooms—regardless of the renter's purpose or propriety—is private conduct that is *sui generis* to operating a hotel. *See Lurch v. City of New York*, No. 19-CV-11253, 2021 WL 1226927, at *3 (S.D.N.Y. Mar. 31, 2021) (holding hotel was not a state actor because "decisions made in the day-to-day administration of a [hotel] are [not] the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public") (first alteration in original). Equally important, there are no allegations that the KCDA "compelled" the Marriott Defendants to rent rooms. *See*

*id.* In fact, the FAC concedes the opposite—*i.e.,* that the KCDA's room rentals were the result of arms-length "contracting" between the KCDA and the Marriott LaGuardia, among other hotels. FAC ¶ 299. *See* Ex. L ("KCDA Reservation Request" documentation allegedly "confirm[ing] reservation" and that "all billing" be directed to KCDA). It is well-settled that contractual arrangements do not create state action. *See Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 492 (2d Cir. 2009) (A defendant's "contract with the government does not convert its conduct into state action. The government enters into contracts for all kinds of goods and services without converting its contractors into state actors[.]"). Thus, Plaintiff cannot rely on the public function or compulsion tests.

**2. Plaintiff's § 1983 Conspiracy Allegations Fail**

Plaintiff also claims that Marriott engaged in state action by participating in a conspiracy with the KCDA. FAC ¶¶ 147, 317–25. *See, e.g.*, JSR at 10; Pl's PML at 2, 5 (citing *Ciambriello*). While conspiracy is recognized as a manner of establishing "joint action" with the state, the FAC utterly fails to allege that the Marriott Defendants acted "in concert" with the KCDA to inflict constitutional injury against Plaintiff, *Ciambriello*, 92 F.3d at 324–25, and the FAC does not establish *any* of the required elements of a § 1983 conspiracy.

"[C]laims alleging conspiracies to violate civil rights are held to a heightened pleading standard" and must be "particularly compelling." *Harrison*, 95 F. Supp. 3d at 323 (citations omitted). A plaintiff must plausibly plead "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello*, 292 F.3d at 324–35 (citation omitted); *accord Dean v. Town of Hempstead*, 527 F. Supp. 3d 347, 435 (E.D.N.Y. 2021). Furthermore, it is well-settled that vague or conclusory allegations are insufficient to plead these requirements;

rather, the complaint must allege "particular acts or facts" establishing the conspiracy. *Brewster v. Nassau Cnty.*, 349 F. Supp. 2d 540, 547 (E.D.N.Y. 2004); *see also Gallop v. Cheney*, 642 F.3d. 364, 369 (2d Cir. 2011) (holding that "allegations of conspiracy are baseless and spun entirely of 'cynical delusion and fantasy'" cannot stand). Altogether, the FAC must detail the "joint, coordinated behavior" between the Marriott Defendants and the KCDA evidencing a "shared a common unlawful goal" to "deprive" Maddix of his constitutional rights. *Defeo v. Leibstein*, No. 16-CV-5150, 2018 WL 5777023, at *4 (E.D.N.Y. Nov. 1, 2018). Mere suggestions of cooperation with the KCDA are insufficient. *See Estiverne v. Esernio Jenseen*, 910 F. Supp. 2d 434, 442 (E.D.N.Y. 2012) (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

Here, Plaintiff's conspiracy theory of liability rests on the unsupported, speculative conclusion that the City and Marriott "explicitly and/or corruptly agreed to commit with each other, and/or other unnamed conspirators, the wrongs" alleged in the FAC and to "cover-up each other's misconduct." FAC ¶ 318. But there are no specific, credible factual allegations supporting this far-fetched conspiracy. Instead, Plaintiff doubles-down on more conclusory allegations that in no way shed light on who from Marriott was involved, why Marriott would be motivated to engage in this conspiracy, when or where the conspiracy was formed, or any other shred of credible factual detail. *See id.* ¶¶ 147 (alleging "civil conspiracy . . . of the KCDA's secret, illegal imprisonment of witnesses as prisoners and serving as a KCDA black site, and maintaining the secrecy of that practice"), 319 (alleging non-exhaustive list of "overt acts . . . to accomplish the goal of the conspiracy"). This "gut feeling"-type of conspiracy is far cry from establishing that Defendants agreed, planned, or acted in concert to commit *Brady* violations. *See DiBenedetto v. Coley*, No. 24-CV-1029, 2024 WL 4662979, at *2 (2d Cir. Nov. 4, 2024) (summary order) (rejecting conspiracy premised on a "gut feeling" that "[f]riends help friends" because the

complaint did not "referenc[e] any express or tacit agreement to inflict constitutional injury").

Indeed, Plaintiff's ill-conceived and generalized allegations of a "conspiracy" fail to satisfy any of the required elements of a § 1983 conspiracy. *First*, no conspiratorial agreement is alleged. Plaintiff "offers not a single fact to corroborate [an] allegation of a 'meeting of the minds' among the conspirators." *Gallop*, 642 F.3d at 369. In the FAC's 74 pages there are ***no*** allegations that any agent or employee of either of the Marriott Defendants discussed any agreement with the KCDA, much less agreed with ADA Reeves or any other KCDA employee to deprive Plaintiff of *Brady/Giglio* material in violation of his due process rights. This alone warrants dismissal. *See Dean*, 527 F. Supp. 3d at 437 (holding conclusory statements that defendants "conspired and agreed to" deny cabaret permits insufficient) (collecting cases); *Berliner v. Port Auth. of NY & NJ*, No. 08-CV-3152, 2008 WL 11434516, at *4 (E.D.N.Y. Nov. 17, 2008) (finding no state action where plaintiff provided "no detail" about alleged "agreement" between airline and law enforcement "to report all passengers declaring firearms" apart from airline staff's alleged reporting of plaintiff).[11]

*Second*, and similarly, the FAC does not allege that the Marriott Defendants "acted in concert" to inflict a *Brady* violation on *Maddix*. *Dean*, 527 F. Supp. 3d at 437. Nothing in the FAC suggests that the Marriott Defendants provided the KCDA with access to hotel rooms "in order to inflict unconstitutional injury." *Id.* at 438 (finding town's provision of email addresses of town residents to politician not done in furtherance of a constitutional tort). Instead, Plaintiff

[11] Indeed, there is no allegation that the Marriott Defendants (or their employees) knew who *Plaintiff* was, much less DeJesus, given the pseudonym used by the KCDA in the reservation request. Ex L. Therefore, even assuming an underlying constitutional deprivation (which the Marriott Defendants do not concede), it is impossible for the Marriott Defendants to have agreed or had a meeting of the minds to wrongfully "deprive *the plaintiff* [*i.e.*, Maddix] of his constitutional rights." *Ciambriello*, 292 F.3d at 325 (emphasis added).

*assumes* this is the case based on allegations from unrelated litigations in which the KCDA is alleged to have routinely used hotel rooms for the Hotel Custody Program. *See supra* Factual Background, Part II. Moreover, even if Marriott-branded hotels were used by the KCDA to house material witnesses, that does not suggest a conspiracy to deprive information from Plaintiff.

*Third*, the only activities alleged to have been conducted by Marriott amount to *independent* actions—not actions "in furtherance of a conspiracy." *Dean*, 527 F. Supp. 3d at 438. The KCDA allegedly requested two rooms, and further requested that the "single room" have no food, TV, and phone access. The managers of the Marriott LaGuardia allegedly obliged. Such reciprocal request-and-fulfillment is not enough to allege a conspiracy to commit wrongdoing. *See Emanuel v. Griffin*, No. 13-CV-1806, 2013 WL 5477505, at *5 (S.D.N.Y. Oct. 2, 2013) ("The mere fact that a private actor is paid by state funds, or is hired by a state actor, is insufficient to establish state action." (citation omitted)). Even if this could be construed as "cooperation" with prosecutors (which the allegations and documents attached to the FAC do not show), "mere cooperation" is not enough. *Estiverne*, 910 F. Supp. 2d at 442.

Plaintiff's allegations of a conspiracy involving the Marriott Defendants are not coherent, credible, or specific. For these reasons, Plaintiff has failed to allege that the Marriott Defendants were state actors or a § 1983 conspiracy existed between the Defendants.

### B. Aiding and Abetting Liability Is Not Cognizable Under § 1983

Plaintiff's repeated claim that the Marriott Defendants are also liable under § 1983 because they "aided and abetted" a violation of § 1983 is also unavailing. FAC ¶ 8, 119, 125–26, 147, 321. *First*, "Congress did not explicitly provide for aiding and abetting liability in the text of § 1983," and thus "§ 1983 does not support aiding and abetting liability." *Woods v. Chadwick*, No. 9:21-CV-0662, 2021 WL 12318012, at *3 n.4 (N.D.N.Y. July 19, 2021) (citation omitted); *see*

*Raghavendra v. N.L.R.B.*, No. 08-CIV-8120, 2009 WL 5908013, at *20 (S.D.N.Y. Aug. 27, 2009) ("Congress never expressly created civil liability for aiding and abetting a civil rights violation."). This theory of liability is simply not available to Plaintiff.

*Second*, even if an aiding and abetting was a permissible theory under § 1983 liability (it is not), the FAC fails to allege the federal common law requirement of specific intent required for aiding and abetting claims. Specifically, the FAC does not allege that the Marriott Defendants acted with "conscious . . . and culpable participation in" the purported wrongdoing of the KCDA. *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 291–92 (2025) (citation and quotation marks omitted) (explaining that an "ordinary merchant does not become liable for all criminal misuses of his goods, even if he knows that in some fraction of cases misuse will occur"). Once again, the complete absence of allegations explaining how, when, where, or why the Marriott Defendants acted alongside the KCDA with the express object of knowingly and intentionally depriving Plaintiff of his rights to a fair trial and covering that deprivation up, as opposed to merely renting a hotel room to the KCDA, dooms the claim.

### C. Plaintiff's Alleged *Monell* Practice of Aiding and Abetting KCDA is Untenable

Plaintiff's final theory of liability rests on *Monell*, a theory of municipal liability under § 1983. That theory is not viable either. To state a *Monell* claim, "a plaintiff must plausibly allege '(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury.'" *Lurch*, 2021 WL 1226927, at *5 (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008)). As there is no state action on the part of the Marriott Defendants, any theory of liability under *Monell* cannot stand. Nevertheless, the FAC does not sufficiently allege several other of the *Monell* factors, as set forth below.

***No Constitutional Deprivation.*** A "*Monell* claim cannot succeed without an underlying constitutional violation, and here there is no constitutional violation." *Mastromonaco v. Cnty. of Westchester*, 779 F. App'x 49, 51 (2d Cir. 2019) (summary order). The Marriott Defendants agree with the City that Plaintiffs fails to allege such a violation.[12] *See* ECF No. 25.

***No Causation.*** "To satisfy the causal element of a *Monell* claim, plaintiffs must demonstrate that the alleged policy is the *proximate cause* of their constitutional injury, not just a but-for cause." *Albert v. City of New York*, No. 17-CV-04315, 2018 WL 5084824, at *11 (E.D.N.Y. Oct. 18, 2018) (emphasis original). Here, the Marriott Defendants' purported rental of hotel rooms to the KCDA is in no way the "moving force" behind any *Brady/Giglio* violation alleged, which is based on the purported concealment of DeJesus's stay. *Id.* at *9 (quoting *Monell*, 436 U.S. at 694). *See* FAC ¶ 315 (providing single conclusory allegation of proximate cause). What is more, the Marriott Defendants are not alleged to have made the decision to conceal DeJesus's stay—or even to have known about Plaintiff's trial—much less to have "proximately caused" Plaintiff's injury.

***No Policy, Custom or Practice.*** The FAC alleges that the Marriott Defendants "created and implemented a plainly illegal, unconstitutional, improper and deliberately indifferent policy, custom, or practice to knowingly facilitate and aid and abet the KCDA's illegal imprisonment of witnesses as prisoners and to serve as one of Hynes's de facto black sites." FAC ¶ 298. Yet the only factual allegations in support of this outrageous claim is that the Marriott Defendants rented

[12] While the FAC asserts due process causes of action as also arising under the Fifth Amendment, *see e.g.*, FAC ¶¶ 121, 327, "[b]ecause the Fifth Amendment applies only to the *federal* government, Plaintiff cannot state a claim for deprivation of due process in violation of the Fifth Amendment where, as here, there are no allegations of "federal action." *Lozada v. Weilminster*, 92 F. Supp. 3d 76, 101 (E.D.N.Y. 2015) (citation and quotation marks omitted) (emphasis added). Any claims rooted in the Fifth Amendment must be dismissed. *Id.*

a hotel room to the KCDA and that DeJesus stayed in this room for 48 hours in 1994. FAC ¶¶ 50–62. The FAC is bereft of allegations that any policymaking executives at Marriott knew about the KCDA's purported unconstitutional practices, and a "single incident involving an employee below the policymaking level will not suffice to support an inference of a municipal custom or policy."[13] *Brewster*, 349 F. Supp. 2d at 549; *Jimenez on behalf of J.M. v. Cnty. of Suffolk*, No. 23-CV-9476, 2025 WL 948348, at *18 (E.D.N.Y. Mar. 28, 2025) ("It is well established that a single incident does not give rise to an unlawful practice by subordinate officials so permanent and well-settled as to constitute custom or usage.").

Similarly, Plaintiff has failed to allege that any employees acted pursuant to a policy established by Marriott employee with sufficient decision-making authority. *See Clancy v. Town of Southold*, No. 15-CV-732, 2018 WL 4185706, at *4 (E.D.N.Y. Aug. 31, 2018) ("Municipal liability attaches only where the decision-maker possesses final authority to establish municipal policy with respect to the action ordered." (citation omitted)). Translated to the facts alleged here, Plaintiff has failed to allege that any purported policy to aid-and-abet the KCDA was made by Marriott "officials" with final "decision-making authority" sufficient to bind the Marriott Defendants. *Dean*, 527 F. Supp. 3d at 453-54. Plaintiff tries to skirt this fundamental prerequisite for *Monell* liability by alleging that Marriott "wholly delegated final policymaking authority to several local managers of the Marriott LaGuardia Hotel." FAC ¶ 297; *see also* FAC ¶¶ 300, 313.

[13] As explained in the Legal Standard, *supra*, the KCDA Logbook is not properly before the Court on this Motion, as it is not part of the FAC. In any case, it does not evidence a policy or practice by the Marriott Defendants to knowingly deprive defendants in state criminal cases of their due process rights under *Brady/Giglio*. Instead, it only purports to show that the KCDA rented Marriott-branded hotel rooms in six instances between December 1992 and March 1993. *Cf. Tanzi v. Town of Marlborough*, No. 13-CV-1113, 2014 WL 2815777, at *8 (N.D.N.Y. June 23, 2014) (collecting cases showing that a handful of "isolated instances" do not make out a *Monell* claim).

But a single conclusory claim that Marriott decisionmakers "delegated" authority to employees of a single hotel (among thousands bearing a Marriott brand name) is not only far-fetched, it fails as a matter of law. *See Clancy*, 2018 WL 4185706, at *5 (collecting dismissals of cases where plaintiff failed to allege direction by an official with the requisite authority). Likewise, the FAC fails to allege that the unnamed local hotel managers were "responsible" for or had the "power to make official policy on a particular issue" that is relevant to the alleged scheme here, such as working with the KCDA or law enforcement. *Roe*, 542 F.3d at 37 ("The court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit."). Under these circumstances, the Marriott Defendants cannot be liable under *Monell*. *See, e.g.*, *Lockwood v. Town of Hempstead*, No. 16-CV-3756, 2017 WL 9485687, at *11 (E.D.N.Y. Feb. 24, 2017) (dismissing case for failure to include "explicit reference" to individuals with final policymaking authority), *report and recommendation adopted,* 2017 WL 3769253 (E.D.N.Y. Aug. 28, 2017).

**D. Plaintiff Relies on Improper Group Pleading**

In addition to the numerous pleading deficiencies identified above, Plaintiff impermissibly "lump[s]" both corporate Marriott Defendants together throughout the FAC, contending they are equally culpable constitutional tortfeasors, which is improper.[14] *Nesbeth v. New York City Mgmt. LLC*, No. 17 CV 8650, 2019 WL 110953, at *3 (S.D.N.Y. Jan. 4, 2019). Notably, the only Marriott-related individuals mentioned in the FAC are "several [unnamed] local managers" at the Marriott LaGuardia hotel, which was allegedly operated by defendant Marriott Hotel Services. FAC ¶¶ 16, 297, 300. As the FAC is bereft of allegations related to Marriott International, there

[14] FAC ¶¶ 8–9 119–26 147–48, 297–316, 318–25, 327–29 (alleging that a singular "Marriott" is liable for various forms of wrongdoing or carried out certain acts).

is no basis to find Marriott International liable on any claim. *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law . . . that a parent corporation . . . is not liable for the acts of its subsidiaries.").

**E. The New York Constitutional Claim Fails**

Assuming the Court agrees that all of Plaintiff's federal claims against all Defendants should be dismissed, it has discretion to either maintain, or decline to exercise, jurisdiction over Plaintiff's parallel state law claim against the Marriott Defendants. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006); *see also* FAC ¶¶ 326–29. The Court should decline to exercise that jurisdiction here. *Id.* ("A district court usually should decline the exercise of supplemental jurisdiction when all federal claims have been dismissed at the pleading stage.").

Separately, this claim fails on the merits. To "trigger" state action under the New York State Constitution, Plaintiff must show "*significant* state action" in the private conduct alleged, a determination that that depends on the factors such as the state's participation, entwinement, or delegation of authority, or the nature of the source of the authority wielded by the private actor. *Maskin v. Mabco Transit, Inc.*, 176 A.D.3d 1539, 1542–43 (3d Dep't 2019) (emphasis added) (citing *SHAD All. v. Smith Haven Mall*, 66 N.Y.2d 496, 506 (N.Y. 1985)). For the reasons discussed in Part III.A, merely renting hotel rooms to the KCDA does not constitute significant state action under New York law.

**<u>CONCLUSION</u>**

For the foregoing reasons, none of the claims alleged against the Marriott Defendants are viable, and the Marriott Defendants respectfully request that the Court dismiss the FAC with prejudice.

[*Signature on the following page*]

**VENABLE LLP**

/s/ Kostas D. Katsiris

Kostas D. Katsiris, Esq.
Emily Seiderman West
Carlos H. Salguero
151 West 42nd Street, 49th Floor
New York, New York 10036
(212) 370-6272
(212) 503-9816
(212) 218-2578
kdkatsiris@venable.com
eawest@venable.com
chsalguero@venable.com

*Counsel for Defendants Marriott Hotel Services, Inc. and Marriott International, Inc.*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby declares the following:

1. This memorandum of law contains 8,467 words, exclusive of the caption, any index, table of contents, table of authorities, signature blocks, or any required certificate, in compliance with Local Civil Rule 7.1.

2. The undersigned relied on the word count function of Microsoft Word.

3. This memorandum of law complies with page limits, spacing, font, requirements of the Court's Individual Practices, Part IV.B.2.

**VENABLE LLP**

/s/ Kostas D. Katsiris

Kostas D. Katsiris, Esq.
Emily Seiderman West, Esq.
Carlos H. Salguero, Esq.
151 W. 42nd Street, Floor 49
New York, New York 10036
Tel. 202.317.5500

*Attorneys for the Marriott Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

WILLIE MADDIX,
Plaintiff,

v.

THE CITY OF NEW YORK, MARRIOTT HOTEL SERVICES, INC., and MARRIOTT INTERNATIONAL, INC.,

Defendants.

25-CV-01909 (HG)

**DECLARATION OF EMILY SEIDERMAN WEST IN SUPPORT OF MARRIOTT DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT WITH PREJUDICE**

I, EMILY SEIDERMAN WEST, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am attorney associated with the firm Venable LLP, counsel to defendants Marriott Hotel Services, Inc. and Marriott International, Inc. I am a member in good standing of the bar of New York and the bar of this Court.

2. Attached as **Exhibit 1** is a true and correct copy of the Complaint filed in *Collins v. City of New York*, *et al.*, 11-CV-766 (FB) (RML) (E.D.N.Y. 2011) (ECF No. 1).

3. Attached as **Exhibit 2** is a true and correct copy of the Amended Complaint filed in *Quezada v. City of New York*, 16-CV-6577 (MKB) (SMG) (E.D.N.Y. 2016) (ECF No. 8).

4. Attached as **Exhibit 3** is a true and correct copy of the Complaint filed in *Cooper v. City of New York*, *et. al.*, 21-CV-4171 (ENV) (JAM) (E.D.N.Y. 2021) (ECF No. 1).

I declare under penalty of perjury that the foregoing is true and correct.

[*Signature on the following page*]

Dated: New York, New York
September 2, 2022

*/s/ Emily Seiderman West*
Emily Seiderman West

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

JABBAR COLLINS,

Plaintiff,

CV 11-00766

Index No. __________

-against-

THE CITY OF NEW YORK,
MICHAEL F. VECCHIONE, BRIAN MAHER,
STEPHEN BONDOR, SHOLOM TWERSKY,
ANTHONY D'ANGELO, MELANIE MARMER,
MORGAN J. DENNEHY, VIRGINIA C. MODEST,
and JODI MANDEL, as employees of the
Kings County District Attorney's Office and
Individually, and VINCENT GERECITANO
and JOSE R. HERNANDEZ, Individually and as
Members of the New York City Police Department,

Defendants.

-----------------------------------------------------------------x

SUMMONS ISSUED

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ FEB 16 2011 ★
BROOKLYN OFFICE

BLOCK, J.

LEVY, M.J.

# COMPLAINT

JOEL B. RUDIN, ESQ.
LAW OFFICES OF JOEL B. RUDIN
200 West 57th Street, Suite 900
New York, New York 10019
(212) 752-7600 (Phone)
(212) 980-2968 (Fax)
E-mail: jbrudin@aol.com

*Attorney for the Plaintiff*

## TABLE OF CONTENTS

***Page***

NATURE OF ACTION .......... 1

JURISDICTION, VENUE, and CONDITIONS PRECEDENT .......... 8

THE PARTIES .......... 9

ALLEGATIONS COMMON TO ALL CAUSES OF ACTION .......... 12

A. The Crime and The Initial Investigation .......... 12

B. Plaintiff's Arrest And Indictment .......... 16

C. The District Attorney's Misconduct in the Period Before Trial .......... 19

1. Edwin Oliva .......... 20

2. Angel Santos .......... 24

3. Adrian Diaz .......... 30

D. Plaintiff's Criminal Trial .......... 34

1. Oliva .......... 36

2. Adrian Diaz .......... 38

3. Angel Santos .......... 39

E. Plaintiff's Conviction, Sentencing, and Unsuccessful Appeals .......... 40

F. The Defendants Cover-up VECCHIONE's Misconduct: The False Denials of Plaintiff's FOIL Requests .......... 40

1. The Law Regarding FOIL Requests .......... 41

2. Plaintiff's July 1995 FOIL Request .......... 42

3. Plaintiff's December 28, 1996, FOIL Request .......... 44

4. Plaintiff's August 1, 2002 FOIL Request .......... 45

***Page***

5. Plaintiff's May 1, 2005 FOIL Request .... 46

6. The Documents That Were Wrongfully Withheld .... 47

G. Defendants Defeat Plaintiff's State Motion to Vacate His Conviction .... 49

H. VECCHIONE's False Statements Further Prolong Plaintiff's Incarceration By Delaying Decision of His Federal Habeas Petition .... 53

I. The D.A.'s Office is Forced to Concede the Habeas Petition But Hynes Nevertheless Ratifies the Misconduct of His Employees .... 55

J. The District Court's Findings .... 58

K. Plaintiff's Damages and Injuries .... 60

<u>FIRST CAUSE OF ACTION</u>
(Malicious Prosecution Under State Law; All Defendants) .... 61

<u>SECOND CAUSE OF ACTION</u>
(Intentional Infliction of Emotional Distress Under State Law; All Defendants) .... 61

<u>THIRD CAUSE OF ACTION</u>
(Abuse of Process Under State Law; Defendants Vecchione, Maher, Bondor, and City of New York) .... 62

<u>FOURTH CAUSE OF ACTION</u>
(Actual and Constructive Fraud Under State Law; Defendants Twersky, D'Angelo, Marmer, Dennehy, Modest, Mandel, Vecchione, Hernandez, and City of New York) .... 64

<u>FIFTH CAUSE OF ACTION</u>
(Negligent Misrepresentation Under State Law; Defendants D'Angelo, Twersky, Marmer, Dennehy, Modest, Mandel, Vecchione, and City of New York) .... 67

***Page***

SIXTH CAUSE OF ACTION
(42 U.S.C. §1983; Denial Of Due Process And A Fair Trial Under the Fifth, Sixth and Fourteenth Amendments; Malicious Prosecution and Deprivation of Liberty Under the Fourth and Fourteenth Amendments; Defendants Vincent Gerecitano and Jose R. Hernandez) ........ 68

SEVENTH CAUSE OF ACTION
(42 U.S.C. §1983; Denial Of Due Process And A Fair Trial Under the Fifth, Sixth and Fourteenth Amendments; Malicious Prosecution, Abuse of Process, and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments; Defendants Vecchione, Maher, Bondor, Twersky, D'Angelo, Marmer, Dennehy, Modest, and Mandel) ........ 71

EIGHTH CAUSE OF ACTION
(*Monell*/42 U.S.C. § 1983: Claim Against Defendant City of New York For The Actions Of The NYPD) ........ **75**

NINTH CAUSE OF ACTION
(*Monell*/42 U.S.C. § 1983 Claim Against Defendant City Of New York For Actions Of The BDAO) ........ 78

TENTH CAUSE OF ACTION
(Negligent Hiring, Training and Supervision Under State Law; Defendant City of New York) ........ 105

DAMAGES DEMAND ........ 106

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JABBAR COLLINS, :

Plaintiff, : **COMPLAINT**

-against- : Index No. ____________

THE CITY OF NEW YORK;
MICHAEL F. VECCHIONE, BRIAN MAHER, : **Jury Trial Demanded**
STEPHEN BONDOR, SHOLOM TWERSKY,
ANTHONY D'ANGELO, MELANIE MARMER, :
MORGAN J. DENNEHY, VIRGINIA C. MODEST,
and JODI MANDEL, as employees of the
Kings County District Attorney's Office and :
Individually, and VINCENT GERECITANO
and JOSE R. HERNANDEZ, Individually and as
Members of the New York City Police Department, :

Defendants. :

-----------------------------------------------------------------X

Plaintiff JABBAR COLLINS ("Plaintiff"), by his attorneys, the LAW OFFICES OF JOEL B. RUDIN, complaining of the Defendants, respectfully alleges, upon information and belief, as follows:

## NATURE OF ACTION

1. This is a civil action, pursuant to 42 U.S.C. §1983 and 1988, and state law, seeking monetary damages for Plaintiff, JABBAR COLLINS, due to his wrongful arrest, prosecution, conviction, and 16-year imprisonment caused by the pervasive misconduct of the Brooklyn District Attorney's Office ["BDAO"] and the New York City Police Department ["NYPD"].

2. Plaintiff's conviction by jury in 1995 was overturned on June 8, 2010, by United

States District Judge Dora Irizarry, who ordered the indictment dismissed with prejudice and that Plaintiff be freed. Judge Irizarry acted based upon compelling evidence that prosecutors in the Office of Brooklyn District Attorney Charles J. Hynes had wrongfully withheld a key witness's recantation, had knowingly coerced and relied on false testimony and argument at trial, had knowingly suppressed exculpatory and impeachment evidence, and had acted affirmatively to cover up such misconduct for 15 years. Judge Irizarry termed the prosecutors' misconduct "shameful" and Plaintiff's wrongful incarceration a "tragedy."

3. This lawsuit seeks to hold the defendant CITY OF NEW YORK liable for the above misconduct under the federal civil rights statute, 42 U.S.C. § 1983, and *Monell v. Dept. Of Social* Services, 436 U.S. 658 (1978). The unlawful actions of police detectives and prosecutors documented in this lawsuit resulted from affirmative or *de facto* municipal policies, practices and customs to violate the constitutional rights of criminal suspects and defendants, or from deliberate indifference by policy-making officials, acting on behalf of the City of New York, to such violations. As Plaintiff will demonstrate, both the NYPD and the BDAO, as a matter of policy, secretly coerced witnesses to give false or unreliable testimony through their misuse of subpoenas, material witness orders, and their powers of arrest and interrogation, unlawfully concealed exculpatory or impeachment evidence known as "*Brady*" material, and lied to or misled courts, defense attorneys, and criminal defendants in order to cover up their unlawful behavior. In the rare case where such misconduct was exposed, these agencies took no disciplinary action against the offending employees, but instead praised and promoted them, thereby encouraging future constitutional violations to occur, including those directed against Plaintiff.

4. The principal individual defendant, acting pursuant to unlawful municipal policy, who caused Plaintiff's unconstitutional conviction and orchestrated the subsequent, 15-year coverup of the Office's misconduct, is the present chief of the Rackets Division of District Attorney Hynes's Office, Michael F. VECCHIONE. Despite his lofty positions as Chief of the Homicide Bureau and then of the Rackets Division, which puts him in charge of prosecuting official corruption, fraud, organized crime, major narcotics, and other important cases, VECCHIONE engaged in a series of fraudulent, deceptive, and literally criminal acts, all caused by and consistent with his Office's unlawful policies, in order to convict Jabbar Collins and make the conviction last. VECCHIONE's illegal behavior in Collins's case included the following:

- Filing in court "sworn" affidavits that he had compelled subordinates to notarize, and "sworn" affirmations, all of which purportedly contained his signature, when, in fact, *he knew the documents had been signed by someone else in his name*.[1] He did so, in violation of the "Oath" requirement of the Fourth Amendment to the United States Constitution, and State law, in order to obtain court orders with which to gain the involuntary custody of witnesses from whom he would then coerce false statements and testimony. VECCHIONE's own Rackets Division has prosecuted such false notarizations and "swearings" under Penal Law §§ 170.10 (Forgery in the Second Degree, a Class D felony), 170.25 (Criminal Possession of a Forged Instrument, a Class D felony), 175.35 (Offering a False Instrument for Filing, a Class E felony), and Executive Law § 15-a(2) (Fraud by Notary Public, a misdemeanor),[2] and it

---

[1]A report by an experienced handwriting expert, Ruth Brayer, is annexed as Ex. A, confirming, as appears obvious from the documents, that the signatures on affidavits and affirmations in this and other cases, purportedly to be VECCHIONE's, in fact are not his signature, and making similar findings as to "sworn" documents "signed" by VECCHIONE's colleague in Plaintiff's case, the late Assistant D.A. Charles Posner. Ms. Brayer finds "similarities" with the handwriting of VECCHIONE's paralegal, Liza Noonan. The documents, as well as Ms. Brayer's curriculum vitae, are attached to her report.

[2]On December 15, 2009, the New York City Department of Investigation announced the arrest of a buildings "expediter" and a notary for, among other things, preparing and filing documents containing false notarizations. DOI announced that the case was being prosecuted by

constitutes a serious violation of professional ethics which normally results in an attorney being suspended or disbarred.[3] *See* ¶¶ 93-97, 109-118, 132-138, 167-178, *infra*.

- Repeatedly making wilfully false representations of "fact" in such "sworn" statements (which would have been perjurious had he actually signed the documents) to create a "factual" basis to obtain court orders with which to gain illegal custody of, and to coerce, potential witnesses. *See* ¶¶ 93-97,

VECCHIONE's Deputy Chief of the Rackets Bureau, Joseph DiBenedetto. The press release, and the Criminal Court complaints that VECCHIONE's bureau filed, are annexed as Ex. B. The New York Court of Appeals, in *People v. Reiter*, 273 N.Y. 348 (1937), established long ago that notarizing a signature of a person who is not present is a misdemeanor even where the notary believes the signature is genuine. *See Bloom v. Power*, 21 Misc.2d 885, 889, 193 N.Y.S.2d 697, 702 (Sup. Ct., Kings Co. 1959) ("[W]here a notary signs a statement that the signer has acknowledged his signature before him ... [t]hat notary's act when untrue constitutes fraud and deceit and is punishable as a misdemeanor ...; if the notary is a lawyer it can lead to disbarment."); *Klin Const. Group, Inc. v. Blue Diamond Group Corp.*, 25 Misc.3d 1230(A) (Sup. Ct. Kings County 2009) (same). Knowingly notarizing, or causing a notary to notarize, a document that was not signed at all by the purported signatory, and then submitting it to a court which will rely upon its authenticity, is an even worse crime.

[3]The Appellate Division, Second Department, whose Disciplinary Committee oversees attorneys practicing in Kings County, has severely punished attorneys for submitting such false documents to a court. *See, e.g., In re Moroff*, 55 A.D.3d 200, 863 N.Y.S.2d 800 (2d Dept. 2008) (suspending attorney from practicing law where he submitted to the court an affirmation in his name that was actually signed by someone else); *Matter of Bunting*, 10 A.D.3d 146, 781 N.Y.S.2d 153 (2d Dept. 2004) (disbarment for signing client's name and notarizing the "signature" on a deposition transcript and then giving false testimony about it); *Matter of Fox*, 225 A.D. 680, 231 N.Y.S. 744 (2d Dept. 1928) (disbarring attorney for notarizing signature of person who did not appear and sign in his presence); *see also Matter of Fauci*, 28 A.D.3d 192, 811 N.Y.S.2d 38 (1st Dept. 2006) (one-year suspension for notarizing client's medical authorization when he was not present). Based upon Plaintiff's preliminary investigation of other cases VECCHIONE has prosecuted, Plaintiff has uncovered VECCHIONE's false "signature" on eight additional "sworn" affirmations and one additional "sworn," notarized affidavit. The most recent is dated July 22, 2005, and was submitted during Mr. Vecchione's highly-publicized prosecution of former Democratic leader Clarence Norman (copy attached as Ex. C). Apparently Mr. VECCHIONE, despite being head of the Rackets Division with responsibility for prosecuting official misconduct, saw nothing wrong in directing his staff, including other attorneys in the office, to violate their sworn responsibilities as notaries, and to expose themselves to criminal prosecution, by falsely swearing to the authenticity of VECCHIONE's and Posner's signatures, and in misleading numerous State judges in serious criminal prosecutions.

109-118, 132-138, 167-178, *infra.*

- Causing the New York State Department of Corrections to illegally revoke the work release of a prisoner, Edwin Oliva, a former drug addict, who had denied any knowledge that Plaintiff was involved in the murder, so that VECCHIONE could obtain illegal custody of this vulnerable individual in order to intimidate him into falsely accusing Plaintiff. *See* ¶¶ 104-108, *infra.*

- Obtaining a court order to produce Oliva at VECCHIONE's Office by representing under "oath" that Oliva would not be questioned unless he consented in writing to such a meeting and then, when Oliva *refused* to consent, *taking illegal custody of him anyway*. *See* ¶¶ 109-116, *infra.*

- Unlawfully imprisoning another individual, Angel Santos, as a "material witness," for more than two weeks, and threatening him with physical harm and long-term imprisonment unless he agreed to a statement that VECCHIONE *knew* was false, without any lawful proceeding authorizing Santos to be detained. *See* ¶¶ 124-148, *infra.*

- In violation of various criminal statutes, directing the preparation and filing, with the BDAO, the NYPD, and the New York City Department of Probation, of official records he *knew* were false claiming that Plaintiff had threatened witnesses, and which he knew would be used to harm Plaintiff. *See* ¶¶ 149-156, 185-199, *infra.*

- While no longer assigned to prosecute the case and acting strictly as a "fact" witness 11 years after trial, lying to prosecutors in his own office, who were investigating Plaintiff's motion to overturn his conviction, by flatly denying various allegations that he *knew* were true, including that Oliva had "recanted" his initial alleged statement to police, that witnesses had been pressured or coerced, and that he had withheld at trial evidence favorable to the defense known as "*Brady*" material, and executing a perjurious affidavit containing such lies, thereby prolonging Plaintiff's imprisonment by four years. *See* ¶¶ 293-303, 307-311, *infra.*

5. VECCHIONE was caused to commit this course of misconduct by Hynes's history of indifference to such behavior by VECCHIONE and by other prosecutors in the office, and by Hynes's consistent public approval and ratification of such behavior. For example:

- VECCHIONE was accused of misconduct, including suppression of *Brady*

material and improper coercion of witnesses, in numerous matters, including the high-profile prosecutions of ex-FBI Agent Lindley DeVecchio and Brooklyn Democratic Leader and Assemblyman Clarence Norman, and Hynes always defended and continually promoted him, even where the accusations appeared to have merit. *See* ¶¶ 468-511, *infra*.

- After VECCHIONE was exposed for having deliberately suppressed, and lied in an affirmation and at a federal hearing about, a secret deal he had made with a crucial prosecution witness in the murder prosecutions of defendant Jeffrey Marshall, forcing Hynes to agree to the early release from prison of a convicted defendant he believed had committed numerous murders, Hynes promoted VECCHIONE to Chief of Investigations and put him in charge of the Office's highly-publicized investigation of alleged political and judicial corruption in Kings County. *See* ¶¶ 473-484, *infra*.

- After Plaintiff, in 2006, fully documented Vecchione's misconduct in Plaintiff's case, Hynes promoted VECCHIONE to Chief of the Rackets Division and presented VECCHIONE with the New York City Bar Association's Thomas E. Dewey award as outstanding prosecutor, proclaiming that he "exemplifies the qualities that serve as an example to all of our prosecutors." *See* ¶¶ 488-492, 501, *infra*.

- Notwithstanding Federal Judge Irizarry's denunciation, after an independent inquiry, of VECCHIONE's misconduct in Plaintiff's case and the Office's defense of it as "sad" and "shameful," Hynes issued a formal statement to the news media, and gave interviews, defending VECCHIONE as a "very principled lawyer" who was "not guilty of any misconduct," and declaring that VECCHIONE would not face any disciplinary action, and then announced publicly that he was placing VECCHIONE in charge of a new Sex Trafficking Unit within VECCHIONE's Rackets Division. *See* ¶¶ 353-358, 360, 506-511, *infra*.

6. Hynes' defense of VECCHIONE and ratification of his unlawful behavior, his unwillingness to even investigate, let alone discipline, VECCHIONE for his documented misconduct in Plaintiff's and other cases, and his repeated promotion of VECCHIONE with knowledge of VECCHIONE's history of misconduct, was consistent with Hynes's pattern, throughout his 20-year tenure as District Attorney, of refusing to ever investigate or impose meaningful discipline on dozens of prosecutors found in court decisions to have engaged in

misconduct, including deliberate misconduct. Ex. H contains a list and description of 56 cases in which courts found *Brady* and related discovery or due process violations by Brooklyn prosecutors, but as to which Hynes conducted no meaningful internal investigation and imposed no disciplinary sanctions on the offending prosecutors. *See* ¶¶ 445-449, *infra.*

7. Hynes' overall deliberate indifference to the very types of constitutional violations that occurred in this case, together with his specific indifference to a history of apparent misconduct by VECCHIONE, was a substantial cause of the misconduct of VECCHIONE and other of Hynes's employees aimed at Plaintiff, and thus exposes defendant CITY OF NEW YORK, for whom Hynes was the chief policymaker in the management and administration of the BDAO, a City agency, to federal civil rights liability under *Monell* for Plaintiff's damages.

8. Two detective-investigators employed by the D.A.'s office and closely associated with VECCHIONE during much of his career, BRIAN MAHER and STEPHEN BONDOR, acted in concert with VECCHIONE in violating Plaintiff's constitutional rights and are named as defendants in their individual as well as their official capacities.

9. This lawsuit also seeks to hold personally accountable six supervising attorneys at the District Attorney's Office, SHOLOM TWERSKY, MORGAN J. DENNEHY, ANTHONY D'ANGELO, MELANIE MARMER, VIRGINIA C. MODEST, and JODI MANDEL, for their misconduct, in an administrative capacity as Freedom of Information Law ("FOIL") officers, in covering up and withholding documents and information continually requested by Plaintiff over nearly 15 years which would have revealed VECCHIONE's and the Office's wrongdoing, and would have provided the basis to overturn Plaintiff's conviction.

10. Finally, and equally importantly, Plaintiff seeks additional recovery against the two New York City homicide detectives who were assigned to his case, VINCENT GERECITANO and JOSE R. HERNANDEZ, for coercing a key witness to manufacture false evidence against Plaintiff, for suppressing exculpatory or impeachment evidence known as "*Brady* material," and for initiating Plaintiff's malicious prosecution based upon allegations in a Criminal Court complaint they *knew* were false. None of the misconduct of the District Attorney's office would have occurred had GERECITANO and HERNANDEZ, in their zeal to "close" an unresolved, high-profile case, not manufactured a phony case against Plaintiff and initiated his wrongful prosecution.

11. Plaintiff, JABBAR COLLINS, is an extraordinarily intelligent and able individual who would have completed college and law school, and been earning a substantial salary as a lawyer, but for the defendants' misconduct in causing his wrongful prosecution, conviction, and imprisonment. He seeks $50 million in actual damages, and $100 million in punitive damages, for the egregious misconduct that deprived him of the joys of raising his three children, of married life, of his legal career, and of living as a free person.

**JURISDICTION, VENUE, and CONDITIONS PRECEDENT**

12. This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York.

13. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

15. On or about July 29, 2010, Plaintiff served upon Defendant City of New York

timely notice of the present claims pursuant to New York General Municipal Law § 50-e. A hearing pursuant to New York General Municipal Law § 50-h was held on November 19, 2010.

16. This action has been commenced within one year of the accrual of Plaintiff's causes of action.

17. Plaintiff has duly complied with all of the conditions precedent to the commencement of this action.

**THE PARTIES**

18. Plaintiff, JABBAR COLLINS, is a citizen and resident of the State of New York and of the United States, and resides within the Eastern District of New York.

19. Defendant, CITY OF NEW YORK, of which the County of Kings is a subdivision, is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

20. Defendant, MICHAEL F. VECCHIONE, at all relevant times, was an assistant district attorney in Kings County (and currently chief of the Rackets Division), was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

21. Defendant, SHOLOM TWERSKY, at all relevant times, was an assistant district attorney in Kings County (and currently a Deputy Bureau Chief), was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

22. Defendant, MORGAN J. DENNEHY, at all relevant times, was an assistant district attorney in Kings County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

23. Defendant, ANTHONY D'ANGELO, at all relevant times, was an assistant district attorney in Kings County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

24. Defendant, MELANIE MARMER, at all relevant times, was an assistant district attorney in Kings County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her individual and her official capacities.

25. Defendant, JODI MANDEL, at all relevant times, was an assistant district attorney in Kings County (and currently is a Deputy Bureau Chief), was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her individual and her official capacities.

26. Defendant, VIRGINIA C. MODEST, at all relevant times, was an assistant district attorney in Kings County (and currently is an Executive District Attorney), was employed by the

City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her individual and her official capacities.

27. Defendant, BRIAN MAHER, at all relevant times, was a detective-investigator in the Kings County District Attorney's Office and employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

28. Defendant, STEPHEN BONDOR, at all relevant times, was a detective-investigator in the Kings County District Attorney's Office and employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

29. Defendant, VINCENT GERECITANO, was a detective employed by the New York City Police Department ["NYPD"], acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

30. Defendant, JOSE R. HERNANDEZ, at all relevant times, was a detective employed by the NYPD, acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

31. The BDAO is an agency of the CITY OF NEW YORK. The District Attorney,

assistants district attorney, and detective-investigators employed by the D.A.'s Office are agents and employees of the City of New York, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

32. Similarly, the NYPD is an agency of the CITY OF NEW YORK. Detectives and police officers employed by the NYPD are agents and employees of the City of New York, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A. The Crime and The Initial Investigation

33. On February 6, 1994, Abraham Pollack, a landlord, was shot and killed during a robbery attempt at 126 Graham Avenue, in the Williamsburg area of Brooklyn, committed by one perpetrator. A handyman, Paul Avery, who came to Pollack's defense, was seriously wounded.

34. The shooting occurred at approximately 11:45 a.m.

35. Eyewitnesses described the perpetrator as a young African-American male.

36. Law enforcement authorities were under heavy pressure to make an arrest in the case. Pollack was a member of the Hasidic Jewish community, which had been extremely vocal in criticizing police for laxity in investigating crimes committed against members of that community by African-Americans, including the highly-publicized Yankel Rosenbaum/Lemrick Nelson incident,[4] and apparently was a rabbi.

---

[4]Nelson, an African-American, was indicted in Kings County, but acquitted at a State trial held during October 1992, for allegedly murdering Rosenbaum on August 19, 1991, during a racially charged incident. The Director of the New York State Division of Criminal Justice

37. Police knew that Avery, while struggling with the perpetrator, had slashed at him with a knife and believed he had "cut him."

38. Supporting Avery's belief was the account of another witness, Lisa Rodriguez, who told police she saw the perpetrator fleeing from the scene of the crime, clutching his back, and bleeding heavily through his clothing.

39. Still another witness to the perpetrator's flight, Esther Velez, told police she saw him limping in apparent pain and also holding his back.

40. Witness Carmen Santiago told police that, an hour after the crime, she encountered a man five blocks away from the shooting telling another man, "I got that motherfucker, but you got to help me, I'm hurt." Santiago told police the man "had a cut on his back. There was blood on the stairway where he was standing."

41. She identified the man.

42. He fit eyewitness descriptions of Pollack's assailant.

43. Police knew that this man and his brother, who resembled him in appearance, were local drug dealers who already were targets of a prior robbery investigation.

44. Based upon the above witnesses' statements, the police notified local hospitals they were looking for a possible perpetrator with knife wounds on his back.

45. On February 8, 1994, at the 90th Precinct, the two brothers invoked their right to

---

concluded that the investigation had been bungled by the NYPD and the Brooklyn D.A.'s Homicide Bureau. *A Report To The Governor On the Disturbances In Crown Heights*, by Richard H. Girgenti, Director of Criminal Justice, State of New York. Nelson eventually was convicted on federal charges, but the conviction was overturned. *United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002). VECCHIONE was chief of Homicide Bureau when Nelson was acquitted and ADA Posner played a behind-the-scenes role in the case.

counsel and, by law, could not be interviewed.

46. However, the next day, police shifted their attention to another target of investigation: Jabbar Collins. They did so after allegedly receiving an anonymous phone call blaming the crime on Plaintiff and claiming that he had committed it after a resident of the building where the crime occurred, Charles Glover, had "set up the landlord."

47. While looking for Plaintiff Collins, police detectives were told by Plaintiff's mother, Margaret Bridges, a nurse, and Plaintiff's girlfriend, Louisa Lopez, that at the time of the crime, Plaintiff was present in Ms. Bridges' apartment, exchanging haircuts with his brother, Elijah. They explained to police that Plaintiff was regularly employed as a barber.

48. Ms. Bridges and Ms. Lopez named several additional individuals who also were present and who could confirm their account.

49. On February 18, Plaintiff, at the request of the police, appeared voluntarily at the 90th Precinct, without an attorney.

50. Defendants GERECITANO and HERNANDEZ, although they lacked probable cause to do so, immediately handcuffed him and placed him under arrest.

51. They examined Petitioner's body, but found no evidence of any injury or scarring from any knife wound inflicted during the robbery incident. Thus, they knew from the outset that there was a strong likelihood that he was innocent.

52. Still, during the next several hours, Plaintiff was exhibited in formal lineups to four eyewitnesses who each had seen the apparent perpetrator of the crime close up, including Paul Avery, one of the victims in the attack. None of these eyewitnesses recognized Plaintiff as the perpetrator.

53. GERECITANO and HERNANDEZ released Plaintiff, but, furious over the failed lineups and still under pressure to make an arrest in the case, continued to try to build a case against him.

54. During the evening of March 1, 1994, Edwin Oliva was arrested for an armed robbery committed two days earlier in the very building where landlord Pollack had been shot and killed.

55. Defendants GERECITANO and HERNANDEZ knew that Oliva was an unreliable individual.

56. Oliva had made a detailed handwritten statement, which they knew was false, denying the robbery he had committed.

57. They knew he was a suspect in at least two additional robberies.

58. They knew he was a heroin addict who was exhausted, going through withdrawal, begging for medical treatment, and desperate to avoid going to prison.

59. Even after the detectives promised him possible leniency for robbery and methadone maintenance to treat his drug problem, Oliva denied any knowledge that Plaintiff had been involved in the Pollack robbery-murder.

60. However, taking advantage of Oliva's vulnerable state, GERECITANO and HERNANDEZ, after interrogating Oliva for hours, coerced him into signing a written statement they had prepared, based upon information he had told them was false.

61. The statement was tailored to conform to the anonymous phone call the detectives were "investigating" that Plaintiff and Charles Glover had planned the Pollack robbery-shooting and that Plaintiff had committed it.

62. During subsequent court proceedings, the BDAO and the court repeatedly took Oliva's "cooperation" into account in offering him protective custody, in asking for or granting him relatively low bail, and in offering and approving a lenient plea bargain.

63. After Oliva was indicted on more serious charges, which limited the court's authority to accept the lenient plea bargain he had been offered, prosecutors, at the court's request, rewarded Oliva's "cooperation" by not filing the indictment and holding open their initial lenient plea offer, in violation of law.

64. Oliva's attorney, on Oliva's behalf, tried to further benefit Oliva by reaching out for an even more favorable plea deal from the D.A.'s Office.

65. She told a prosecutor in court that Oliva "understood" that he would "get [a] deal" in exchange for his cooperation with the authorities.

66. However, VECCHIONE, who had determined not to use Oliva's testimony in the grand jury, personally turned down this request for further leniency "at this time," but held open the possibility of future benefits if Oliva's "cooperation" was needed later.

67. On March 9, 1994, Oliva accepted the original plea offer and entered an illegally lenient plea of guilty to a reduced charge under which, in a matter of months, he would be eligible for work release.

68. During the guilty plea proceeding, Oliva admitted his involvement in the robbery which he had denied in his previous false handwritten statement to police.

**B. <u>Plaintiff's Arrest And Indictment</u>**

69. Later the same day, HERNANDEZ and GERECITANO relied on the signed statement they had obtained from Oliva, which they knew was false, to obtain authorization from

Case 1:11-cv-00786-FB-RML Document 1 Filed 02/16/11 Page 21 of 111 PageID #: 21

the BDAO to arrest Plaintiff and to initiate criminal proceedings against him.

70. To formally initiate such proceedings, HERNANDEZ, under oath, executed and caused to be filed a Criminal Court complaint.

71. The complaint alleged that HERNANDEZ had been "informed by a witness" that Plaintiff had robbed Pollack at gunpoint and shot him to death, and that a second witness, the surviving victim (presumably Paul Avery), had identified Plaintiff as the assailant.

72. In fact, the only witness to "inform" the police that Plaintiff had been involved in robbing or shooting Pollack was Oliva, whose statement Hernandez knew was false or, at the very least, coerced and unreliable.

73. The second alleged witness, victim Paul Avery, had told police he did *not* recognize Plaintiff when he viewed Plaintiff at a lineup.

74. Thus, HERNANDEZ knew that his sworn allegation that the second witness had identified Plaintiff as the assailant also was false.

75. HERNANDEZ and GERECITANO, with deliberate indifference to the truth, and notwithstanding that their investigation went on for several weeks, never attempted to interview any of Plaintiff's additional alibi witnesses.

76. Once they had Plaintiff in their sights as a suspect and a way to "close" the case, they dropped any effort to continue investigating the two brothers who had been the original suspects and against whom there remained significant evidence of guilt.

77. Based upon the false sworn complaint executed by defendant HERNANDEZ, Plaintiff was arraigned on murder, attempted murder, and robbery charges, and was ordered held without bail. He was to remain in custody for the next 16 years and three months.

78. In April 1995, Plaintiff was indicted by a Brooklyn grand jury, following a false, fraudulent, misleading, and incomplete grand jury presentation.

79. Two witnesses offered affirmative evidence against Collins in the grand jury.

80. One of them, Angel Santos, did not claim to have seen the shooting, but claimed to have seen someone running past the window of a furniture store, opposite the building where the shooting had occurred, while he was inside the store reporting the shooting by telephone to a police 911 operator. Based upon this fleeting observation, Santos claimed to recognize the man as Plaintiff.

81. The grand jury was *not* informed that:

(a) Santos, by his own admission to police, was a "24/7" drug addict whose ability to accurately observe and to recall was affected by his constant use of drugs;

(b) Santos's identification had been obtained by means of a highly suggestive photo array; and

(c) Although all 911 calls are recorded, there was no record of Santos's alleged call, meaning that his testimony was false.

82. The second witness, Adrian Diaz, also had not seen the shooting. He claimed to have made a fleeting observation of an individual, whom he identified as Plaintiff, leaving the building where shots had been fired and reaching behind him, apparently to hide a gun.

83. The grand jury was *not* informed that:

(a) Diaz had *not* reported this alleged observation to police, even though he claimed he saw them at the scene of the shooting trying to solve this heinous crime;

(b) Diaz did not come forward until he heard that he could obtain a financial reward;

(c) By this time it was well known in the community that police were trying to make a case against Plaintiff;

(d) Diaz's identification initially had been obtained by means of a highly suggestive photo array; and

(e) Diaz was a drug seller and user who was on probation and had breached its conditions, and thus was potentially motivated to make himself an important witness in order to ingratiate himself with the authorities.

84. Neither witness could say that the person they saw – whoever it was – was the shooter, as opposed to someone fleeing from the scene of a frightful incident.

85. The grand jury also was not informed of critical additional exculpatory evidence, known to police and prosecutors, that further negated probable cause to believe Plaintiff was guilty of the crimes, including the following:

(a) The evidence implicating the two brothers;

(b) The evidence that the perpetrator had been wounded, but Plaintiff had not been wounded;

(c) The fact that four eyewitnesses, including victim Paul Avery, had *not* recognized Collins as the perpetrator when they viewed him in lineups, and

(d) The fact that Collins had a solid alibi defense supported by at least five other witnesses.

**C. <u>The District Attorney's Misconduct in the Period Before Trial</u>**

86. Defendant VECCHIONE, then Chief of the BDAO's Homicide Bureau, was the lead prosecutor assigned to Plaintiff's prosecution. He was assisted by ADAs Charles Posner (now deceased) and Stacey Frascogna, as well as by defendants MAHER and BONDOR.

87. By VECCHIONE's own admission, none of these subordinates did anything significant while investigating or prosecuting Plaintiff's case without informing VECCHIONE

Case 1:11-cv-00786-FB-RML Document 1 Filed 02/16/11 Page 24 of 111 PageID #: 24

and obtaining his approval.

88. By early 1995, whatever "cause" there had been to prosecute Plaintiff, and to continue to detain him without bail, had evaporated.

89. Oliva had "recanted" his "statement" to police. He had told VECCHIONE, Posner, MAHER, BONDOR, and/or their colleagues that he had no knowledge that Plaintiff had been involved in the murder and that police had coerced him into signing the "statement."

90. Santos's statements, including his grand jury testimony, that he was on a 911 call with police when he made his claimed observation, had been refuted by the 911 recording.

91. Diaz, whose credibility was dubious to begin with, *see* ¶¶ 83-84, *supra*, had violated the terms of his narcotics probation by fleeing to Puerto Rico without permission, the Probation Department was preparing to direct his arrest, and he appeared unavailable to testify.

92. Realizing that there was insufficient evidence with which to continue the criminal prosecution of Plaintiff, VECCHIONE determined to do whatever was necessary, including using blatantly illegal investigative tactics, to manufacture such "probable cause."

**1. <u>Edwin Oliva</u>**

93. On or about January 26, 1995, VECCHIONE caused to be prepared an affirmation, bearing his purported signature, "swearing" under penalties of perjury that Oliva had communicated to VECCHIONE's office his desire to cooperate and asking the Court to authorize VECCHIONE's detective-investigators to take custody of Oliva for this purpose.

94. Based upon these apparently "sworn" factual representations, the court issued the requested order, on the condition that Oliva provide written consent to go with the D.A.'s detectives.

95. VECCHIONE's "sworn" affirmation, upon which he knew the court would rely, was a fraud on that court.

96. VECCHIONE's "signature" purporting to attest to the truthfulness of his factual representations under the penalties of perjury was not his signature at all, but apparently that of his paralegal. *See* Exh. A, annexed hereto.

97. Moreover, Oliva had *not* made any communication to VECCHIONE's office that he presently wished to cooperate; this representation was a fabrication.

98. After Oliva told VECCHIONE that the police statement he had signed was untrue, VECCHIONE directed that GERECITANO be asked for his help in pressuring Oliva to conform his story to the written statement he had been coerced into signing.

99. GERECITANO had retired from the NYPD and was a private citizen.

100. However, he agreed to meet with Oliva at the D.A.'s Office for this purpose, and in fact pressured Oliva to falsely accuse Plaintiff.

101. Oliva had been released from prison under a Department of Corrections-sponsored work release program.

102. GERECITANO, VECCHIONE, Posner and/or their associates threatened Oliva that, unless he adopted the false "sworn" statement contained in GERECITANO's report, he would be subject to prosecution for conspiracy to rob the landlord Pollack and for perjury, and his work release would be revoked.

103. Nevertheless, at or following the meeting with GERECITANO and the others, Oliva, continuing to renounce the statement to police he had been forced to sign, refused to cooperate with the police or the prosecutors.

104. On or about February 28, 1995, VECCHIONE and Posner caused the New York State Department of Corrections to "suspend" Oliva's work release.

105. This action was pursuant to the BDAO's secret practice of causing State Corrections and State Division of Parole officials to revoke the release of former inmates to compel them to appear at the BDAO and to "cooperate."[5]

106. Oliva had a good adjustment to work release and there was no legitimate reason for his work release to be suspended.

107. After being taken into custody, Oliva was sent to Ulster Correctional Facility.

108. He was informed that he would remain imprisoned upstate until he agreed to "cooperate" with the D.A.'s Office.

109. On or about March 3, 1995, at VECCHIONE's direction, ADA Posner submitted what purported to be Posner's sworn affirmation to the Supreme Court, Kings County, requesting Oliva's transfer from State Prison to the custody of detective-investigators for the BDAO.

---

[5]ADA Monique Ferrell, in the course of opposing Plaintiff's later motion to vacate his conviction, admitted this practice in a sworn affirmation. *See* Affirmation of Monique Ferrell in Opposition to Plaintiff's CPL § 440.10 Motion, Nov. 3, 2006, p. 41 ¶ S ("Pursuant to the usual practice of this Office when a witness on supervised release who has previously made a statement and who is needed as a witness is non-compliant, we may have notified Mr. Oliva's parole officer if he was not cooperating with our efforts to speak with him about his testimony. It is our experience that such a notification can sometimes result in the supervising agency making the prisoner available to us via appropriate court order.")

The "usual" practice followed by the BDAO and the State agencies was illegal. An offender on work release may not have his work release revoked without written notice that he has violated a specific condition of his release, an evidentiary hearing before a three member Temporary Release Committee, and a written account of the evidence and reasons supporting his removal. *See Quartararo v. Catterson*, 113 F.Supp.2d 405, 412 (E.D.N.Y. 2000); 7 N.Y.C.R.R. § 1904.2. It is not a condition of release that an offender cooperate with a district attorney's office, or attend meetings at such an office, and thus the revocation of an offender's work release for not doing so is plainly illegal.

110. Seemingly under oath, Posner represented that Oliva had "communicated to representatives of this Office" that he wished to provide information and cooperate and assured the court that Oliva would not be taken into custody without his "written consent."

111. Based upon Posner's purported affirmation, the court (Justice Egitto) signed an order that authorized detective-investigators to take Oliva into temporary custody and bring him to their office.

112. Posner's "affirmation," like VECCHIONE's previous one, was a fraud.

113. Like VECCHIONE, Posner had someone else sign for him.

114. Furthermore, as VECCHIONE and Posner well knew, Oliva had not "communicated" that he wished to provide information or cooperate: he was in prison because he had *refused* to cooperate with the BDAO.

115. Although the court's order was conditioned on Oliva providing his written consent, Oliva handwrote on the form: "I *refuse* to go down with Detectives D.A" (emphasis added), and signed his name.

116. This did not deter VECCHIONE or the detective-investigators acting under his direction. In defiance of the court's order, they took custody of Oliva anyway and brought him involuntarily to VECCHIONE's Office.

117. There, VECCHIONE threatened him with physical harm, further prosecution, and long-term imprisonment unless he would agree to falsely accuse Plaintiff of the robbery/murder, and promised him his speedy release if he did so.

118. Oliva then agreed to testify to the contents of the statement to police that he previously had told VECCHIONE was untrue and had been coerced from him.

119. After Oliva testified, VECCHIONE caused State authorities to be notified that Oliva could be released, and within a week Oliva was freed.

**2. <u>Angel Santos</u>**

120. VECCHIONE knew the police 911 tape refuted Santos's original claim that he was on the phone with a 911 operator when he observed a man he identified as Plaintiff run by the store window.

121. Rather than abandon Santos as a witness, in or about February, 1995, VECCHIONE caused defendants MAHER and BONDOR to serve an "office" subpoena on Santos directing him to appear at the D.A.'s Office.

122. This "office" subpoena was illegal, as VECCHIONE well knew, since judicial subpoenas may only be used to compel witnesses to appear in *court* to testify, not to coerce them to appear at a prosecutor's office for an interview.

123. Indeed, a judge of the Supreme Court, Kings County, had just held, in a published decision (*People v. Neptune*, 161 Misc.2d 781 (Sup. Ct. Kings County 1994) (Gerges, J.)), that VECCHIONE's own Homicide Bureau had improperly issued such subpoenas in another case to coerce witnesses and that it should desist from ever doing so again.

124. When Santos failed to comply with VECCHIONE's unlawful subpoena, MAHER and BONDOR, on February 23, 1995, found Santos and forcibly transported him to VECCHIONE's office.

125. Santos told VECCHIONE, MAHER, BONDOR, and others present that he did not wish to testify at trial.

126. Santos told VECCHIONE and the others that, at the time of his alleged

Case 1:11-cv-00786-FB-RML Document 1 Filed 02/16/11 Page 29 of 111 PageID #: 29

observation in the store, and continuing to that date, he was a "24/7" drug addict using crack and other illegal drugs.

127. Undeterred, VECCHIONE, in the presence of MAHER, BONDOR, and others, threatened Santos that if Santos did not cooperate with him, VECCHIONE would hit Santos over the head with a coffee table, immediately send him to jail, keep him in prison for a long time, and prosecute him for perjury.[6]

128. Santos still declined to cooperate.

129. Under Article 620 of the New York Criminal Procedure Law, a potential witness may be taken into custody on a material witness warrant, issued by a court on a party's sworn written application, based upon a showing of "reasonable cause" to believe the individual has material testimony to give and will not appear when required in response to a lawful subpoena.

130. The court is required to formally arraign the individual, advise him of his right to counsel, appoint counsel if he cannot afford one, consider releasing him on bail, and require the People, at a formal hearing to be held thereafter, to prove the materiality of his testimony and that he will not appear voluntarily if released from custody. The individual is entitled to present evidence and witnesses on his behalf at such a hearing and to appointment of counsel if indigent.

131. VECCHIONE knew that Santos was in particular need of legal assistance: he was a drug addict, he was illiterate, and he had given prior testimony that was untrue.

132. While MAHER and BONDOR detained Santos at VECCHIONE's Office, VECCHIONE caused to be prepared and filed in court the requisite "sworn" affirmation in

---

[6]Santos gave such testimony in June, 2010, at a federal habeas corpus hearing and was credited by the judge.

support of a material witness warrant authorizing Santos to be arrested and to be brought to court for a formal material witness hearing.

133. But VECCHIONE's purported signature on the "sworn" document was not his own: he had someone else in his Office sign it, apparently his paralegal. VECCHIONE then had this "signature" *notarized* by another attorney who worked in the office, who claimed to have been present when *VECCHIONE* executed the document! *See* Affirmation of MICHAEL VECCHIONE, Feb. 23, 1995, attached as Ex. D.

134. The "affirmation"claimed that Santos was a material witness, but misled the court as to the materiality of Santos's testimony by failing to reveal VECCHIONE's knowledge, based upon the 911 tape, that Santos's testimony would be false. Presumably a judge would not grant a material witness order to compel a witness to give testimony the prosecutor knew was untrue.

135. Indeed, VECCHIONE provided no information of any kind in his "affirmation" demonstrating "reasonable cause" to believe Santos was a *material* witness.

136. Following Santos's arrest on the warrant that the court had authorized based upon VECCHIONE's false affirmation, VECCHIONE further violated the law by not bring Santos before any court for the statutorily required material witness proceeding.

137. Instead, VECCHIONE, assisted by MAHER and BONDOR, caused Santos to be delivered to jail.

138. VECCHIONE thereby avoided the appointment of counsel who might protect Santos's rights.

139. After denying for 15 years that there were any material witness applications or orders in Plaintiff's case at all, the Office, in 2010, produced a material witness application and

order containing the following notation on it: "2/23/95 4:10 p.m. Remanded to Civil Jail /s/ Francis X. Egitto JSC."

140. It did so shortly after Plaintiff, through a Freedom of Information Law request, obtained a copy of the same documents from the court clerk's office and learned about the existence of such documents for the first time. (Plaintiff's 15-year-long effort to obtain documents through FOIL is detailed below.)

141. Neither the court nor the D.A.'s office produced any record indicating that any court proceeding was held to adjudicate whether Santos was a material witness or should be held without bail before Justice Egitto purportedly authorized him to be "remanded to civil jail."

142. Santos was locked behind bars at the Bronx House of Detention, housed with accused criminals, for a full week.

143. On March 2, 1995, VECCHIONE somehow arranged for Santos to be transferred from the Bronx House of Detention into VECCHIONE's custody.

144. The D.A.'s Office later acknowledged that Santos could not have been properly taken from the jail, or released from the custody of the Department of Corrections, without a formal court order based upon a sworn written application.[7]

145. However, no such application or order is in the court file, and the D.A.'s Office has never produced one. VECCHIONE acted in the complete absence of any legal authority.

146. Having obtained Santos's transfer from the illegal custody of the Department of Corrections to VECCHIONE's illegal custody, VECCHIONE again threatened Santos that unless

---

[7]Affirmation of Monique Ferrell in Opposition to Plaintiff's Amended Petition for Writ of Habeas Corpus, Apr. 30, 2010, p.5 n.1.

he agreed to cooperate with VECCHIONE he would be imprisoned indefinitely.

147. Now, Santos knew that VECCHIONE had the raw power to make good on his threats.

148. Santos finally broke down and agreed to cooperate with VECCHIONE by adhering to the story that VECCHIONE knew was false, and by testifying in court.

149. To cover up that Santos had refused to appear in court voluntarily and had been unlawfully kidnaped and coerced, VECCHIONE, on March 2, 1995, caused the manufacturing and filing of false official records making it appear that Santos's hesitancy to cooperate had resulted from threats he had received from Plaintiff and his family.

150. First, VECCHIONE directed his paralegal, Liza Noonan, to prepare, and file in the records of the BDAO a "Threat Analysis" report that VECCHIONE knew was false.

151. At VECCHIONE's direction, Ms. Noonan wrote that, in *May or June, 1994*, Santos had received "telephone calls from [an] unknown male who told Mr. Santos, 'If you go to court and testify we're going to blow you away,'" that Santos's family had also been approached on the street and threatened, and that 8 to 10 calls had been received in which the caller person said, "'Kill, kill, kill.'" Ms. Noonan wrote that Santos's wife purportedly had dialed *69 in an effort to obtain the caller's phone number. (The alleged results of that effort were not detailed.)

152. Second, VECCHIONE directed defendant HERNANDEZ to file a false Complaint Report with the NYPD opening up an official file on the Santos threat allegations.

153. HERNANDEZ reported that numerous threats had been made in May and August, 1994, against Santos and four members of his family.

154. HERNANDEZ's report, like Noonan's, was totally false.

155. As Santos later testified in federal court, he never told the authorities that he had received threats.

156. His identity as a prospective witness was not even disclosed to Plaintiff or his counsel until after Santos had agreed to testify on *March 2, 1995* – nearly *one year* after the threats allegedly were received.

157. During Plaintiff's criminal trial, VECCHIONE falsely claimed that Santos was in "protective custody" because he had received threats on behalf of Plaintiff "over the last several months." (Evidently VECCHIONE could not remember his own false report, which claimed that the threats had been received in May and June, 1994, approximately *nine months* before trial.)

158. VECCHIONE warned plaintiff's counsel to limit his cross-examination or else such threat evidence would be elicited. As a result, counsel asked no questions that might have inadvertently exposed the circumstances of Santos's illegally coerced testimony.

159. Immediately after Santos testified, the police "threat" file was "closed."

160. No investigation was ever conducted into the allegations of intimidation and obstruction of justice. This was so even though the alleged perpetrators – friends and relatives of Plaintiff, a murder defendant – were still at large, and there were numerous avenues of investigation that easily could have been explored.

161. Obviously, the reason the file was closed without any investigation was that all concerned knew the allegations had been fabricated.

162. The only person who had ever threatened Angel Santos was VECCHIONE.

163. The foreseeable consequence of VECCHIONE's manufacturing of false threat "evidence" was to harm Plaintiff in numerous ways in the course of the trial and subsequent

proceedings related to Plaintiff's case. VECCHIONE's fabrication was used to inhibit Plaintiff's trial defense, as a basis to enhance Plaintiff's sentence, as a ground for the District Attorney to successfully oppose Plaintiff's Freedom of Information Law requests, to prejudice the State court into denying Plaintiff's motion to vacate his conviction, and to oppose and delay the determination of Plaintiff's federal habeas corpus petition.

**3. Adrian Diaz**

164. VECCHIONE directed defendants MAHER and BONDOR to locate, and secure the cooperation of, Adrian Diaz.

165. Diaz's probation officer, J. LeViness, informed BONDOR, in writing, that Diaz had left the jurisdiction and failed to report and that the "official violation process is currently in motion."

166. Through investigation, MAHER and BONDOR learned that Diaz was living with family members in Puerto Rico.

167. On February 24, 1995, VECCHIONE submitted a fraudulent "affidavit" to Justice Egitto in order to obtain a certificate which VECCHIONE could use in Puerto Rico to obtain a court order directing Diaz's involuntary return to New York to testify.

168. The "affidavit" contained what purported to be VECCHIONE's signature, swearing to the truthfulness of the contents.

169. The purpose of requiring an affidavit was to ensure there was a reliable factual predicate for a court order authorizing the extreme step of forcibly removing a potential witness from another jurisdiction, here Puerto Rico.

170. Once again, the signature was not VECCHIONE's, but apparently had been

Case 1:11-cv-00786-FB-RML Document 1 Filed 02/16/11 Page 35 of 111 PageID #: 35

affixed by his paralegal.

171. The signature also was *notarized* as VECCHIONE's by another BDAO employee.

172. In obtaining this document and submitting it to a court, VECCHIONE exposed his subordinates (and himself) to prosecution for committing or aiding and abetting the crimes of perjury, false notarization, false filing, fraud, and other serious offenses.

173. VECCHIONE's "affidavit" did not disclose to the court that Diaz was in violation of his probation and that the Probation Department was preparing to request a court order authorizing his arrest.

174. Rather, VECCHIONE wrote: "It is believed that Adrian Diaz has been *threatened* in New York State which caused his relocation to Puerto Rico. There is reason to believe that because of these *threats*, Adrian Diaz will not *voluntarily* submit to service of process and return to New York to testify in the above-captioned case" (emphasis added).

175. VECCHIONE represented that, in view of such alleged threats, he would immediately return Diaz to Puerto Rico after he testified.

176. According to Probation Department records readily available to VECCHIONE, Diaz had been determined to be in violation of his probation on *May 5, 1994*.

177. His identity as a witness in Plaintiff's case was not disclosed to Plaintiff or his counsel until *ten months later – March 2, 1995.*

178. VECCHIONE had not spoken with Diaz and had no basis to believe that Diaz had been threatened or that his "flight" in 1994 was related to Plaintiff's case. Once more, he lied.

179. Armed with the Certificate he had fraudulently obtained, VECCHIONE, accompanied by Frascogna, MAHER and BONDOR, flew to Puerto Rico on February 25, 1995.

180. Several hours outside San Juan, MAHER and BONDOR located Diaz.

181. Diaz tried to flee.

182. Diaz said he fled out of fear of arrest of arrest for violating his probation.

183. Diaz was promised that VECCHIONE would "take care" of this problem and make sure that Diaz could return to Puerto Rico without being arrested.

184. Absent such a promise, Diaz would not have "voluntarily" returned to New York to testify.

185. Following Diaz's testimony on March 10, 1995, VECCHIONE called Diaz's probation officer to inform him that Diaz had been or was being returned to Puerto Rico.

186. VECCHIONE falsely claimed that the only reason Diaz had moved to Puerto Rico was that he had received threats from Plaintiff or his agents. VECCHIONE lied to Probation in order to fulfill his promise to Diaz to protect him from probation violation proceedings.

187. VECCHIONE memorialized this conversation in a formal letter dated March 17, 1995, which he sent to Probation Officer LeViness for the purpose of filing in the official records of the Department of Probation, and which LeViness did so file.

188. In the letter, VECCHIONE represented that Diaz had fled due to threats by "[t]he perpetrator of the crime and his family and friends ... that anyone who testified against the defendant would be killed. In addition *several of the witnesses received direct threats* attributed to the defendant. ... Any failure to report to probation by Mr. Diaz is directly related to his fear in testifying in this case" (emphasis added).

189. In fact, as Diaz later swore in an affidavit, he had never claimed any threats and any such fear.

190. In fact, VECCHIONE had no evidence that any witness had received any threat.

191. As with Santos, VECCHIONE had made up such allegations, and had created and filed a false document to create a cover story with which to hide the truth about his witness.

192. Notwithstanding VECCHIONE's letter, on March 20, 1995, the Probation Department drew up a "Specification of Alleged Violation of Probation."

193. The Specification was supported with a report stating that Diaz's "adjustment is poor, his failure to cooperate with the Dep[artmen]t's reporting guidelines indicates a lack of regard for his probation sentence," and noting as well that Diaz had been required to attend a drug treatment program.

194. The supervising probation officer recommended a "term of incarceration" if Diaz was found, as alleged, to have violated his probation.

195. Thereafter, VECCHIONE again intervened with the Probation Department on behalf of Diaz.

196. By letter dated June 26, 1995, VECCHIONE wrote Probation Officer John Dawson claiming that Diaz had gone to Puerto Rico to live with his parents "[b]ecause of *threats* made on his life in connection with this case ..." (emphasis added).

197. VECCHIONE also caused this false record to be filed in the official records of the Probation Department.

198. As a result of VECCHIONE's efforts on Diaz's behalf, the Probation Department elected not to file the probation violation specification, and Diaz avoided imprisonment.

199. The false threat allegations regarding Diaz that VECCHIONE caused to be filed resulted in the Probation Department later opposing, successfully, Plaintiff's Freedom of

Information Law ["FOIL"] requests and federal civil action seeking discovery of information, on the ground of "danger" to the witness.

200. VECCHIONE's false threat allegations also were relied on by the BDAO subsequently in opposing Plaintiff's State and Federal motions to vacate his conviction,[8] thereby substantially delaying Plaintiff's ultimate release.

**D. <u>Plaintiff's Criminal Trial</u>**

201. VECCHIONE was required, under the Constitution and the laws of the United States and of the State of New York, to disclose to the defense all evidence and information known to the BDAO or to the NYPD that was favorable to the defense and, considered cumulatively, was reasonably likely to affect the outcome of the trial ["*Brady*" material].

202. Where such information had been specifically requested by the defense, VECCHIONE was required under New York law to disclose it if there was any reasonable possibility that it might affect the trial's outcome.

203. This included (a) information directly tending to establish the defendant's

---

[8]The false threat allegation also was used by the BDAO to oppose a FOIL request by the newspaper Newsday, in *Newsday v. Office of District Attorney*, Kings County, Kings Co. Index No. 1549/2001. *Newsday*'s reporter, Leonard Levitt, was researching allegations that VECCHIONE had a sexual relationship with Frascogna and had promoted her, and other women, with whom he had such affairs. Records ultimately obtained by Plaintiff showed that Ms. Frascogna was earning $33,000 in 1995 but, within three years of her trip to Puerto Rico with VECCHIONE, was promoted to Deputy Bureau Chief and was earning an annual salary, with bonuses, of $105,500.00. VECCHIONE ultimately admitted the Frascogna relationship but denied that it was going on at the time he took her to Puerto Rico. VECCHIONE claimed, in an interview with Newsday, that Frascogna was useful for her Spanish-language ability and for "charming" Diaz into coming back "voluntarily" to New York. However, Diaz spoke English perfectly, as Frascogna certainly knew, from having presented his grand jury testimony. And it was not Frascogna's "charms" that induced Diaz to come back to New York, but rather VECCHIONE's secret promise to take care of Diaz's probation violation and potential imprisonment, which VECCHIONE did.

innocence, and (b) information tending to impeach the credibility of significant witnesses called by the prosecution to meet its burden of convincing every member of the jury, beyond a reasonable doubt, that the defendant was guilty.

204. Such information was required to be disclosed in a timely manner, meaning sufficiently in advance of trial to permit the defense to adequately investigate and make use of it.

205. Such information had to be disclosed whether it was recorded or just verbal.

206. In addition, VECCHIONE had a Federal Constitutional obligation not to introduce testimony or evidence, or to make argument, that he knew, or should have known, was false or misleading, and to promptly correct any false or misleading evidence or argument that the prosecution presented to the court or to the jury.

207. Finally, VECCHIONE had an absolute obligation under New York law, at the beginning of the trial, to disclose to the defense all recorded statements of prosecution witnesses (known as "*Rosario* material") relevant to the subject matter of their direct testimony.

208. Where *Rosario* material was favorable to the defense and material, it would also be required to be disclosed under *Brady*.

209. By law, the defense was legally entitled to rely on the completeness of VECCHIONE's *Brady* and *Rosario* disclosures.

210. By law, the defense was not required to assume that VECCHIONE, as an officer of the court and a law enforcement official, had made an incomplete, false, or misleading disclosure.

211. VECCHIONE did not disclose the names of Santos and Diaz as prosecution witnesses until March 2, 1995, during a pretrial hearing.

Case 1:11-cv-00786-FB-RML Document 1 Filed 02/16/11 Page 40 of 111 PageID #: 40

212. VECCHIONE did not at that time disclose any other information about them except that they had identified Plaintiff out of court during police-arranged identification procedures. 213. VECCHIONE did not disclose Oliva's identity until the first day of testimony, March 7, 1995, immediately before Oliva took the witness stand.

214. Thus, neither Plaintiff nor his counsel had any meaningful opportunity to investigate the background, the general credibility, or the possible motives underlying the "cooperation" of these witnesses.

215. As a result, even more so than in a typical case, the defense was completely reliant on the accuracy and the completeness of the information provided by the prosecutor. But the prosecutor was VECCHIONE.

216. Rather than comply with his constitutional and statutory obligations, VECCHIONE systematically misled the court, the jury, and the defense concerning the circumstances under which his three main witnesses were testifying, introduced testimony from these witnesses and made argument which he knew was false or misleading, and withheld *Brady* and *Rosario* material he knew or should have known he was required to disclose, including evidence that Plaintiff was innocent.

**1. <u>Oliva</u>**

217. VECCHIONE represented in court that the only promise he had made to Oliva was that VECCHIONE would send a letter to the State Parole Board "detailing his cooperation ... and to attempt to relocate him ... if he gets out" on parole.

218. VECCHIONE denied any promise to request Oliva's release, or any other agreement.

219. Under VECCHIONE's direction, ADA Posner then conducted Oliva's direct examination and elicited the following false information:

(a) That Oliva overheard Plaintiff planning the crime with Charles Glover, and that afterwards Glover told him that Plaintiff had admitted disposing of the weapon used in the shootings (Oliva had told the ADAs this story was false and had been coerced from him by detectives while he was undergoing heroin withdrawal);

(b) That Oliva initially cooperated with police and told them the same story he was testifying to (in fact, Oliva initially told police he knew nothing about the Pollack murder and falsely denied his own participation in the robbery to which he later pleaded guilty);

(c) That Oliva's sentence of 1 ½ to 3 years on his robbery case did not have "anything to do" with his statement to police against Collins, which was never "brought up at all" or "discussed" in connection with Oliva's robbery case (in fact, Oliva's statement was continually brought up during his case as a basis for court consideration and a lenient plea bargain);

(d) That Oliva had pleaded guilty to a "D" felony (which would have been a permissible plea under the law after he was indicted, when in fact he was allowed to plead to an "E" felony, which was an impermissibly lenient and invalid plea);

(e) That Oliva had been serving his sentence for one year at Ulster Correctional Facility (when in fact he had been there just a week following the suspension of his work release for failing to cooperate with the BDAO); and

(f) That the only promise Oliva had received was a letter to the Parole Board and relocation "[i]f they let me out" (when in fact Oliva had been promised that he would be immediately restored to work release in exchange for his testimony).

220. With respect to Oliva's initial "cooperation" with police, VECCHIONE and Posner did not disclose the information contained in ¶¶ 54-68, above, including Oliva's false statement denying his own robbery, his initial statement denying knowledge of Plaintiff's alleged involvement in the Pollack murder, the coercive circumstances under which he signed his written

statement, and the relationship between his "cooperation" and the handling of his own case.

221. With respect to the coercion that led to Oliva's trial testimony, VECCHIONE and Posner failed to disclose the information contained in ¶¶ 93-119, including Oliva's denial or "recantation" of his "sworn" written statement implicating Plaintiff, the revocation of and promise to restore his work release, his refusal to voluntarily appear at the D.A.'s office pursuant to the court's order, the D.A.'s illegal seizure of his person anyway and unlawful interrogation of him, and the threats and promises that ultimately brought about his agreement to testify in conformity with his false written statement to police.

222. VECCHIONE's summation contained numerous false or highly misleading statements about Oliva's cooperation that were harmful to Plaintiff's defense, including the following:

(a) The defense suggestion that Oliva had any kind of "deal" with the prosecution, or was receiving any undisclosed benefits, was "so absurd that it is laughable";

(b) Prosecutors' sole promise had been to write an objective letter to the Parole Board setting forth Oliva's "cooperation with the prosecution," without any "recommendation" that he receive any leniency;

(c) Oliva had no motivation to help himself when he initially provided a statement to police implicating Plaintiff, and did not ask for or receive any benefits in relation to his initial statement or cooperation;

(d) "*Oliva's motive is simple, just like all the rest of the witnesses, he saw something. He heard something. Someone asked him about it. And he is telling what he saw and he is telling what he heard. Nothing else*" (emphasis added).

**2. <u>Adrian Diaz</u>**

223. VECCHIONE told the court and the defense that Diaz had come back from Puerto

Case 1:11-cv-00780-FB-RML Document 1 Filed 02/16/11 Page 43 of 111 PageID #: 43

Rico voluntarily to testify at the BDAO's expense and would be flown back after testifying, and disclosed his criminal record.

224. VECCHIONE flatly denied having any "cooperation agreement" with any witness, including Diaz. The judge then stated to defense counsel, "So now ... you have the whole picture."

225. However, this was not so. VECCHIONE did not disclose the information contained in ¶¶ 164-198, *supra*, concerning Diaz's probation violation, flight from detectives, VECCHIONE's promise to him, and VECCHIONE's fulfillment of that promise.

226. VECCHIONE then made false arguments about Diaz's motives during his summation. He contended that Diaz had no conceivable interest in testifying and was doing so *solely* because he had been asked to and it was the right thing to do.

**3. Angel Santos**

227. VECCHIONE denied having any "cooperation agreement" with Santos. He claimed Santos was in protective custody and warned Plaintiff's counsel that if he inquired about the circumstances prejudicial evidence of threats would come out.

228. VECCHIONE conducted Santos' direct examination and led Santos to testify that he observed Plaintiff run by a store in which Santos was on the telephone talking to a 911 operator.

229. During his summation, VECCHIONE denounced the defense for suggesting that Santos might have some ulterior motive for testifying and told the jury: "Don't even give [that] a second thought in your deliberations." All the witnesses, he represented, were testifying solely because they were asked to, "nothing else."

230. At no point did VECCHIONE disclose the information contained in ¶¶ 120-162, including the 911 tape proving the falsity of Santos's testimony, Santos "24/7" drug addiction, Santos's refusal to testify, and VECCHIONE's coercion of him through a pattern of threats and illegal incarceration.

**E. Plaintiff's Conviction, Sentencing, and Unsuccessful Appeals**

231. On March 13, 1995, the jury convicted Plaintiff of murder, attempted murder, robbery, assault, and criminal possession of a weapon.

232. On April 3, 1995, after VECCHIONE and Posner falsely claimed that Plaintiff had threatened witnesses, they asked the court to impose the maximum sentence.

233. The court then sentenced Plaintiff to serve a total sentence of 33 1/3 years to life. The judge stated that he wished he could have sentenced Plaintiff to a mandatory life sentence at hard labor.

234. After sentencing, VECCHIONE no longer was assigned to handle Plaintiff's case. The case was transferred to the Appeals Bureau and handled by prosecutors assigned to that unit.

235. Plaintiff's direct appeal, among other things, challenged the weight of the evidence against him. The D.A.'s Office relied on the credibility of witnesses Oliva, Santos, and Diaz in opposing this argument, and Plaintiff's appeal was denied.

236. Representing himself, Plaintiff brought a motion to vacate his conviction, which also was denied.

**F. The Defendants Cover-up VECCHIONE's Misconduct: The False Denials of Plaintiff's FOIL Requests**

237. Knowing he was innocent, Plaintiff believed there had to be evidence explaining

why the witnesses against him had lied or been mistaken in their testimony. He attempted to discover such evidence through a series of requests under the State's Freedom of Information Law ("FOIL"), Public Officers Law §§ 84-90, 21 N.Y.C.R.R. § 1401.

**1. <u>The Law Regarding FOIL Requests</u>**

238. The FOIL requires New York governmental agencies, including a District Attorney's Office, to permit the public to inspect and copy *every* record they hold, excepting only those records that fall within one of ten narrowly defined grounds for withholding records. Once a witness in a criminal case testifies in open court, or if records pertaining to that witness were required to be disclosed to a defendant as written *Brady* or *Rosario* material, such records must also be disclosed to that defendant under the FOIL.

239. The FOIL also requires agencies to designate both Records Access and Appeals Officers. The Records Access Officer receives and responds to FOIL requests. He may grant access to the records or, if the records are exempt from disclosure, withhold the records and explain his reasons for doing so in writing.

240. The person making the request may then administratively appeal to the agency's Appeals Officer, who is required to overturn the denial and grant access if the records do not properly fall within the grounds for denying access.

241. Both the Records Access Officer and the Appeals Officer are prohibited by law from denying a request by falsely claiming that a requested record does not exist. Indeed, it is a violation of the New York Penal Law to intentionally prevent the public from inspecting records requested under the FOIL. *See* Penal Law § 240.65.

242. At the same time, as representatives of the District Attorney's Office, FOIL

officers have a continuing constitutional obligation to disclose material exculpatory evidence that the Office should have disclosed at trial under *Brady*.

243. If the Appeals Officer upholds the Records Access Officer's denial of a FOIL request, the requester may then commence a civil lawsuit, under Article 78 of the New York Civil Practice Law and Rules, to challenge the agency's decision. However, New York law requires courts hearing such lawsuits to defer to an agency if it claims that the requested records could not be located. In other words, the entire system assumes and relies upon the truthfulness and honesty of the Records Access and Appeals Officers.

**2. <u>Plaintiff's July 1995 FOIL Request</u>**

244. By a letter dated July 19, 1995, Plaintiff made a FOIL request to the BDAO for, in relation to his case, all *Brady* and *Rosario* material, all statements made by Oliva, Santos, and Diaz, agreements with or promises to those witnesses, any letters the D.A.'s office wrote to the Probation Department regarding Diaz, information regarding Angel Santos' drug abuse, all witness subpoenas, all material witness applications and orders, and other materials.

245. On or about May 1, 1996, defendant ANTHONY D'ANGELO, acting as a FOIL Records Access Officer, represented to Plaintiff in a letter that those records were not in the possession of the D.A.'s office and refused Plaintiff's requests.

246. This representation was false.

247. Plaintiff administratively appealed that denial on May 8, 1996.

247. On May 28, 1996, defendant MELANIE MARMER, acting as a FOIL Appeals Officer, wrote to Plaintiff upholding D'ANGELO's denial.

248. She too represented that the BDAO did not possess the records.

249. This representation was false.

250. MARMER attached to her letter denying Plaintiff's appeal a "certification" by D'ANGELO that the BDAO did not have possession of the requested records.

251. This certification was false.

252. Plaintiff then commenced a civil lawsuit to challenge the denial of his FOIL request. *Collins v. Hynes, et. al.*, Kings Co. Index No. 22973/96. The case was assigned to Supreme Court Justice Joseph J. Dowd.

253. To oppose Plaintiff's lawsuit, in September 1996, the BDAO Office submitted MARMER's and D'ANGELO's prior letters and certification claiming the BDAO did not possess the requested documents, and affirmations by those defendants, dated September 6 and 9, 1996, respectively, swearing the records did not exist.

254. These affirmations were false.

255. On January 22, 1997, Justice Dowd dismissed Plaintiff's lawsuit challenging the denial of those records. He ruled that the BDAO's submissions "are sufficient to establish ... that the District Attorney is not in possession of the records."

256. Justice Dowd nevertheless ordered D'ANGELO and MARMER to provide Plaintiff with any "written or recorded" statements made by "Angel Santos."

257. This order included within its scope the alleged statements VECCHIONE claimed, in his material witness application, that Santos had made that he would not cooperate with any subpoena and would not voluntarily testify.

258. Nevertheless, D'ANGELO and MARMER failed to disclose the application containing Angel Santos' alleged statements.

Case 1:11-cv-00766-FB-RML Document 1 Filed 02/16/11 Page 48 of 111 PageID #: 48

### 3. Plaintiff's December 28, 1996, FOIL Request

259. By letter dated December 28, 1996, Plaintiff made another FOIL request to the BDAO, again seeking all cooperation agreements with, and promises of leniency to, Oliva, Santos, and Diaz.

260. By letter dated May 13, 1998, defendant VIRGINIA MODEST, acting as a FOIL Records Access Officer, administratively denied Plaintiff's request on the ground that those records did not exist.

261. Plaintiff administratively appealed that denial to defendant SHOLOM TWERSKY, in his capacity as a FOIL Appeals Officer.

262. As a basis for denying that appeal, MODEST submitted a "certification" claiming she could not locate any records containing information concerning benefits conferred upon witnesses in exchange for their testimony.

263. TWERSKY, in denying Plaintiff's appeal, also represented that the BDAO did not possess the records Plaintiff requested and that therefore Plaintiff's request was moot.

264. TWERSKY added that there was no chance that any of Plaintiff's requests had been overlooked because MODEST had certified that she "conducted a diligent search of [the] office's records and was unable to locate any records containing information concerning benefits conferred upon witnesses in exchange for their testimony."

265. Plaintiff commenced a second civil lawsuit challenging the BDAO's denial of his FOIL request. *Collins v. Hynes, et. al.*, Kings Co. Index No. 15641/97. The case once again was assigned to Justice Dowd.

266. In opposition to Plaintiff's lawsuit, MODEST submitted an affirmation, dated

May 13, 1998, representing that she had "personally reviewed all the records" in Plaintiff's prosecution and appeal files and that the requested records were not there.

267. Relying on the false "threat" records VECCHIONE had filed with the BDAO's witness protection and relocation unit, MODEST asserted she had properly withheld the protective custody or relocation records of "several witnesses whose lives were threatened during the pendency of [Plaintiff's] prosecution," who received "death threats," and who, if these records were revealed now, might be killed.

268. On May 19, 1999, Justice Dowd, citing MODEST's affirmation, dismissed Plaintiff's lawsuit.

269. Relying on MODEST's false factual representations, Justice Dowd found that "cooperation agreements" and "records concerning benefits conferred upon witnesses" who testified "do not exist in their file[.]"

270. Justice Dowd explicitly relied on MODEST's assertions about threats (all in turn based upon the false records VECCHIONE had created and filed) in ruling that "disclosure of records concerning the protective custody of witnesses would ... pose a risk of harm to the individuals to which such documents relate."

**4. <u>Plaintiff's August 1, 2002 FOIL Request</u>**

271. By a letter dated August 1, 2002, Plaintiff made a FOIL request to the BDAO for all subpoenas, and court and material witness orders, along with their supporting affidavits, "to secure the attendance of any out of state or incarcerated witness."

272. On March 19, 2003, defendant MORGAN J. DENNEHY, acting as a FOIL Records Access Officer, denied Plaintiff's request.

Case 1:11-cv-00766-FB-RML Document 1 Filed 02/16/11 Page 50 of 111 PageID #: 50

273. He stated that, "to the extent that court orders to produce witnesses even exist, they are not in" the BDAO's possession.

274. Plaintiff then commenced a third civil lawsuit to challenge that denial. *Collins v. Dennehy*, Kings County Index No. 3364/03.

275. On November 19, 2004, DENNEHY submitted his own affirmation to the court swearing that no such court orders or supporting documentation were in the BDAO's possession, and arguing therefore, that Plaintiff's lawsuit should be denied.

276. On December 1, 2004, Justice Herbert Kramer, citing DENNEHY's representations, dismissed Plaintiff's lawsuit.

**5. <u>Plaintiff's May 1, 2005 FOIL Request</u>**

277. By letter dated May 1, 2005, Plaintiff made a final FOIL request to the BDAO for the "subpoena" Vecchione obtained to have Diaz returned from Puerto Rico,[9] the supporting affidavit, records regarding Diaz's failure to comply with the terms of his probation, and all letters between the D.A.'s Office and the Department of Probation.

278. On January 17, 2006, defendant DENNEHY wrote to Plaintiff that "to the extent [the records] even exist, they are not in the [D.A.'s] possession." Included with DENNEHY's letter was a "certification" he signed, also dated January 17, 2006, stating that "an exhaustive search was conducted" of the BDAO's records but no records regarding the BDAO's "*alleged* 'intervention'" (emphasis added) in Diaz's probation proceedings could be located.

---

[9]Plaintiff made this request after belatedly learning about reporter Leonard Levitt's Newsday article, "Silence Broken," which had appeared April 9, 2001, and reported that VECCHIONE had been accompanied by fellow prosecutor Stacey Frascogna and had been armed with a court order when he brought back witness Adrian Diaz from Puerto Rico in connection with Plaintiff's case. *See* ¶ 200, n. 8, *supra*.

279. On February 10, 2006, Plaintiff wrote to the FOIL Appeals Officer, defendant JODI MANDEL, objecting to the BDAO's failure to disclose the "subpoena" VECCHIONE obtained to bring Diaz back from Puerto Rico.

280. In a March 1, 2006, letter, MANDEL claimed that, "to the extent they exist," the subpoena and supporting papers "could not be located." MANDEL wrote that "because this Office does not possess the documents you seek, your FOIL request is denied." Included with MANDEL's letter was a March 1, 2006, *notarized* "certification" she executed claiming that "an exhaustive search" of the BDAO's records had been conducted "but no witness subpoenas or supporting papers for the subpoenas could ... be located."

281. Upon information and belief, the aforementioned false FOIL responses (¶¶ 244-280, *supra*) were made with the knowledge, and at the direction, of VECCHIONE.

**6. <u>The Documents That Were Wrongfully Withheld</u>**

282. Years later, discovery in Plaintiff's federal habeas corpus proceeding proved that, contrary to the false representations of D'ANGELO, MARMER, TWERSKY, MODEST, DENNEHY, and MANDEL over the previous 15 years, the BDAO did in fact possess the documents Plaintiff had repeatedly requested and which constituted *Brady* and/or *Rosario* material, including:

(a) Oliva's post-arrest handwritten statement falsely denying his commission of the robbery for which he was arrested, indicted, and convicted;

(b) A March 1994 Early Case Assessment Bureau Data Sheet and other records indicating Oliva was a suspect in additional robberies;

(c) Handwritten entries in the BDAO's case folder for Oliva's robbery case in March 1994 indicating that, because Oliva was "[an] *informant* in [a] homicide case" (emphasis added), the Office should ask for "nominal bail"

Case 1:11-cv-00786-FB-RML Document 1 Filed 02/16/11 Page 52 of 111 PageID #: 52

and agreed to keep its original plea offer open even though Oliva had been indicted;

(d) Handwritten notes in the BDAO's case folder indicating Oliva's attorney had contacted the BDAO, on behalf of Oliva, seeking further consideration in exchange for his prior statement and potential testimony, that VECCHIONE had been consulted regarding that request, and that VECCHIONE had held open the possibility of benefits being bestowed in the future;

(e) The January 26, 1995, order to produce Oliva at the BDAO and VECCHIONE's supporting "affirmation" representing that Oliva had communicated his desire to meet with ADAs and to cooperate;

(f) The March 3 and 6, 1995, orders to produce Oliva at the BDAO, or in court, and their supporting applications representing that Oliva had communicated his desire to meet with ADAs and to cooperate and would be taken to the BDAO only upon his written consent;

(g) Oliva's handwritten statement on March 6, 1995, the day before his testimony, refusing to consent;

(h) The Santos material witness application stating that he had defied a subpoena and said he did not wish to and would not cooperate, and the order authorizing his arrest;

(i) An unsigned notation, purporting to be Justice Egitto's order, remanding Santos to "civil jail";

(j) District Attorney and police records containing Santos's alleged statements complaining that he and his family had received threats from representatives of Plaintiff;

(k) The Diaz out-of-state material witness application stating that he had moved out of the jurisdiction, and the court order for his involuntary return;

(l) A Probation Department memorandum to BONDOR disclosing plans to initiate violation of probation proceedings against Diaz; and

(m) VECCHIONE's letters to the Probation Department providing a false explanation of Diaz's unauthorized move to Puerto Rico and the BDAO's role in returning him there.

G. **Defendants Defeat Plaintiff's State Motion to Vacate His Conviction**

283. On March 15, 2006, Plaintiff, now represented by counsel, moved to vacate his conviction, and for a new trial.

284. Plaintiff's motion relied on the results of Plaintiff's 11-year re-investigation of his case, including FOIL requests and litigation, court records, and witness interviews.

285. The motion contended that VECCHIONE and the BDAO had withheld *Brady* and *Rosario* material, and presented false and misleading evidence and argument at trial, including: (a) Oliva's initial statement denying knowledge that Plaintiff was involved in the crime, police coercion of Oliva, benefits promised to Oliva or for which he was hoping, Oliva's pre-trial recantation, the use of a work release suspension to coerce his trial testimony, and the promise of restoration to work release which VECCHIONE made to Oliva and caused to be fulfilled immediately after Oliva testified; (b) the promise to help Diaz avoid probation revocation and arrest, and (c) the police 911 tape showing that Santos's trial testimony had been false.

286. The motion principally was based upon Oliva's affidavit revealing the manner in which his testimony had been manufactured and coerced; Oliva's confidential Legal Aid Society and State Corrections records which Oliva had consented to provide to Plaintiff, and court records, which corroborated Oliva's affidavit; Plaintiff's tape-recorded interview from prison of Diaz in which Diaz admitted the BDAO's promises to him; and the police 911 tape, together with the report of Plaintiff's voice identification expert, concluding that Santos's voice was not on the tape.

287. At the time the motion was filed, VECCHIONE, as Chief of the Rackets Division,

was leading a highly-publicized investigation of alleged widespread judicial corruption in Kings County and handling other high-profile investigations.

288. Plaintiff moved to disqualify the BDAO from handling the motion.

289. He contended that VECCHIONE was the most powerful prosecutor in Hynes's Office and that no lower-ranking assistant district attorney could fairly and impartially investigate his conduct in connection with Plaintiff's prosecution.

290. Plaintiff also moved for a change of venue and for a judge outside Brooklyn to handle the matter because all judges in Brooklyn were potentially subjects of investigation or witnesses in VECCHIONE's investigation.

291. This motion first was summarily denied by a city-wide administrative judge, and then, after Plaintiff renewed it, by the judge in Brooklyn, Robert K. Holdman, assigned to handle Plaintiff's motion.[10]

292. With hundreds of prosecutors in the BDAO from whom to choose to assign the matter, Hynes selected Monique Ferrell – VECCHIONE's own Counsel to the Rackets Division who had worked closely with VECCHIONE in numerous high-profile cases.

293. Ferrell interviewed VECCHIONE as a "fact" witness.

---

[10]Judge Holdman had been a long-time ADA in the Bronx recently appointed to the Court of Claims and was sitting by "designation" in Brooklyn. He revealed that he had been friends during law school with District Attorney Hynes' son and had visited the Hynes home, but claimed he could be fair and impartial. This was rather questionable. The New York Law Journal reported that in one year, the Appellate Division, Second Department, which rarely ever does so, had reversed *four* of Judge Holdman's sentences as "excessive." Mark Fass, *In One Year, Court finds Four of Judge's Sentences Excessive*, New York Law Journal, June 9, 2008, p. 1. Remarkably, after that article appeared, three more such reversals occurred. *See People v. Williams*, 52 A.D.3d 748, 860 N.Y.S.2d 595 (2d Dept. 2008), *lv. to appeal denied,* 11 N.Y.3d 836, 897 N.E.2d 1095 (2008); *People v. Tyquan S.,* 54 A.D.3d 1062, 864 N.Y.S.2d 170 (2d Dept. 2008), and *People v. Dyer*, 60 A.D.3d 690, 874 N.Y.S.2d 245 (2d Dept. 2009).

294. VECCHIONE told Ferrell that, as the lead prosecutor assigned to Plaintiff's case, he had directed the activities of Posner, Frascogna, MAHER, BONDOR, and others who worked on the case, had known everything significant that occurred, and still remembered the case well.

295. VECCHIONE denied that any witness had recanted, that any witness had to be threatened or forced to testify, and that any evidence favorable to the defense under *Brady* had been withheld at the trial.

296. VECCHIONE knew these denials were all false.

297. Due to VECCHIONE's false statements, the BDAO opposed Plaintiff's motion.

298. Ferrell prepared an affirmation containing VECCHIONE's false statements.

299. VECCHIONE's affirmation declared that, despite the passage of nearly a decade, he had "a clear recollection of" the case.

300. He declared that he alone "determined the course of [the] investigation and the manner in which the trial was conducted," and that Posner "did not act without consulting" him.

301. VECCHIONE wrote that he had read "the allegations contained" in Plaintiff's motion, and that they were "*without exception*, untrue" (emphasis added).

302. VECCHIONE then went on to make the following declarations:

(a) Oliva "never recanted his statement";

(b) Oliva's robbery case was handled "without regard to the fact that he had given a statement regarding his knowledge" of the landlord's murder;

(c) Oliva "did not ask for anything other" than VECCHIONE's promise to neutrally inform the parole board of his testimony;

(d) VECCHIONE did not speak to Oliva until the evening of March 6, 1995, the day before he testified;

(e) Oliva's suspension from work release was not "undertaken as a means of forcing Oliva to testify against his will";

(f) VECCHIONE "promised Oliva nothing other than what he informed the court and defense counsel";

(g) VECCHIONE did not intercede "in any manner" in the Department of Probation's handling of Diaz's probation;

(h) VECCHIONE truthfully disclosed the promise made to Diaz (regarding his airfare and lodging) and "made no promises concerning" Diaz's probation;

(i) No "deals were made with witnesses";

(k) "No witness had to be threatened or forced to testify," and

(l) Neither he nor Posner intentionally elicited "false testimony or knowingly allowed any witness to testify in a manner that was untruthful."

303. VECCHIONE knew the above assertions were false or, at the very least, misleading. He signed his false affirmation knowing that Ferrell would rely on its false factual allegations to oppose Plaintiff's motion and to prolong his imprisonment.

304 Ferrell then submitted her own affirmation which, relying on VECCHIONE's, denied that Oliva had ever recanted his statement, any witness had any undisclosed incentive to testify, and even "arguably exculpatory information" had been withheld from the defense.

305. Despite the BDAO's on-going, constitutional obligation to disclose *Brady* material, Ferrell refused to comply with Plaintiff's specific requests for such disclosure.

306. As a result of VECCHIONE's false statements denying Plaintiff's allegations and the Office's refusal to disclose additional *Brady* material, the State court denied Plaintiff's motion for a new trial without even allowing an evidentiary hearing. Permission by the Appellate Division to appeal that decision also was denied.

Case 1:11-cv-00780-FB-RML Document 1 Filed 02/16/11 Page 57 of 111 PageID #: 57

**H. VECCHIONE's False Statements Further Prolong Plaintiff's <u>Incarceration By Delaying Decision of His Federal Habeas Petition</u>**

307. On April 3, 2008, Plaintiff filed a petition for a writ of habeas corpus in the United States District Court, Eastern District of New York, contending that his conviction and imprisonment had been obtained in violation of his federal constitutional rights, that his continuing detention was unlawful, and that he should be released from State custody.

308. Based upon VECCHIONE's false denials to Ferrell of Plaintiff's allegations, the BDAO, still represented by Ferrell, asked that Plaintiff's petition be denied without a hearing.

309. With VECCHIONE's knowledge and consent, Ferrell submitted, and asked the federal court to rely upon, VECCHIONE's false State affirmation.

310. Ferrell also relied on the false business records VECCHIONE had manufactured alleging that Plaintiff was responsible for threats against Santos. In an affirmation, she wrote that "[t]he records of this Office establish, and as *ADA Vecchione informs me*, that Santos ... told him that he fears for his safety and that of his family if he were to testify" (emphasis added). She cited and attached the false 90th Precinct complaint report that HERNANDEZ had filed for VECCHIONE claiming that Santos and four members of his family had been threatened.

311. Ferrell unequivocally denied every one of Plaintiff's claims, arguing, among other things, that "no witness had to be threatened or forced to testify"; Oliva "never recanted; Oliva was not forced to testify, and he was promised nothing other than the People disclosed at trial"; and the Office did not withhold "any arguably exculpatory evidence or information," "any previously recorded statement of any witness," or "any material information concerning witnesses Diaz, Santos, and Oliva."

312. Meanwhile, Plaintiff, after so many unsuccessful FOIL requests brought in his own name, submitted a FOIL request and lawsuit in the name of another prisoner, Dominic Dupont, this time against the Kings County Clerk's Office.

313. The court ordered that Office to comply.

314. In December, 2009, the Clerk's Office sent Dupont a copy of a material witness application and order for Angel Santos – the very documents Plaintiff had been seeking, and the Defendants had denied existed, for nearly 15 years.

315. Based upon these documents, Plaintiff moved to add to his habeas corpus petition the allegation that VECCHIONE, contrary to his and Ferrell's sworn affirmations, had secretly coerced Santos to testify and had withheld this information from the defense, court and jury.

316. Based upon VECCHIONE's continued false statements to her, Ferrell denied this new allegation, opposed Plaintiff's application to amend, and again denied that Oliva or any other witness had ever recanted, or been pressured, or sought anything, or been promised anything, to testify, and to deny that any *Brady* material had been wrongfully withheld.

317. Nevertheless, the assigned federal judge, the Honorable Dora Irizarry, granted Plaintiff's motion to amend his petition.

318. She also directed Ferrell to cooperate with Plaintiff in providing document discovery, and ordered an evidentiary hearing.

319. Ferrell thus was forced to disclose *from the BDAO's own file* the items of *Brady* material, enumerated in ¶ 282, which the Office and the Individual Defendants previously had denied existed and/or had failed to produce despite Plaintiff's many specific requests.

320. In or about April, 2010, District Attorney Hynes assigned an additional ADA to

work on Plaintiff's case, Kevin Richardson.

321. He was chief of the Political Corruption Bureau, which was part of the Rackets Division that VECCHIONE headed.

322. He had been a co-counsel of VECCHIONE's in various high-profile investigations and prosecutions handled by the Office.

323. In other words, once again, Hynes designated one of VECCHIONE's underlings to investigate and represent the Office concerning allegations against VECCHIONE.

### I. The D.A.'s Office is Forced to Concede the Habeas Petition But Hynes Nevertheless Ratifies the Misconduct of His Employees

324. On May 5, 2010, Richardson revealed to Plaintiff's counsel, and to the court, that Plaintiff's claim that Oliva had recanted, which VECCHIONE and the BDAO had been denying since 2006, was true after all.

325. According to Richardson, after Plaintiff subpoenaed GERECITANO to the hearing, GERECITANO revealed to Richardson and Ferrell that, in January or February, 1995, Oliva did in fact recant his statement to police.

326. GERECITANO told Richardson that prosecutors had asked him to meet with Oliva at the BDAO to "persuade" Oliva to confirm his written statement, and that one or more assistant district attorneys were present at this meeting and knew that Oliva had recanted.

327. However, based upon VECCHIONE's continued lies to them, Richardson and Ferrell denied that VECCHIONE had known about the recantation, and continued to oppose Plaintiff's petition, resulting in his continued incarceration.

328. Prior to the evidentiary hearing scheduled for May 25, 2010, Richardson wrote to

the court conceding that, based upon GERECITANO's statement, there had been a *Brady* violation – the failure to disclose Oliva's recantation.

329. Richardson consented to an order granting Plaintiff's petition and directing that he be promptly re-tried in State court within 90 days.

330. Richardson took the position that this obviated the need for any evidentiary hearing at which VECCHIONE or any other present or former official might have to testify.

331. However, Judge Irizarry, stating that the remaining allegations were "extremely troubling," directed that the hearing be held anyway to determine whether the violations of Plaintiff's rights had been so pervasive that she should prohibit a retrial.

332. The first witness to testify was Angel Santos.

333. Represented by court-appointed counsel after expressing fear of prosecution for "perjury," he listened to the 911 tape and acknowledged his voice was not on it.

334. Santos revealed that when VECCHIONE's detectives, prior to Plaintiff's trial, brought him to VECCHIONE's office, he stated he did not want to testify and that he had been a "24/7" drug addict at the time of his alleged observations.

335. VECCHIONE, Santos testified, had threatened to hit him over the head with a coffee table, to immediately commit him to jail, and to prosecute and imprison him for perjury.

336. When he still would not agree to cooperate, Santos testified, VECCHIONE arranged to have him jailed at the Bronx House of Detention, where he remained for a week, housed with accused criminals.

337. Santos had no recollection of seeing a judge before or after he was incarcerated.

338. After one week, Santos testified, VECCHIONE had him transferred to a hotel,

where he was guarded, under lock and key, by BDAO detective-investigators.

339. Santos then finally agreed to testify. He was held for approximately one more week in such custody until that occurred.

340. In his federal habeas testimony, Santos denied that anyone had threatened him – except for VECCHIONE.

341. After Santos testified, and before any further inquiry into VECCHIONE's conduct could be conducted, the BDAO capitulated.

342. On June 8, 2010, on behalf of Hynes, Richardson consented to an order vacating Plaintiff's conviction, prohibiting any retrial, and dismissing the indictment "with prejudice."

343. The BDAO stipulated that Oliva's pre-trial recantation had not been disclosed to Plaintiff, which violated Plaintiff's due process rights under *Brady*.

344. The BDAO further stipulated that this violation was material to the outcome of the trial, and that Plaintiff's conviction had not been "fairly and lawfully obtained."

345. Richardson acknowledged that Oliva was the "key witness" at trial to prove that Plaintiff had "planned the robbery" and "possessed the firearm of the type used in the homicide."

346. He acknowledged that Santos was "the key witness" in observing the defendant near the murder scene.

347. He asserted that Santos no longer was credible because, among other reasons, "perhaps [he was] under the influence of drugs then." (Santos had testified that police detectives and VECCHIONE had known of his drug use before Plaintiff's criminal trial.)

348. However, on behalf of Hynes, *Richardson approved and ratified the conduct of the Office and its agents, including VECCHIONE, in every respect.*

349. He denied that the BDAO's withholding of the recantation evidence had been intentional, even though, according to GERECITANO, the recantation had occurred in front of one or more ADAs at the BDAO and VECCHIONE has sworn that he knew everything significant that happened in the case.

350. Richardson further declared:

> *This Office stands behind* the conduct of former Assistant District Attorney Posnor and Fisconia [sic] and current Assistant District Attorney VECCHIONE, who prosecuted the defendant at his trial, along with the Office's staff and detective investigators who assisted them, and *we deny each and every one of the allegations* leveled against them, and against the trial court that conducted the trial, and the police officers who investigated the homicide, and who testified against the defendant. (emphasis added)

351. Richardson also stated that the Office stood behind the "post conviction investigation into the claims raised by the defendant headed by ADA Ferrell."

352. Richardson defended the failure to disclose to the defense Santos's drug addiction and possible inability to accurately perceive events, insisting that "never has it been my understanding of the Brady rule that I would be required to turn over a witness's status as a person who uses drugs or alcohol, unless that drug use or alcohol use was in some way relative to what that witness witnessed."

**J. <u>The District Court's Findings</u>**

353. Judge Irizarry, in a proceeding that she declared was part of the court's order, credited Santos's hearing testimony. *See* Final Judgment Order of the Honorable Dora. L. Irizarry, and Transcript of Plaintiff's habeas proceedings, both dated June 8, 2010, in *Collins v.*

*Ercole*, 08 CV 1359 (CLP)(DLI), annexed as Ex. E.

354. She found that his criminal trial testimony had been obtained under the duress of threats of "jail" and "physical abuse," apparent drug withdrawal, actual imprisonment as a "material witness" without any proper legal proceeding or assignment of counsel, and the threat of possible prosecution for perjury. She found that Santos had been "scared stiff."

355. Judge Irizarry further concluded, contrary to Richardson's statement, that Santos's drug use should have been disclosed under *Brady* because he was "probably high" when he made his alleged observation and when he was first interviewed. She stated: "The fact is that whether or not a person is intoxicated or under the influence of drugs at the time that he or she makes the observations that are at issue ... is relevant to credibility."

356. Judge Irizarry found that the police 911 tape "wasn't turned over to the defense."

357. Judge Irizarry found that it "defied credulity to believe that Mr. Vecchione ... did not know about the recanted witness [Oliva]."

358. She decried the District Attorney's position that "they did nothing wrong, that they weren't aware of any material witness orders, that they weren't aware of any violation of probation order [Diaz] and so on, it is, indeed, beyond disappointing. It is really sad that the D.A.'s Office persists in standing firm and saying that they did nothing wrong here. It is, indeed, sad." She added that the District Attorney's conduct had been "shameful," and that what Hynes' office did to Plaintiff and his family was "a tragedy[.]"

359. Judge Irizarry also concluded, based on the evidence before her, that "no reasonable juror would have been able to find" Plaintiff guilty beyond a reasonable doubt.

360. *Notwithstanding the proceedings in court, Hynes told the news media that*

*VECCHIONE is a "very principled lawyer," "was not guilty of any misconduct," and would face no disciplinary action. He announced that he would conduct no investigation of VECCHIONE's or other prosecutors' behavior in the matter.*

361. On June 9, 2010, after spending 16 years and 3 months in prison for a crime he did not commit, Plaintiff, Jabbar Collins, was finally released from custody.

**K. Plaintiff's Damages and Injuries**

362. Plaintiff's injuries and damages include, but are not limited to:

(a) His false and malicious prosecution and conviction for murder, attempted murder, assault, robbery, and criminal possession of a weapon, and sentence of 33 1/3 years to life in prison;

(b) The wrongful denial or delay of his motions to vacate his conviction filed in State and Federal Court;

(c) His loss of his liberty for a total of 16 years and 3 months, including one year preceding his conviction and the balance of time after that event;

(d) Physical injuries he suffered during assaults by other inmates, and the mental and emotional effects of such assaults and of the gruesome, terrifying homicidal and disfiguring assaults on other inmates he witnessed;

(e) Past and future physical illnesses and injuries as a result of his wrongful conviction and his experiences in prison;

(f) Past and future mental and emotional injuries and suffering;

(g) The loss of the services, society, companionship, and consortium of his three children, wife and fiancee, mother, grandmothers, brothers and sister, and other family members and friends;

(h) Legal fees and expenses for which he is responsible exceeding $500,000, based upon more than 1,300 hours of attorney time necessitated by the vigorous opposition by the D.A.'s office to his State and Federal motions to vacate his conviction; and

(i) The loss of employment income, and diminution of future earning ability, due to his inability to complete his education and to realize his dream of becoming an attorney.

**FIRST CAUSE OF ACTION**

**(Malicious Prosecution Under State Law; All Defendants)**

363. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 362 of this Complaint.

364. By virtue of the foregoing, the Individual Defendants, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

365. The criminal proceedings terminated in Plaintiff's favor.

366. There was no probable cause for the commencement or the continuation of the criminal proceedings.

367. The Defendants acted with actual malice.

368. Defendant City of New York is liable under the principle of *respondeat superior*.

**SECOND CAUSE OF ACTION**

**(Intentional Infliction of Emotional Distress Under State Law; All Defendants)**

369. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 368 of this Complaint.

370. Defendants engaged in a continuous pattern of extreme and outrageous conduct directed at Plaintiff at least until his release from prison in June, 2010.

371. Defendants engaged in that pattern of conduct with an intention to cause, or in reckless disregard of the substantial probability that it would cause, Plaintiff severe emotional

distress.

372. Specifically, defendants, individually, in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, while acting in an investigative or administrative capacity, coerced witnesses into making false statements to be used against Plaintiff, created false official records to be used against Plaintiff, initiated or caused the initiation and continuation of false and unfounded criminal charges against Plaintiff while lacking probable cause to do so, abused judicial process in order to gain unlawful custody of and to coerce witnesses to make false statements against Plaintiff and commit perjury at Plaintiff's trial, suppressed *Brady*, *Giglio*, and *Rosario* material before, during, and after trial, attempted to cover up and conceal their misconduct, and repeatedly and continually lied to and defrauded every court to review Plaintiff's conviction concerning the existence of evidence favorable to Plaintiff and their past misconduct.

373. Plaintiff suffered severe emotional distress as a result of, and that was proximately caused by, the Defendants' aforementioned actions.

374. By virtue of the foregoing, Plaintiff suffered the actual damages identified in ¶ 362.

375. Defendant City of New York is liable under the principle of *respondeat superior*.

**<u>THIRD CAUSE OF ACTION</u>**

**(Abuse of Process Under State Law; Defendants Vecchione, Maher, Bondor, and City of New York)**

376. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 375 of this Complaint.

377. Defendants, individually, in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, employed regularly issued criminal legal process against Plaintiff.

378. Specifically, they issued improper "office" subpoenas, unauthorized by law, commanding witnesses to appear at the BDAO; obtained an improper material witness warrant with which to arrest and detain Angel Santos; obtained an unlawful, invalid court "order," which the court lacked jurisdiction to issue, directing the incarceration of Santos despite the absence of any lawful judicial material witness proceeding and the failure to appoint counsel for Santos; lied to the court in order to obtain orders to produce an incarcerated witness, Edwin Oliva, at the BDAO, and deliberately disregarded the terms of the order prohibiting them from taking custody of Oliva without his written consent; and obtained an interstate order to involuntarily produce Adrian Diaz from Puerto Rico.

379. The material witness warrant and purported "order" to remand Santos, and the orders to produce Oliva and Diaz, were obtained through the use of false representations of fact and purpose in phony "affirmations" or affidavits that were not actually signed or sworn to by the purported affirmants, and thus were a nullity.[11]

380. Defendants used such process in a perverted manner to obtain a collateral objective outside the legitimate ends of the process used, namely, to gain unlawful, coercive custody of the aforementioned individuals, who otherwise had no obligation to appear at the BDAO and had

[11] *See Reboul, MacMurray, Hewitt, Maynard & Kristol v. Quasha*, 90 A.D.2d 466, 466, 455 N.Y.S.2d 86 (1st Dept. 1982) ("affidavit" signed by another person, even with formal permission under a power of attorney, "is a nullity" (quoting 1 N.Y. Jur.2d, *Acknowledgments, Affidavits, Oaths, Notaries and Commissioners,* § 58 at 257); *Maniscalco v. Slamowitz*, 123 A.D. 690, 108 N.Y.S. 65 (2d Dept. 1908) (same).

refused or failed to do so, in order to intimidate them into giving false statements against Plaintiff which the Defendants knew, believed, and intended would later be used in court against Plaintiff at his criminal trial, and which were so used.

381. Defendants did so with an intent to do harm to Plaintiff, with actual malice, and without excuse or justification.

382. By virtue of the foregoing, Plaintiff was caused the actual and special damages identified in ¶ 362.

383. Defendant City of New York is liable under the principle of respondeat superior.

**FOURTH CAUSE OF ACTION**

**(Actual and Constructive Fraud Under State Law; Defendants Twersky, D'Angelo, Marmer, Dennehy, Modest, Mandel, Vecchione, Hernandez, and City of New York)**

384. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 362 of this Complaint.

385. Defendants made representations of material "fact" which were false, and known to be false by Defendants, for the purpose of inducing other parties, including Plaintiff, to rely upon such false representations, and the other parties did so rely, in ignorance of the falsity of such representations, thereby causing Plaintiff's injuries alleged in ¶ 362.

386. Specifically, Defendants made, caused to be made, acted in concert or conspired to make, and/or aided or abetted one another to make, representations as to material facts which were false, and known to be false by Defendants, to wit, the representations by HERNANDEZ in his sworn Criminal Court complaint set forth in ¶ 70-74, *supra*, the false affirmations and affidavits of VECCHIONE and Posner which VECCHIONE caused to be made and submitted to the court,

*see* ¶¶ 93-97, 109-118, 132-138, 167-178 *supra*, the false business records VECCHIONE caused to filed with the D.A.'s office, Police Department, and Probation Department claiming that witnesses had been threatened, *see* ¶¶ 149-155, 167-178, and 187-197, *supra*, and the false representations by VECCHIONE in his 2006 affidavit as set forth in ¶ 302.

387. Furthermore, Defendants made various representations of material fact to Plaintiff, to BDAO supervisors, and/or to courts, that the following documents or categories of documents related to Plaintiff's criminal prosecution did not exist in the files of the BDAO:

(a) Material witness applications, warrants, and orders;

(b) Applications and orders to produce witnesses;

(c) Orders or certificates to produce witnesses from jurisdictions outside New York;

(d) Subpoenas to compel witnesses to appear at the BDAO;

(e) Documents containing or evidencing promises to or benefits provided Adrian Diaz;

(f) Letters to the Probation Department concerning and on behalf of Adrian Diaz;

(g) Department of Probation records pertaining to Diaz and his violations of probation;

(h) BDAO records concerning Edwin Oliva's cooperation, benefits he requested, was promised, or received, and records reflecting his possible motive, bias or interest in testifying; and/or

(i) Statements by Oliva and Santos relevant to the subject matter of their direct testimony ("*Rosario*" material) and/or to their motive, bias or interest in testifying ("*Brady*"material).

388. The aforementioned statements, made by the Defendants personally and/or at their direction, were known by them to be false or misleading or were made with deliberate

indifference to their truth or falsity or to their misleading nature.

389. The statements were made by Defendants (or at their direction) for the purpose of inducing other parties, including various courts, Defendants' supervisors, and/or Plaintiff, to rely upon such false representations, and such parties rightfully did so rely, in ignorance of the falsity of such representations, and to Plaintiff's detriment.

390. The Defendants employed by the BDAO had a fiduciary, confidential, and special relationship with and duty to Plaintiff, arising out of their special status under the law as officers of the court, the absolute deference and trust that courts give to their factual representations concerning the possession or control by the BDAO of *Brady* material, their strict legal duty under the Constitution and the laws of the United States and the State of New York to fully and accurately disclose such material, and Plaintiff's entitlement to rely upon the accuracy and the completeness of such disclosures, to make accurate and complete disclosures so that Plaintiff would not be misled as to the existence or non-existence of such materials and whether to file legal actions for redress of violations of his constitutional rights.

391. Plaintiff was entitled to rely, and foreseeably did rely, upon defendants to faithfully carry out their aforementioned duties and on defendants' factual representations.

392. Defendants' aforementioned conduct caused or perpetuated the Plaintiff's injuries and damages as alleged in ¶ 362, *supra*, by knowingly, wilfully, intentionally, recklessly, and/or negligently depriving him, or delaying his acquisition, of information to which he was legally entitled and by causing him to believe that such information did not or might not exist, and, as a result, by causing him to delay for many years the filing of his State "440" motion to vacate his conviction and his successful Federal motion for a writ of habeas corpus.

393. Defendant City of New York is liable under the principle of *respondeat superior*.

**FIFTH CAUSE OF ACTION**

**(Negligent Misrepresentation Under State Law; Defendants D'Angelo, Twersky, Marmer, Dennehy, Modest, Mandel, Vecchione, and City of New York)**

394. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 362 and ¶¶ 384-393 of this Complaint.

395. Defendants had a duty, as a result of their special relationship with Plaintiff, to give Plaintiff and others correct information.

396. Defendants made false representations to Plaintiff and others that Defendants should have known were incorrect, including, but not limited to, the false representations that the BDAO did not possess the records Plaintiff had specifically requested (*see, e.g.*, ¶ 387, *supra*).

397. Defendants' false representations were made for the purpose of inducing other parties, including Plaintiff, other prosecutors, and various State and Federal courts, to rely upon such false representations.

398. Defendants knew that the information supplied in their representations was desired by Plaintiff, and others, for a serious purpose, specifically, to challenge Plaintiff's murder conviction and sentence to life imprisonment and/or to comply with or rule upon Plaintiff's request for access to *Brady* material.

399. Plaintiff and others, including other prosecutors, and various State and Federal courts, intended to rely and act upon Defendants' representations, and did in fact reasonably rely on those representations, in ignorance of the falsity of such representations.

400. Defendants' aforementioned conduct caused or perpetuated Plaintiff's injuries as

Case 1:11-cv-00780-FB-RML Document 1 Filed 02/16/11 Page 72 of 111 PageID #: 72

alleged in ¶ 362, *supra*, by causing the wrongful continuation of his criminal conviction, his imprisonment, and his related damages, by causing him to incur substantial legal fees, by depriving him of the employment income he would have been able to earn had he not been convicted and imprisoned, and by depriving him, or delaying his acquisition, of information favorable to his defense to which he was entitled under the Constitutions and the laws of the State of New York and of the United States and which was necessary for him to successfully litigate his motions to vacate his conviction.

## SIXTH CAUSE OF ACTION

**(42 U.S.C. §1983; Denial Of Due Process And A Fair Trial Under the Fifth, Sixth and Fourteenth Amendments; Malicious Prosecution and Deprivation of Liberty Under the Fourth and Fourteenth Amendments; Defendants Vincent Gerecitano and Jose R. Hernandez)**

401. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 375 and 385-86 as if fully set forth herein.

402. Defendants GERECITANO and HERNANDEZ knowingly and wilfully manufactured, or caused the manufacturing of, a false written statement, which they prepared and improperly compelled or induced Oliva to sign under "oath," accusing Plaintiff of participation in the robbery and murder of Abraham Pollack.

403. They knew that the statement would, and caused the statement to, be relied upon by the BDAO and the court as a basis to arrest Plaintiff, to formally initiate his prosecution, to hold him for trial without bail, and to compel Oliva to give testimony consistent with his statement at the trial itself.

404. HERNANDEZ thereafter knowingly swore to a false Criminal Court complaint

Case 1:11-cv-00786-FB-RML Document 1 Filed 02/16/11 Page 73 of 111 PageID #: 73

initiating the criminal prosecution of Plaintiff, and causing Plaintiff to be held without bail.

405. When Oliva denied or "recanted" his "statement," GERECITANO, even though he had retired, appeared at the BDAO as a private citizen to pressure or threaten Oliva into accusing Plaintiff by conforming his present statement to his prior "sworn" written statement, which GERECITANO knew had been coerced and was false.

406. Additionally, prior to trial, HERNANDEZ manufactured false "threat" evidence by filing a false police complaint alleging that Plaintiff was responsible for numerous threats against Angel Santos. This false filing caused injuries to Plaintiff, as set forth above. *See* ¶¶ 163, 362.

407. By virtue of the foregoing, GERECITANO and HERNANDEZ, with actual malice, initiated and continued, or caused the initiation and continuation of, criminal proceedings against Plaintiff for which they knew, or should have known, there was no probable cause, and for which in fact there was no probable cause, and thereby caused Plaintiff to be deprived of his liberty. Such proceedings ultimately were terminated in Plaintiff's favor.

408. Additionally, GERECITANO and HERNANDEZ knew, but withheld from the BDAO, either permanently or for a substantial period of time, and therefore from the court and the defense, exculpatory or impeachment evidence that tended to negate Plaintiff's guilt and which they knew or should have known the law required them to timely disclose. This evidence included, but was not limited to, Oliva's statements denying any knowledge that Plaintiff had committed the Pollack robbery-murder; Oliva's handwritten statement falsely denying his own involvement in the robbery for which he had been arrested; the fact that Oliva was a drug addict going through withdrawal when he was questioned; the improper tactics used to coerce Oliva into signing a statement he had denied; Santos's admission that he was a "24/7" drug addict who likely

Case 1:11-cv-00786-FB-RML Document 1 Filed 02/16/11 Page 74 of 111 PageID #: 74

was high when he claimed to have made his fleeting observation of the possible perpetrator; their discovery that Collins did not have any wound on his back and therefore could not have been the perpetrator; and their unreasonable failure to investigate the information provided to them by two or more witnesses that Collins could not be guilty because he had a truthful alibi.

409. The aforesaid conduct, which Defendants committed in concert with and in aid of each other, and/or in concert or conspiracy with others named and unnamed, operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States:

(a) Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

(b) Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c) To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

410. The foregoing violations of Plaintiff's federal constitutional rights by the Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Plaintiff's criminal prosecution, his loss of liberty and detention without bail, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages.

411. The foregoing violations of Plaintiff's rights amounted to Constitutional torts and

were affected by actions taken under color of State law, and within the scope of the Defendants' employment and authority.

412. Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

413. By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## SEVENTH CAUSE OF ACTION

**(42 U.S.C. §1983; Denial Of Due Process And A Fair Trial Under the Fifth, Sixth and Fourteenth Amendments; Malicious Prosecution, Abuse of Process, and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments; Defendants Vecchione, Maher, Bondor, Twersky, D'Angelo, Marmer, Dennehy, Modest, and Mandel)**

414. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 400 as if fully set forth herein.

415. Knowing that any colorable cause to continue the prosecution had evaporated, VECCHIONE, in the capacity of an investigator or "witness," acted in concert and conspired with Posner, Frascogna, MAHER, BONDOR and others, named and unnamed, to use any means, no matter how unlawful or coercive, to gain custody of three uncooperative witnesses, Oliva, Santos, and Diaz, in order to intimidate them into falsely accusing Plaintiff of the charged crimes.

416. These illegal and unconstitutional means included, but were not limited to,

(a) Abusing judicial process by misusing the court's subpoena power to compel witnesses to appear at VECCHIONE's office;

(b) Abusing judicial process by deceiving the court into issuing "orders to

produce" and material witness orders purportedly authorizing Defendants to take custody of prospective witnesses, including Oliva, Santos and Diaz, in violation of the "oath" requirement of the Fourth Amendment as well as the State Criminal Procedure Law, by submitting purportedly sworn "affirmations" and "affidavits" that in fact were not sworn and were nullities;

(c) Personally attesting to "facts" which they knew were untrue in order to deceive the court into issue orders authorizing them to take custody of such witnesses;

(d) Seizing Santos, a drug addict, and holding him in jail and then in Defendants' custody without lawful authority;

(e) Causing Oliva's work release to be illegally administratively revoked by the State Department of Corrections so that he would be imprisoned and made vulnerable to coercion, and

(f) Illegally seizing Oliva and forcing him, against his will, to meet with VECCHIONE and Posner at the latters' Office in defiance of a court order withholding such authority.

417. These lawless actions foreseeably caused the aforementioned witnesses to manufacture false evidence which VECCHIONE and Posner then used to continue Plaintiff's malicious prosecution, without probable cause, and to bring about his false conviction at trial.

418. To cover up his criminally coercive tactics, VECCHIONE, again in his capacity as an "investigator," and/or a complaining witness, acted in concert with HERNANDEZ and others in the BDAO to manufacture false documents, and to file them with the BDAO, the NYPD, and the N.Y.C. Probation Department, representing that Santos's and Diaz's reluctance to cooperate or flight had been caused by threats they or their family members had received from Plaintiff or his family, when VECCHIONE, HERNANDEZ, and their accomplices well knew that there had been no such threats.

419. In 2006, VECCHIONE, who no longer was assigned to the prosecution of Plaintiff

and was acting purely as a "fact" or complaining witness, provided false statements to ADA Ferrell, the prosecutor now assigned to respond to Plaintiff's motion for a new trial, in a successful effort to cover up his previous misconduct in coercing witnesses, deceiving the court, defense, and jury, and withholding *Brady* and *Rosario* material, and to convince the BDAO to oppose Plaintiff's meritorious motion to overturn his conviction. He then memorialized these false statements in a sworn affirmation knowing it would be used to defeat Plaintiff's motion to overturn his conviction, and it was so used, causing Plaintiff to serve four additional years in prison.

420. Additionally, defendants TWERSKY, D'ANGELO, MARMER, DENNEHY, MODEST, and MANDEL, acting in an investigative or administrative capacity, had a duty to Plaintiff to carry out the Office's ongoing obligation, pursuant to the Due Process Clause of the Constitution and *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose, upon Plaintiff's request, documents and information favorable to Plaintiff with respect to his criminal prosecution and conviction. Nevertheless, acting in concert with defendant VECCHIONE, said defendants knowingly, wilfully, recklessly, and/or with deliberate indifference to their Constitutional and statutory obligations, failed to disclose said documents and information to Plaintiff, thereby substantially delaying Plaintiff's efforts to overturn his wrongful conviction and prolonging his prosecution and imprisonment.

421. The aforesaid conduct operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States:

(a) Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses

who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Fourth and Fourteenth Amendments, and the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments, to the United States Constitution;

(b) Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c) To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

422. The foregoing violations of Plaintiff's federal constitutional rights by the Defendants, together with their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the continuation of Plaintiff's malicious prosecution without probable cause, his wrongful conviction, his subsequent imprisonment, the defeat and delay of his efforts to overturn his wrongful conviction, and his other injuries and damages.

423. The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the Defendants's employment and authority.

424. Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, negligently, and/or with deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

425. By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

Case 1:11-cv-00788-FB-RML Document 1 Filed 02/16/11 Page 79 of 111 PageID #: 79

## EIGHTH CAUSE OF ACTION

**(*Monell*/42 U.S.C. § 1983: Claim Against Defendant City of New York For The Actions Of The NYPD)**

426. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 393 and 401 through 413 as if fully set forth herein.

427. The foregoing violations of Plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities.

428. Prior to Plaintiff's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

(a) The use of excessive promises of rewards and unduly coercive interrogation techniques with vulnerable potential witnesses, including drug users and addicts, drug dealers, and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

(b) The determination of probable cause to make an arrest; and

(c) The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information (*"Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witnesses has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that

the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady*.

429. With respect to "a" and "c" in the preceding paragraph, prior to Plaintiff's arrest and the initiation of his prosecution in 1994, the NYPD provided no training at all.[12]

430. The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

a) to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b) that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

c) that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

431. The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, among other circumstances:

---

[12]Undersigned counsel for Plaintiff has obtained deposition testimony from present and former police detectives, including supervisors, during several civil rights lawsuits, including *Zahrey v. City of New York, et al.*, 98 Civ. 4546 (DLP) (S.D.N.Y.), establishing, prior to and during the time period of Plaintiff's arrest and prosecution, the NYPD provided no training concerning appropriate interrogation of accomplice or informant witnesses and *Brady* compliance. Most such witnesses had no idea what "*Brady*" was and no clue about their obligation to comply with it.

a) credible allegations, many substantiated by judicial decisions finding, that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony (*see* Exh. F appended hereto and incorporated herein by reference, listing some of those decisions);

b) civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or conducted searches or arrests without probable cause (*see* Exh. G appended hereto and incorporated herein by reference, listing some of those lawsuits);

c) numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as the probable cause requirement of the Fourth Amendment;

d) judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison, supra*;

e) formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

f) the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions.

432. Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and

prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of *Brady* material.

433. The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

434. During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

435. The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Plaintiff's rights under the Constitution and laws of the United States.

436. By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

**NINTH CAUSE OF ACTION**

**(*Monell*/42 U.S.C. § 1983 Claim Against Defendant City Of New York For Actions Of The BDAO)**

437. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through

400 and 414 through 425 as if fully set forth herein.

438. At the time of Plaintiff's original prosecution, and continuing until the Federal Court's dismissal of Plaintiff's case and his release from prison, District Attorney Charles J. Hynes, as the manager and chief administrator of the BDAO, a City agency, maintained a policy, custom and/or practice of deliberate indifference to violations by his employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Kings County, including, but not limited to, abuse of process, manufacturing of false evidence and testimony through improper coercion of witnesses, *Brady* violations, reliance on false or misleading evidence and argument at trial ("the policy"), and covering up the same.

439. This policy began with his induction as District Attorney in 1990 and has continued to this day.

440. The policy permits, encourages, or acquiesces in the commission of, constitutional violations of the rights of suspects and defendants by prosecutors, detective-investigators, and NYPD detectives working with the D.A.'s Office, particularly in high profile or serious cases where arrest and conviction is most desired by the Office. The policy led directly to the violations of Plaintiff's constitutional rights before and during his trial, his wrongful conviction, and the subsequent cover-up of police and prosecutors' wrongdoing, which greatly prolonged Plaintiff's wrongful imprisonment and other damages.

441. More specifically, it was the policy of Hynes to directly encourage, or be indifferent to and thereby indirectly encourage, prosecutors, detective-investigators, and NYPD detectives working with them to abuse lawful process to gain custody of vulnerable witnesses in order to coerce them into giving inherently unreliable or false testimony favorable to the

prosecution. The above law enforcement officials would use the following illegal tactics to coerce witnesses:

(a) Issuing unauthorized and unlawful "office" subpoenas to compel witnesses to attend interviews at their office, despite numerous judicial decisions making clear that such process was unlawful;

(b) Lying to courts about their need and entitlement for material witness warrants, thereby obtaining authorization to bring purportedly recalcitrant witnesses directly to court for appointment of counsel and a judicial hearing, only to then kidnap the witnesses and hold them either in their Office or in a hotel room, where they would threaten, intimidate, or cajole them into "cooperating" and remaining in their custody until completing their testimony at trial;

(c) Misleading courts to issue orders allowing them to take custody of incarcerated witnesses and interview them at the D.A.'s office in the presence of the witnesses' counsel, only to then interrogate such witnesses without notifying their counsel;

(d) Causing the New York State Division of Parole and the State Department of Corrections to illegally revoke the release of prisoners[13] so that prosecutors could gain custody of them and threaten them with indefinite imprisonment unless they "cooperated" by testifying favorably for the prosecution; and

(e) Coercing witnesses who have been arrested on unrelated charges to "cooperate" by exploiting their drug withdrawal and dependency, holding them prisoner in remote locations while threatening to interrogate them indefinitely, and threatening harsh prosecution and imprisonment while simultaneously holding out a carrot stick of leniency and monetary reward.

442. It was Hynes's policy as well to tolerate (and thereby encourage) violations of his Office's constitutional obligation to make timely disclosure to the defense of exculpatory or

---

[13]*See* Monique Ferrell Affirmation in Opposition to Plaintiff's CPL § 440.10 Motion, dated Nov. 3, 2006, ¶ 41 (Office's "usual practice" is to notify the Division of Parole that a parolee or inmate on work release is not cooperating so that it will take him into custody and make him "available," terming this an "[e]ntirely routine practice"); Ferrell, Supplemental Affirmation dated Nov. 9, 2006, ¶ 12 ("practice of this Office" to notify a supervising agency when a parolee "misses appointments and refuses to cooperate").

impeachment information known as *Brady* material. His deliberate indifference to such violations created an "anything goes" atmosphere that caused such violations to continue, including in Plaintiff's case.

443. In this regard, prosecutors and investigators were permitted and/or encouraged to refrain from making any record of false or inconsistent out-of-court statements of prospective prosecution witnesses in order to avoid creating "*Rosario* material" that would have to be disclosed to the defense under State law, even though this policy also resulted in prosecutors ultimately not disclosing the same information as *Brady* material. Indeed, under the Office's "riding" policy, prosecutors were permitted and even encouraged to make a record of statements that tended to inculpate a suspect or defendant, while ignoring statements that were inconsistent with their belief about the suspect's or defendant's guilt.

444. Hynes's prosecutors were permitted and/or encouraged to withhold recantation evidence, as well as statements and evidence, including 911 tapes, tending to prove a defendant's innocence, unless they "believed" such evidence, thus depriving the defense and the jury of vital information, required to be disclosed under *Brady*, that was necessary to evaluate witnesses' credibility and defendants' guilt or innocence.

445. Prosecutors, in violation of *Brady*, were permitted and/or encouraged to refrain from disclosing material witness applications, orders, and proceedings, relocation assistance promised or provided to witnesses, and other pressure tactics, promises, or rewards used to influence witnesses.

446. Prosecutors were permitted and/or encouraged not to comply with the Office's ongoing *Brady* obligations after trial, to resist defendants' efforts to obtain disclosure on appeal,

during collateral attacks on convictions, or through FOIL requests, and to even lie to or mislead courts in affidavits and testimony, all in order to cover up the original misconduct and defeat defendants's efforts to expose misconduct and overturn wrongful convictions.

447. While prosecutors were told in theory to comply with their *Brady* obligations, they were not told there would be any negative consequence to them if they failed to, and in fact there was none.

448. Hynes had no employee handbook, manual, or other document setting forth any disciplinary process for such misconduct, or potential sanctions for them.

449. Despite dozens of court decisions, 56 of which are listed in Ex. H, finding that prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under *Brady*, *Rosario*, or statutorily-mandated discovery procedures, or otherwise had engaged in conduct that misled the court, jury, and/or defense, none of the prosecutors involved were disciplined.[14] They were not fired or suspended, fined, or demoted. Notations were not placed in their personnel files. They were not reported to outside disciplinary bodies. To the contrary, in opposing defendants' efforts to overturn their convictions in such cases, Hynes almost always defended the propriety of his assistants' behavior, thereby ratifying it or at least signalling his tolerance of it – just as he did in Plaintiff's case – and such personnel continued to receive raises, bonuses, and promotions.[15]

---

[14]Ex. H contains cases either explicitly finding constitutional violations or finding violations under State law of *Rosario* or discovery violations that amounted to *Brady* violations. In the State law decisions, the appellate court did not need to reach the *Brady* issue, but the violations were constitutional in nature nonetheless.

[15]During depositions in *Zahrey v. City of New York, et al.*, 98 Civ. 4546 (DLP) (S.D.N.Y.), the former Chief of Investigations for Hynes, Dennis Hawkins, and Hynes's Counsel

450. A number of cases handled by Hynes's office during the time period of Plaintiff's prosecution evidence the above polices and patterns of misconduct by Hynes's staff and Hynes's approval or toleration of such behavior.

451. Early in his tenure, Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending his Office's murder conviction obtained in *People v. Russ*, 79 N.Y.2d 152 (1992). The case was built on the testimony of two teenage girls who, before trial, recanted their statements to police and to the grand jury. When one of the girls, Ms. Lawrence, testified that she had not seen the defendant commit the crime and then, in the midst of being challenged by the prosecutor, invoked her Fifth Amendment right against self-incrimination, the following astounding events occurred, according to the New York Court of Appeals' opinion:

> [T]he prosecution interrupted Lawrence's midafternoon testimony and obtained a continuance. Lawrence, then 17 years old, was (1)

---

to the District Attorney, Dino Ameruso, acknowledged that there was no formal disciplinary procedures or policies and they were unaware of any ADA having ever been disciplined during Hynes's tenure for misconduct committed during the investigation or prosecution of criminal allegations. Further, the City Law Department acknowledged, with respect to a list of court decisions involving *Brady* and related violations, that no discipline had been imposed on any of the prosecutors. Hawkins admitted the Office had no written policy for disclosing *Brady* material. Hawkins and ADA Theresa Corrigan, who also gave a deposition, admitted that they were unaware of any specific training the Office provided on how to question or evaluate informant or accomplice witnesses. Finally, Hawkins testified that, despite having virtually daily contact with Hynes over many years, he had not once ever heard him discuss the training of ADAs in such areas. Although the defendants in the *Zahrey* lawsuit did not admit liability, judgment was entered against Corrigan and Charles Guria, the chief of Hynes's Civil Rights Bureau who reports to VECCHIONE, individually (and against the City of New York and three former detective-sergeants), in 2009, for $750,001, plus counsel fees, pursuant to F. R. Civ. P. 68, to resolve Zahrey's lawsuit alleging malicious prosecution and manufacturing of false testimony during 1994-95, but Hynes's conducted no investigation and imposed no discipline on Guria or any other prosecutor for their conduct of the matter.

> arrested; (2) charged with perjury; (3) taken in handcuffs crying and frightened to the District Attorney's office; (4) interrogated and threatened with 2 to 7 years in prison; (5) removed to Central Booking for fingerprinting; (6) held until 5:00 A.M. the next morning without sleep; (7) moved to a precinct lockup; and (8) returned to court at 9:00 A.M. where she was kept in handcuffs except for her time on the stand. Lawrence's postarrest and postincarceration testimony, tending to inculpate defendant by describing his role in the mugging, resulted immediately in the perjury charges being dropped. She was only then released from police custody. (79 N.Y.2d at 177).

452. In reversing the conviction,[16] the Court condemned the "egregious" behavior of the BDAO in "'legally' coerc[ing Lawrence's] testimony." *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172 (1952) (conduct that "shocks the conscience"). That the jury heard what had occurred and could judge the witness's credibility was "not adequate," the Court's emphasized. "Experience has taught that such reliance offers only chilly comfort to prejudiced defendants, no less than to innocent victimized witnesses, and to maintenance of the integrity of the criminal justice process." *Id.*

453. Shortly after the *Russ* decision, prosecutors under Hynes showed that they would take their lead from Hynes, not the Court of Appeals. In *People v. Ruddy Quezada*, police detectives working with the BDAO secretly arrested the prosecution's principal witness, Sixto Salcedo, on a material witness order the BDAO had obtained. Instead of taking him to court, they kidnaped him, and held him with his wife incommunicado at the Marriott Hotel at LaGuardia Airport, where they threatened him with prison unless he conformed his trial testimony to his

[16]The Court reversed the conviction on the ground that the prosecution had violated the defendant's rights by misusing the two recanting witnesses' hearsay grand jury testimony as the basis for the jury to convict.

Case 1:11-cv-00786-FB-RML Document 1 Filed 02/16/11 Page 89 of 111 PageID #: 89

grand jury testimony. Neither the material witness order, the detention at the hotel, nor the other coercive threats to this witness was disclosed to the defendants, who were convicted.

454. Years later, Salcedo recanted his trial testimony, and other witnesses emerged showing that the defendant, contrary to the People's case, had not committed the shooting. When Quezada, in 2003, moved in State court to vacate his conviction, the trial prosecutor, who was still in the office, ADA Ephraim Shaban, presented the sworn testimony of the detective, Thomas Buda, to deny that any material witness order had been obtained, that Salcedo had been arrested, or that he had been held at a hotel, and argued that Salcedo's "false" allegations of coercion undermined the credibility of his recantation. *See People v. Quezada*, 16 Misc.3d 1113(A) (Sup. Ct., Kings Co. 2007) (Gerges, J.). The People were successful. The court denied the defendant's motion, leave to appeal was denied, and it appeared he would never be able to challenge his conviction, since he already had lost a federal habeas corpus petition and by law had the right to bring just one.

455. However, in a highly unusual decision, the United States Court of Appeals directed that the Federal District Court permit Quezada to pursue his second habeas petition. *See Quezada v. Smith*, 624 F.3d 514 (2d Cir. 2010).

456. Just as in Plaintiff Collins's case, Quezada's attorneys sought discovery, and the BDAO then had no choice but to reveal the truth that it had been falsely denying, through knowing reliance on perjury, for seven years: there *was* a material witness application and warrant, and there *were* records showing that Salcedo had been held at the Marriott Hotel at LaGuardia Airport.

457. Shortly after the trial in the *Quezada* case, the same judge who had presided,

Justice Abraham G. Gerges, denounced the practice of the BDAO to misuse the court's subpoena process to coerce witnesses. In a decision published July 7, 1994, Justice Gerges, in still another murder case being prosecuted by VECCHIONE's bureau, condemned a homicide ADA for serving a subpoena on a witness on a day there would be no testimony "in the hope that it would *coerce* the witness into consenting to be interviewed prior to testifying," found this to be "unprofessional conduct" under numerous prior court decisions outlawing the practice, and admonished the BDAO that the "practice should not be replicated." *People v. Neptune*, 161 Misc.2d 781, 785, 615 N.Y.S.2d 265, 267 (Sup. Ct., Kings Co. July 7, 1994) (emphasis added) (quoting *People v. Natal*, 75 N.Y.2d 379, 385 (1990)).

458. Immediately thereafter, in another murder case prosecuted by Hynes's bureau, *People v. Brian Bond*, Ind. No. 13991/91, the assigned ADA defied Justice Gerges and the decisions of the Court of Appeals and the Appellate Division upon which his decision had been based. ADA Stan Irvin and detective-investigators working under his direction illegally subpoenaed all prospective witnesses to their Office to coerce them to submit to office interviews before testifying at the trial. Without disclosing to the court the impropriety of his subpoenas, Irvin then obtained material witness orders authorizing the arrest of any witness who failed to comply with the subpoenas.

459. One witness, a crack addict named Carmen Green, had told police detectives and detective-investigators that she had not seen the incident in question at all. When BDAO detective-investigators found her, they noted that she was too "impaired" to comply with the subpoena. They knew as well that she was under investigation for, and feared, that she and her children would be arrested for dealing drugs out of her apartment. Obtaining a material witness

warrant authorizing Green to be taken "forthwith" to court, where an attorney would be appointed for her, Irvin instead had her brought to his Office, where he and the detectives threatened her with incarceration and interrogated her on and off for eight hours. Only after she agreed to remain in their custody "voluntarily" did they finally bring her to court, after midnight, so that a judge could sign an order ratifying her "consent" to be detained until the conclusion of her testimony.

460. The prosecutor, ADA Irvin, then violated the BDAO's *Brady* obligations by not disclosing to the defense Green's prior statements denying having seen the shooting, her eight-hour unlawful interrogation, her "impairment" on drugs, the threats to arrest her and her family, and promises to relocate her at public expense. Nor did he disclose the statements of her other family members that she was not present during the shooting, or that they, too, had been promised, and did receive, relocation assistance. Bond was convicted, in December, 1994, of murder.

461. During an evidentiary hearing held in 1998 concerning Bond's subsequent motion to vacate his conviction due to *Brady* and related constitutional violations, an unapologetic ADA Irvin testified that it was the Office's *regular practice* to pick up witnesses on material witness warrants and, instead of bringing them directly to court "forthwith" as such warrants direct, to forcibly take them for interrogation to the D.A.'s Office.

462. In 2000, the New York Court of Appeals vacated Bond's conviction due to the Office's failure to disclose Green's statements denying having seen the homicide. The Office's Appeals Bureau had argued, on behalf of District Attorney Hynes, that it had no obligation to disclose statements that, in its view, were "untrue."

Case 1:11-cv-00786-FB-RML Document 1 Filed 02/16/11 Page 92 of 111 PageID #: 92

463. In August and September, 1994, during the BDAO's investigation of an NYPD detective, Zaher Zahrey, on corruption allegations, detectives working under the supervision of ADA Charles Guria obtained court orders to produce a prospective witness, Sidney Quick, who was a crack addict and a career criminal, for interviews on the condition that his attorney would be present, but then, with Guria's approval, interrogated him without notifying his attorney.

464. In March, 1995, after Quick had been sent upstate to serve his sentence, detectives, with Guria's approval, again met with Quick without his attorney, and, through a combination of coercion and excessive promises of speedy release, caused him to adopt a story they suggested to him, implicating the target of their investigation, which they knew from other evidence was false. They tape recorded this meeting and gave the tape to Guria, who listened to it, heard the coercion and improper promises, and heard the encouragement of Quick to adopt a false story. Remarkably, rather than condemn the detectives' tactics, he told them that Quick's statements were "promising."

465. In or about January, 1996, detectives working directly under Guria's supervision arrested several other individuals in the hope of turning them into State's witnesses, took them to remote locations instead of to court, and illegally interrogated them in violation of their right to counsel and to prompt arraignment.

466. Because none of Quick's false story could be corroborated, which is a prerequisite for prosecution under New York, but not federal, law, Guria and his colleagues obtained Hynes's approval to recommend the case to federal authorities for prosecution. However, in doing so, they did not disclose the tape, the improper interrogation tactics used with Quick, or numerous of

Quick's prior inconsistent statements.[17] When Quick inadvertently disclosed to the federal prosecutor that he had been taped, Brooklyn ADAs delayed disclosing the tape for several weeks to ensure that the federal authorities went ahead with the high-profile indictment and publicly committed themselves to the case. Zahrey ultimately was acquitted, but not until he had spent nearly nine months in pretrial confinement. (Guria is presently the chief of the BDAO's Civil Rights Bureau and reports to VECCHIONE.)

467. Also in 1994, Hynes ratified the misconduct of his Office in the Sami Leka murder prosecution. Leka was convicted, in March, 1990, early in Hynes's tenure as District Attorney, of murdering a relative on a Brooklyn street. Shortly after the conviction, Leka moved to vacate his conviction because the prosecution had actively suppressed from the defense its knowledge that an off-duty police officer's observation of the shooting from his apartment window was flatly inconsistent with the People's proof at trial, which consisted of the highly questionable identification testimony of two traumatized passersby, and had suppressed two other witnesses' potentially exculpatory statements. Not only did Hynes's office vigorously oppose the defendant's motion and appeal; *Hynes* wrote Leka's new defense counsel that he had "*personally* reviewed the facts and circumstances" of the case and "Mr. Leka's due process rights as a defendant were *amply and ably protected*" (emphasis added). However, in 2001, the United States Court of Appeals vacated Leka's conviction, finding that the BDAO had actively

---

[17]One of the prosecutors, ADA Theresa Corrigan, testified at a deposition that, pursuant to her training at the Office, she did not believe she was under any obligation to disclose to the defense prior inconsistent statements or "recantations" if she did not find such statements to be credible or true. This was the position that the Office took in the Brian Bond appeal. She also testified to her training not to make any record of witness statements to avoid disclosure under *Rosario*.

"suppressed" exculpatory evidence, decrying one of its arguments as "ridiculous," and concluding that the evidence the prosecution had suppressed would have had a "seismic impact" upon the results of the trial. *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001). With the only two identification witnesses having recanted their testimony, the BDAO was forced to dismiss the case and Leka, an apparently innocent man, was released after serving 12 years in prison.[18]

468. Hynes has been on notice over the years, beginning before Plaintiff's trial, of credible allegations of overzealousness and misconduct directed specifically at VECCHIONE, but has consistently encouraged misconduct by VECCHIONE, just as he has encouraged the rest of his staff, by his indifference to such allegations.

469. In February, 1995, which was prior to Plaintiff's trial, defendant Frank Rodriguez, who had been convicted at trial in October 1993 (*People v. Rodriguez*, Ind. No. 9893/92), documented in his appellate brief that VECCHIONE had blatantly violated numerous fundamental rules of trial behavior. The brief showed that VECCHIONE repeatedly and sarcastically asked the defendant on cross-examination whether the other witnesses in the case were lying – despite numerous appellate decisions decrying such a tactic. In summation, the brief showed, VECCHIONE had improperly ridiculed the defense as "laughable," improperly argued that the defendant wanted the jury to believe only he was telling the truth while all the People's witnesses were lying, and impermissibly vouched for the People's witnesses as not "the type" of people who would lie.

470. In early 1995, also before Plaintiff's trial, Hynes's office opposed the motions of

[18]In 2008, the City of New York settled Leka's *Monell* lawsuit based upon the BDAO's *Brady* violations for $3.1 million.

defense lawyers in *People v. Steven Ruiz, et al.*, Ind. No. 12848/94, which exposed VECCHIONE's improper practice of using "office" subpoenas to compel witnesses, including the defendant, to appear at his Office for interviews without counsel. Supreme Court Justice Robert Kreindler found that the Homicide Bureau (led by VECCHIONE) had utilized such "office" subpoenas "unethically and abused court process," and that they had "improperly denied [the defendant's] request for an adjournment of the subpoena in order to obtain counsel." VECCHIONE's conduct was particularly egregious because it came after Justice Gerges's decision directing the BDAO to no longer misuse subpoenas in this fashion.

471. But that was not all of VECCHIONE's misconduct in *Ruiz*. Defense motions showed that a key prosecution witness, Ashan Iqbel, did not identify the defendant Pennachio or recall a crucial alleged incident during an interview with police. Only after three meetings, totalling nearly 10 hours, with VECCHIONE, MAHER, and BONDOR at VECCHIONE's office, did Iqbel, under VECCHIONE's relentless pressure, finally change his account and implicate the defendant in wrongdoing. In order to avoid disclosure to the defense, VECCHIONE, MAHER, and BONDOR took no notes of these interviews, and VECCHIONE did not disclose Iqbel's statements under *Brady*. The witness's oral statements favorable to the defense under *Brady* were not disclosed until a pretrial identification or *Wade* hearing, when MAHER was compelled to reveal them under questioning. Because no one had taken notes, MAHER's recollection was vague about the specifics of what Iqbel had said.

472. Still another witness, Ricardo Urichima, made a statement to police supporting the defendant's self-defense defense, but, despite his *Brady* obligations, VECCHIONE and his subordinates did not disclose it for a full year, until jury selection, when the witness no longer was

available to the defense. (The practice in VECCHIONE's bureau of delaying disclosure of *Brady* material until the defense could no longer make use of it was condemned by the Federal Court of Appeals in its decision in the *Leka* case.)

473. VECCHIONE's misconduct reached new heights (and was eerily similar to his misconduct in Plaintiff's case), and was fully exposed to Hynes, in the Office's triple murder prosecution of Jeffrey Marshall. During the first trial in March, 1993, VECCHIONE represented, and had his key rebuttal witness, Cicero Murphy, testify, that Murphy was a "volunteer" witness, that VECCHIONE had made no promises to Murphy, and that Murphy expected no benefit in return for his testimony. Murphy testified that he had only weapon possession and assault cases open, and that there was no relationship between these open cases and his testimony. Marshall was convicted of robbery and received a sentence of 12 ½ to 25 years in prison.

474. VECCHIONE's homicide bureau then brought Marshall to trial in two additional murder cases. The ADA whom VECCHIONE assigned to handle these two cases, and who was working under his supervision, did not disclose any cooperation agreement between the Office and Murphy, and Murphy testified in 1994 that there wasn't any. (In both cases, Marshall was acquitted.)

475. Shortly thereafter, the Nassau County District Attorney's Office prosecuted Marshall in an attempted murder case, and wrote the BDAO to find out whether the Office had any cooperation agreement with Murphy. VECCHIONE personally responded, by letter dated January 17, 1995, *unequivocally denying* that his Office had any such agreement. Despite Murphy's testimony, Marshall was acquitted.

476. Following Marshall's robbery conviction, on January 12, 1996, Marshall,

represented by new counsel, moved, pursuant to Criminal Procedure Law § 440.10, to vacate his conviction. New counsel's investigation had revealed that VECCHIONE, after the first trial, had written to the State Division of Parole on Murphy's behalf to assist Murphy in obtaining an early release, and four days later had *personally* entered into a *formal written cooperation agreement* with Murphy to testify in the next two cases. The agreement allowed Murphy to receive a mere two-year sentence in satisfaction not only of his gun charge but also of his pending *first degree rape* charge, for which he faced up to 25 years in prison – a charge that VECCHIONE had not disclosed to the defense at Marshall's first trial.

477. Murphy's motion also included VECCHIONE's letter to the Nassau County D.A. *denying* the existence of the formal written cooperation agreement that *VECCHIONE himself* had signed.

478. To defeat Marshall's motion, VECCHIONE then signed a sworn affirmation (also eerily similar to the false affirmation he executed to oppose Plaintiff's 440 motion), containing the following false assertions of "fact": that VECCHIONE had never discussed any benefit with Murphy before his initial testimony; that VECCHIONE did not even know at the first trial that Murphy was facing a rape charge; that VECCHIONE did not know that his subordinate had not disclosed the written cooperation agreement before the second and third trials, and that VECCHIONE somehow had misunderstood the Nassau County D.A.'s inquiry when VECCHIONE represented that "There are no agreements between this Office and Cicero Murphy ..." Based upon VECCHIONE's affirmation (as in Plaintiff's case), a state judge denied the defendant's 440 motion without a hearing.

479. Hynes then rewarded VECCHIONE with a promotion to First Deputy District

Case 1:11-cv-00786-FB-RML Document 1 Filed 02/16/11 Page 98 of 111 PageID #: 98

Attorney.

480. But a completely unforeseen and unlikely development led to the further exposure of VECCHIONE's misconduct. In 2002, Brooklyn Federal District Judge Edward R. Korman granted an exceedingly rare federal habeas corpus hearing into the Marshall case, and VECCHIONE was forced to respond to questioning, under oath, about his conduct.

481. During cross-examination, VECCHIONE admitted that his affirmation claiming that, at the time he prosecuted Marshall, he had not known about Murphy's pending rape charge, was false. He further admitted that, while he had represented to the court during that trial in his sworn application for an "order to produce" that he would contact Murphy's attorney so that he could protect Murphy's rights, he had not done so. Meanwhile, Murphy's attorney's testimony showed that, before Murphy testified, the attorney, *with Murphy's knowledge*, had been trying to negotiate a lenient misdemeanor deal for his client with VECCHIONE, and that VECCHIONE had circumvented the attorney by secretly obtaining the order to produce Murphy at his office without notifying the attorney.

482. To avoid adverse findings of fact by Judge Korman about VECCHIONE's dishonesty and lack of credibility and his commission of *Brady* violations, *District Attorney Hynes*, in February 2003, authorized the Office to reduce Marshall's 25-year sentence to time served, and Marshall went free after serving a fraction of his sentence despite being, in the Office's view, a multi-murderer.

483. Neither VECCHIONE, nor any other ADA, was disciplined in any respect for the misconduct – remarkably similar to Plaintiff's case – that occurred in the Marshall case.

484. To the contrary, immediately after this startling and deeply troubling resolution of

the Jeffrey Marshall case, Hynes placed VECCHIONE, assisted by ADAs Monique Ferrell and Kevin Richardson, in charge of the highly-publicized and important investigations of Brooklyn Democratic leader Clarence Norman and of alleged judicial corruption in Kings County. Hynes reportedly referred to VECCHIONE as his "go-to" guy on corruption and his "architect and quarterback" in this highly-publicized investigation, and promoted VECCHIONE to be the Office's Chief of Investigations. He did so despite his awareness of still other troubling allegations about VECCHIONE's uncontrolled overzealousness.

485. In *People v. Smith*, 267 A.D.2d 483 (2d Dept. 1999), the Appellate Division found that VECCHIONE's summation in a murder case "may have been excessive and improper," but declined to reverse the conviction because of its view that the defendant would have been convicted anyway. In that case, a robbery that led to the fatal shooting of a police officer, VECCHIONE flagrantly violated established rules restricting a prosecutor's rhetoric in summation. He called the defendant's testimony a "fairy tale," suggested that his attorney had helped him fabricate his testimony, intimidated the jury by telling it that if it gave any credit to the defendant's testimony it would be making "a mockery of this system," ignored the court's sustaining of an objection to this comment and improperly reiterated it, and tried to inflame the jury's emotions by reading the "Police Officer's Prayer" to "the Lord" and urging the jury to convict so that "Ray Cannon's [the officer's] rest with the Lord [may] be long and peaceful."

486. In March 2000, Judge Alan Marrus dismissed an indictment of a businessman, Sam Lustigmann, in an obstruction of justice case, because VECCHIONE had caused a grand jury to indict him despite having given him immunity from prosecution in exchange for his cooperation during an office interview. While VECCHIONE claimed that his agreement with

Lustigmann was voided by the latter's withholding of material information, the court rejected this defense because of VECCHIONE's failure to record or take any notes during the interview.

487. In *People v. Rodriguez*, 28 A.D.3d 496 (2d Dept. 2006), the highly-publicized murder case involving social worker Amy Watkins, VECCHIONE, during the trial in July 2001, repeatedly denigrated defense counsel for trying to fool the jury, castigated the defendant as a "calculated coward" who (despite the absence of such evidence) had probably committed other robberies, and tried to inflame the passions of the jury by defying the court's rulings sustaining objections to his blatant appeals for sympathy for the victim and her family. The court found VECCHIONE's tactics to be "improper," but upheld the verdict due to the overwhelming evidence of guilt.

488. On March 15, 2006, Plaintiff filed his CPL § 440.10 motion in the Supreme Court, Kings County, seeking to vacate his conviction due to the myriad, and fully documented, *Brady* and related constitutional violations by VECCHIONE and his co-prosecutors. Plaintiff moved to disqualify the District Attorney's office itself because no subordinate ADA would be able to conduct an impartial investigation of the conduct of such a powerful, higher-ranking official.

489. Hynes did not merely decide to oppose Plaintiff's disqualification motion – he assigned to handle Collins's 440 motion VECCHIONE's loyal colleague and subordinate, ADA Ferrell. Ferrell not only had been VECCHIONE's colleague for 15 years – she was Counsel to VECCHIONE's Rackets Division, working with him constantly, and was his co-counsel in the Clarence Norman and other high-profile cases.

490. Ferrell, on behalf of the Office, submitted VEECHIONE's own affirmation, and represented to the court in her own sworn statement, that no witness had recanted any statement,

no witness was pressured or forced to testify, there were no undisclosed material witness orders or witness statements, no undisclosed promises or benefits had been conferred or requested with respect to any witness, and no *Brady* material had been withheld. All of these representations turned out to be false.

491. Ferrell also refused, contrary to her Office's continuing *Brady* obligation, to disclose various items of *Brady* material that Plaintiff had requested and which she knew her Office possessed.

492. While the serious allegations in Plaintiff's motion were pending, Hynes promoted VECCHIONE still again, to be Chief of the Rackets Division, a position requiring him to oversee virtually every major bureau in the Office having to do with *integrity*, including Political Corruption, Major Frauds and Arson, Rackets, Civil Rights and Police Integrity, Major Narcotics Investigations, Money Laundering and Revenue Crimes, Organization Crime and Political Corruption Investigations, and Gangs.

493. Furthermore, after Plaintiff filed his motion, Hynes announced that VECCHIONE would handle the sensational and highly controversial indictment and trial of a former FBI Special Agent, Lindley DeVecchio, on charges that he assisted a notorious Colombo Crime Family leader, the late Gregory Scarpa, Sr., many years back, to commit at least four "gangland" murders.

494. The case essentially was based on the testimony of one witness: Scarpa's former mistress, Linda Schiro. Well into the trial, VECCHIONE was forced to dismiss all charges after a well-known journalist, Tom Robbins, revealed that he had audiotapes of interviews with Schiro that directly contradicted her trial testimony.

495. Hynes, who originally had termed the DeVecchio case, during a March 30, 2006,

press release, "the most stunning example of official corruption that I have ever seen," told reporters that the prosecution would have been unthinkable, and he never would have authorized it, had he known about the Schiro tapes.

496. VECCHIONE agreed that he never would have prosecuted had he known about Schiro's prior inconsistent statements to journalist Robbins.

497. However, there was substantial evidence that VECCHIONE *did* know all along, but hoped that the defense would never find out about this exculpatory evidence.

498. A well-known and highly experienced Detective-Investigator for Hynes's Office, Tommy Dades, told the news media that VECCHIONE had known about the tapes all along. Dades said Schiro had told him and another ADA, Noel Downey, and Dades personally told VECCHIONE. Dades was particularly credible on this issue because he was VECCHIONE's friend and later co-authored a book with him, "Friends of the Family" (HarperCollins 2009).

499. Hynes conducted no investigation of VECCHIONE's evident mishandling (or worse) of the DeVecchio case.

500. Also during 2007, VECCHIONE's overzealous and improper summations and cross-examinations in the two Clarence Norman prosecutions was exposed during the appeals. (Norman had been convicted of Offering a False Instrument for Filing and Falsifying Business Records, the same conduct VECCHIONE repeatedly had committed during the course of Plaintiff's case.) On May 27, 2007, the Appellate Division found that VECCHIONE's misconduct was "not *so egregious* as to have" denied Norman a fair trial. *People v. Norman*, 40 A.D.3d 1130 (2d Dept. 2007) (emphasis added). Two days later, the same court upheld Norman's conviction because "any ... error" in VECCHIONE's conduct was not serious enough to deprive

Norman of a fair trial.

501. On November 28, 2007, Hynes issued a press release announcing that he would be personally presenting VECCHIONE with the Thomas E. Dewey Medal Award on behalf of the New York City Bar Association "recognizing [his] excellent work" as "an outstanding prosecutor" in Kings County. Hynes praised VECCHIONE as "an exceptional prosecutor" who was "truly deserving of this award" and boasted that VECCHIONE "exemplifies the qualities that serve as an example to all of our prosecutors."

502. On April 3, 2008, Plaintiff filed his petition in Federal Court for a writ of habeas corpus, contending that the Office was continuing to cover up *Brady* violations, coercion of witnesses, and other illegal behavior, and that the Office had a continuing obligation to disclose evidence of such misconduct. Knowing the substance of Plaintiff's claims and the considerable extent to which they were documented, Hynes, rather than conduct any independent investigation, again assigned Monique Ferrell to represent the Office. With Hynes's knowledge and approval, Ferrell, again denying all of Plaintiff's allegations under oath, again sought to have the petition denied without a hearing.

503. After Federal Judge Irizarry directed a hearing and stated that Ferrell would have to testify about her handling of Plaintiff's claims over the preceding four years, Hynes appointed another prosecutor who was highly unlikely to conduct an independent inquiry, Kevin S. Richardson, to handle the matter. Richardson was head of the office's Political Corruption Bureau, reporting directly to VECCHIONE, and had been co-counsel with VECCHIONE and Ferrell in the Clarence Norman prosecutions.

504. To avoid further disclosures of improprieties by VECCHIONE and his Office, and

to relieve VECCHIONE from having to testify about his perjurious affirmations in the cases of Plaintiff and Jeffrey Marshall, as well as his other misconduct, Hynes, virtually on the eve of the court-ordered evidentiary hearing, authorized Richardson to consent to vacating Plaintiff's conviction and re-try him in Brooklyn Supreme Court.

505. After Judge Irizarry ordered the hearing to proceed anyway and Santos testified to VECCHIONE's coercion of him, Hynes, desperate to protect VECCHIONE and himself from further revelations, authorized Richardson to agree to the Order barring any re-trial and dismissing the State indictment "with prejudice."

506. However, Hynes, aware of Federal Judge Irizarry's highly critical comments about VECCHIONE's and the Office's handling of the matter, directed Richardson to deny that any "living" prosecutor employed by the Office had done anything wrong – an obvious and despicable attempt to scapegoat the late ADA (and Criminal Court judge) Posner.

507. Notwithstanding Judge Irizarry's above-cited remarks denouncing this blanket denial of wrongdoing, Hynes issued a formal statement to the news media once more ratifying everything that VECCHIONE and other prosecutors and detective-investigators employed by him had done in his name.

508. VECCHIONE, he stated, is a "very principled lawyer."

509. Hynes announced that he would conduct no investigation of VECCHIONE's or other prosecutors' behavior in the matter.

510. Hynes declared, "Mike VECCHIONE was not guilty of any misconduct," and would not face any disciplinary action.

511. Shortly after those public statements, Hynes further signalled his approval of

VECCHIONE's behavior by publicizing his decision to place under VECCHIONE's control a new Sex Trafficking Unit.

512. The foregoing violations of Plaintiff's federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the BDAO, namely:

(a) the institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

i. the duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings, including bail hearings, pretrial hearings, and trial;

ii. the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means;

iii. the continuing duty to obtain, to preserve, and to make timely disclosure to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions, of all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses, and including verbal as well as recorded information; and

iv. the duty to refrain from abusing court process or otherwise coercing or manufacturing false or inherently unreliable statements and testimony from witnesses;

(b) the failure to adequately instruct, train, supervise, and discipline their employees with respect to such matters.

513. The aforesaid deliberate or *de facto* policies, procedures, regulations, practices

and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City, including, but not limited to, the District Attorney of Kings County and his delegates, who knew:

a) to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b) that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

c) that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

514. The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances:

a) as noted above, numerous credible allegations, many substantiated by judicial decisions, that police officers and ADAs, including VECCHIONE, had wrongfully withheld, lost, or destroyed evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under *Brady*, had presented or failed to correct false or misleading testimony and argument, and/or had abused judicial process to coerce false or inherently unreliable statements or testimony from witnesses;

b) civil lawsuits, some of which resulted in substantial civil settlements, alleging that police and/or ADAs had falsified, exaggerated, or withheld evidence, thereby wrongfully injuring individuals suspected or accused of crime;

c) numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of New York City or

Brooklyn prosecutors to comply with that rule;

d) judicial decisions putting the Kings County District Attorney on notice that the City could be held liable for its failure to adequately train, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, including their obligations not to abuse judicial process or coerce false or unreliable statements and testimony, *see, e.g., Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dept. 2001), *Leka v. City of New York*, 04 CV 8784 (DAB), and *Zahrey v. City of New York, et al.*, 98 Civ. 4546 (DCP);

e) the inherent obviousness of the need to train, supervise and discipline ADAs in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

515. Despite this knowledge, the supervisory and policymaking officers and officials of the Defendant City perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices and/or customs, did not effectively instruct, train and/or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, had no employee handbook or other published practices, policies or procedures for investigating and disciplining prosecutors who had engaged in *Brady* violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead sanctioned or tolerated the policies, procedures, regulations, practices and/or customs, described above, with deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the City and the State of New York.

516. The aforesaid policies, procedures, regulations, practices and/or customs of Defendant CITY were collectively and individually a substantial factor in bringing about the

aforesaid violations of Plaintiff's rights under the Constitution and Laws of the United States and in causing his damages.

517. Under the principles of municipal liability for federal civil rights violations, the District Attorney of Kings County (or his authorized delegates) has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," not to abuse judicial process, to make timely disclosure of exculpatory evidence or *Brady* material to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

518. The Kings County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance of its duties.

519. The District Attorney of Kings County at all relevant times was and is an elected officer of Kings County, one of the constituent counties of Defendant CITY, and the Office was and is funded out of the CITY's budget.

520. Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); and New York has provided by statute (N.Y. County Law §§ 53, 941) that the CITY's constituent counties (including Kings County), and hence Defendant CITY itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

521. The District Attorney of Kings County, Charles J. Hynes, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

522. During all times material to this Complaint, the CITY, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

523. By virtue of the foregoing, Defendant CITY is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

**TENTH CAUSE OF ACTION**

**(Negligent Hiring, Training and Supervision Under State Law; Defendant City of New York)**

524. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 523 of this Complaint.

525. By virtue of the foregoing, defendant City of New York is liable to plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the BDAO and.or the NYPD with regard to their aforementioned duties.

**DAMAGES DEMAND**

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a. For compensatory damages of not less than $50 million;

b. For punitive damages against the individual Defendants of $100 million;

c. For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court;

d. For pre-judgment interest as allowed by law; and

e. For such other and further relief as this Court may deem just and proper.

Dated: New York, New York
February 15, 2011

LAW OFFICES OF JOEL B. RUDIN

BY: JOEL B. RUDIN, ESQ. (JR 5645)
200 West 57th Street, Suite 900
New York, New York 10019
(212) 752-7600
Email: jbrudin@aol.com

*ATTORNEY FOR THE PLAINTIFF*

To: Corporation Counsel of the City of New York

All Defendants

**TABLE OF EXHIBITS TO 42 U.S.C. § 1983 COMPLAINT**

| | |
|---|---|
| Handwriting Report and curriculum vitae of Ruth Brayer, and exhibits to report | A |
| Press Release and Felony Complaints in *People v. Stroud*, Kings Co. Complaint. No. 2009KN099449 and *People v. Torres*, Kings Co. Complaint No. 2009KN099450 | B |
| Affirmation of Michael Vecchione, July 22, 2005, in *People v. Clarence Norman*, Kings Co. Ind. No. 55588/2003 | C |
| Notarized Affirmation of Michael Vecchione, Feb. 25, 1995, in support of Application for Material Witness Warrant | D |
| Final Judgment Order of the Honorable Dora L. Irizarry, and Transcript of Plaintiff's habeas proceedings, both dated June 8, 2010, in *Collins v. Ercole*, 08 CV 1359 (CLP)(DLI) | E |
| List of judicial decisions finding that NYPD officers had wrongfully withheld, lost, or destroyed evidence favorable to the defense | F |
| List of civil lawsuits alleging NYPD officers falsified, exaggerated, or withheld evidence | G |
| List of cases finding that Brooklyn prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense | H |

# EXHIBIT 2

DAVID B. SHANIES LAW OFFICE
411 Lafayette Street, 6th Floor
New York, New York 10003
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUDDY A. QUEZADA,<br><br>Plaintiff,<br><br>– against –<br><br>CHARLES J. HYNES (*in his official capacity*), THOMAS J. BUDA, ALBERT A. PICA, JOSEPH CIMINO, RENEE KRELIK, DONALD J. LASALA, CHRISTOPHER SALSARULO, and THE CITY OF NEW YORK,<br><br>Defendants. | 16-CV-6577 (MKB) (SMG)<br><br>**AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Ruddy A. Quezada, by and through his attorney, David B. Shanies, as and for his First Amended Complaint against the above-captioned Defendants, alleges as follows:

## NATURE OF THE ACTION

1. Mr. Quezada brings this action under 42 U.S.C. § 1983 and New York State law, seeking to recover damages caused by the denial of his constitutional and legal rights and his resulting wrongful conviction and loss of liberty.

2. In 1993, Mr. Quezada was wrongfully convicted of murder for the October 1991 shooting of José Rosado in East New York, Brooklyn – a crime Mr. Quezada did not commit. He was consequently imprisoned until 2015, when his conviction was vacated and all charges dismissed.

3. The misconduct that caused Mr. Quezada's wrongful conviction included the abuse of legal process, including a material witness order;[1] the suppression of *Brady* information;[2] the fabrication of evidence; and the presentation of false testimony and arguments.

4. Mr. Quezada's wrongful conviction was a direct consequence of acute and systemic prosecutorial, investigative, and police misconduct attributable to municipal policies, practices, and customs of the City of New York to permit and encourage violations of the constitutional rights of criminal suspects and defendants, including through the deliberate indifference of policy-making officials, acting on behalf of the City of New York, to such violations.

5. Former Kings County District Attorney ("KCDA") Charles J. Hynes, as a matter of policy, practice, and custom: (a) permitted and encouraged an illegal "Hotel Custody" program, which was used to secretly coerce witnesses to give false or unreliable testimony

---

1. A material witness order is a legal mechanism established by Article 620 of the New York Criminal Procedure Law. Where a prosecutor can demonstrate that a witness has information relevant to a criminal case and would not be "responsive to a subpoena," the court may issue a material witness order, commanding the witness to appear before the court for a determination of whether he or she should be adjudicated a material witness and have bail set to ensure his or her attendance. N.Y. Crim. Proc. L. §§ 620.10, 620.20, 620.30.

   If, in addition to making that showing, a prosecutor demonstrates that the witness would be "unlikely to respond to such an order" (or had previously disregarded one), the court may issue an arrest warrant directing a police officer "to take such prospective witness into custody" and bring him or her before the court "forthwith" for a material witness proceeding. N.Y. Crim. Proc. L. § 620.30.

   A person arrested on such a warrant, in addition to being brought before the court "forthwith," has the right to "a prompt hearing" at which he or she "possesses all the rights, and is entitled to all the court instructions" applicable to a defendant being "arraigned upon a felony complaint in a local criminal court." N.Y. Crim. Proc. L. § 620.40. The witness has the rights to: (a) counsel, (b) have bail set, (c) testify on his or her own behalf, (d) compulsory process, and (e) a presumption against detention as a material witness (which the prosecutor can overcome only by meeting the burden of proof through sworn testimony).

   A material witness order is an extremely powerful tool, particularly where an arrest is authorized, and the standards and judicial oversight governing material witness orders are strict.

2. Throughout this complaint, the term "*Brady*" information refers to information that must be disclosed to a criminal defendant under the Fifth and Fourteenth Amendments to the U.S. Constitution, including exculpatory, impeachment, and other favorable information, as explained in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), *United States v. Agurs*, 427 U.S. 97 (1976), *United States v. Bagley*, 473 U.S. 667 (1995), and their progeny.

through the KCDA's misuse of subpoenas, material witness orders, and their powers of arrest and interrogation; (b) permitted and encouraged the concealment of *Brady* information; and (c) permitted and encouraged his employees to lie to or mislead courts, defense attorneys, and criminal defendants in order to cover up their unlawful behavior.

6. In the rare case where such illicit misconduct was exposed, the KCDA took no disciplinary action against the offending employees, but instead praised and promoted them, thereby condoning their behavior and encouraging future constitutional violations to occur, including those directed against Mr. Quezada.

7. One of those employees was KCDA prosecutor Ephraim "Effie" Shaban, whose first homicide trial was the Quezada case.

8. In the weeks leading up to that trial, Mr. Shaban learned that his sole witness, Sixto Salcedo, recanted his earlier identification of Mr. Quezada and refused to testify at trial.

9. Mr. Salcedo was the entire case against Mr. Quezada. There was no other witness and no physical or forensic evidence implicating Mr. Quezada in the crime.

10. During the trial, Mr. Shaban sent a request to the KCDA detective investigators ("DI") bureau to arrest Mr. Salcedo and hold him in custody in accordance with their policies and practices. As a result, four police officers arrested Mr. Salcedo and held him unlawfully in so-called "Hotel Custody" until he agreed to testify, falsely, that he saw Mr. Quezada shoot Mr. Rosado.

11. The Hotel Custody program was a longstanding (and now infamous) practice, employed by the KCDA under former District Attorney ("DA") Charles J. Hynes, whereby individuals who refused to cooperate with prosecutors were arrested without judicial process, incarcerated in hotel rooms, and coerced into testifying as prosecution witnesses.

12. Former DA Hynes' Hotel Custody program has received widespread media attention and earned well-deserved condemnation by judges, legal scholars, and practitioners alike.[3] The illegal practice played a key role in the late Kenneth P. Thompson's successful campaign in 2014 to unseat former DA Hynes, then a 24-year incumbent, as District Attorney.

13. The Hotel Custody program earned from the press the derisive moniker of "Hotel Hynes," and was forcefully denounced by former DA Thompson as "Guantanamo on the Hudson" and a practice with "no place in civilized society."[4]

14. The KCDA under former DA Thompson acknowledged that the unlawful Hotel Custody program existed under his predecessor and assured the public that the "practice stopped when District Attorney Thompson took office."[5]

15. Mr. Quezada's case presents the most egregious example of the abusive Hotel Custody practice that has been documented to date.

16. As Mr. Quezada's trial date approached, the trial prosecutor, Mr. Shaban, obtained a material witness order and arrest warrant for Mr. Salcedo by submitting to the court a sworn statement that Mr. Salcedo "would not appear voluntarily" and falsely representing that he had disregarded a subpoena.

---

3. *See, e.g.*, *1993 Murder Conviction Vacated; Brooklyn Prosecutor Said Evidence Was Withheld*, THE NEW YORK TIMES, Aug. 31, 2015 (*available at* goo.gl/hsxIk9); *Trial And Error: A Man Convicted of Murder Wins Release, and Questions of Responsibility Linger*, PROPUBLICA, Sept. 15, 2015 (*available at* goo.gl/tDhvfP); *Man convicted by 'lying prosecutor' released from prison after 24 years*, THE NEW YORK POST, Sept. 1, 2015 (*available at* http://nyp.st/1UiUZBa); *Warrant 'found': DA email shocker to set free man convicted of murder*, THE NEW YORK DAILY NEWS, Sept. 1 2015 (*available at* goo.gl/z7Y6EY); *Hell in 'Hotel Hynes' – Brooklyn DA accused of coercing witnesses to give false testimony, suit claims*, THE NEW YORK POST, May 30, 2013 (*available at* http://nyp.st/1ihSR8X); *Brooklyn Prosecutor's Office Is Accused of Detaining Trial Witnesses*, THE NEW YORK TIMES, May 29, 2013 (*available at* goo.gl/rLGqUi); *A Powerful Legal Tool, and Its Potential for Abuse,* PROPUBLICA, Aug. 16, 2013 (*available at* goo.gl/ZVvLU4).

4. *See Brooklyn DA flip-flopped on 'illegal' witness detention: docs*, THE NEW YORK POST, Mar. 9, 2015 (*available at* http://nyp.st/1AWKofr).

5. *Id.*

17. During the trial, KCDA DIs Renee Krelik, Donald J. Lasala, and Christopher Salsarulo (collectively, the "DI defendants"), along with former NYPD detective Thomas J. Buda, illegally arrested Mr. Salcedo and brought him to a hotel, flouting a court order requiring that the witness be brought before a judge, and denying the witness his statutory and constitutional rights (including the rights to an attorney and to a hearing).

18. One or more of the DI defendants and Detective Buda threatened Mr. Salcedo with prosecution and imprisonment if he refused to testify.

19. The DI defendants then unlawfully detained Mr. Salcedo in a hotel before bringing him to the District Attorney's office, where he was again threatened with prosecution and imprisonment if he continued to refuse to testify.

20. As a result of the Defendants' coercion, Mr. Salcedo took the witness stand and falsely identified Mr. Quezada as the man who shot Mr. Rosado in October 1991.

21. Mr. Shaban hid from both the defense and the jury the fact that Mr. Salcedo had been arrested, threatened, and illegally held in the custody of the KCDA.

22. In his summation, Mr. Shaban urged the jury to convict Mr. Quezada and disregard the *three alibi witnesses* who testified for the defense, arguing that Mr. Salcedo was to be believed because he "came forward to testify" and "was not hesitant." Mr. Shaban repeatedly emphasized this point to the jury, referring to Mr. Salcedo supposedly "coming forward" to testify at least five times.

23. More than 20 years later, when Mr. Salcedo's arrest and imprisonment were brought to light, Retired Judge Abraham Gerges issued his own rebuke, telling a reporter, "[t]here is no question it should've been turned over" at Mr. Quezada's trial.[6]

24. By lying to the jury and concealing the arrest and detention of his key witness,

6. *Trial And Error*, PROPUBLICA, Sept. 15, 2015 (*available at* goo.gl/tDhvfP).

Mr. Shaban convinced jurors to ignore the defense's three alibi witnesses, former neighbors of Mr. Quezada's with no relation to him and no criminal history.

25. Mr. Quezada was convicted of second degree murder.

26. After obtaining the conviction, Mr. Shaban and others in the DA's Office spent years covering up the misconduct, falsely denying the existence of the material witness order used to imprison and coerce Mr. Salcedo, and repeatedly lying to state and federal courts.

27. Former Assistant District Attorney Marie-Claude Wrenn, an Appeals Bureau attorney who was responsible for the Quezada case for more than 15 years of post-conviction litigation, repeatedly lied about the material witness order to the state court judge who presided over Mr. Quezada's first state post-conviction motion (2003-2007), the federal district court judge who presided over Mr. Quezada's habeas corpus petition (2008-2015), and the state court judge who presided over Mr. Quezada's second state post-conviction motion (2015-2016).

28. Ms. Wrenn committed perjury regarding the material witness order in both a federal deposition and state post-conviction proceedings.

29. The same day former DA Thompson decided to dismiss all charges against Mr. Quezada, he fired Ms. Wrenn for the misconduct she committed in Mr. Quezada's case.

30. Through her egregious behavior, Ms. Wrenn earned the dubious distinction of becoming *the only* KCDA prosecutor to be fired for prosecutorial misconduct since former DA Hynes took office in 1990.

31. Before that moment arrived, and in the face of that misconduct, Mr. Quezada persisted in litigating his case in the state and federal courts for more than 20 years.

32. In 2010, Mr. Quezada obtained from the Second Circuit the extraordinary remedy of leave to file a second habeas corpus decision under 28 U.S.C. § 2244. *Quezada v. Smith*, 624